# Exhibit 11

1               CAUSE NO. D-1-GN-18-001605

2  MARCEL FONTAINE,            )   IN THE DISTRICT COURT
                               )
3          Plaintiff,          )
                               )
4  vs.                         )   TRAVIS COUNTY, TEXAS
                               )
5  INFOWARS, LLC, FREE         )
   SPEECH SYSTEMS, LLC, and    )
6  KIT DANIELS,                )
                               )
7          Defendants.         )   261ST JUDICIAL DISTRICT

8

9            ORAL AND VIDEOTAPED DEPOSITION OF

10        BRITTANY PAZ, CORPORATE REPRESENTATIVE OF

11              FREE SPEECH SYSTEMS, LLC

12                  February 15, 2022

13

14     ORAL AND VIDEOTAPED DEPOSITION OF BRITTANY PAZ,

15  CORPORATE REPRESENTATIVE OF FREE SPEECH SYSTEMS, LLC,

16  produced as a witness at the instance of the Plaintiff

17  and duly sworn, was taken in the above-styled and

18  numbered cause on February 15, 2022, from 9:03 a.m. to

19  3:34 p.m., before Amy M. Clark, Certified Shorthand

20  Reporter in and for the State of Texas, reported by

21  computerized stenotype machine at the offices of Kirker

22  Davis, LLP, 8310-I North Capital of Texas Highway, Suite

23  350, Austin, Texas 78731, pursuant to the Texas Rules of

24  Civil Procedure and the provisions stated on the record

25  or attached hereto.

---

**2**

```
 1                    APPEARANCES
 2
 3 FOR PLAINTIFF:
 4    Mr. Bill Ogden
      Mr. Mark Bankston
 5    Kaster Lynch Farrar & Ball, LLP
      1117 Herkimer Street
 6    Houston, Texas 77008
      Telephone: (713)221-8300
 7    Fax:  (713)221-8301
      Email: bill@fbtrial.com
 8    Email: mark@fbtrial.com
 9 FOR DEFENDANTS:
10    Ms. Jacquelyn Blott
      Law Office of Jacquelyn W. Blott
11    200 University Boulevard
      Suite 225, No. 251
12    Round Rock, Texas 78665
      Telephone: (512)639-9904
13    Email: jblott@jblottlaw.com
14 ALSO PRESENT:
15    Mr. Manuel Martin, Videographer
16
17
18
19
20
21
22
23
24
25
```

---

**3**

```
 1
 2                      INDEX
 3                                          PAGE
 4 Appearances .......................................2
 5 BRITTANY PAZ, CORPORATE REPRESENTATIVE OF
   FREE SPEECH SYSTEMS, LLC
 6
   Examination by Mr. Odgen ...................5
 7 Examination by Ms. Blott .................265
   Further Examination by Mr. Ogden .........268
 8 Signature Page ...........................280
   Court Reporter's Certificate .............283
 9
10                    EXHIBITS
11 EXHIBIT      DESCRIPTION              PAGE
12 Exhibit 1    Email from Kit Daniels to  31
                Infowars Staff, 6/7/18
13
   Exhibit 2    Web message, Use the links on  97
14              the left to browse saved web
                pages.
15
   Exhibit 3    Web search message, Page no    97
16              longer available
17 Exhibit 4    Defendant's Amended Responses 117
                to Plaintiff's First Request
18              for Production
19 Exhibit 5    Defendant's Responses to      125
                Plaintiff's Second Request for
20              Production
21 Exhibit 6    Defendant's First Supplemental 137
                Answers to Plaintiff's First
22              Set of Interrogatories
23 Exhibit 7    Social media post             140
24 Exhibit 8    Prison Planet dot com post    141
25
```

---

**4**

```
 1                   EXHIBITS (cont.)
 2 EXHIBIT        DESCRIPTION              PAGE
 3 Exhibit 9      Defendant's Answers to      148
                  Plaintiff's Second Set of
 4                Interrogatories
 5 Exhibit 10     Photograph                  159
 6 Exhibit 11     Post from 4chan             162
 7 Exhibit 12     Infowars internal system screen 168
                  capture
 8
   Exhibit 13     Defendant's Answer to       176
 9                Interrogatory Regarding Net
                  Worth
10
   Exhibit 14     Profit & Loss, 2020         184
11
   Exhibit 15     Balance Sheet, 12/31/20     195
12
   Exhibit 16     Income statement            195
13
   Exhibit 17     UCC Financing Statement     196
14
   Exhibit 18     Notepad                     219
15
   Exhibit 18A    Handwritten notes about     254
16                conversation with Mr. Jones
17 Exhibit 18B    Handwritten notes, 2/14/22  261
18 Exhibit 18C    Handwritten notes, 2/15/22  262
19
20
21
22
23
24
25
```

---

**5**

1    THE VIDEOGRAPHER:  We are on the record on

2 February 15th, 2022 at 9:03 a.m.  This is the videotaped

3 deposition of Brittany Paz.

4 BRITTANY PAZ, CORPORATE REPRESENTATIVE OF FREE SPEECH

5               SYSTEMS, LLC,

6 having been first duly sworn, testified as follows:

7               EXAMINATION

8 BY MR. OGDEN:

9   Q.  Could you please introduce yourself to the

10 jury.

11   A.  Sure.  My name is Brittany Paz.

12        MS. BLOTT:  And, just for the record,

13 we're gonna take this subject to the protective order

14 that's been entered in this case.

15        MR. OGDEN:  Okay.

16        MR. BANKSTON:  There's no protective -- is

17 there a protective?  I don't think we have one.  I'm not

18 sure we do.

19        MS. BLOTT:  Okay.

20        MR. OGDEN:  I don't think we do.

21        MS. BLOTT:  My apologies.  I will have to

22 check that.

23        THE WITNESS:  Before we get started, can I

24 amend something that we talked about yesterday?

25        MR. OGDEN:  It's kind of a different case.

---

Paz, Brittany                                    02-15-2022

6

1          THE WITNESS: Well, I --
2          MR. BANKSTON: You get to read and sign.
3      MS. BLOTT: No. No. No. She --
4          THE WITNESS: Well, I want to add
5 something. Just -- it was on the subject of -- Attorney
6 Bankston asked me about a Bloomberg article that was
7 referenced by Mr. Jones. And I didn't know which
8 article it was. But I located the article. So I just
9 wanted to bring it to your attention and put it on the
10 record.
11          MR. OGDEN: I don't --
12      MS. BLOTT: It's an entirely different
13 deposition.
14          THE WITNESS: Yeah. Okay. Okay.
15          MR. OGDEN: Different case, different
16 subject matter.
17          THE WITNESS: Okay. Well, I guess
18 Attorney Blott can email you.
19          MR. BANKSTON: We're not terribly
20 concerned with what your attorney's prepared you on
21 after your obligations for that deposition.
22          THE WITNESS: It wasn't --
23          MS. BLOTT: I'm gonna object. Because --
24          THE WITNESS: It wasn't anything she
25 prepared me on. But, okay.

7

1          MS. BLOTT: Go ahead.
2          MR. BANKSTON: Well, I mean, just because
3 this is put on the record, and it may be used in the
4 Sandy Hook case, and I was taking that deposition. It's
5 our position, Ms. Paz was ordered by the Court to appear
6 yesterday for a deposition, prepped on those topics. We
7 do not feel she was prepared. And anything she did last
8 night, after the obligation of that deposition, is
9 completely irrelevant to us. That's our position on the
10 Sandy Hook case.
11      Q.   (By Mr. Ogden) All right. So what -- Ms. Paz,
12 what do you do for a living?
13      A.   I am a practicing attorney in Connecticut.
14      Q.   Today we are obviously in Austin, Texas.
15          You're not gonna be practicing law today,
16 correct?
17      A.   No.
18      Q.   What are you -- what were you tasked with doing
19 today?
20      A.   For this deposition?
21      Q.   Yes.
22      A.   In the Fontaine deposition, I was tasked with
23 being the corporate representative for Free Speech in
24 relationship to the petition that he filed.
25      Q.   And you just used the term corporate

8

1 representative.
2          What does that mean to you?
3      A.   It means that I am a fact witness on behalf of
4 the company.
5      Q.   Okay. And does that job require -- have
6 responsibilities with it?
7      A.   I think I was tasked and have the
8 responsibility to speak -- speak coherently on what the
9 company knows or knew at the time that the allegations
10 were made about the allegations in his petition.
11      Q.   And that's it?
12      A.   In relation to this case?
13      Q.   Yes.
14      A.   Yes.
15      Q.   Okay.
16          MR. OGDEN: Do you have a copy of the
17 notice?
18          MR. BANKSTON: It ought to be in your
19 book. I can show it to you.
20          MR. OGDEN: Yeah.
21          MR. BANKSTON: One second.
22      Q.   (By Mr. Ogden) When were you retained to be the
23 corporate representative in this case?
24      A.   It was at the same time as what the previous
25 case is. So January 31st, February 1st, around that

9

1 time. It's about two weeks ago.
2      Q.   Who retained you?
3      A.   The company.
4      Q.   No. Who specifically?
5      A.   I believe Mr. Jones retained me.
6      Q.   He called you?
7      A.   Did I speak directly to him at the time? No.
8 I spoke to Attorney Blott.
9      Q.   So Ms. Blott reached out to you to be the
10 corporate representative?
11      A.   And Mr. -- and Mr. Pattis.
12      Q.   Okay.
13      A.   So Attorney Blott and Mr. Pattis.
14      Q.   Was it kind of like a conference call with
15 everybody on it, or did Mr. Pattis call you and then
16 Ms. Blott called you?
17      A.   I think Mr. Pattis called me and then Attorney
18 Pattis called me.
19      Q.   Okay. And you have a relationship with
20 Mr. Pattis, correct?
21      A.   I have a prior professional relationship with
22 Attorney Pattis, yes.
23      Q.   Okay. Do you have any personal relationship
24 with him in any way, as you sit here today?
25      A.   No.

Paz, Brittany                                      02-15-2022

10

1   Q.   So y'all aren't friends?
2   A.   I wouldn't consider us friends.  I consider us
3 work colleagues.
4   Q.   When Mr. Pattis called you to be the corporate
5 representative for Free Speech Systems and Infowars,
6 LLC, what was your reaction?
7   A.   I don't know that I had a reaction.  He had a
8 need for someone to serve as the corporate
9 representative.  He asked if I would be able to do so,
10 given the time constraints and my other work
11 obligations.  I considered it.  We had some discussions
12 about it; and, ultimately, we decided it would work.
13   Q.   You understand that Free Speech Systems and
14 Infowars, LLC have had a couple different corporate
15 representatives previously, correct?
16   A.   Yes.
17   Q.   And so -- and when Mr. Pattis retained you, did
18 he tell you that time constraint of you only have two
19 weeks to prepare?
20   A.   Yes.  I was aware.  I think I had already seen
21 the deposition notice.
22   Q.   And did -- when Mr. Pattis was telling you
23 about the time constraints, did he also mention the
24 amount of work and materials that would go into being
25 prepared for these depositions?

11

1   A.   Yes.
2   Q.   Okay.  And so he told you, Mr. Pattis did, that
3 you'd have to review over a hundred thousand pages of
4 documents?
5   A.   He said that there were those types of volumes
6 of documents that were a part of the case, yes.
7   Q.   And you agreed that you were, you know,
8 able-bodied enough to be able to be prepared and review
9 every single one of those documents?
10   A.   I don't think anyone is able to review every
11 single one of those documents.  I think what I was
12 tasked to do is try to be as prepared as possible, given
13 the time constraints, because the Court ordered a
14 corporate representative to come in and cogently talk
15 about these topics.  And I did that to best of my
16 ability.
17   Q.   Okay.  And did Mr. Pattis tell you that the
18 judge in these cases on the record -- and we have the
19 transcript -- went into pretty good amount of detail as
20 to what she expected out of you as the corporate
21 representative in these depositions?  Did you know that?
22   A.   I didn't read the transcript, and I don't think
23 he read the transcript.  I read the deposition notice.
24   Q.   As we sit here today, if the judge had
25 expectations of what a corporate representative should

12

1 be prepared to do, would that be something you'd
2 probably find helpful as you were getting started in
3 preparing for these depos?
4   A.   Would I have found it helpful to have read the
5 transcripts?
6   Q.   Of what the judge specifically said for you, as
7 the corporate representative, to be prepared to do in
8 these rooms the last two -- yesterday and today?
9   A.   Sure.  It would have been helpful.  But I did
10 review the depo notice.
11   Q.   So if the judge said, I expect every single
12 document to be read, would you understand that to mean
13 that the corporate representative that sits down for
14 these depos should have reviewed every single document?
15   A.   I don't know that that's what was said.
16   Q.   I'm not asking you if you know that that's what
17 was said.
18        I'm saying:  If the judge said that, you
19 would understand that to mean whoever's sitting in the
20 chair that you were sitting in right now should've
21 reviewed every single document that was produced in
22 discovery?
23   A.   I don't know.  I don't know the answer -- how
24 to answer that.  I don't think it's possible for one
25 person to read all those documents.

13

1   Q.   I think you're right.
2        So would it surprise you to know that the
3 judge, on the record -- we have the transcript, if you'd
4 like to review it on break -- said this would likely
5 require multiple corporate representative designees for
6 different topics to share the brunt of what would be
7 expected.
8        Did you know that?
9   A.   I don't know.  Like I said, I haven't reviewed
10 the transcript.
11   Q.   Right.  But one thing we can agree on is that
12 you don't have the capacity to be fully prepared to
13 discuss the topics in detail for the depo notices from
14 today and yesterday?
15   A.   No.
16   Q.   No.  You don't agree with that?
17   A.   No.  I don't agree with that.
18   Q.   Well, you said just a second ago, to the best
19 of your ability, not I'm completely prepared.
20        So which is it?
21   A.   I think that I have reviewed documents that are
22 relevant and to be prepared to talk on the topics that
23 the deposition has noticed me for.
24   Q.   That didn't answer my question.
25   A.   I think it did.

Paz, Brittany                                           02-15-2022

14

1   Q.   Okay.  What was my question?
2   A.   Your question was whether or not I am able to
3 testify as to the topics in this -- in this deposition
4 that were noticed as per Mr. Fontaine, and I am able to
5 do that.
6   Q.   Okay.  That wasn't my question.  But we'll just
7 move on from there.
8           How much are you being paid?
9   A.   As I testified yesterday, this --
10   Q.   For this case, and this case only, how much are
11 you being paid?
12   A.   It was the same amount as the -- as the case
13 yesterday.  So as I testified yesterday, I was paid a
14 flat fee of $30,000, and it encompassed both cases.
15   Q.   Okay.  How much did you --
16       MR. OGDEN:   I -- I'm not everyone.  Okay.
17   Q.   (By Mr. Ogden) How much of the $30,000 was for
18 today?
19   A.   It wasn't divided up or allocated.  It was just
20 a flat $30,000 for the both cases.
21       (Sotto voce conversation between Mr. Ogden
22        and Mr. Bankston.)
23   Q.   (By Mr. Ogden) So the $30,000 that you were
24 paid was not allocated to the specific time that was
25 done, rather it was just a flat fee to encompass all of

15

1 it?
2   A.   Yes.
3   Q.   Okay.  Where did that number come from?
4   A.   I believe I testified yesterday that we had --
5 that there was a starting number and that we negotiated
6 from there.
7   Q.   Okay.  Okay.  What was the starting number?
8   A.   I believe it was 25,000, and then I negotiated
9 back at 30.
10   Q.   Okay.  Where did you get that number?
11   A.   Just given the amount of time that I thought it
12 would take, how many documents I would have to review,
13 how much -- how much time constraints there were with
14 the case, that's -- I thought it was a fair number.
15   Q.   Right.  And I'm trying to figure out, why
16 did -- how did you come to the idea that $30,000 was
17 fair?
18   A.   As I just testified, the time that I thought it
19 would require, the documents I would have to review, and
20 the time constraints involved in the case; that's how I
21 came to that number.
22   Q.   How much time did you think it would require?
23   A.   I would think it would require as much time as
24 I could dedicate to it.  But, ultimately, it ended up
25 requiring probably around a hundred hours of review

16

1 time.
2   Q.   Okay.  For this case specifically, how many
3 hours did you spend preparing?
4   A.   So with the document review of the -- just
5 specifically related to Mr. Fontaine, including the
6 interviews that I had with Mr. Daniels and other
7 employees in connection with this case, I would say
8 probably in the neighborhood of 10 hours.  That also
9 includes preparation with the attorneys discussing the
10 case.
11   Q.   So 10 hours total?
12   A.   Probably, yes.
13   Q.   Okay.  Do you remember how many topics were on
14 the deposition notice?
15   A.   I believe there were eight.
16   Q.   All right.  So you spent roughly 1.25 -- an
17 hour and 15 minutes per topic?
18   A.   Well, that doesn't -- you told me specifically
19 related to Fontaine.
20   Q.   Correct.
21   A.   So I testified that it's taken a hundred hours
22 of review time total to review all of the documents.  So
23 I think that per the eight topics, if we're dividing
24 them up, that would include all hundred hours.  But the
25 Fontaine documents specifically, it was about 10 hours.

17

1   Q.   Right.
2   A.   Right.
3   Q.   And there's eight topics for the Fontaine
4 case --
5   A.   Right.
6   Q.   -- which is why we're here today, right?
7   A.   Right.  That would also include the Sandy Hook
8 discovery.  So that would include a hundred hours of
9 dis- -- of review of that material.
10   Q.   Are they -- tell me how they're related.
11   A.   A lot of those questions have to do with the
12 company and the business structure of the company and
13 the information about the -- I might be referring to the
14 other deposition notice.
15   Q.   I think you are.
16   A.   Okay.
17   Q.   Okay.  I can print this out, if you need it.
18   A.   Sure.
19   Q.   (Inaudible.)
20   A.   I don't recall off the top of my head which
21 ones those are.
22   Q.   Yesterday you came in and you had a pretty,
23 color-coded, tabbed-up binder with a lot of information
24 in it.
25           You remember that?

Paz, Brittany                                           02-15-2022

18

1   A.   Yes.
2   Q.   And today you don't have anything?
3   A.   That was marked as an exhibit for that
4 deposition.
5   Q.   Was there something in that binder that you
6 would have needed for today?
7   A.   Most of that binder were the video discoveries,
8 the video -- I'm sorry -- not video discoveries.  The
9 summaries that I had of the videos specifically related
10 to Sandy Hook.
11   Q.   Okay.  Right.  So we don't need those.
12   A.   I don't think we were talking about those for
13 the Fontaine case.
14   Q.   Correct.
15   A.   Right.
16   Q.   So you didn't bring anything with you today for
17 this case?
18   A.   Aside from the supplemental dis- -- production
19 that we produced yesterday.
20   Q.   Okay.  And have you reviewed all of that
21 production?
22   A.   I believe so, yes.
23   Q.   When did you review it?
24   A.   Sometime last week and through the weekend.
25   Q.   So that supplemental production was prepared

19

1 and ready to go last week --
2   A.   No.
3   Q.   -- and it was given to us today?
4   A.   That's not what I said.
5   Q.   Okay.  When did you review that?
6   A.   This particular packet (indicating)?
7   Q.   Yes.
8   A.   It was emailed to me this morning.
9   Q.   Okay.
10   A.   But the materials in here had been started to
11 be put together -- sometime last week we started to put
12 it together.
13   Q.   How do you know that?
14   A.   Because I looked at some of the Fontaine
15 production.
16   Q.   Okay.  Which parts of the Fontaine production
17 were you able to see last week?
18   A.   So on our Dropbox that I believe I did mention
19 yesterday, I did see articles.  I saw blog posts.  I
20 saw -- and social media posts on Twitter, Facebook.  I
21 saw -- not just news articles, but articles posted by
22 people on the internet.  I believe I saw our article.
23 There wasn't -- there was maybe a couple hundred pages
24 worth of material on that.
25   Q.   A couple hundred.  Let's say 200.

20

1   A.   You could round it.
2   Q.   Okay.  So you got an additional 140 pages this
3 morning?
4   A.   Yes.
5   Q.   And you were able to review those fully?
6   A.   I haven't read each and every line of these,
7 no.
8   Q.   Have you looked at every single page, at least?
9   A.   I did try to look at each and every single
10 page.  But...
11   Q.   I didn't ask if you tried, Ms. Blott -- excuse
12 me, Ms. Paz.  I asked if you have looked at every page
13 prior to you flipping through --
14   A.   I don't know that I looked at every page.
15   Q.   Okay.  So it's safe to say if one of the
16 expectations today was to be able to testify to the
17 discovery produced, there's probably some things in
18 there you're not prepared to do, considering you haven't
19 reviewed it all?
20   A.   Well, it was filed this morning -- or yesterday
21 morning.  So, no.
22   Q.   Okay.  Were you surprised when you got a call
23 from Mr. Pattis to be the corporate representative in
24 this case?
25   A.   I wouldn't say I was surprised.  I knew he had

21

1 been working on the Mr. Jones case for a couple of
2 years.  So I wouldn't say I was surprised.
3   Q.   When you say working on, he's been litigating
4 it?
5   A.   I believe he litigates the Connecticut cases.
6   Q.   Correct.  So when he said, hey, I need you to
7 go to Texas, did that surprise you?
8   A.   Not really.
9   Q.   Have you ever given a deposition prior to
10 yesterday?
11   A.   No.
12   Q.   Have you ever served as a corporate
13 representative?
14   A.   No.
15   Q.   Ever gone to a -- you know, have you ever gone
16 through a civil jury trial?
17   A.   Have I gone through a jury trial?  No.
18   Q.   Okay.  So your background is in criminal law,
19 correct?
20   A.   For the most part, yes.
21   Q.   So when a civil lawyer calls you and says, I'd
22 like for you to be the corporate representative in these
23 civil matters, things you've never done before, you
24 weren't at all surprised?
25   A.   Well, Norm is not only a civil lawyer.  But...

Paz, Brittany                                          02-15-2022

22

1 No. I wasn't very surprised.
2    Q.   I didn't say Norm was only a civil lawyer.
3    A.   You said when a civil lawyer calls you. So
4 he's not just a civil lawyer.
5    Q.   True or false, Norm's a civil lawyer?
6    A.   He practices civil and criminal.
7    Q.   There we go.
8         So the answer to my question would be yes,
9 and I don't need all the extra.
10        You understand that, right?
11   A.   Sure.
12   Q.   Right. Because I sat through yesterday. And,
13 unfortunately, Mr. Bankston is far more patient than I'm
14 gonna be. Okay? I'm just putting it out there.
15        If I ask a question, answer the one that's
16 on the table.
17        You're a lawyer. You know what to do,
18 right? Or do you?
19   A.   Is there -- is there an actual question there?
20   Q.   Yes. Do you know what to do when someone asks
21 you a question --
22   A.   Yes.
23   Q.   -- in a deposition?
24        Okay. Well, then, based on what just
25 happened there, let me tell you that when I'm asking a

23

1 question in a deposition, let me finish, and then answer
2 so that Ms. -- the court reporter right here can get
3 down a clear record. Okay?
4    A.   Sure.
5    Q.   Giving you another heads up. Because when you
6 said yes you know what you're doing, you're actually
7 kind of violating a different rule.
8         When it came to your $30,000 flat rate,
9 how much were you estimating per hour?
10   A.   I don't know if it actually works out to be
11 that. But, usually, my hourly rate was around $350.
12 But given the amount of time, I doubt it's calculated
13 out to be that much.
14   Q.   Sure. I was asking how you came to that
15 number, $30,000.
16        It's a specific number, correct?
17   A.   Sure. It's a specific number.
18   Q.   Okay. So if you estimated, I guess, what, 86
19 hours of work times 350 would get us there, correct?
20   A.   That's probably what it breaks down to; but,
21 ultimately, it required more.
22   Q.   Right. Are you gonna charge more?
23   A.   No.
24   Q.   Okay. Who'd you -- you mentioned that you
25 talked with Mr. Daniels in preparation for today, right?

24

1    A.   Yes.
2    Q.   How long did y'all talk?
3    A.   A couple of hours. I think probably about two
4 hours.
5    Q.   Okay. That was on the phone?
6    A.   No. I spoke to him in person.
7    Q.   Where?
8    A.   At the office.
9    Q.   Whose office?
10   A.   The company's office.
11   Q.   In Austin?
12   A.   Yes.
13   Q.   Okay. When was that?
14   A.   Saturday.
15   Q.   Okay. Who else?
16        You said you spoke with Mr. Daniels and
17 other employees earlier.
18        Who else did you talk to?
19   A.   In connection with just the Fontaine case?
20   Q.   Yes, ma'am.
21   A.   I spoke to Mr. Jones; I spoke to Mr. Salazar; I
22 spoke to -- I spoke to the attorneys.
23   Q.   You said that plurally.
24        Who are the attorneys?
25   A.   I spoke to Attorney Blott; I spoke to Attorney

25

1 Pattis.
2    Q.   Okay. What was Mr. Pattis's role in all of
3 this?
4    A.   I just -- generally, we're talking about the
5 depositions and the information that I needed and
6 required.
7    Q.   What'd y'all talk about?
8    A.   I -- I think that's privileged.
9    Q.   I didn't ask you if you think it's privileged.
10 If it's privileged, Ms. Blott will object and instruct
11 you.
12        But Mr. Pattis isn't an attorney of record
13 here. He's not an employee of Infowars and you, in your
14 capacity, weren't acting as a lawyer.
15        So I'm gonna ask you again: What did you
16 and Mr. Pattis talk about?
17        MS. BLOTT: I'm gonna object to
18 attorney-client privilege.
19   A.   I think Attorney Pattis is an attorney for the
20 company, maybe not in this particular case, but he is an
21 attorney for the company.
22   Q.   (By Mr. Ogden) And Mr. Pattis was in Austin?
23   A.   No. He's not in Austin.
24   Q.   You said you spoke to him on this case.
25        So he's not -- you didn't speak to him

Paz, Brittany                                    02-15-2022

26

1 here?
2   A.   In person?  No.  I spoke to him on the phone.
3   Q.   Okay.  And was Mr. Pattis giving legal advice?
4   A.   About this particular case?
5   Q.   Yes.
6   A.   I believe so, yes.
7   Q.   Okay.
8         MR. OGDEN:  I'm just gonna leave that
9 there.
10        MR. BANKSTON:  Yeah.
11  Q.   (By Mr. Ogden) You understand that if
12 practicing law in a state that you're not licensed is an
13 ethical violation and, in most states, criminal.
14        Do you understand that?
15  A.   I'm not here to testify as to that.
16  Q.   I just asked you if you understood that.
17  A.   I don't understand that.
18  Q.   Okay.  Mr. Jones, Mr. Daniels, Mr. Salazar,
19 Ms. Blott, and Mr. Pattis.
20        Anybody else you spoke to on this case?
21  A.   I don't believe so.
22  Q.   Do you feel, sitting here right now, that you
23 are adequately prepared to discuss the topics that were
24 in the deposition notice?
25  A.   Yes.

27

1   Q.   Did you think walking into yesterday that you
2 were prepared?
3   A.   As much as I could be, yes.
4   Q.   I didn't ask as much as you could be.  I asked
5 if you were prepared, fully prepared.
6   A.   Like I said, as much as I could be, yes.  I
7 don't think there was anybody who could have testified
8 any better as to those topics.
9   Q.   Okay.  Did I ask that?
10  A.   No.
11  Q.   Did I ask you if you thought there was anyone
12 else that could be better prepared?
13  A.   No.
14  Q.   Okay.  Why'd you say it?
15  A.   Because it's true.
16  Q.   Right.  But I like hot dogs is true, but I'm
17 not gonna blurt it out randomly in a deposition.
18  A.   It wasn't random.
19  Q.   It wasn't, which is why I'm asking you why you
20 said it.
21  A.   And I just told you.
22  Q.   Cause it's true?
23  A.   No.  Because it's relevant to your question.
24  Q.   Okay.  I truly want to get on the road back
25 home today.  You understand that?

28

1         I'm not from Austin; did you know that?
2   A.   No, I don't.
3   Q.   Okay.  I know you need to get back home, too,
4 right?
5   A.   Sir, do you have a question for me?
6   Q.   Right.
7         You -- you have a flight booked this
8 afternoon, correct?
9   A.   Yes, I do.
10  Q.   Okay.  And it leaves at 4:00, right?
11  A.   No, it doesn't.
12  Q.   Okay.  Then you need to leave here by 4:00?
13  A.   Yes.
14  Q.   Okay.  And I'd like to get us both out of here.
15 Truly, I don't want to be here any longer than I can be.
16        But when you start randomly injecting
17 information into questions that aren't asked, do you
18 understand that that's going to make this a much longer
19 process?
20  A.   Sir, can you pose me a question.
21  Q.   I asked you:  Do you understand that?
22  A.   I understand what your point is.
23        Can you please pose me a question.
24  Q.   Sure.  How old are you?
25  A.   I'm 35.

29

1   Q.   Okay.  Where'd you go to law school?
2   A.   Quinnipiac University School of Law.
3   Q.   You said, I believe, you're in your 10th year.
4   A.   Yes.
5   Q.   Where is your office?
6   A.   I have an office in Shelton, Connecticut.
7   Q.   Okay.  How -- you -- earlier you said you had a
8 professional relationship with Mr. Pattis.
9         You used to work for him, correct?
10  A.   Yes.
11  Q.   How long?
12  A.   About five years.
13  Q.   Okay.  And that was right out of law school?
14  A.   Yes.
15  Q.   What'd you work -- what kind of cases did you
16 work with?
17  A.   Mostly criminal, but we did do some civil.
18  Q.   Did you handle any defamation cases?
19  A.   No.
20  Q.   All right.  There is a number of individuals at
21 the company that are -- that have been with the company
22 for much longer than two weeks, correct?
23  A.   Yes.
24  Q.   Okay.  Why do you think that you were the only
25 person, as you stated earlier, that could have possibly

Paz, Brittany                                    02-15-2022

30

1 been prepared to testify on the subject matter of these
2 two depositions?
3    A.   Because I think that you have previously tried
4 to depose two other people.  Those depositions, they
5 were not adequately able to testify as to the topics
6 that were presented.  And I also think that perhaps they
7 didn't have either the time that was required to
8 dedicate to such an undertaking.  And, third, that I
9 think that there is no one person that is in charge
10 with -- of this material at the company to testify as to
11 it.
12    Q.   What did you do to prepare to discuss the
13 company's policies regarding the factual vetting of
14 information that Infowars disseminates?
15    A.   Sure.  So I've spoken to -- as we testified to
16 yesterday, I've spoken to a number of other people in
17 connection with the policies and procedures.  So I spoke
18 to Melinda; I spoke to Daria; I spoke to Rob Dew; I
19 spoke to Alex Jones, a bunch of other people.
20        And, generally speaking, as far as the
21 vetting procedures for sourcing and articles, the
22 company's position is that it does not engage in
23 journalism.  So it requires the vetting be done by the
24 sources that it's citing.
25    Q.   I believe yesterday you said there are no --

31

1 there are no policies at Infowars for fact checking, I
2 think is how it came out.
3        Do you remember that?
4    A.   Right.  There are no written policies.  But,
5 generally speaking, as I said earlier and yesterday, the
6 company relies on the sources to do their fact checking.
7    Q.   Okay.  And the sources were also -- let's back
8 up a little bit.
9        Also, you said that Infowars doesn't
10 really have journal- -- and by Infowars, you understand
11 I mean Free Speech Systems and its --
12    A.   I understand.
13    Q.   You said that Infowars doesn't necessarily have
14 journalists; it's all punditry-type things.
15    A.   Right.  Commentary, blogging, that type of
16 thing; that's right.
17        MR. OGDEN:  Let's mark Exhibit 1.
18        (Exhibit 1 marked.)
19    Q.   (By Mr. Ogden) Let's mark this as Exhibit 1,
20 now that you gave me that answer.
21        Exhibit 1, can you read for the jury who
22 that's from?
23    A.   It appears to be from Kit Daniels.
24    Q.   Okay.  And you spoke with Mr. Daniels preparing
25 for today?

32

1    A.   I did.
2    Q.   So you had spoken to him prior to you just
3 telling the jury that there are no written policies and
4 procedures, correct?  Correct?
5    A.   May I just look at this for a second.
6    Q.   The question doesn't require you to know what's
7 in there.
8        I'm just asking you if you spoke to Kit
9 Daniels before you just told the jury that there are no
10 written policies and procedures?
11    A.   I did speak to Kit Daniels.
12    Q.   Okay.
13    A.   And I have seen this --
14    Q.   Okay.
15    A.   -- in the connection with -- this is the
16 company handbook that was produced to me by --
17    Q.   There's no question.
18    A.   -- Melinda.
19    Q.   There's no question on the table.  You're just
20 talking.
21    A.   The question was did I speak to Kit Daniels.
22 Yes, I did.
23    Q.   Okay.  And I'll -- trust me, I will ask you
24 about Melinda, if I need to.
25        The front page of Exhibit 1, can you read

33

1 who that's to?
2    A.   It says Infowars staff.
3    Q.   Okay.  And the subject line, can you read it
4 for me?
5    A.   It says, new editorial policy for all
6 reporters, journalists, and writers.
7    Q.   I swear -- so after reporters, what was that
8 word you said?
9    A.   It says journalists.
10    Q.   And you told us that you have seen this prior
11 to today, correct?
12    A.   This particular email (indicating)?
13    Q.   Exhibit 1.
14    A.   Well, Exhibit 1 is two things.  So I want to
15 know what part of it you are asking about.
16    Q.   Did you see the first page before today?
17    A.   No.
18    Q.   Don't you think you probably should have?
19    A.   Sure.
20    Q.   Especially if you spoke to the person that
21 wrote it who implemented the policies, correct?
22    A.   I did speak to Kit Jones [sic].  So, yes.
23    Q.   Daniels, correct?
24    A.   Oh, yes.  I'm sorry.  I did say Jones.
25    Q.   Mr. Daniels, he withheld this information about

Paz, Brittany                                02-15-2022

34

1 sending this out, a specific policy that was implemented
2 post the filing of these lawsuits?
3    A.   I don't know that he withheld it.
4    Q.   But you didn't know about it, right?
5    A.   I didn't see this.  No.
6    Q.   All right.  You wish you would have?
7    A.   Sure.
8    Q.   Because prior to me handing you that document,
9 you also told the jury that Infowars doesn't have
10 journalists, and that document appears Mr. Daniels, in a
11 supervisorial [sic] role, that -- is instructing
12 requirements for journalists, right?
13    A.   As I testified earlier, it's the company's
14 position that we're not engaged, generally, in
15 journalism.
16    Q.   Was not my question.
17          My question was, Mr. Daniels is writing
18 that to researchers and journalists?
19    A.   It doesn't say researchers; it says reporters.
20    Q.   Excuse me.  You're right.
21          Reporters and journalists.
22    A.   That's what it says.
23    Q.   Okay.  And the keyword there is journalist, and
24 that's what I want to focus on.
25          Because you would agree that prior to me

35

1 handing you that document, you were going to have this
2 jury believe that Infowars doesn't have journalists.
3    A.   It's the company's position that we're not
4 engaged in journalism.
5    Q.   Wasn't my question.
6          I asked if you were -- prior to that
7 document being handed to you, your testimony would lead
8 this jury to believe that Infowars doesn't have
9 journalists?
10    A.   Yes.  That's the company's position.
11    Q.   Okay.  When did that change?
12    A.   What -- what do you mean, when did that change?
13    Q.   Well, you had Mr. Jones three times,
14 Mr. Shroyer, Mr. Dew twice, Ms. Karpova at least once,
15 and that document, in front of you, all stating that
16 Infowars does journalism and has journalists.
17          So I'm asking you:  When did the policy
18 change to where they no longer have journalists and
19 don't do journalism?
20    A.   I don't think it's changed.
21    Q.   Okay.  You would agree with me that every
22 single person I listed before you in that last question
23 is more qualified to tell us what Infowars does,
24 correct?
25    A.   No.

36

1    Q.   You think you're more qualified than which one,
2 which person that I named?
3    A.   Well, first of all, I don't want to ad- -- not
4 just advocate, but I don't want to say that I agree with
5 what you're saying, that these people have said these
6 things in the past.
7          But I'm here to testify on the behalf of
8 the company, not individual people and what individual
9 people may think about themselves and what they do.
10    Q.   Okay.
11    A.   The company's position is that 98 percent of
12 what we do is commentary on things that have already
13 been in the news cycle.
14    Q.   I heard you say that 98 percent yesterday.
15    A.   Yes.
16    Q.   Very specific number.
17          Where'd you get it?
18    A.   That's based on my conversations with Mr. Jones
19 and the other employees that -- vast, vast majority of
20 what they do is, like I said yesterday, the production
21 process of looking through the news cycle and what is --
22 what other sources are saying and commenting on those
23 particular sources.
24          There are a small percentage of things
25 that would probably be considered independent, such as

37

1 the few articles Mr. Salazar did, as an example.  But
2 that is not the norm or what the company is engaged in
3 for the vast majority of it.
4    Q.   Okay.  And I know that we have to say the
5 company --
6    A.   Yes.
7    Q.   -- because there's a legal vacuum of LLCs.
8          Who owns the company?
9    A.   Who owns Free Speech?
10    Q.   Who owns Free Speech and Infowars, LLC?
11    A.   I believe Mr. Jones owns Free Speech.
12    Q.   Right.  And -- and you understood earlier when
13 I said Mr. Jones has been in a deposition chair, raised
14 his right hand, and swore to God to tell the whole truth
15 three times before you sat here, correct?
16    A.   I know he's given three depositions, yes.
17    Q.   And Mr. Jones also started these companies,
18 right?
19    A.   Yes, he did.
20    Q.   And you're sitting here today saying your
21 testimony is the company's position, but Mr. Jones
22 testifying on the company as the owner and inventer of
23 these companies, we -- we should discount that?
24    A.   I'm saying I don't recall what you're referring
25 to in his depositions.  But, like I'm saying, after my

Paz, Brittany                                02-15-2022

38

1 conversations with Mr. Jones and others, as I've already
2 testified, that is the company's position.
3    Q.   Do political commentary, people that do
4 political commentary, do they have a duty to tell their
5 audiences the truth?
6    A.   I think that what we are offering are opinions.
7    Q.   Didn't ask what you're offering.  Didn't even
8 get close to that question.
9    A.   Yeah.  You said I'm offering political comment.
10   Q.   If you listen carefully, I'll ask it again.
11   A.   Sure.
12   Q.   Do individuals that do political commentary --
13   A.   Uh-huh.
14   Q.   -- owe a duty to their viewers to be truthful?
15   A.   And here's what my problem with the question
16 is.  When you're saying truthful, something is truthful
17 if it's capable of being true or false.  An opinion is
18 an opinion and capable of being proven true or false.
19 So that's why I'm having a problem with your question.
20   Q.   Okay.  The things that a political commentator
21 say that can be proven true or false --
22   A.   Uh-huh.
23   Q.   -- does that individual have a duty to its
24 viewers to be truthful in those positions?
25   A.   So I think that the company's position has been

39

1 that they do strive to put forth truthful information.
2 So...
3    Q.   I didn't ask that.
4    A.   And -- but as far as a duty owed to the
5 viewership or whoever's listening to the broadcasts, I
6 think what the company puts forth are the source
7 materials and tells the -- tells the audience where they
8 can go find this information and then that source has a
9 duty to be truthful.
10        MS. BLOTT:  Listen to the question.
11   Q.   (By Mr. Ogden) You've watched a number of hours
12 of Infowars, I'm sure, over the past two weeks.
13   A.   Yes.
14   Q.   Okay.  Surely, you've heard Mr. Jones on one of
15 his shows numerous times say his -- kind of a motto that
16 he does when he's signing off that says, we're the truth
17 in journalism.
18        Surely, you've heard that if you've
19 watched a hundred hours.
20   A.   I -- I do recall him saying something to that
21 effect.
22   Q.   What do you think he meant?
23   A.   I don't know.
24   Q.   Surely, if you're gonna sit here and say that
25 98 percent isn't journalism, you'd ask him in one of the

40

1 interviews right?
2    A.   As I said, Mr. Jones has his own opinions, and
3 this is something that you'd probably have to ask him.
4    Q.   Right.  We did.  He doesn't think in any way
5 your 98 percent is accurate on any planet.
6    A.   I don't think that that's accurate, based on my
7 conversations with him.
8    Q.   Okay.  That's why I asked did you ask when it
9 changed.
10        Because you read his deposition, right?
11   A.   I didn't read all of them.  I think my
12 testimony was I didn't read them all.
13   Q.   Why didn't you read them all?
14   A.   Just time constraints.
15   Q.   Is that the only reason?
16   A.   Yes.
17   Q.   Okay.  The depositions that you did read, who
18 gave those to you?
19   A.   They were provided to me on our Dropbox.  So it
20 was the materials that were produced in connection with
21 these cases, the Texas cases.
22   Q.   Who created that Dropbox?
23   A.   You -- you know what, I'm not a hundred percent
24 sure.  We do have a -- at one time did have a consultant
25 that we worked with to try to put information on the

41

1 Dropbox and organize it and try to help us find
2 material, but I don't -- I don't know anything other
3 than that.
4    Q.   A third -- not an Infowars person?
5    A.   No.  He's not a --
6    Q.   A third party?
7    A.   A third party.
8    Q.   Surely, he signed the protective order, right?
9    A.   I don't know the answer to that.
10   Q.   You didn't sign a protective order?
11   A.   No, I didn't.
12   Q.   And you're not an employee of Infowars?
13   A.   No, I'm not.
14   Q.   Or Free Speech Systems?
15   A.   No.
16   Q.   Okay.  I want to get back to this 98 percent,
17 because you've said it twice under oath, and it seems
18 like you base that number on all of the research and
19 preparation you did for the two depositions yesterday
20 and today, correct?
21   A.   Yes.
22   Q.   What'd you use?  Some sort of algorithm or
23 matrix to get to that number?
24   A.   No.
25   Q.   Why didn't you settle for a whole number, like

Paz, Brittany                                02-15-2022

42

1 95 or 99, 97?  How'd you get to that 98?
2    A.   That wasn't my number.  I think that was a
3 number that Mr. Jones had said that in his estimation
4 that's what he thought we did as a company.
5    Q.   Okay.  So Mr. Jones is now the position --
6 based on the company, the company's position is that
7 Mr. Jones believes that 98 percent of what he does on
8 air is not journalism, correct?
9    A.   I think the company's position is that, not
10 Mr. Jones.
11   Q.   Right.
12   A.   But, yes.
13   Q.   But the company is basing that opinion on an
14 interview it did with Mr. Jones, right?
15   A.   It's not just that interview, no.
16   Q.   Okay.  What else is it?
17   A.   It was based on my interviews with the other
18 employees, as to the purpose and types of material that
19 are put on to the air on a daily basis, and how they do
20 their production, and what the purpose of those
21 productions are.  So I think that it's based on
22 confirmatory interviews that I did with other people,
23 not just with Mr. Jones.
24   Q.   Okay.  Mr. Jones, did -- did he give you a
25 percentage?

43

1    A.   I believe that that percentage came from
2 Mr. Jones, based on our conversation.  But, like I said,
3 it was confirmed by my other conversations with people.
4    Q.   Okay.  So other people in the company also are
5 saying 98 percent?
6    A.   I don't think they used that number.  But their
7 position to me was that the process is and generally
8 what they're engaged in is commentary on what is in the
9 news cycle and the process by which that happens on a
10 daily basis.
11   Q.   If I ran a business and 98 percent of it was
12 baking cakes and 2 percent of it was doing brain
13 surgery, you would expect that I would be extremely
14 qualified and adhered to the standards for 2 percent of
15 brain surgery that I do, correct?
16   A.   I don't know how to answer that.
17   Q.   Well, let me ask you this:  Because 2 percent
18 is journalism --
19   A.   Uh-huh.
20   Q.   -- would you agree that Infowars has a duty to
21 make sure that what they report is true?
22   A.   For the -- for the articles or whatever that
23 are independent reporting, sure.
24   Q.   Okay.  And when Mr. Jones or any other
25 personality goes on air and says, I've done the

44

1 research; I've seen the data, and this is my conclusion,
2 what is that?
3    A.   It's an opinion.
4    Q.   What if they don't say opinion?  What if they
5 say, based on the evidence, this is a fact?
6    A.   I don't think that's what he said.  That's
7 not -- that's not what he said.
8    Q.   Who and when?
9    A.   I think you're referring to Mr. Jones'
10 statement that I've done the deep research, and I think
11 this, et cetera.
12   Q.   No.
13   A.   He doesn't -- he did not say it the way you
14 said it.
15   Q.   I'm not saying he did.  I'm not talking about
16 that.
17   A.   Okay.
18   Q.   I'm saying if a personality like David
19 Knight --
20   A.   Okay.
21   Q.   -- or Owen Shroyer -- Owen Shroyer,
22 specifically, we'll focus on him -- says I've done the
23 research, and this is a fact.
24          If that comes out of someone's mouth at
25 Infowars, there's a duty that it should be truthful,

45

1 right?
2    A.   I'm sorry.  I don't know which statement you're
3 referring to.
4          Are you representing that Owen did, in
5 fact, say that?
6    Q.   Did you --
7    A.   Or are you saying -- is that a hypothetical
8 question?
9          I want to make sure I understand.
10   Q.   Well, I'll say it's a hypothetical right now.
11   A.   Okay.  If it's a hypothetical and someone is
12 the original source saying this is a fact and I -- this
13 is -- and putting something forth as a fact, then I
14 think there's a different standard, yes.
15   Q.   What do you mean -- what do you mean when you
16 use the term source?
17   A.   What I mean is, is that someone has done
18 vetting of a particular piece of information.
19   Q.   Okay.  So when someone's talking about the
20 vetting they've done on a piece of information, that's a
21 source?
22   A.   Right.
23   Q.   So if Infowars is talking about the -- the
24 research and the review of data that they've done, and
25 then they come out with a conclusion at the end of that,

Paz, Brittany                          02-15-2022

46

1 that they would be the source?
2   A.   No.
3   Q.   How is that different?
4   A.   Because when the research that they're
5 referring to are other articles that have cited their
6 own source and have done their own sourcing and their
7 own vetting, that is not -- that is not -- they are --
8 they are not the source.
9   Q.   Right.
10   A.   The person that the information came from is
11 the source.
12   Q.   Right.  But when someone from Infowars takes an
13 independent article and then says, I read this; I've
14 done the research; I've seen this stuff, and this is my
15 conclusion.
16   A.   I don't think that's the context of the
17 statement.  I think the context is, is I've read this
18 source, this is what I'm basing my opinion on, and
19 here's my opinion.
20   Q.   Oh.  So they definitely used the word opinion?
21   A.   I don't think they definitely used the word
22 opinion, but it was presented as an opinion.
23   Q.   How do the viewers of Infowars know when it's
24 opinion or when it's fact?
25        MS. BLOTT:  Objection; calls for

47

1 speculation.
2   A.   I don't know how to answer that.
3        MR. OGDEN:  If you want to restrict those
4 to form and adhere to the Texas rules, I'd appreciate
5 it.
6   Q.   (By Mr. Ogden) Can you repeat your answer,
7 please.
8   A.   I said I don't really know how to answer that.
9 I don't know what somebody else is going -- is going to
10 think.
11   Q.   Okay.  If a source is used at Infowars, who
12 determines whether or not they're trustworthy?
13   A.   So I believe this is a conversation we had
14 yesterday, too.
15        But -- so preproduction, there is a list
16 of sources.  Each host has their own list that they --
17 of preferred sources that they like to go -- that they
18 like to go to.  That source is -- it changes over time
19 based on my conversations with -- for example, Nikko,
20 Alex's list now is not Alex's list from when Nikko
21 worked with him.
22        But, basically, these are sources that the
23 host prefers and has found to be reliable in the past
24 and so would then trust -- trust where the articles are
25 coming from.  Excuse me.

48

1   Q.   And you saw the lists?
2   A.   Did I see the lists for each host?  No.  I did
3 talk to Daria about what Alex's current list is.  But
4 aside from that, I -- I did not do any research for
5 other hosts.
6   Q.   What's on Mr. Jones' current list?
7   A.   I don't know if this is an exhaustive list, but
8 I know that he looks at Drudge Report.  He looks at what
9 is trending on Twitter.  He looks at Zero Hedge.  And
10 there may be two -- two or three others that I'm
11 missing.  But there's -- there's a list of five or six
12 different sources.
13   Q.   Okay.  Is 4chan on there?
14   A.   No.
15   Q.   Why not?
16   A.   I don't think that he does his sourcing from
17 4chan.
18   Q.   Does anyone use 4chan to -- for sourcing?
19   A.   I don't think that sourcing is the right word.
20 But I do know that based on my conversations, that
21 certain of the reports -- writers, probably a better
22 word, uses that for tips.  But I wouldn't say that it
23 was used -- it's used for sourcing.
24   Q.   Okay.  When you say sourcing, are you -- is
25 there an implication that sourcing is reliable?

49

1   A.   I'm sorry.  I don't understand the question.
2 Can you rephrase it.
3   Q.   Something you use as a source is reliable.
4 Something you use for a tip is just kind of -- is what
5 it is and you need to go verify it?
6   A.   Yes.  That would be a fair -- fair assessment.
7   Q.   Okay.  Now that you've seen Exhibit 1 --
8   A.   Uh-huh.
9   Q.   -- you understand it's from Kit Daniels?
10   A.   I understand it looks like an email from Kit
11 Daniels, yes.
12   Q.   And yesterday you testified he's one of the
13 supervisor roles at the company, correct?
14   A.   Yes.  I think he started in that capacity
15 sometime in 2018.
16   Q.   Why would he be sending that out to all
17 journalists, among other people, if Infowars doesn't
18 have any?
19   A.   I don't know why he used these specific terms.
20 I do know that after the litigation, there had been some
21 efforts made to try to put forth some standards,
22 policies, and procedures that weren't in place
23 previously.
24   Q.   Did Infowars -- in the Fontaine case, did
25 Infowars do anything wrong?

Paz, Brittany                                    02-15-2022

---

50

1    A.  In the Fontaine case specifically?
2    Q.  Correct.
3    A.  I think that in the Fontaine case, there was a
4 breaking news story; that Mr. Daniels saw a photo
5 circulating on social media.  He had seen that photo in
6 a couple of different locations, and he posted an
7 article the same day -- it was late in the afternoon --
8 and then left for the day.  Saw that it was inaccurate
9 and immediately took it down the next day.
10    Q.  The answer to my question is?
11    A.  No.
12    Q.  No, Infowars didn't do anything wrong?
13    A.  No.
14    Q.  Okay.  In the Sandy Hook coverage, did Infowars
15 do anything wrong?
16    A.  Can you be more specific.
17    Q.  No.  Do you think in any way Infowars did
18 anything wrong in the Sandy Hook case?
19    A.  I don't know how to answer that just because I
20 don't know what you're referring to.
21    Q.  Okay.  Their coverage, was any of it wrong or
22 inaccurate?
23    A.  I think that most of the Sandy Hook coverage
24 was opinion statements that -- that the hosts are
25 entitle- -- and writers are entitled to have opinions.

---

51

1    Q.  Okay.  Was any of it wrong?
2    A.  Wrong factually?
3    Q.  Correct.
4    A.  Which part?
5    Q.  Any of it.
6    A.  I don't know what you're specifically referring
7 to.
8    Q.  Well, I'm trying to figure out why after the
9 litigation started that one of the supervisors at
10 Infowars decided to put a policy in place to protect the
11 company, if the company's position is it didn't do
12 anything wrong?
13    A.  I didn't testify it was to protect the company.
14    Q.  Okay.  Why would he put that in place?
15    A.  Because I think that it came to the attention
16 of the company that it was growing, it was -- there were
17 a lot of different people involved, different
18 departments, and that it wasn't being managed or
19 supervised in an appropriate way, and they wanted to
20 make certain policies clearer going forward.
21        All of these things, like I testified
22 yesterday, there were departments that nobody was
23 talking to anybody, there was really no overall
24 hierarchical structure.  So after the lawsuits, there
25 were efforts made to rectify that.

---

52

1    Q.  Okay.  So based on that answer, you -- we can
2 agree on something, finally, which is the way that these
3 different departments were being supervised was
4 inappropriate?
5    A.  I just think it was not organized well, for --
6 for a company.
7    Q.  Well, you used the term -- you said they were
8 not managed appropriately.
9        And then I inferred from that, that we can
10 agree that they were managed inappropriately, correct?
11    A.  I think they could have been managed better.
12    Q.  Right.  Wasn't my question.
13        But --
14    A.  I wouldn't use the term inappropriate.
15    Q.  Okay.  Then I'll use it the way that you used
16 it in your answer.
17        We can agree that Infowars was managed --
18 the way that Infowars was managed was not appropriate --
19    A.  It --
20    Q.  -- correct?
21    A.  Correct.  It could have been done better.
22    Q.  Okay.  Can I see that real quick.
23    A.  This?
24    Q.  Yeah.  I only have one copy.  But...
25        (Mr. Ogden reviewing document.)

---

53

1    Q.  (By Mr. Ogden) That policy, would you agree,
2 was made to protect the company?
3    A.  Which policy?  The one in this -- in -- in the
4 email.
5    Q.  Right.  The email that has the attachment
6 behind it.
7    A.  Well, the attachment is not the same thing as
8 what is being cited in the email.
9    Q.  Okay.
10    A.  So that's why I wanted to know which policy.
11    Q.  I'm focused on the policy in the body of the
12 email.
13    A.  Okay.  So this policy in the body of the
14 emailing regarding possibility of crimes being
15 committed, that's the one you're talking about?
16    Q.  (Nodding.)
17    A.  Okay.  What was your question?
18    Q.  It's made to protect the company?
19    A.  I think it was made to give guidance on how to
20 write articles in the -- in the future.
21    Q.  Why was it giving guidance to write articles in
22 the future?
23    A.  Because there was no -- there was no guidance
24 previously.
25    Q.  Okay.  And the reason we're giving guidance is

---

Paz, Brittany                                   02-15-2022

54

1 to protect the company, correct?
2          I'm not sure why we're fighting on this.
3 It helps you.
4     A.   I don't know why it would -- I mean, sure it
5 helps the company.  So there could be -- obviate any
6 potential future lawsuits.  So, sure, it could help the
7 company.
8     Q.   Okay.
9     A.   It could be for other things.  I don't know if
10 the purpose of it was that.  But...
11    Q.   The -- it mentions in there that any story
12 involving even the potential for criminal liability
13 needs to be vetted by multiple, in all caps, editors,
14 correct?
15         MS. BLOTT:  I'm gonna object to the extent
16 that it mischaracterized the content.
17         MR. OGDEN:  Ms. Blott -- Ms. Blott, I'm
18 gonna ask you one more time.  If you don't follow the
19 Texas rules -- and you can object to form or the other
20 two permissible objections.
21         MS. BLOTT:  Objection; form.
22         MR. OGDEN:  Thank you.  I'll ask if I need
23 clarification to cure it.
24         I mean, I'm not trying to be rude at all,
25 but I'm having a hard enough time getting your witness

55

1 to answer my questions, and if I have a bunch of
2 speaking objections for you, that's just gonna -- I -- I
3 don't think that we're gonna be able to do this.  We may
4 have to get the judge on the phone.  Okay?
5          (Ms. Blott looking at Mr. Ogden.)
6     A.   I'm sorry.  What was your question?
7     Q.   (By Mr. Ogden) My question was, that it
8 needs -- that articles need to be checked by multiple,
9 in all caps, editors, correct?
10    A.   That's what it says.
11    Q.   Why would something need to be checked by
12 multiple editors?
13    A.   I don't know.
14    Q.   Prior to today, you had never seen that email?
15    A.   No.  I've never seen this email.
16         MR. OGDEN:  Right.
17    Q.   (By Mr. Ogden) And so whenever I asked you
18 about Topic 1 in your deposition notice, which were the
19 policies regarding the factual vetting of information,
20 nobody even gave you this piece -- this document to
21 prepare, true?
22    A.   No.  This -- this doesn't have a Bates stamp on
23 it, so it wouldn't have been included in the -- in the
24 material that I was provided.
25    Q.   So the only thing that you reviewed for this

56

1 case was Bates stamped?
2     A.   I don't think the only material I reviewed was
3 Bates stamped.  The depositions are not Bates stamped.
4     Q.   Did you review any other documents that weren't
5 Bates stamped preparing for yesterday or today?
6     A.   The depositions, as I said, were not Bates
7 stamped.  I don't believe the petitions were Bates
8 stamped.
9     Q.   How many documents did you get through out of
10 the 81,290- --
11    A.   Thousands of documents.
12    Q.   Let me finish my question, please.
13         Of the 81,297 documents, how many did you
14 get through?
15    A.   Thousands.
16    Q.   How many thousands?
17    A.   I don't know how many thousands.
18    Q.   Tens of thousands?  Fives of thousands?
19    A.   Probably 10s of thousands.
20    Q.   Okay.  Did you get about half, maybe?
21    A.   I'm sorry?
22    Q.   Halfway?
23    A.   Halfway through what?
24    Q.   Did you get to 40,596 documents through?
25         That's half of the document production.

57

1     A.   I don't know.  I don't know the exact number.
2     Q.   And probably because you don't is because -- I
3 don't know -- 22,000 of those documents were produced by
4 Infowars without Bates stamps.
5          Did you know that?
6     A.   I know that there has been an issue with the
7 organization of the production materials.
8     Q.   So surely you weren't shocked when you said
9 that you didn't review -- you've never seen this, but it
10 doesn't have a Bates stamp, right?  Because you saw a
11 number of documents that were produced in this
12 litigation that didn't have those, right?
13    A.   Did I see documents without Bates stamps; is
14 that your question?
15    Q.   Correct.
16    A.   I didn't see documents like this without Bates
17 stamps.
18    Q.   What do you mean like this?
19    A.   This is an email.
20    Q.   Sure.
21    A.   I didn't see any emails without Bates stamps.
22    Q.   So we can -- out of the production that's been
23 given to us, all emails that aren't Bates labeled, we
24 can take those out, because you didn't read those?
25    A.   I didn't see any emails that didn't have Bates

Paz, Brittany                                    02-15-2022

58

1 stamps.
2    Q.  Okay.  Because that'll give us a better idea of
3 what documents you did get through.
4    A.  Okay.
5    Q.  Because there's a number of them.
6    A.  Okay.
7    Q.  Wouldn't you agree that Mr. Daniels is creating
8 a policy for vetting information?
9    A.  For vetting this specific type of information.
10    Q.  Right.  So if I say all information, and that's
11 a specific type of information, the answer to my
12 question is yes, true?
13    A.  Not all information.  Just this type of
14 information, yes.
15    Q.  Right.  Other than the one that I just was --
16 had the privilege of teaching you about, are there any
17 other policies regarding the vetting of information at
18 Infowars that began February 2018 to today?
19    A.  I don't believe so.  But I will say, just --
20 just a caveat to this is, in my conversations -- I don't
21 want to make you think, like, Mr. Daniels didn't talk to
22 me about this.  I was aware of this.  I just never saw
23 this particular email.
24    Q.  I --
25    A.  I just -- I just wanted to make sure that

59

1 we're -- you're aware of that.  It's not that I didn't
2 know that this -- he made this policy.  It's just I
3 didn't see this particular document.
4        MR. OGDEN:  Madam Court Reporter, I'm
5 gonna object to all of that as nonresponsive.
6    Q.  (By Mr. Ogden) Other than the policy that you
7 just got put in front of you today, the -- you were also
8 tasked with the -- actually, let's back up.  Sorry.
9        Other than that policy there, are there
10 any other policies Infowars has in place to vet
11 information?
12    A.  To vet information, no.
13    Q.  Okay.  So from the inception of Infowars to
14 February of 2000- -- actually, I don't know what the
15 date is on that one.
16    A.  June 2018.
17    Q.  June 2018.
18        There were no policies for whether or not
19 anybody needed to vet the veracity of information that
20 was disseminated by Infowars?
21    A.  The veracity, no.  I do believe, based on my
22 conversations with people, that there was a -- I don't
23 want to say policy, but there was an understanding that
24 there would be multiple sources used for articles, that
25 you wouldn't rely solely on one source.  But I don't

60

1 think that that's checking the veracity of the
2 information.  So, no.
3    Q.  Outside of articles, what about with on-air
4 talent?
5    A.  I think that that would apply on air, as well.
6    Q.  Okay.  So anything that went out on air, that
7 was, quote, unquote, journalism --
8    A.  Uh-huh.
9    Q.  -- would have multiple sources to back it up,
10 true?
11    A.  Assuming it was journalism, it should have
12 multiple sources.
13    Q.  Okay.  Who told you that?
14    A.  So that's based on my conversation with
15 Mr. Daniels, when I asked him about prior to him being a
16 supervisor, if Kurt Nimmo had the same policy -- we're
17 calling it a policy; although, it's not a written
18 policy, but it is an understanding that it would have
19 multiple sources.
20        When I spoke to Adan, his position was
21 similar that he agreed that he was expected to cite to
22 more than one source.  And that during the writing
23 process -- and they circulate amongst themselves
24 articles -- they would try to check to make sure each
25 other's articles have multiple sources.

61

1        But, again, that's not checking the
2 veracity of the source.  It's just checking to see if
3 you have multiple sources.
4    Q.  I just asked for names.
5    A.  Sure.
6    Q.  I just asked for who.  I didn't ask for
7 anything else.  I'll ask you follow-ups, I promise.
8 I've got a lot of them.  I'm really good at follow-up
9 questions.  It's probably one of my best qualities.
10    A.  I spoke to Adan and I spoke to Kit, and those
11 are the two people I spoke to.
12    Q.  Perfect.  Thank you.
13        Are there any policies or procedures in
14 place when it comes to using anonymous sources?
15    A.  I'm sorry.  Can you be more specific.
16        You mean about like 4chan, like that type
17 of source?
18    Q.  Anonymous social media content.  That would be
19 what I am referring to.
20    A.  Okay.  So if there is a policy or procedure
21 about checking to make sure that something is -- that's
22 seen on a social media source and it's anonymous.
23        So when I asked this question, I don't
24 think there's a policy, so to speak.  Information, such
25 as 4chan or on social media, I think I said earlier,

Paz, Brittany                                        02-15-2022

---

62

1 those are used more so as tips rather than sources.
2        So if it's seen on social media,
3 generally, we try to find another source or two, at
4 least make sure where that information is coming from
5 is, like, not a fake page or something like that.
6    Q.   Okay.  So -- and by fake page, you mean a page
7 that was recently created with a name of -- that's not
8 an actual person and maybe a picture that's not of a
9 person at all?
10   A.   You mean like the profile picture?
11   Q.   Any of it.
12   A.   So when I talked to -- when I talked to Nikko,
13 his basic premise when he was trying to vet -- vet
14 guests, that was his process by just trying to make sure
15 that a person was who he said he was.
16        But as I said earlier, I think that --
17 sites such as 4chan were used more as tips rather than
18 actual sources, and then they would try and go verify it
19 in another place.
20   Q.   Okay.  Like Twitter?
21   A.   Like Twitter.  On Twitter -- Twitter has also
22 links and cites to other news sources.  So, like, if
23 something was trending, it would link to other news
24 articles, things like that.  So Twitter could
25 potentially be a source to link to other sources.

---

63

1    Q.   You've used the term trending a couple of times
2 today.
3    A.   Yes.
4    Q.   What's that mean?
5    A.   On Twitter, there are -- there are -- I
6 don't -- I'm sorry.  I don't personally use Twitter.
7        But on Twitter, there are news stories
8 that are trending for the day and the time.  Some might
9 be breaking news.  And so there's things on Twitter with
10 a hashtag that would be trending for that time period.
11   Q.   So the hashtags that are attached to different
12 categories of information, based on that hashtag,
13 something could be trending if it was popular enough?
14   A.   Sure.
15   Q.   Okay.  You -- we kind of went into the
16 anonymous social media content policies.  And it sounded
17 like there were more like they're not rules; they're,
18 like, guidelines.
19   A.   Guidelines is a good word, guidelines.
20   Q.   Nobody's getting fired if they disseminate
21 something that's completely factually wrong, because
22 they pulled it off of 4chan and threw it up on Infowars
23 dot com, correct?
24   A.   They could be.
25   Q.   Okay.  What would make -- was Mr. Daniels

---

64

1 fired?
2    A.   No.  Mr. Daniels was not fired.
3    Q.   Okay.  Has anybody, to your knowledge, ever
4 been fired for doing that?
5    A.   For doing that?  I'm not sure if for doing
6 that, but there are people who have been terminated from
7 the company.
8    Q.   I would assume so.  It's been 30 years.
9        But for the specific topic that we were
10 talking about, which is has anybody ever been fired for
11 disseminating, recklessly, information that's just not
12 true?
13   A.   I don't know.
14   Q.   When you say -- when I say, oh, they're not
15 gonna get fired, you say they could be.
16        Pure guess?
17   A.   No.  It's not a pure guess.
18   Q.   Okay.
19   A.   Because when I've spoken to Mr. Jones and
20 Melinda, who does HR, there are -- they couldn't name
21 for me specific instances where people had been fired,
22 but it is a possibility and it is listed in the handbook
23 as up to termination.  So it is a possibility.
24   Q.   What about prior to June 2018?
25   A.   This handbook was not made in June 2018.

---

65

1    Q.   Okay.  When was it made?
2    A.   It says effective date 10/1/2012.
3    Q.   Okay.
4    A.   So that was when this was last updated.
5    Q.   I gotcha.  So it's your position that the
6 employee handbook was updated in June of 2018?
7    A.   No.  I don't believe that this policy was ever
8 incorporated into this -- into this employee handbook.
9    Q.   Was that employee handbook made specifically
10 for Infowars?
11   A.   I don't know.  It says Free Speech Systems on
12 it.  When I asked Melinda about the handbook, because I
13 did ask to see it, she said it was there -- it predated
14 her tenure there, so she doesn't know who created it or
15 when.  It was updated on that date, but it had existed
16 before then.
17   Q.   You did ask Melinda, though?
18   A.   I did talk to Melinda about the handbook, yes.
19   Q.   And when she said she didn't know, surely you
20 went and asked Mr. Jones.
21   A.   Oh, I don't think Mr. Jones would have known.
22 He -- he didn't write this.  There was --
23   Q.   Okay.  He's been at the company the longest,
24 though, correct?
25   A.   Well, I mean, it's his company, but he wouldn't

---

Paz, Brittany                                02-15-2022

66

1 have written this.
2    Q.    So he would -- he would know when that was
3 initially implemented?
4    A.    I don't know if he knows that.
5    Q.    Right.  Because you didn't ask him?
6    A.    I didn't ask him about the handbook, no.  I
7 asked Melinda.  There was a -- I can't remember the name
8 of the woman that was there before her.  But...
9    Q.    Okay.  Let's -- let's break this down.
10          You asked someone about the handbook, and
11 they said, I don't know, that was before I started here,
12 right?
13    A.    Regarding when it was produced?
14    Q.    Correct.
15    A.    Yes.
16    Q.    And who produced it?
17    A.    She didn't know who produced it.
18    Q.    Why it was produced initially?
19    A.    I don't know why it would have -- why it's
20 produced.  But...
21    Q.    Right.  So, yet, this person says I don't know,
22 I don't know, I don't know, and that's where you stop
23 your investigation?
24    A.    The person who probably would have known didn't
25 work there anymore, and I didn't know how to reach her.

67

1    Q.    You used the word probably.
2          But you don't know, because you didn't ask
3 anybody that was there when it was implemented?
4    A.    I couldn't.  That person -- whoever would have
5 been there is no longer there.
6    Q.    You don't think the owner of the company knows
7 when he invoked an employee handbook?
8    A.    No, I don't.
9    Q.    Why?
10    A.    Because I don't think he would have had
11 anything to do with this.
12    Q.    But you had conversations with him, right?
13    A.    I did have a conversation with him.
14    Q.    And you'd seen this document before that,
15 right?
16    A.    Sure.
17    Q.    Okay.  So you could have just asked?
18    A.    I could have.
19    Q.    But you chose not to?
20    A.    I don't know that I chose not to.  I just
21 didn't ask.
22    Q.    Okay.  You either didn't care or you chose not
23 to, correct?
24    A.    No.
25    Q.    Okay.  What's the other alternative?

68

1    A.    That I didn't think he was a good source of
2 information on that particular topic.
3    Q.    Do you think he's a good source of information
4 on any topics?
5    A.    Sure.
6    Q.    Like what?
7    A.    Like what type of business the company is
8 engaged in, as he started the business; like what he is
9 doing on a daily basis on his shows; like some of the
10 structure of the company, that type of information.
11    Q.    What person at the company is in charge overall
12 of making sure all employees follow the rules?
13    A.    There's no one such person.
14    Q.    Okay.  So if Alex Jones tries to fire someone
15 because they violated a rule, there are other -- he --
16 depending on the department, he may or may not have that
17 power?
18    A.    I didn't say that.
19    Q.    Okay.
20    A.    Alex Jones is -- obviously, it's his company.
21 So I'm sure he would have the ultimate say over whether
22 someone got fired or not.  But to a lesser extent, if
23 there's some issue within a department, I'm sure the
24 supervisor would take up the issue with the person,
25 whatever the issue was.  And if it escalated, I'm sure

69

1 Alex would take care of it.
2    Q.    Okay.  So when I asked who, if anyone, at
3 Infowars is -- is overall in charge, the answer to that
4 question is Alex Jones?
5    A.    Whether he had the ultimate say, sure.
6    Q.    Were there any policy -- the -- the policies in
7 place in February of 2018 regarding the reliability of
8 4chan posting -- or the information in 4chan posts and
9 any facts or knowledge informing that position, that's
10 one of the topics you're tasked with, correct?
11    A.    I believe so.
12    Q.    Okay.  What was the company's position?
13    A.    On 4chan?
14    Q.    (Nodding.)
15    A.    On 4chan, I think, as I testified earlier, it
16 was more so used as a tip.  And then the general
17 position -- guideline, I think is the word you used --
18 you should always make sure to have multiple sources,
19 and that would include for 4chan.
20    Q.    Okay.  Multiple additional sources is what you
21 said?
22    A.    I think -- well, it says here multiple editors.
23 But I think that it -- based on my conversation, it was
24 at least two sources.
25    Q.    Okay.

Paz, Brittany                                    02-15-2022

70

1   A.  I don't know that there was a specific number
2 attached to that guideline.
3   Q.  Who told you about the two-source rule?
4   A.  When I spoke to Mr. Daniels, he indicated that
5 prior to that -- this time period where he's the
6 supervisor, Kurt Nimmo was the supervisor, that was
7 generally his policy, as well.  That was confirmed by
8 Adan when I spoke to him, as well.
9   Q.  Can you remember if you spoke to Mr. Nimmo or
10 not?
11  A.  I did not speak to Mr. Nimmo.
12  Q.  Okay.  Any particular reason?
13  A.  I don't -- I don't know that I had his
14 information readily available, and I don't know that I
15 had the time to talk to him.  I spoke to a lot of
16 people.
17  Q.  Did you ask for it?
18  A.  For Mr. Nimmo's phone number?  Yes.  I did ask
19 Melinda for it, and I don't know if she was able to find
20 it.
21  Q.  Did she tell you?
22  A.  Did she tell me?
23  Q.  Actually, let's back up.
24        How'd you communicate with Melinda?
25  A.  I spoke to Melinda in person.

71

1   Q.  Okay.  And you just asked her for Kurt Nimmo's
2 phone number?
3   A.  I asked her for a bunch of phone numbers, yes;
4 Kurt Nimmo's was among them.
5   Q.  Okay.  You don't -- you can't recall whether or
6 not you were given --
7   A.  No.  I was not given it.
8   Q.  -- Mr. --
9        And what was Mr. Nimmo's position in
10 February 2018?
11  A.  I -- I believe at that time he was the lead
12 writer.
13  Q.  Okay.
14  A.  So he would have been, like, the supervisor.
15  Q.  Who's the lead writer currently?
16  A.  I believe it's Mr. Daniels.
17  Q.  Has Paul Watson ever held that title?
18  A.  No.  Paul Watson, I believe, has always been a
19 consultant.
20  Q.  Okay.  Now, the analytics for the number of
21 pages used for Mr. Daniels' article received by Free
22 Speech from February 14th to February 15th, 2018, are
23 you prepared to discuss that topic?
24  A.  I -- I believe I did see Google analytics, yes.
25  Q.  I asked you if you were prepared to discuss the

72

1 topics.
2   A.  Yes.
3   Q.  Okay.  When did you see Google analytics?  Was
4 that part of this morning, or was that part of when you
5 had it last week?
6   A.  I believe I reviewed the Google analytics when
7 I spoke to Mr. Zimmerman last week, Thursday or Friday,
8 maybe.
9   Q.  And that was for Fontaine, not for the Sandy
10 Hook's, correct?
11  A.  I think for both.
12  Q.  Okay.  What did Mr. Zimmerman have to say about
13 the Fontaine case?
14  A.  Specifically about the Fontaine case?
15  Q.  Correct.
16  A.  I think that what he --
17  Q.  Let's back up real quick.
18  A.  Sure.
19  Q.  I don't want any answers to start it might,
20 maybe, I think.  Not here for your personal opinion;
21 and, frankly, I just don't care about it.  I want to
22 know what you know and only what you know.  If you don't
23 know, that's fine; you can say that.  We have procedures
24 in place here where we can go and cure these
25 deficiencies.

73

1   A.  Okay.  I'm not --
2   Q.  So don't guess.
3   A.  I'm not -- I don't specifically remember what
4 he said.
5   Q.  Okay.  As far as discussing the analytics and
6 the number of page views between February 14th and
7 February 15th for Free Speech Systems, you will be
8 relying wholly on the documents produced to plaintiffs
9 last night, correct?
10  A.  That is a fair statement.
11  Q.  Okay.
12        (Sotto voce conversation between
13        Mr. Bankston and Mr. Ogden.)
14  Q.  (By Mr. Ogden)  Yeah.  Those are the documents
15 that were produced.
16  A.  This was what was handed to me by counsel.  So
17 I --
18  Q.  Okay.  And when it was handed to you, Ms. Blott
19 represented to you that that's what was produced to us
20 last night?
21  A.  I think so.
22  Q.  Okay.  Where in the documents -- can you point
23 to where in those documents you are going to pull the
24 analytics for the page use?
25  A.  I'd have to look through every single page,

Paz, Brittany                                    02-15-2022

74

1 sir. It was produced -- I've not seen this before this
2 morning.
3    Q.   Okay. So, yeah, so fair to say that if you
4 you've got to flip through everything, because you've
5 never seen some of these before, you're not prepared,
6 right? I'm not trying to trick you. I'm just...
7    A.   No. I mean, I can't off the top of my head
8 tell you a specific number without looking at a
9 document, no.
10    Q.   Sure. Give me a cheat sheet. Look through the
11 document.
12    A.   I -- you want me to flip through all --
13 couple-hundred pages?
14    Q.   333.
15    A.   Okay. So, like I said, you want me to flip
16 through all couple-hundred pages?
17    Q.   Sure. If you're -- if you are aware of what
18 you're looking for, it's not hard to flip through 333
19 pages. We'll wait. I'm okay with some awkward silence.
20    A.   I mean, I don't imagine where it would be.
21    Q.   I bet it's in that stack. You told me that it
22 was.
23    A.   Well, I don't know if it is in this stack. I
24 didn't put this together.
25    Q.   Now you are guessing. And we already talked

75

1 about what happens when you guess.
2    A.   I'm not guessing. I didn't put this -- this
3 document together.
4        MR. BANKSTON:  You said that it was in
5 there.
6    Q.   (By Mr. Ogden) Yeah. You told me it was in
7 there, and then you said, well, I don't know if it's in
8 here.
9        So which one is? Were you lying then or
10 are you lying now?
11    A.   I'm not lying at all.
12    Q.   Sure.
13    A.   I just don't know what's in here, because I
14 didn't put this together.
15    Q.   Okay. Where's the materials you did put
16 together for this depo?
17        Yesterday you had a very extensive binder
18 with tabs and color-coding. It looked very
19 professional.
20        Where's the one for today, or are you
21 just -- this one is not as serious as yesterday?
22    A.   It's not that it's not as serious. There
23 weren't a lot of documents in connection with this
24 specific case.
25    Q.   Sounds like there were. You said, how am I

76

1 supposed to flip through all these documents to find the
2 analytics?
3    A.   I don't know if the analytics are in here is
4 what I'm telling you.
5    Q.   Why didn't you bring them with you? If you
6 needed them to discuss Topic 4, why didn't you bring the
7 information you needed?
8    A.   I don't know.
9    Q.   Because without that information, it's safe to
10 say, you're not prepared to talk about Topic 4, are you?
11    A.   I can't give you a specific number without
12 looking at it.
13    Q.   Okay. And you don't -- as far as right now,
14 you don't have it?
15    A.   I don't know if it's in here, no.
16    Q.   Okay. Well, I'm gonna represent to you that
17 that's being unprepared. And if I'm wrong, Ms. Blott
18 will correct me right now.
19        MS. BLOTT:  You're wrong.
20        MR. OGDEN:  Okay.
21        MS. BLOTT:  Now, would you like me to tell
22 you why?
23        MR. BANKSTON:  Absolutely not.
24        MR. OGDEN:  I don't, Ms. Blott. Because
25 the witness here, she's supposed to tell me.

77

1    Q.   (By Mr. Ogden) So, actually, here's my
2 question: Tell me the page used for February 14th,
3 2018, for the -- for the web -- web page in question in
4 this lawsuit?
5    A.   I think I already answered your question.
6    Q.   How many?
7    A.   I can't tell you a specific number without
8 looking at the document.
9    Q.   Sure. Take your time.
10    A.   I'm not gonna flip through all those pages. I
11 don't know if it's in there.
12    Q.   Okay. Well, what do you --
13        MR. BANKSTON:  I think we need
14 (inaudible).
15        MR. OGDEN:  Actually, let's take a break.
16 We're gonna get the Court on the phone.
17        MR. BANKSTON:  Well, I think we should at
18 least give the court reporter a break.
19        MR. OGDEN:  Yeah. We're gonna -- we're
20 off the record.
21        MR. BANKSTON:  Let's talk about this. We
22 may be suspending the deposition.
23        THE VIDEOGRAPHER:  We are off the record
24 at 10:18.
25        (Recess from 10:18 a.m. to 10:28 a.m.)

Paz, Brittany                                                02-15-2022

---

78

1        THE VIDEOGRAPHER:  We are back on the
2 record at 10:28.
3    Q.  (By Mr. Ogden) Ms. Paz, we just got back from a
4 break.  I -- I observed you walk back into the room with
5 Ms. Blott and the documents that you brought with you
6 today.
7        Were -- did you -- were you able to go
8 through those documents during the break?
9    A.  I did not look through the entirety of the
10 documents.  I flipped through it.
11    Q.  Before we call the Court and inform the Court
12 that the question -- a question has been asked verbatim
13 of Topic 4 on the deposition notice, the witness has
14 informed us that the responsive information might be in
15 the set of documents that she brought with her today and
16 she is refusing to look through it to find that
17 information, before we do that, now that we've come back
18 from a break, would you like to change your answers?
19    A.  I don't believe it's in there.
20    Q.  Okay.  So if it's not in there and you didn't
21 bring anything else with you for this case, is it safe
22 to say you're not prepared to discuss Topic 4 today?
23    A.  I can't discuss the exact numbers, but the
24 Google analytics are the ones that I reviewed that have
25 been produced in this case.  So it's in the production,

---

79

1 but I just don't have it in front of me.
2    Q.  Right.  I understand the -- I mean, there's
3 81,000 pages of documents.
4        You understand that you're designated here
5 today -- 81,000, that's actually in the Sandy Hook case.
6        In the Fontaine case, it's like 450
7 documents, right?
8    A.  It was a much smaller number.
9    Q.  Right.  And the -- you understand that you're
10 here as the corporate representative to discuss those
11 documents?
12    A.  The 450 pages that you just mentioned?
13    Q.  If the 450 pages contain the information that's
14 listed in a specific topic that you were given to be
15 prepared for?
16    A.  I don't know if the Google analytics were
17 prepared amongst those 450 pages.  I do know that Google
18 analytics were produced in connection with the general
19 Sandy Hook case.  So we did not make a differentiation
20 between the -- this case and Sandy Hook case.  As far as
21 the Google analytics, we produced analytics for all of
22 our landing pages.  Amongst those, would have been this
23 particular article.
24    Q.  You're certain?
25    A.  Right.  So what we did was there were thousands

---

80

1 of landing pages for thousands of articles and thousands
2 of videos, and what I reviewed with Mr. Zimmerman were
3 the thousands of -- that Google analytics page that had
4 those thousands of landing pages.
5        Do I believe those were produced?  Is that
6 what you're asking?
7    Q.  No.  Are you certain that the information for
8 the Fontaine post is in those analytics?
9    A.  Yes.  It would have been in the landing page
10 because it's all of our landing pages.
11    Q.  Okay.  Do you understand, as the corporate
12 representative, you are tasked with being able and
13 prepared to discuss the analytics of that post?
14    A.  Yes.
15    Q.  Okay.  Are you prepared?
16    A.  I can't testify as to the exact number because
17 I just don't have it in front of me.
18    Q.  Okay.  I'll ask my question a simpler way.
19        Are you prepared?
20    A.  I don't have the number in front of me, so I
21 can't espys [sic] the number.
22    Q.  So would that be on the yes side of prepared or
23 the no side?
24    A.  I don't want to agree with your words.
25    Q.  Okay.  I'm not asking you to agree one way or

---

81

1 another.
2        I'm just asking you if you're prepared to
3 discuss Topic 4?
4    A.  And as I've already testified, I can't testify
5 as to the exact number.  I don't have the document in
6 front of me.
7        MR. OGDEN:  Ms. Blott, before we have to
8 call the Court -- I really don't want to.
9        MS. BLOTT:  Is it yes or no?
10        MR. OGDEN:  Thank you.
11    A.  No.  I cannot testify to the number.
12    Q.  (By Mr. Ogden) No, you are not prepared to
13 Discuss Topic 4?
14    A.  No.
15    Q.  Okay.  Let's talk about Topic 5, the analytics
16 for the number of pages used after a retraction was
17 posted on April 2nd, 2018.
18        Are you prepared to Discuss Topic 5 today?
19    A.  That would be the same answer as the
20 previous -- previous one.
21    Q.  Which was, no, I'm not prepared to discuss the
22 topics that were laid out in Plaintiff's Notice of
23 Deposition of a Corporate Representative?
24    A.  As far as the numbers, no.
25    Q.  I'm sorry.

---

Paz, Brittany                          02-15-2022

82

1        As far as the numbers, no, you are not
2 prepared or no --
3    A.  That was your question, yes, are you prepared.
4    Q.  Right.  Okay.  Just making sure.  That was a
5 bad question.  I will be the first one to say I'm gonna
6 ask bad questions; I do it all the time.
7        Okay.  Topic No. 6, the company's
8 knowledge of Mr. Fontaine.
9    A.  (Nodding.)
10   Q.  Are you prepared to discuss Mr. Fontaine?
11   A.  Yes.
12   Q.  Okay.  What did you do to prepare for that?
13   A.  So in addition to speaking to Mr. Daniels, I
14 spoke to -- I think we talked about we spoke to
15 Mr. Salazar.  I spoke to Mr. Jones.  I reviewed the
16 documents that we had and are in the production.  And I
17 think that's the universe of information that I have on
18 that.
19   Q.  Why'd you talk to Mr. Jones about the Fontaine
20 case?
21   A.  I wanted to see what, if anything, he knew
22 about the case.
23   Q.  Did --
24   A.  Which wasn't very much.
25   Q.  Did he know anything?

83

1    A.  No, not really.
2    Q.  You said not really and you said very much.
3        So what did Mr. Jones know about Fontaine,
4 specifically?
5    A.  I don't think he really knew anything except
6 that there was this issue that happened and that it was
7 rectified in a relatively short period of time.
8    Q.  I'm not asking you what you think.  That's what
9 you know.
10   A.  That's what he conveyed to me is what he knew.
11   Q.  Let's slow down.  I promise, I'll let you
12 finish your answer, if you let me finish my question.
13       I'm not asking you what you think.  I'm
14 asking you what you know.
15       So what do you know?
16   A.  I know that he doesn't know anything aside from
17 the article went up and it was taken down in a
18 relatively short period of time.
19   Q.  Okay.  That's Mr. Jones' knowledge of
20 Mr. Fontaine?
21   A.  Right (nodding).
22   Q.  Okay.  What did Mr. Salazar have to say?
23   A.  According to my interview with him, he thought
24 that it -- the article went up relatively late in the
25 afternoon, but there were some red flags relatively

84

1 shortly thereafter within a few hours.  I think it was
2 pretty late in the afternoon, and I think that what he
3 conveyed to me was that there -- I believe people had
4 left for the afternoon already, but that they had talked
5 about it amongst themselves, and that they agreed that
6 it should be taken down, and so it was taken down.
7    Q.  Who is they?
8    A.  According to my conversation with Adan, is he
9 spoke to the other writers.  I want to say one of
10 them -- his name is -- you know what, I'm not really
11 sure the other two names.  There's two other names.  And
12 then had spoken with Kit, and then they all agreed that
13 it had been -- that it should be taken down.
14   Q.  Okay.  If I wanted to know what other two
15 writers were in the editorial discussion as to whether
16 or not to take the post down, how would I ascertain that
17 information?
18   A.  I could -- I could probably get their names.  I
19 just can't remember off the top of my head right now.
20   Q.  How would you get them?
21   A.  I'm sorry?
22   Q.  How would you get those names?
23   A.  I could ask for them.
24   Q.  From whom?
25   A.  From either Mr. Jones or Mr. Salazar or

85

1 Mr. Daniels.
2    Q.  Let's back up a little bit.
3        I thought you said Mr. Jones' knowledge
4 was restricted to only knowing that a post went up and a
5 post came down?
6    A.  He knows who is in his writers -- in his
7 writing department.
8    Q.  Okay.  Are those the only two other writers in
9 his writing department, or are there more?
10   A.  There's a group of three writers that are
11 generally the three main writers.
12   Q.  Who was working that day?
13   A.  I'm sorry.  I don't have that informations in
14 front of me.
15   Q.  Okay.
16   A.  I -- I think we produced an exhibit yesterday
17 that might -- it might have been in there.  But...
18   Q.  And again, might, may, I thinks, I don't want
19 them.
20   A.  Okay.  I'm not sure.
21   Q.  Not fair to jury.
22   A.  All right.
23   Q.  The only job -- you have a couple of jobs
24 sitting in that chair today.  One of them is don't
25 guess.

Paz, Brittany                                    02-15-2022

86

1        And whether or not it's been produced is
2 irrelevant to me.  Because I want to know, as the
3 corporate representative tasked with discussing these
4 topics, what you know.  Okay?
5        Other than the two unknown writers,
6 Mr. Salazar, Mr. Daniels and Mr. Jones, did anyone else
7 at the company have any knowledge of Mr. Fontaine?
8   A.  No.
9   Q.  And I'm saying that from the date of
10 February 4th, 2018, to today.
11   A.  No.  We don't have any other information on
12 Mr. Fontaine.
13   Q.  Okay.  You don't -- no one knows where he
14 lives, correct?
15   A.  I believe I read in an article he lives in
16 Massachusetts.  But other...
17   Q.  Was it an Infowars article?
18   A.  No.
19   Q.  So then why do I care?
20   A.  That's why I'm saying.  You're asking me what I
21 know, and I'm telling you what I know.
22   Q.  On behalf of -- I'm not asking for your
23 personal knowledge.  I'm asking you your knowledge as
24 the corporate representative.  And I know it's a
25 confusing topic for people that don't do this all the

87

1 time, and I'm trying to be patient with you.
2        But when I say what you know, it means
3 what you know, based on the list of instructions on
4 information you were supposed to go and prepare.
5   A.  And I do know it based on that, because it was
6 in the production.
7   Q.  Okay.
8   A.  I didn't do any independent research, if that's
9 what the question is.
10   Q.  Okay.
11   A.  I read it in the production.
12   Q.  When you read it, did you ask:  Hey, where'd
13 this come from?
14   A.  Where did the piece of paper in the production
15 come from?
16   Q.  Correct.
17   A.  No.  I didn't ask where it came from.
18   Q.  Did you ask who pulled it and why?
19   A.  No.
20   Q.  Okay.  Did you ask where this was saved?  Are
21 there any others in that folder?
22   A.  In what folder?
23   Q.  Whatever folder this was in.
24   A.  I don't know what folder you're talking about.
25 It was in -- amongst the production material in the

88

1 Dropbox for this particular case.
2   Q.  Okay.  So an attorney gave you a document to
3 review, and you saw that it contained information about
4 the plaintiff, right?
5   A.  Information about where he lived, yes.
6   Q.  Information about the plaintiff.  Not splitting
7 hairs here.
8   A.  Right.
9   Q.  And so then when you got the deposition notice
10 and you saw the company's knowledge of the plaintiff,
11 and you were like, oh, that document definitely is
12 knowledge of the plaintiff, you didn't ask any
13 follow-ups as to, hey, where'd this come from?  Why?
14 When?
15   A.  I didn't really think it was a relevant
16 question just 'cause it was clearly not our article.
17   Q.  So it's -- does this ask for the knowledge of
18 Infowars' articles of the plaintiff?
19   A.  No.
20   Q.  No.  It isn't.
21        Other than that one article, were there
22 any other articles that you came across or that were
23 given to you?
24   A.  There were numerous articles in the production.
25   Q.  About Mr. Fontaine?

89

1   A.  About the issue for which he is suing, about --
2 I don't know if there's any more personal information
3 about him, other than where he lives in the articles.
4 But there were numerous articles.
5   Q.  Okay.  Is it all in that production?
6   A.  This production (indicating)?  It's not in this
7 production.
8   Q.  Is it in the previous production of the
9 Fontaine case?
10   A.  That's where I saw it on the Dropbox.
11   Q.  Did you do any -- did you do any searching on
12 your own to figure out if there were any other documents
13 about Mr. Fontaine at Infowars that were not in the
14 production?
15   A.  Did I independently do a search?
16   Q.  Right.  Because yesterday you said that you did
17 a pretty in-depth search in the Sandy Hook case while
18 you were at Infowars searching for documents and
19 different things.
20        And so I'm asking you:  Did you do the
21 same thing in the Fontaine case?
22   A.  Well, yesterday what I testified to was I did a
23 search trying to -- trying to narrow down documents that
24 I should look at.  So I did a search regarding search
25 terms.

Paz, Brittany                                    02-15-2022

90

1        Is that what you're referring to?  Did I
2 do the same thing here?
3    Q.   Let's break this down.
4        Did you do a search -- when you did the
5 search in the Sandy Hook case preparation --
6    A.   Yes.
7    Q.   -- was that search limited to only the
8 documents that have been produced, or was that at
9 Infowars -- you know, their -- their email servers or
10 going through their files or that kind of thing?
11   A.   No.  I didn't do any -- I didn't do that, no.
12   Q.   So you relied on the documents that were given
13 to you by an attorney?
14   A.   Right.
15       (Sotto voce conversation between Mr. Ogden
16        and Mr. Bankston.)
17   Q.   (By Mr. Ogden) I just conferred with my
18 co-counsel, and he went through the indexing of the
19 first set of production.  And last night he and I had
20 the benefit of going through the new set of production.
21 We don't see any of the articles that you're talking
22 about.
23   A.   I'm sorry.
24   Q.   We don't see any of the articles that you're
25 talking about referencing where Mr. Fontaine lives, what

91

1 state he lives in, anything like that.
2    A.   I disagree.  I remember -- I recall
3 specifically reading articles.
4    Q.   Okay.  Show me.
5    A.   I don't have the entirety of the production
6 that has been produced in this case.  I have the
7 supplemental production, but I don't have that
8 production.
9    Q.   You have -- so all this -- all this information
10 was sent to you on Dropbox; is that true?
11   A.   Right.
12   Q.   You keep this in Dropbox.
13       Okay.  Did you bring your computer today?
14   A.   Sure.
15       MR. OGDEN:  Okay.  Let's take a break.
16 Let her pull her computer out and find the documents in
17 the production that she has in the Dropbox, and then she
18 can point us to what she's talking about.
19       THE VIDEOGRAPHER:  We are off the record
20 at 10:42.
21       (Recess from 10:42 a.m. to 11:02 a.m.)
22       THE VIDEOGRAPHER:  We are back on the
23 record at 11:02.
24   Q.   (By Mr. Ogden) We just took a break so that you
25 could look through some materials on your computer to

92

1 find the document that we were talking about.
2        The stack of documents that's next to you,
3 is that the production that was made last night?
4    A.   I believe so, yes.
5    Q.   Okay.  Can you flip to the last page.
6    A.   (Witness complies.)  Okay.
7    Q.   Okay.  Can you read Bates number on it?
8    A.   The last one?
9    Q.   Yes, ma'am.
10   A.   DEFS000334.
11   Q.   Okay.  The article we were talking about that
12 identifies personal information about Mr. Fontaine,
13 what's the Bates number on that?
14   A.   This one says Fontaine 001103 through 1104.
15   Q.   Okay.  That would signify that there are 1104
16 pages of production, correct?
17   A.   I don't know how these Bates numbers are
18 produced, but I think that's accurate, yep.
19   Q.   Okay.  Because when I asked you earlier how
20 many documents were involved, we -- it appeared the
21 global number of documents was about 425, correct?
22   A.   I think that was the number you put on it, and
23 I said I didn't know how many documents there were, but
24 that it was significantly less than Sandy Hook.
25   Q.   Okay.

93

1    A.   I don't think I ascribe -- subscribed to that
2 number.
3    Q.   Okay.  The -- how many documents, roughly, did
4 you review in the Fontaine case?
5    A.   A few hundred documents, probably.
6 Definitely -- definitely more than a couple hundred
7 documents.  It probably would be in the range of five or
8 600 pages total.
9    Q.   So if there are 1,104 pages, it's safe to say
10 you didn't review it all?
11   A.   I don't know if that's the end of production.
12   Q.   That's fine.
13   A.   Yeah.
14   Q.   But if there are 1100, you didn't look at 1100?
15   A.   I don't know that I looked at 1100 pages, no.
16   Q.   Probably more like half?
17   A.   I don't know how many.
18   Q.   Do you know when that document was produced?
19   A.   It doesn't say when it was produced.
20   Q.   What article -- what's the source of that
21 article?
22   A.   You mean where did this article come from?
23   Q.   Yes.
24   A.   I don't know how it came to be in our
25 possession.  I know it appears to be a -- American

Paz, Brittany                               02-15-2022

94

1 Statesman article dated 4/2/2018. But, otherwise, I
2 don't know where else it came from.
3     Q.   Okay. You don't know who -- who in Infowars
4 found it, saved it, anything like that?
5     A.   That's assuming anybody at Infowars did do
6 that. I don't know if that's accurate.
7     Q.   Okay. So this production could have come from
8 outside of Infowars and someone slapped a Fontaine
9 sticker on it?
10    A.   No. Someone could have sent it to us. It
11 could have been produced in connection with the
12 litigation by one of our attorneys. I just -- just
13 don't know how it came to be in the company's
14 possession.
15    Q.   Okay. So as far as the knowledge of the
16 defendants, with regards to Mr. Fontaine, you aren't
17 sure where that knowledge came from or how it was given,
18 if at all, to Infowars?
19    A.   Regarding his location in Massachusetts?
20    Q.   Yes.
21    A.   Well, I can testify as to the source of my
22 knowledge of these articles. But as far as how these
23 articles came to be in our possession, no, I don't know
24 that.
25    Q.   Okay. And you understand that you're here to

95

1 testify on how they came -- our possession? It's not
2 your personal knowledge, but you're here to testify the
3 company's knowledge?
4     A.   Yes.
5     Q.   Okay. You can't do that as far as where this
6 document came from when, why, or how?
7     A.   I don't know where this document came from, no.
8     Q.   Okay. Are there any other documents --
9         (Mr. Bankston enters.)
10    Q.   (By Mr. Ogden) -- that contain information that
11 Infowars has on Mr. Fontaine similar to this one?
12        MR. BANKSTON:  Bates number on it. Bates
13 don't go that high in this case.
14        MR. OGDEN:  I agree.
15    Q.   (By Mr. Ogden) There any others, besides the
16 one you're viewing now?
17    A.   Yes. I do recall a report from a psychologist.
18 I believe that might have been produced by plaintiffs.
19 I recall reading a letter from his psychologist or
20 therapist.
21    Q.   Okay. So Mr. Fontaine's personal information
22 was shared with you, and you have not signed a
23 protective order; that's true?
24    A.   I don't have -- I didn't sign anything, no.
25    Q.   So true?

96

1     A.   Yes, that's true.
2     Q.   Did you come across any documents that were
3 stamped confidential during your review?
4     A.   That document may have been stamped
5 confidential.
6     Q.   Do you --
7     A.   I'm not sure.
8     Q.   In general, do you remember any documents?
9     A.   I don't remember anything stamped confidential.
10    Q.   Okay. Other than Mr. Fontaine's mental health
11 records that were given to you by counsel and the
12 article that is Bates labeled Fontaine 1103 and 1104,
13 does the company have any other knowledge of
14 Mr. Fontaine?
15    A.   This might not be the only article that would
16 list his location in Massachusetts. So I don't know if
17 this is the only article. But I think that that's the
18 entirety of what the company knows about Mr. Fontaine;
19 that's correct.
20    Q.   Okay. Did you look at the posts that the
21 company had done that displayed Mr. Fontaine's image?
22    A.   Oh, you mean the -- the specific -- the
23 photograph, you mean?
24    Q.   Any -- any post that the company has made --
25    A.   I viewed --

97

1     Q.   -- with Mr. Fontaine's photograph?
2     A.   Sure. I viewed the post -- or I should call it
3 an article regarding this -- the Parkland shooting that
4 contained that -- the photograph of Mr. Fontaine.
5     Q.   Did you read the comments?
6     A.   I've read some comments. There -- there are
7 also a bunch of comments on other sites regarding that
8 photograph. But...
9     Q.   Okay. When you were going through -- and I'm
10 gonna mark these Exhibits 2 and 3.
11        (Exhibits 2 and 3 marked.)
12    Q.   (By Mr. Ogden) When you were reviewing the
13 documents that were previously produced in this case --
14 give you some printouts.
15        Do you understand that those are Bates
16 labeled 252 and 296? Do you see that at bottom?
17    A.   I see that, yes.
18    Q.   Okay. Did you come across documents like this
19 when you were reviewing?
20    A.   I did see some photo -- see some pages that
21 looked like this.
22    Q.   Okay. So when you had them, you couldn't
23 access these either, correct?
24    A.   No.
25    Q.   Okay. So when you got them, did you download

Paz, Brittany                               02-15-2022

98

1 them immediately?
2    A.  When I got what?
3    Q.  Well, there's been an accusation in this case
4 that the reason that the production looks like this is
5 because we didn't download them when they were sent;
6 however, we did, and you just verified that you don't
7 have -- yours looked like this, too, correct?
8    A.  What I have in the Dropbox.
9    Q.  Okay.  When -- did you ask anybody, hey, where
10 are these web pages?
11   A.  I think that what you just said was what was
12 conveyed to me, which was, there are links that we no
13 longer have anymore.
14   Q.  Okay.  So who told you that?
15   A.  I don't know if I can testify as to --
16       MS. BLOTT:  Attorney-client --
17   A.  Right.
18       MS. BLOTT:  Objection; attorney-client
19 privilege.
20   Q.  (By Mr. Ogden) Okay.  When were you told that
21 these web pages were no longer available?
22   A.  When I was reviewing the Fontaine material this
23 past week.
24   Q.  Okay.  So it was in the last seven days?
25   A.  Right.

99

1    Q.  Once you informed them that the pages were no
2 longer available, was that the end of the conversation,
3 or did it go any further?
4    A.  When I was informed?
5    Q.  Yes.
6    A.  No.  That was the end of the conversation.
7    Q.  They just said skip over them, we don't have
8 them?
9    A.  They did not say that.  But I can't testify as
10 to what our communications were.
11   Q.  Okay.  Did you skip over them because you
12 didn't have them?
13   A.  I can't review something I don't have.
14   Q.  I can't either.
15   A.  Right.  (Laughing.)
16   Q.  Finding some more common ground, Ms. Paz.
17       Okay.  The -- other than -- is it your
18 understanding that the documents Fontaine 1103 to 1104
19 has been produced to the plaintiffs in this case?
20   A.  I know that we've given over everything that we
21 have.  I -- I know that there have been some production
22 issues as to what's been turned over to you.  So I don't
23 know what's been turned over to you.  I know that it has
24 a Bates label on it, so, to me, that means that it was
25 produced.

100

1    Q.  Okay.  I'm gonna represent to you that I
2 produced this.
3    A.  Okay.
4    Q.  Other than the production that we've provided
5 to defendants, are there any -- is there any other
6 knowledge of Mr. Fontaine that anyone at Infowars has?
7    A.  Based on my review, no, nothing that I can see.
8 If you produced this, then we didn't have this in our
9 original -- in our material.
10   Q.  Okay.  Did you review a letter that was sent
11 after the article went up requesting a retraction and
12 correction?
13   A.  Yes.  I did see that.
14   Q.  Okay.  And the information in that is -- states
15 that Mr. Fontaine is, in fact, not Mr. Cruz and the post
16 is incorrect, correct?
17   A.  That's what the letter says.
18   Q.  Okay.  So that would be knowledge of the
19 plaintiff, as well, correct?
20   A.  I don't think that's knowledge of the
21 plaintiff.
22   Q.  Okay.  Prior to that letter, was the company
23 aware they had posted a picture of the wrong person?
24   A.  Yes.  Because we had taken it down before we
25 received that letter.

101

1    Q.  Okay.  When -- we'll get to that.
2        How did the company -- what information
3 would the company become aware of to take down the post?
4    A.  Just based on my comments -- or, I'm sorry --
5 my communications with Mr. Daniels and interviews, I
6 think that this -- this photograph was originally seen
7 on social media by Mr. Daniels.  He had seen it in a
8 number of places on social media.  He had put it in --
9 it wasn't just unfortunate, it was on other locations on
10 social media.  And then he wrote the article.  The
11 article contained a photograph that says it's -- an
12 alleged picture of the shooter.  And then there were
13 quickly chatter on social media that confirmed that that
14 picture was not of the shooter.  And so based on that,
15 it was felt that that photograph was not accurate and
16 taken down.
17   Q.  Okay.  Where -- where was this chatter?
18   A.  Based on my conversations with Mr. Daniels,
19 the -- it appears that it was on social media.
20   Q.  Okay.  Did Infowars take steps to save any of
21 that?
22   A.  To save what he reviewed?
23   Q.  To save whatever information on social media
24 that he found chattering about the identity of
25 Mr. Fontaine's photo?

Paz, Brittany                                    02-15-2022

102

1    A.   No.  But I will say that in this -- in this
2 material -- I don't know if it's production that you've
3 produced or we've produced -- there is a lot of social
4 media information and chatter talking about the identity
5 of the person in the photograph.  So it could very well
6 have been something like that.  But did -- did the
7 company take any steps to preserve those particular
8 posts, no.
9    Q.   And just for the record, everything you said
10 about the article that you have in front of you marked
11 Fontaine 1103 and 04, that's just conjecture.
12         You have no idea when the company got
13 that, if it ever got it, and if it's ever been reviewed
14 by anybody other than an attorney?
15    A.   This particular document?
16    Q.   Yes, ma'am.
17    A.   I know that it was produced by you because you
18 just told me it was produced by you.
19    Q.   Right.
20    A.   So it's not conjecture.
21    Q.   You don't -- you don't know -- right.  But you
22 said, oh, well, this article has all this information
23 about social media chatter.  But --
24    A.   No.  This -- this article doesn't.  No.
25    Q.   Okay.  Maybe I just misunderstood your

103

1 question.  And, frankly, I think I got what I need out
2 of this.
3    A.   Okay.
4    Q.   The net worth of the company, are you prepared
5 to discuss that?
6    A.   Yes.
7    Q.   Okay.  What did you do to prepare for that
8 topic?
9    A.   So this also was in the binder from yesterday
10 that we marked as Exhibit 8, I believe.  But I do also
11 have another copy of that.  But, essentially, what I did
12 was I sat with Melinda, who does the QuickBooks, and I
13 went through the profit-loss sheet for 2020 -- that's
14 the most recent time that that is -- that information is
15 available -- and we discussed the profit-loss sheet.
16 But I --
17    Q.   Okay.  What else did you do?
18    A.   I discussed with Melinda the structure of the
19 company so that I could understand the reasons why I was
20 seeing what I was seeing and the numbers and the
21 relationship between Free Speech and other companies,
22 such as PQPR, because there are some -- some debts
23 owed -- due and owing amongst the companies.  And I may
24 have -- I think I may have reviewed Alex's tax
25 statements, which I believe you have.  I think that's

104

1 it.
2    Q.   Were they tax statements, or were they bank
3 statements?
4    A.   I think they were his tax returns.
5         MR. OGDEN:  Ms. Blott, I don't have those.
6         MR. BANKSTON:  Yeah, we definitely don't.
7         MR. OGDEN:  What do we do here?
8         MR. BANKSTON:  Because if she reviewed
9 them...
10         MR. OGDEN:  I gotcha.
11         MS. BLOTT:  They were produced in the net
12 worth discovery in the Sandy Hook case; I know that.
13         MR. BANKSTON:  No.
14         MR. OGDEN:  Not in Texas.
15         MR. BANKSTON:  No, they were.
16         Mr. Reeves specifically (inaudible)
17 against that.
18         MR. OGDEN:  While you're looking for that,
19 can I proceed a little bit with this?
20         MS. BLOTT:  Yeah.
21         MR. OGDEN:  Okay.
22    Q.   (By Mr. Ogden) So you discussed with Melinda
23 the company structure, the profit-loss, PQPR, and
24 Mr. Jones' tax statements.
25         Anything else?

105

1    A.   No, that's it.
2    Q.   Are you positive?
3    A.   (Nodding.)  I believe so.  That's -- I think
4 that's it, yes.
5    Q.   Didn't ask if you believe you were positive.
6    A.   That's it.
7    Q.   Okay.  Because yesterday I swore I heard you
8 say that you talked with Dustin Whittenburg.
9    A.   Dustin is the -- is a tax attorney.
10    Q.   What'd you talk to him about?
11    A.   I did not talk to him about the company's
12 profit-loss.
13    Q.   What'd you talk to him about?
14         MS. BLOTT:  I'm gonna object to the extent
15 of attorney-client privilege and any conversations that
16 she had with Mr. Whittenburg.
17    Q.   (By Mr. Ogden) Who's Mr. -- Mr. Whittenburg's a
18 tax attorney for who?
19    A.   I believe he's a tax attorney for the company.
20    Q.   Okay.  I'm not gonna ask you what you talked
21 about; I'm gonna ask why you talked to him.
22    A.   I think that would necessitate I talked to him
23 about what we talked about.
24    Q.   I don't think it would necessitate that.
25         Why'd you talk to him?

Paz, Brittany                                              02-15-2022

---

106

1   A.  Because I felt like maybe I should talk to him.
2   Q.  Why'd you feel that way?
3   A.  To get a better idea about the company, and
4 that was pretty much it.
5   Q.  A better idea about what about the company?
6   A.  Sir, I do believe that these are privileged
7 conversations.
8   Q.  That's fine.  I'm not asking what y'all talked
9 about.  I'm not asking about the communications.  I'm
10 asking your beliefs and feelings going forward in your
11 preparation for yesterday.  And you said that you wanted to
12 talk to him.  And so I'm asking why did you want to talk
13 to him.
14   A.  I didn't specifically ask to talk to him, no.
15 So he came, and I talked to him.  But I didn't
16 specifically request that I talk to him.  I don't think
17 I ever testified that I requested to speak to him.
18        MR. OGDEN:  Can you read back her prior
19 answer.
20        (The record was read as requested.)
21   Q.  (By Mr. Ogden) So you said you talked to him
22 because you wanted a better idea of the company,
23 correct?
24   A.  He was there; I spoke to him.
25   Q.  Not my question.  Not even close.

---

107

1        I said you spoke to him because you wanted
2 a better idea of the company, correct?
3   A.  He was there, and he was available, and I could
4 get a better idea about the company.  So I said I
5 could -- so I figured I would talk to him.
6   Q.  What about the company?
7   A.  About the structure of the company, about
8 the -- how the company runs.  We also talked about some
9 other privileged information.  But that's pretty much
10 it.
11   Q.  Okay.  You do any white collar law?
12   A.  Not usually, no.
13   Q.  During any of your preparation for yesterday or
14 today, were there any instances where you drew concern
15 as far as any ethical duties that may have -- may or may
16 not have been violated by anyone in this case?
17   A.  I'm sorry.  Can you be more specific.
18        Anyone meaning who, like the attorneys?
19   Q.  Anybody you talked to.
20   A.  Did I have a concern about ethical violations
21 by attorneys, by accountants?
22        Can we break that down a little bit.
23   Q.  Sure.
24   A.  Sure.
25   Q.  We'll start with accountants.

---

108

1   A.  Sure.  No, I did not have a concern about
2 ethical violations on the part of the accountants.
3   Q.  Did you speak with Robert Roe?
4   A.  I did.
5   Q.  Okay.  Are you aware of his history in
6 litigation regarding Sandy Hook cases?
7   A.  I'm sorry.  Can you be more specific.
8   Q.  Yeah.  Did you know that -- that the defendants
9 in that case were sanctioned because Mr. Roe had been
10 found by the Court to have manipulated the QuickBooks
11 entries prior to producing them?  Did you know that?
12   A.  I'm aware there was an issue to which there was
13 a profit-loss statement or something to that effect that
14 there were missing lines that weren't produced at the
15 bottom that were subsequently reproduced.  So I'm aware
16 of that issue, yes.
17   Q.  Did you read the Court's order?
18   A.  I did not read the Court's order, no.
19   Q.  Well, how did you find out the information you
20 just regurgitated?
21   A.  I was told that by Mr. Roe and in discussions
22 with counsel.
23   Q.  Okay.  Because I encourage you to go read that
24 order.
25        What about any lawyers?

---

109

1   A.  Do I have concerns about whether lawyers in the
2 case have breached duty to the company?  Is that your
3 question?
4   Q.  Only with regard to anything you came across
5 while preparing for the last two depositions.
6   A.  Anything regarding -- you mean the financial
7 statements or anything in the entire universe of the
8 case?
9   Q.  Anything that you came across in preparation
10 for your depositions.
11   A.  I did have concerns on behalf of the company
12 regarding the company's prior representation, yes.
13   Q.  What about it?
14   A.  The company's prior lawyers.
15   Q.  Okay.  What about them?
16   A.  I think that there are issues that there have
17 been -- even though the company has produced material to
18 its at- -- attorneys, has not been produced
19 appropriately and has resulted in many, if not all, of
20 the sanctions.
21   Q.  Would that be in the Texas cases or the --
22   A.  Both.
23   Q.  -- Connecticut?
24        Okay.  Any lawyers in specifics?
25   A.  I think that there are specific issues

---

Paz, Brittany                                    02-15-2022

110

1 regarding Mr. Randazzao but -- although he doesn't have
2 an appearance in this file, and Brad Reeves, and perhaps
3 the -- I can't remember his name before him.
4    Q.   There's six.
5    A.   There's a bunch.  And I agree with you, yes.
6    Q.   Okay.  So Brad Reeves, Mr. Randazzao -- I'll
7 just go -- Mr. Enoch.
8    A.   I'm not sure about Mr. Enoch.  I think he's --
9 he's done a pretty decent job.
10   Q.   T. Wade Jefferies?
11   A.   I'm sorry.  I don't know much about him.  I
12 don't have an opinion about him.
13        MR. OGDEN:  Burnett?
14        MR. BANKSTON:  Michael Burnett.
15   Q.   (By Mr. Ogden) Michael Burnett?
16   A.   I don't have an opinion about him either.
17        MR. BANKSTON:  Bob Barnes.
18   Q.   (By Mr. Ogden) Bob Barnes.
19   A.   Barnes.
20   Q.   You did have an issue with him?
21   A.   Yes.
22   Q.   Okay.
23        MR. OGDEN:  Is that Whitehurst --
24        MR. BANKSTON:  It's Wilhite.
25   Q.   (By Mr. Ogden) Wilhite?

111

1    A.   Oh, I'm sorry.  I don't have an opinion about
2 him either.
3    Q.   And Ms. Blott?
4    A.   I think Ms. Blott is fabulous.
5    Q.   I think she is, too.
6         Okay.  With regards to Mr. Randazzao, what
7 were your kind of issues you took with his
8 representation?
9    A.   I think -- the company thinks that there have
10 been attempts by Mr. Randazzao to gain entry into Texas
11 pro hac vice.  Those attempts were unsuccessful
12 ultimately.  But while those issues were pending, there
13 were orders and time lines and deadlines and scheduling
14 orders that were in place that weren't being responded
15 to in a timely fashion.
16        There's also some issues regarding the
17 organization.  I think we already talked about the Bates
18 stamp and how they're not necessarily organized
19 appropriately so we know which -- what was produced
20 where.  I think I said that yesterday, as well, that I'm
21 not really sure what documents were produced in which
22 cases.  And that's a problem with the organization
23 amongst the attorneys.
24   Q.   I want to -- and I assume that was the problem
25 for Mr. Barnes, Mr. Reeves, and Mr. Randazzao?

112

1    A.   Yes.  I'm -- I'm not really sure which time
2 periods are overlapping and who was responsible for
3 what.  But, generally, based on my discussions, those
4 were my issues.
5    Q.   And we'll just go in order.  We'll start with
6 Mr. Randazzao.
7         So while his pro hac was pending, his
8 representation of the company caused a disorganization
9 and inability to tell whether or not something had or
10 had not been produced, correct?
11   A.   Right.  What -- and, also -- I don't even know
12 whether he was communicating to us about what needed to
13 be produced or what was still outstanding, if there was
14 anything outstanding.  So, in general, there were a lot
15 of issues regarding production.
16        THE WITNESS:  Here.  (Handing phone to
17 Ms. Blott.)
18   Q.   (By Mr. Ogden) Mr. Randazzao, was he in charge
19 of the litigation?
20   A.   At what time?
21   Q.   When he was involved.
22   A.   I don't know the time period.  I'm sorry.  I
23 know there's a lot -- there's some overlap.  There were
24 six or seven other attorneys at various points, so I
25 don't know the time period.

113

1    Q.   I'll just say this:  At some point since the
2 Sandy Hook and the Fontaine case have been filed,
3 Mr. Randazzao was representing the defendants in these
4 defamation suits?
5    A.   Yes.
6    Q.   Okay.  As he was doing his representation in
7 the litigation, did -- did he have an explanation as to
8 when he would be pro hac -- filing a motion for pro hac
9 vice or, you know, kind of anything like that?
10   A.   You mean to the company?
11   Q.   Or -- correct.  To the client -- his clients.
12   A.   I think those -- he was having those
13 conversations ongoing about getting admitted.  But we
14 were not being informed as to, you know, the issues
15 regarding the production and the time lines with the
16 case.
17   Q.   And at that point, he was in charge of --
18   A.   I believe so.  But I could -- like I said, I
19 don't know what dates.  There's -- there's those
20 overlaps.
21   Q.   Okay.  Yeah.  I went over this a little bit
22 with Mr. Shroyer in his deposition, and I'll ask you the
23 same thing.
24        Based on the information that you just
25 testified to, is the company -- has the company decided

Paz, Brittany                                                     02-15-2022

---

114

1 one way or another on legal malpractice as a potential
2 asset?
3    A.  We have not decided on -- made any final
4 decisions on legal malpractice yet.
5    Q.  Okay.
6    A.  As to whether to file or who to file against,
7 we've not made any final decisions on that.
8    Q.  Okay.  Is it being -- has it been discussed or
9 is it going to be discussed?
10    A.  It's being discussed.
11    Q.  I would ask that should that discussion happen
12 and that go forward, that the plaintiffs in this case,
13 as a potential creditor, just be made aware, because
14 that could be a potential asset to the company.
15    A.  Sure.
16    Q.  Was the company at all aware -- did
17 Mr. Randazzao inform the company at any --
18         (Phone ringing.)
19         MS. BLOTT:  I'm stupid.  Can we go off the
20 record a minute.
21         MR. OGDEN:  Do you need to take that?
22         MS. BLOTT:  No.  I need to --
23         Are we off the record?
24         THE REPORTER:  No.
25         MS. BLOTT:  Okay.  I'm older than you

---

115

1 guys.  I don't know how to make it quit ringing.  Let me
2 just turn it off.  And I sincerely apologize.
3         MR. OGDEN:  Hold the power button.
4         THE WITNESS:  The power button.
5         MS. BLOTT:  My son just bought this for
6 me.
7         Is this the power button?
8         (Siri responds:  Interesting question.)
9         MS. BLOTT:  So y'all can all laugh at me.
10 Okay?
11         (Siri responds:  I'm sorry.)
12         MS. BLOTT:  Oh, fuck you.
13         I'm sorry.  I apologize for my language.
14         THE WITNESS:  See, as to your question, I
15 said she's fabulous; that's why.
16         MS. BLOTT:  Why?  Because I don't know how
17 to work an iPad?
18         THE WITNESS:  More so your language.
19 But...
20         MS. BLOTT:  I apologize.
21         THE WITNESS:  I just proved the veracity
22 of my opinion.
23         But go ahead.
24    Q.  (By Mr. Ogden) At any point during these
25 proceedings, did Mr. Randazzao inform the company that

---

116

1 he was practicing law in Texas without a license and
2 without any order on the pro hac vice?
3    A.  I don't -- I don't know the answer to that.
4    Q.  (By Mr. Ogden) Okay.  Did Mr. Randazzao ever
5 work on the preparation of any pleadings or motions or
6 documents involved in this -- in these two actions in
7 Texas?
8    A.  I don't -- I don't know the answers if he -- if
9 he worked on them, like, as in drafts.  I know he didn't
10 sign them because he couldn't sign them and file them.
11 But I don't know if he worked on them, no.
12    Q.  Okay.  Did Mr. Randazzao give any legal advice?
13    A.  To the company?
14    Q.  Yes.  Specific to the actions in Texas.
15    A.  I mean, he represented the company.  So...
16    Q.  Okay.
17    A.  I -- I believe that that's a yes answer.
18         MS. BLOTT:  Don't guess.
19    A.  I mean, I haven't had any conversations with
20 Mr. Randazzao, so I don't --
21    Q.  (By Mr. Ogden) Did --
22    A.  -- know for sure.
23    Q.  -- did you receive -- we'll go back up to the
24 net worth.  Well, because this is kind of all tied into
25 it.

---

117

1    A.  Sure.
2    Q.  When you talked with Mr. Whittenburg, did he --
3 did you review any document that he gave you?
4    A.  I never spoke to Mr. Whittenburg.
5    Q.  Okay.  I thought you had conversations with --
6 with Dustin Whittenburg.
7    A.  Oh, I'm sorry.  That's his name.  I didn't know
8 his last name.  You're right.  I did talk -- talk to
9 Mr. Whittenburg.
10    Q.  Did you review any documents when you spoke
11 with him?
12    A.  No.
13    Q.  Okay.  He didn't show me anything.
14         MR. BANKSTON:  Circle back on those tax
15 documents, too.
16         (Brief pause as Mr. Ogden goes through
17         documents.)
18         MR. OGDEN:  This is gonna be Exhibit 4.
19         (Exhibit 4 marked.)
20    Q.  (By Mr. Ogden) Did you review this prior to
21 today?
22    A.  No.
23         MR. BANKSTON:  Oh, that's the number --
24    Q.  (By Mr. Ogden) You did -- you said you did not
25 look at the discovery responses?

---

Paz, Brittany                                    02-15-2022

118

1   A.   I don't think I saw this, no.  (Shaking head.)
2   Q.   Okay.
3   A.   Aside from the pleadings -- the petition, I
4 think -- I think the petitions were the only pleadings I
5 reviewed.  So, no, I didn't read this.
6   Q.   I'll point you to Request for Production No. 4
7 on Page 3.
8   A.   Okay.
9   Q.   And Request for Production No. 4 on Page 3
10 says, all communications within Infowars relating to the
11 plaintiff, the article in question, or efforts to
12 ascertain the identity of the Douglas High School
13 shooter.
14   A.   I see that.
15   Q.   In response, the answer is:  After a diligent
16 search, no responsive documents in Free Speech Systems'
17 possession, custody, or control were identified.
18   A.   I see that.
19   Q.   Okay.  Can you tell me what this search --
20 how -- who did the search?
21   A.   So after speaking to Mr. Daniels, once we were
22 informed that there was going to be a lawsuit, he
23 searched through his personal computer.  He searched
24 through his phone, and, I believe, searched through
25 anything that would have been on his computer at work,

119

1 and there was nothing found.  So we -- we didn't have
2 anything in our custody.
3   Q.   Okay.  So it was -- there was just Mr. Daniels
4 doing the search?
5   A.   Mr. Daniels searched his -- his specific phone
6 and computer, and I believe -- I'm sorry -- let me just
7 amend my response.  I think that also we --
8   Q.   I don't want thinking.
9   A.   Because we did search our emails, and that was
10 not done by Mr. -- by Mr. Daniels.
11   Q.   Okay.
12   A.   So we did search the emails, as well.
13   Q.   Okay.  Who searched the emails?
14   A.   I don't know the identity of the person who
15 searched the emails.  I'm not -- I'm not sure.  I
16 think -- and, like I said, I'm not sure.  So...
17   Q.   Then we can end it there.
18   A.   Right.
19   Q.   I don't know is -- is an answer that --
20   A.   I'm not sure.
21   Q.   Okay.  And how do you know that they -- that
22 someone did an email search?
23   A.   Because we've produced many thousands of pages
24 of emails.
25   Q.   In this case?

120

1   A.   In the -- amongst the two cases.  I don't know
2 in this case specifically, but I know we've produced
3 many thousands of emails.
4   Q.   Have any emails at all been produced in this
5 case regarding Mr. Fontaine or specifically the
6 information requested in requests for production?
7   A.   I don't believe that we had any responsive
8 emails on Mr. Fontaine.
9   Q.   I didn't ask if you believed if you did.  I
10 asked if --
11   A.   We did not produce any emails because there
12 were no responsive emails on Mr. Fontaine.
13   Q.   Okay.  What -- when was the search done?
14   A.   I'm sorry.  I don't know the answer to that.
15   Q.   Okay.  What were the searching and culling
16 terms?
17   A.   Because I don't know who did the search, I'm
18 not sure who -- who did the search terms.
19   Q.   Okay.  Did you -- when you came and did your
20 interviews with members of the company, were you given
21 any sort of restrictions on your access of who you could
22 talk to?
23   A.   No.  (Shaking head.)
24   Q.   Okay.  Did you ask who did the search?
25   A.   I don't remember.

121

1   Q.   Did you ask when the search was done?
2   A.   Well, so here -- here's the reason why I don't
3 know is just because I know we have been dealing --
4 there was a -- some third-party person, and I'm not
5 really sure who or when that was.  So I -- no, I'm not
6 sure.
7   Q.   So you mean third party as in the defendants
8 hired a person from a different company to search their
9 own system?
10   A.   No.  I don't know necessarily search.  I know
11 that was there was a mirror image done of our hard
12 drives, and I don't know who did that.  But I don't know
13 who did the search, if it was that third party or
14 someone in the company.  It may very well have been
15 Mr. Zimmerman, but I don't know.
16        (Sotto voce conversation between Mr. Ogden
17        and Mr. Bankston.)
18        MR. OGDEN:  Okay.
19   Q.   (By Mr. Ogden) And did you ask Mr. Zimmerman if
20 he did the search?
21   A.   You know what, I may have, but I just -- I
22 don't remember, as I sit here right now.
23   Q.   Did you ask Mr. Zimmerman what searching and
24 culling terms he used in the ESI?
25   A.   That's assuming he did it.  I don't know.

Paz, Brittany                                          02-15-2022

---

122

1   Q.   Okay.  Did you ask him if he was aware of who
2 did it?
3   A.   You know what, I don't recall.
4   Q.   Do you know when this third party imaged the
5 defendants' ESI system?
6   A.   No.
7   Q.   Okay.  Do you remember how you became aware
8 that a third-party contractor had imaged the hard drives
9 at the defendants' place of business?
10   A.   I know that based on my discussions with
11 counsel that there had -- that had been done.  I just
12 didn't know how or when.
13   Q.   (Inaudible.)
14   A.   I'm sorry?
15   Q.   I said excuse me.  Water went down the wrong
16 pipe.
17         Okay.  So earlier you gave me a definitive
18 response that there are no communications, correct?
19   A.   I'm sorry.  Communications regarding Requests
20 for Production 4?
21   Q.   Yes.
22   A.   Yes.
23   Q.   Okay.  And you've given me the affirmative.
24         You're not saying you're not sure; you're
25 saying there are none, correct?

---

123

1   A.   Based on my review of the documents -- and I
2 know we've produced the document -- everything that we
3 have -- we do not have anything regarding Production
4 No. 4.
5   Q.   And the documents you reviewed were based on a
6 search that you do -- that you have no idea what the
7 parameters are, correct?
8   A.   You mean my search?
9   Q.   No.
10   A.   My search through the documents?
11   Q.   The documents were given to you by lawyers,
12 correct?
13   A.   Right.
14   Q.   Those documents were the result of someone
15 doing a search, correct?
16   A.   Yes.
17   Q.   You have no idea what was searched for,
18 correct?
19   A.   No, I don't know.
20   Q.   You don't know what terms -- searching terms or
21 culling terms were used, correct?
22   A.   No, I don't.
23   Q.   You don't know when it was done?
24   A.   No.
25   Q.   And you don't know who did it?

---

124

1   A.   No.
2   Q.   Okay.  And based on those four points, you are
3 sitting here today definitive -- definitively telling
4 this jury that no communications exist, correct?
5   A.   Whatever -- whatever we had, we produced, and
6 we don't have anything.
7         MS. BLOTT:  It's yes or no.
8   A.   No.
9         MS. BLOTT:  Sorry.
10   Q.   (By Mr. Ogden) I'm sorry.
11         And that question was -- well, a little
12 winded.
13         But based on that, you're telling this
14 jury that there are no communications that exist,
15 correct?
16   A.   Yes.
17   Q.   Okay.  Would you -- as -- you know, I'm not
18 even asking you as a lawyer.
19         Do you think that that is a reliable basis
20 to come to that conclusion under oath swearing to God?
21   A.   I know that we've produced everything that we
22 have on Mr. Fontaine, so, yes.
23   Q.   So you believe that you have reliable
24 information to make that conclusion to the jury?
25   A.   Based on my review and my communications with

---

125

1 the interviews.  (Nodding) yes.
2   Q.   Okay.
3   A.   We produced everything.
4   Q.   By based on your communications, you mean the
5 conversation you had with Mr. Zimmerman that you don't
6 even remember?
7   A.   I don't remember the whole thing.  I spoke to
8 Mr. Zimmerman a long time.
9   Q.   But you don't remember anything about the
10 definitive answer you're now giving the jury, correct?
11   A.   I don't know anything about who did the search.
12   Q.   Or if he did?  When?
13   A.   He -- yeah.  I don't know the specifics of
14 that; that's correct.
15   Q.   Okay.  Gonna mark this Exhibit 5.
16         (Exhibit 5 marked.)
17   Q.   (By Mr. Ogden) Earlier you said you hadn't
18 reviewed any of the pleadings or responses in discovery.
19         Is that true for this document, as well?
20   A.   Yes.
21   Q.   Okay.  I want to focus on Request for
22 Production No. 1.
23   A.   Okay.
24   Q.   Produce any documents which show what time on
25 February 14th, 2018 the challenged image was published

---

Paz, Brittany                                    02-15-2022

126

1 on Infowars dot com.

2          The response says, Defendant will produce
3 any additional responsive documents in its possession,
4 custody, or control, correct?

5   A.  That's what it says.

6   Q.  Okay.  When was the document first published,
7 at what time?

8   A.  Based on my conversations with Mr. Daniels, it
9 was published late in the afternoon, probably around
10 4:00 p.m.  That's...

11   Q.  So answer to my question is I don't know
12 exactly, true?

13   A.  I -- I don't know exactly what time.  But based
14 on my conversations with Mr. Daniels, it was late in the
15 afternoon.

16          (Sotto voce conversation between Mr. Ogden
17          and Mr. Bankston.)

18   Q.  (By Mr. Ogden) Earlier, you said once we were
19 infer- -- informed that a lawsuit may be coming.

20          Do you remember that, when you said that?

21   A.  In response to what question?  I'm sorry.

22   Q.  This lawsuit, anything that you -- do you know
23 when the company was informed there may or may not be a
24 lawsuit?

25   A.  When we received your letter.

127

1   Q.  Okay.  Do you remember the date on that?

2   A.  I don't remember the exact date.

3   Q.  Okay.  Would you -- is it safe to say that once
4 that letter was received, efforts were made by the
5 defendants to preserve evidence?

6   A.  (Nodding) yes.

7   Q.  Okay.  What were those efforts?

8   A.  As I had testified to earlier, Mr. Daniels was
9 made aware of the letter, and he made efforts to search
10 through his devices and report back whether there was
11 anything responsive.

12          And as I also testified, I don't know
13 exactly when those searches were done for emails.  So I
14 can't really respond to it for the emails end of it.
15 But...

16   Q.  So you can respond for Mr. Daniels,
17 specifically, but not really for the company in any way,
18 true?

19   A.  Regarding the emails?

20   Q.  Regarding the preservation of evidence.

21   A.  Regarding the preservation of the information
22 on Mr. Daniels' devices, I can.

23   Q.  Right.

24   A.  For the company.

25   Q.  And the rest of the company?

128

1   A.  You mean -- you mean other individuals besides
2 Mr. Daniels?

3   Q.  Well, I'll give you a very specific one.

4          The original post --

5   A.  Uh-huh.

6   Q.  -- was that preserved?

7   A.  I thought that -- you know, I don't -- I don't
8 want to know -- say if I read the original post.  But I
9 do remember seeing the article as it is in current form,
10 but I don't know if I read -- saw the original post.

11   Q.  So you don't -- sitting here today in a
12 defamation lawsuit against the defendants, you're
13 sitting as the corporate representative for the
14 defendants, and you're not sure if you've even seen the
15 defamatory post?

16   A.  The defamatory post was taken down the very
17 next day.  And so in its current form or in its original
18 form was not preserved because we did not receive that
19 preservation email from you or letter until after it was
20 already taken down.

21   Q.  How do you know?

22   A.  Because we received that letter many weeks
23 later.

24   Q.  You said you didn't know when you received the
25 letter.

129

1   A.  I don't know the exact date, but it was way
2 after we took it down.

3          (Sotto voce conversation between Mr. Ogden
4          and Mr. Bankston.)

5   Q.  (By Mr. Ogden) Are you aware -- I'm gonna
6 represent to you that our letter was sent to you on
7 February 26th.

8   A.  Okay.

9   Q.  I'm going to then represent to you that this --
10 there was no response and that a lawsuit was filed on
11 April 1st.  Okay?

12   A.  Okay.

13   Q.  I'm then going to represent to you that the
14 retraction and -- in its current form, as you've
15 referred to it as, was done on April 2nd, the next day.

16   A.  The post was taken down on February 15th.  So
17 10 days before your letter -- or 11 days before your
18 letter.

19   Q.  The post was or the...

20   A.  The article was revised on February 15th.

21   Q.  To -- to say what?

22   A.  To take out the defamatory language.

23   Q.  Okay.  So you would -- one thing we can agree
24 on, there was defamatory language?

25   A.  I think that the photograph representing that

Paz, Brittany                                    02-15-2022

130

1 it was Mr. Fontaine was not accurate and represented him
2 to be a -- potentially the shooter at Parkland.  So it
3 was removed on February 15th, along with the language
4 saying this is the alleged -- alleged photo of the
5 shooter was removed.
6   Q.   When was the retraction done?
7   A.   I don't know the date.
8   A.   April 2nd.
9   A.   Okay.
10   Q.   Did you your -- did you read the letter that
11 plaintiffs sent on February 26th?
12   A.   Yes.  I saw the letter.
13   Q.   Okay.  Based on that, do you have -- did --
14 were you able to learn why defendants did not, pursuant
15 to the statute, do a proper retraction until after the
16 deadline that's in the statute?
17   A.   I don't believe that's accurate.  I don't
18 believe we -- we missed the deadline per the statute.
19 And I do believe that we mitigated the -- issue
20 regarding the photograph.
21   Q.   Do you -- do you know if Mr. Fontaine's ever
22 even been to Florida?
23   A.   No, I don't know.
24   Q.   Do you know about the death threats that
25 Mr. Fontaine has received?

131

1   A.   I don't believe I reviewed anything like that
2 in the production.  So, no.
3   Q.   Well, you read our production.  We know,
4 because you cited it, Fontaine 1103, 1104.
5        So you read some of my production,
6 correct?
7   A.   I read some of your production.
8   Q.   In that production, you didn't see any of the
9 horrific things that were said about him online in the
10 comment sections?
11   A.   I'm sure there were horrific things.  Yes.  I
12 read a number of --
13   Q.   I didn't ask you if you were sure there were.
14 I'm asking you if you read them.
15   A.   Yes.  I did read them.
16   Q.   Okay.  So when I asked you whether or not you
17 know about it, I don't want to hear, oh, I'm sure there
18 were.  I want to know whether or not you know.
19   A.   Yes, I know.
20   Q.   Okay.  After reading some of those comments,
21 what did you come away with?
22   A.   I came away with there was a misidentification
23 of Mr. Fontaine as the shooter and that there were
24 negative comments about him as a result.
25   Q.   When you say negative comments, what do you

132

1 mean?
2   A.   Negative comments, not nice comments.
3   Q.   Sure.  Were there any threats?
4   A.   Not that I recall.  But...
5   Q.   Okay.  I encourage you after this depo to keep
6 reading, because there's a lot of them.
7        Is the -- are any of the defendants
8 apologetic for putting Mr. Fontaine through this?
9   A.   Oh, yes.  When I spoke to Mr. Daniels, he was
10 very, very upset, and he is very apologetic.  So, yes.
11   Q.   Usually when you're apologetic, you give an
12 apology to the person, correct?
13   A.   I -- I would disagree with that when --
14 especially when there's ongoing litigation.  So I would
15 disagree with that.
16   Q.   Right.  You would tell your lawyer, and the
17 lawyers would tell each other, right?
18   A.   Tell each other or tell the other lawyers.
19   Q.   The lawyers would tell -- if Mr. Daniels wanted
20 to, at any point, he could have asked Ms. Blott or
21 Mr. Reeves, Mr. Randazzao, Mr. Barnes, Mr. Whitehurt --
22 I forget -- Wilhite, Mr. Enoch, Mr. -- I mean, he could
23 have asked any of them, hey, I would like to apologize
24 to the plaintiff, and that could have been communicated
25 through the lawyers, right?

133

1   A.   I don't know if he was advised not to do that.
2   Q.   (By Mr. Ogden) Oh, so the lawyers may have
3 advised him --
4   A.   I don't know.
5   Q.   -- not to apologize?
6   A.   I don't know the answer to that.
7   Q.   Stop guessing.
8   A.   Yeah.  But you're asking me --
9   Q.   Keep reminding you of that.
10   A.   But you're saying that he could have, and I
11 don't know that he could have because I don't know if he
12 was advised not to.
13        Like, I -- I will traditionally advise my
14 clients who commit offenses and criminal offenses, they
15 may be very apologetic, but they cannot make admissions
16 during the pendency of the case.
17        And so I don't know that he could have
18 done that.
19   Q.   Do you know what happened to Mr. Shroyer after
20 he was -- he -- he communicated an apologetic message to
21 the plaintiffs?
22   A.   Do I know if anything happened to him?  No, I
23 don't know.
24   Q.   So you don't know that -- where he currently
25 stands in this case?

Paz, Brittany                                    02-15-2022

---

134

1    A.   What do you mean?  Can you be more specific.
2    Q.   Whether or not --
3    A.   I know he's still a defendant in the case.
4    Q.   Yeah.  Do you know whether or not he's a -- in
5  negotiations to settle?
6    A.   I can't answer that.
7    Q.   Because you don't know?
8    A.   I don't know.  (Shaking head.)
9    Q.   Okay.  And does -- does -- do any of the
10 defendants contend that they produced documents showing
11 what time the article -- this article in question was
12 originally published?
13   A.   No.
14   Q.   Okay.  I want to go to Request for
15 Production 2.
16   A.   Are we still on No. 5?
17   Q.   Yes.
18        MS. BLOTT:  Would this be a good time to
19 take a break.
20        MR. OGDEN:  If I can get through this one,
21 this will be the last of this document.
22        MS. BLOTT:  Okay.  Thanks.
23   A.   Which one did you say?
24   Q.   (By Mr. Ogden) No. 2.
25   A.   Okay.

---

135

1    Q.   It says a copy of every version of the article
2  in question which was published on Infowars' website.
3        And the response is:  Free Speech Systems
4  has produced responsive documents in its possession,
5  custody, or control.
6    A.   I'm sorry.  Which one are you on?
7    Q.   No. 2.
8    A.   This one says, web browser history for No. --
9  Request for Production 2.
10   Q.   Maybe I did -- oop, you're right.  I'm sorry.
11 I'm on the right one now.
12        No. 2.
13   A.   This is Exhibit 2?
14   Q.   Yes.
15   A.   Okay.  Let me just --
16   Q.   No.  I'm sorry.  This is the exhibit you were
17 on.
18   A.   Oh, it's the same exhibit.
19        Okay.  So which one was it?  I'm --
20   Q.   The one you were on.
21        Produce a copy of any web browser history
22 showing all pages you visited from each web browser on
23 any electronic device you used on February 14th to --
24 2018 to February 15th, 2018, concerning searches or
25 pages related to the challenged publication, the

---

136

1  challenged image, the plaintiff, or your efforts to
2  ascertain the identity of Stoneman Douglas High School
3  shooter.
4    A.   I see it.
5    Q.   Okay.  Response:  None known to exist.
6        What does that mean?
7    A.   It means that at the time this was drafted, we
8  didn't have any knowledge that we -- that existed that
9  had these browser histories that were being requested.
10   Q.   Were there any attempts to -- to search for
11 this information?
12   A.   I -- I don't know.
13        MR. BANKSTON:  Or preserve it.
14   Q.   (By Mr. Ogden) Were there any -- were there any
15 efforts to preserve this information?
16   A.   I don't know.  As I -- as I said, I think we --
17 we -- we asked Mr. Daniels to search his computer.  So I
18 don't know if Mr. Daniels did it.  So I don't know.
19   Q.   Did you ask anybody else?
20   A.   No.
21   Q.   Okay.  So you didn't ask -- you didn't ask any
22 of the individuals that you listed out to us --
23 Mr. Salazar or the two ghost writers that we do not know
24 the identities of, you didn't ask them to preserve their
25 browsing history and to search it?

---

137

1    A.   I don't -- I don't know the answer to that.
2    Q.   Okay.  So --
3        (Sotto voce conversation between Mr. Ogden
4        and Mr. Bankston.)
5        MR. BANKSTON:  There it is right there.
6    Q.   (By Mr. Ogden) So when it comes to the
7  company's efforts to preserve evidence for this case,
8  Topic No. 7 in the notice of deposition, you would not
9  be prepared to discuss any of the preservation of web
10 browsing history, because the only thing that you did
11 was talk to Mr. Daniels?
12   A.   Yes.
13        MR. OGDEN:  We can take a break.
14        THE VIDEOGRAPHER:  We are off the record
15 at 11:57.
16        (Recess from 11:57 a.m. to 12:12 p.m.)
17        THE VIDEOGRAPHER:  We are back on the
18 record at 12:12.
19   Q.   (By Mr. Ogden) Give you Exhibit 6.
20        (Exhibit 6 marked.)
21   A.   Oh, and I don't know if you want the names of
22 the three writers, but I could give that to you, if you
23 want them.
24   Q.   (By Mr. Ogden) Over here.  Go ahead.
25   A.   So it's Adan, Kellan, and Jaimie.  I did not

---

Paz, Brittany                                      02-15-2022

138

1 speak to Kellan and Jaimie, though.
2    Q.   Jaimie a boy or a girl?
3    A.   He's male.
4    Q.   Exhibit 6.
5         We're gonna look at Interrogatory No. 6.
6 It's on Page 3.
7    A.   Okay.
8    Q.   Okay.  It says, list every occasion and every
9 medium by which any employee or agent of Infowars
10 publically posted a link, shared, or otherwise
11 referenced the article in question.
12        Do you understand what that request is
13 for?
14   A.   Yes.  I think you're -- you're asking for
15 whether or not the company or an employee for the
16 company posted the original article about Mr. Fontaine,
17 correct?
18   Q.   It's asking for a list of any time that that
19 post was made, shared, or referenced.
20   A.   Okay.
21   Q.   Okay.  And the answer is kind of long, so I'll
22 go slow.
23        Answer:  As set forth in its general
24 response above, Infowars, LLC does not engage in any
25 business, has no employees, and did not publicly discuss

139

1 or post a link to the article in question, and thus does
2 not have in its possession, custody, or control
3 information responsive to this interrogatory.
4         Free Speech Systems, LLC published a link
5 to the challenged publication on the Infowars dot com
6 website on February 14th, 2018.  The challenged
7 publication was also scraped to NewsWars dot com, but
8 Free Speech does not believe that version of the article
9 published on the site contained the image of
10 Mr. Fontaine, parentheses, because the web archive does
11 not contain a version of the article with the image, end
12 parentheses.
13        Kit Daniels shared a link to the
14 challenged publication on his work-related Twitter
15 account and his work-related Facebook page on
16 February 14th, 2018.  Free Speech Systems, LLC does not
17 have any records of whether or not a link to the
18 challenged publication was -- was posted on social media
19 accounts maintained by Free Speech Systems, LLC,
20 parentheses, including Twitter and Facebook, end
21 parentheses, since those platforms, without notice to or
22 consent from Free Speech Systems, LLC removed all Free
23 Speech Systems -- Free Speech Systems, LLC's content.
24        Did I read that correctly?
25   A.   Yes.

140

1    Q.   Okay.  So the only place that Free Speech
2 Systems published the article with Mr. Fontaine's
3 picture was Mr. Daniels' article -- on Infowars dot com,
4 correct?
5    A.   Yes.  So that's what this answer is saying,
6 yes.
7    Q.   Okay.
8         MR. OGDEN:  I don't have a Tab 7.
9         MR. BANKSTON:  What do you mean?  Tab 7 is
10 this.  We took it out, remember?
11        MR. OGDEN:  Oh, that's right.
12        MR. BANKSTON:  So you just need to go
13 there.
14        MR. OGDEN:  Yeah.  You're right.
15   Q.   (By Mr. Ogden) Okay.  This is gonna be Exhibit
16 No. 7.
17        (Exhibit 7 marked.)
18   Q.   (By Mr. Ogden) Gonna be two pages.  Excuse
19 me -- one page.
20        Here's a copy.
21        Okay.  Have you ever seen this document?
22   A.   I believe I saw this in the materials that I
23 reviewed.  So, yes.
24   Q.   Okay.  And can you describe for the jury what
25 this document is?

141

1    A.   This appears to be a post on social media, not
2 sure which, it might be Facebook or Twitter.  And it's
3 replying to at the Real Donald Trump at CNN and at
4 MSNBC.  And the commentary is shooter was a communist,
5 with a photograph of Mr. Fontaine on the right and an
6 advertisement for Trump 2020 on the left.
7    Q.   Okay.  Gonna hand you Exhibit 8.
8         (Exhibit 8 marked.)
9    Q.   (By Mr. Ogden) So when you click on the images
10 in Exhibit 7, this is the full picture of Exhibit 8,
11 which is a screenshot.
12        You would agree?
13        And I take that as look at the top right
14 of the document.  You can see a cell phone battery,
15 time, all that good stuff.
16   A.   Yes, I see that.  But I guess I don't
17 understand what you're saying.
18        Is if I click on a link on Exhibit 7, it
19 will link me to Exhibit 8?
20   Q.   No.  Exhibit 7 is two photographs.
21   A.   Right.
22   Q.   Okay.  If you click on either of them, you can
23 see the entire photograph.
24   A.   Okay.  Yes.  Yes.
25   Q.   Okay.  And so you understand Exhibit 8 would be

Paz, Brittany                                          02-15-2022

142

1 enlarging the -- the picture on the right of Exhibit 7?
2    A.   I don't -- I don't know that that's true.
3    Q.   Okay.  I'm going to represent to you that
4 that's what we did.
5    A.   Okay.
6    Q.   Okay.  And it doesn't really matter,
7 necessarily, what the stuff at the top is of the
8 screenshot.
9         But if you look at the bottom of it, you
10 can see that that picture was taken from a website.
11        Can you read what website that is?
12   A.   Prison Planet dot com.  WWW dot Prison Planet
13 dot com.
14   Q.   Have you ever heard of Prison Planet dot com?
15   A.   Yes.
16   Q.   Who owns it?
17   A.   I believe that this -- well, actually, I'm not
18 sure, because I know that Mr. Watson has something to do
19 with Prison Planet dot com.  So I'm not sure that he
20 owns it or the -- personally or the company posts on
21 that with his consent.  So I'm not sure.
22   Q.   I'm gonna represent to you that the public
23 filings show that Prison Planet dot com is owned by Free
24 Speech Systems, LLC.
25   A.   Okay.

143

1    Q.   And the reason we went through the last three
2 exhibits is we saw the interrogatory response that I
3 read earlier the said the only place we could find that
4 it was posted was Infowars dot com.
5    A.   Yes.  I see that.
6    Q.   But then when plaintiffs actually go do a
7 search, not with the internal documents, but just what's
8 out in the public, we find that it was also posted on
9 the defendant's other website.
10        So I have to ask, what efforts were made
11 to actually locate responsive information?
12   A.   Well, I don't -- I don't know anything about
13 Exhibit 8.  I've never seen that before, and it wasn't
14 amongst the materials that I reviewed.  So I don't know
15 where it came from.
16        I see what you're -- that you're
17 representing that it was taken from Prison Planet dot
18 com, but I don't have any independent recollection or
19 information that that's where it came from.
20   Q.   Well, you told the jury you'd seen Exhibit 7
21 before, right?
22   A.   Yes.  I've seen this, yes.
23   Q.   And you saw it on your computer, true?
24   A.   Yes.
25   Q.   Okay.  And was it a native?

144

1    A.   You mean could I, from that article, make --
2 click and it would redirect me?
3    Q.   Correct.
4         To CNN or MSNBC or the Real Donald Trump?
5    A.   No.  I couldn't click it.  So it was -- it was
6 just a photo.
7    Q.   Okay.  Well, in the production, these two were
8 right next to each other, correct?  Or did the attorneys
9 who gave you documents leave that one out?
10   A.   I don't remember ever seeing this in Exhibit 8.
11   Q.   If you had seen it, would it have caught your
12 eye?
13   A.   Yes.  (Nodding.)
14   Q.   Okay.  So it's fair to say that this Exhibit 7
15 was the document you did review, but Exhibit 8 was a
16 document you did not review, correct?
17   A.   Right.
18   Q.   Okay.
19   A.   And then -- go ahead.
20   Q.   From this we can establish that there are at --
21 there are additional posts with Mr. Fontaine's
22 photograph that the defendants published, correct?
23   A.   I don't know.
24   Q.   And I will -- and I'll say it like this:  If
25 Exhibit 8 is rendered to be a true and accurate copy of

145

1 a Prison Planet dot com post, that would be an
2 additional publication Defendants made that was not
3 disclosed in their interrogatory answers, which were
4 sworn to be a complete and accurate truth, true?
5    A.   If this, in fact, was published by Prison
6 Planet dot com?
7    Q.   Yes.
8    A.   Yes.
9    Q.   And I will represent to you that if you went to
10 Prison Planet dot com and tried to find this, that it's
11 been taken down.
12   A.   Okay.
13   Q.   Do you know anybody outside of the defendants
14 that would have access to take down posts on a website
15 owned by Free Speech Systems?
16   A.   I don't know how -- I don't know the answer to
17 that.
18   Q.   Okay.  Do you know whether or not any
19 preservation or searching and culling was done on the
20 Prison Planet dot com platform?
21   A.   I don't know.
22   Q.   Other than this photo in Exhibit 8 that shows
23 Prison Planet dot com, did you come across any other
24 Prison Planet dot com postings or information regarding
25 that website?

Paz, Brittany                                        02-15-2022

146

1    A.  No.  I don't recall seeing anything else by
2 Prison Planet dot com.
3    Q.  In your conversations with the individuals you
4 spoke to at Free Speech Systems regarding this lawsuit
5 and evidence preservation, did any of them mention
6 Prison Planet dot com?
7    A.  No.
8    Q.  When you talked with Melinda about the company
9 structures and how they work, did she disseminate any
10 information to you explaining how Infowars' post can end
11 up on Prison Planet dot com?
12    A.  No.  Those conversations were mostly about
13 the -- the structure of the company, not necessarily all
14 the websites that we post content to.
15    Q.  Do you -- sitting here today, do you have an
16 understanding of -- of how Infowars dot com, Prison
17 Planet dot com, Free Speech Systems, and all of the
18 programming at Free Speech Systems, how they're -- all
19 work together and cross-post and republish?  Do you have
20 an understanding of how that works?
21    A.  No.
22    Q.  Okay.  Based on the documents that were
23 produced by the defendants in this case that you
24 reviewed, will you agree that this document was not in
25 there?

147

1    A.  I don't recall seeing it, so I don't -- I don't
2 know -- I don't want to say it's not in there, but I
3 don't recall seeing it.  I recall seeing this photo
4 (indicating) with the picture of Mr. Fontaine and this
5 commentary underneath, R0 shooter is a commie Re,
6 whatever that means.  I recall seeing that.  I've seen
7 it reposted a number of times.  But I don't recall
8 seeing this with the Prison Planet dot com on the
9 bottom.
10    Q.  Okay.  And the -- based on your testimony in
11 this line of questioning, it's fair to say that you
12 don't have any information on the viewership or any
13 analytics for Prison Planet dot com, correct?
14    A.  No.  I don't have analytics for that website.
15    MR. BANKSTON:  Just for the record,
16 because the Bates number's obscured on here because of
17 the document.  You might want to put on the record --
18        (Sotto voce conversation between Mr. Ogden
19        and Mr. Bankston.)
20    MR. OGDEN:  Sure.  For the record
21 Exhibit 8 is Bates labeled Fontaine 000989.
22    Do you know what this one is?
23    MR. BANKSTON:  Oh, yeah.  Oh, that one
24 doesn't have -- might not -- what I think.  Give me one
25 second.  Oh, it is.  It's 991.

148

1        MR. OGDEN:  991.
2        MR. BANKSTON:  Uh-huh.
3        MR. OGDEN:  And then Exhibit 7 is a page
4 from Fontaine 00991.
5    Q.  (By Mr. Ogden) This is gonna be Exhibit 9.
6        (Exhibit 9 marked.)
7    Q.  (By Mr. Ogden) Okay.  I've handed you
8 Exhibit 9, and we're gonna look at Interrogatory No. 3.
9        Interrogatory No. 3 says, if Free Speech
10 Systems, LLC contends there were any publications of the
11 challenged image by a nonparty on February 14th, 2018,
12 prior to the publication of the challenged image on the
13 Infowars website, identify the nonparty publisher, the
14 time of publication, and the location of the
15 publication, such as internet, URL link, newspaper,
16 television, et cetera.
17        The answer is:  Free Speech Systems
18 responds that Kit Daniels visited websites on
19 February 14th, 2018, where he saw the challenged image
20 of Mr. Fontaine, parentheses, prior to the publication
21 of the challenged image on Infowars dot com, end
22 parentheses, including 4chan dot org, Twitter dot com,
23 and other websites, the identities of which he cannot
24 recall.
25        Mr. Daniels does not recall the exact

149

1 times he saw the challenged image on these websites on
2 February 14th, 2018, but it was after the Parkland
3 shooting was reported and before the publication of the
4 challenged image on the Infowars dot com website.
5        Did I read that correctly?
6    A.  Yes.
7    Q.  Okay.  Please tell the jury what efforts were
8 made to preserve the sources that Mr. Daniels allegedly
9 relied on?
10    A.  You mean did we go back to 4chan, Twitter, and
11 other websites, the identities of which Mr. Daniels
12 cannot recall, to preserve what he saw?  Is that what
13 the question is?
14    Q.  Yes.
15    A.  We did not do that.
16    Q.  Okay.  What did you do?  Just ask Mr. Daniels?
17    A.  We asked -- asked Mr. Daniels what his basis
18 for the post was or the article, using the photograph in
19 his article, and he told us.
20        We don't traditionally maintain those
21 types of records.  So whenever -- when we source an
22 article and we're -- you know, we don't take screenshots
23 of the original source to save for later.  We'll link it
24 usually in the article, but we don't -- it's not a part
25 of our records system to preserve every single source.

Paz, Brittany                                          02-15-2022

150

1    Q.  Did you link it here?
2    A.  He did not link it, no.
3    Q.  Okay.  So Mr. Daniels' behavior in this case
4  was abnormal?
5    A.  I -- I think I would agree with that.  He saw
6  a -- some pictures on social media; it had been
7  circulating.  In his opinion, he had seen it in a number
8  of places and that was adequate sourcing.
9    Q.  At the time of this post, who was in
10  Mr. Daniels' position -- his current -- Mr. Daniels'
11  current position as a supervisor role?
12    A.  Right.
13    Q.  Who was the supervisor at that time?
14    A.  Kurt Nimmo.
15    Q.  Kurt Nimmo.
16        So after Mr. Daniels posted this article
17  in an abnormal way that was not standard operating
18  procedure, we'll call it, he was promoted, correct?
19    A.  Promoted in the sense that he currently is a
20  supervisor?
21    Q.  Well, before he posted it, the -- let's say
22  this:  When he woke up on February 14th, he wasn't a
23  supervisor, correct?
24    A.  Right.
25    Q.  And then when he woke up this morning, he was

151

1  the supervisor, right?
2    A.  Yes.
3    Q.  That's a promotion, correct?
4    A.  Yes.
5    Q.  So he was rewarded for what he does for the
6  company and promoted into a -- a more important role,
7  correct?
8    A.  I don't think he was promoted because of this,
9  but he has been promoted, yes.
10    Q.  Okay.
11    A.  I can't say as to why.
12    Q.  Other than the subject post that Mr. Daniels
13  made on February 14th, 2018, have any other Infowars
14  employee -- or, excuse me -- Free Speech Systems
15  employees made defamatory posts and then been promoted?
16    A.  I don't know.
17    Q.  Did you ask why Mr. Daniels was promoted?
18    A.  No.
19    Q.  Did he get a pay raise?
20    A.  I don't know.
21    Q.  You would agree, typically, when you're
22  promoted you get a pay raise?
23    A.  Not necessarily.
24    Q.  Okay.  Okay.  But typically?
25    A.  I -- I don't know whether it happened in this

152

1  case, and I don't want to say that it happened.
2    Q.  I'm not asking if it happened in this case.
3        I'm asking if your understanding is,
4  typically, when someone's promoted to a supervisor role,
5  there's a pay increase?
6    A.  I don't know.
7    Q.  Okay.  If -- I'll let that answer stand for the
8  jury.
9        On February 26th of 2018, you would agree
10  Mr. Daniels' web browsing history was -- existed?
11    A.  On what date?
12    Q.  Excuse me.
13        On February 26th, 2018, you would agree
14  with me that Mr. Daniels' web browsing history from
15  February 14th still existed, true?
16    A.  I don't know.  I don't know how often he
17  cleared -- clears his web browser history.
18    Q.  So you would not be prepared to discuss the
19  evidence perseveration on that specific topic or
20  question?
21    A.  No.
22    Q.  Okay.  Are you aware of any steps that the
23  defendants took to preserve Mr. Daniels' web browsing
24  history?
25    A.  Aside from what I've already testified to, no.

153

1    Q.  Which you've testified to nothing.
2    A.  No.
3    Q.  Correct?
4    A.  That's not accurate.
5        I testified that we requested that
6  Mr. Daniels review his computer and his phone to get the
7  material, and he did so.
8    Q.  When?
9    A.  I don't know when.  It would have been sometime
10  after we received your letter.
11    Q.  Okay.  Could have been a month ago?  Could have
12  been a year ago?  Could have been two years ago?
13    A.  I don't know.
14        MR. BANKSTON:  Who instructed him?
15    Q.  (By Mr. Ogden)  Okay.  Who instructed him?
16    A.  I'm not sure exactly who he spoke to.
17    Q.  So your information on this is purely just
18  Mr. Daniels telling you that someone told him to -- at
19  some point that we just don't know, instructed him to
20  preserve his web browsing history?
21    A.  It's based on my communications with
22  Mr. Daniels, yes.
23    Q.  Did you ask anybody else?
24    A.  About who preserved -- if -- or what
25  preservation efforts were made for the -- for the

Paz, Brittany                                    02-15-2022

154

1 browser history specifically?
2    Q.   Correct.
3    A.   No.  Because he was the only one that would
4 have had access to that.  He would have been -- he was
5 the one that was asked to preserve that.
6    Q.   Right.  But you were tasked with discussing
7 what the company did to preserve, right?
8    A.   Right.  And --
9    Q.   So what did the company do?
10   A.   We asked Mr. Daniels.
11   Q.   Who is we?
12   A.   The company -- I'm not sure who individually
13 representing the company.  But the company asked
14 Mr. Daniels to preserve his -- to go through his
15 materials.
16   Q.   Do you -- do you know who -- who from -- how do
17 you know that it was the company that asked him?
18   A.   You mean do I think it was a lawyer who asked
19 him?
20   Q.   I'm asking you why you keep saying the company
21 did this, but you have no idea who that person is.
22   A.   I just don't know who exactly asked him.
23   Q.   But somebody from the company?
24   A.   (Nodding.)
25   Q.   You're 100 percent certain on that and not

155

1 guessing?
2    A.   I -- I don't know who talked to him.  I
3 don't -- I -- as I said, I don't know who asked him to
4 do it.
5    Q.   So you don't know what the company did or
6 didn't do?  You don't know if the company was the one
7 who asked him, true?
8    A.   I don't know who -- who -- who asked him.
9    Q.   Right.  So you don't know what the company did
10 to -- to preserve this?
11       MS. BLOTT:  Objection; asked and answered.
12       MR. OGDEN:  It's been asked.  I will agree
13 with that.
14   A.   I've answered to the best of my knowledge that
15 I do not know who asked him.
16   Q.   (By Mr. Ogden) Okay.
17       MR. BANKSTON:  She keeps saying that I
18 told him --
19       (Sotto voce conversation between Mr. Ogden
20        and Mr. Bankston.)
21       MR. OGDEN:  Yeah.
22   Q.   (By Mr. Ogden) Yeah.  You mentioned that
23 Mr. Daniels was told by someone, either with the company
24 or not, to preserve his emails and some other items,
25 correct?

156

1    A.   I don't know that he was asked specifically
2 what to preserve.  I think he was asked to go through
3 his phone and his computer to preserve information
4 related to Mr. Fontaine.  I don't know that it was
5 specified what -- what to preserve.
6    Q.   Is that concerning to you that --
7    A.   I don't --
8    Q.   -- somebody said, we need you to go preserve
9 all this; we're not gonna tell you what, but you need to
10 preserve it?
11   A.   Like I said, I don't know if it was
12 communicated to him what to preserve.
13   Q.   Again, same question:  Isn't that very
14 concerning, sitting here where you are right now?
15   A.   No.  I don't know that it didn't happen.  It
16 could have happened.  I just don't know whether it
17 happened or not.
18   Q.   Sure.  And it -- it could -- just as well could
19 have not happened, right?
20   A.   Sure.
21   Q.   Because you're guessing?
22   A.   I'm not guessing.  I'm just saying I don't
23 know.
24   Q.   Any time you say it could have happened, let's
25 be honest with each other, we know what that means,

157

1 right?
2    A.   I don't understand your question.
3    Q.   It means you have no idea.
4    A.   That's exactly what I said.  I don't know what
5 was communicated to him on what to preserve or if there
6 was direction given to him.  I don't know, because I
7 don't know who communicated it to him.
8    Q.   Right.  And you did nothing to find out who
9 communicated it, true?
10   A.   I don't know who communicated it, no.
11   Q.   I didn't say that.
12        I said you, as the corporate
13 representative tasked with this topic, did nothing to
14 find out who made this direction to Mr. Daniels or what
15 they actually told Mr. Daniels to do, correct?
16   A.   No, not correct.  I believe I asked, but I
17 don't think I got a reply or a response or nobody knew
18 for sure.  So...
19   Q.   Who did you ask?
20   A.   I asked Mr. Daniels.  I don't think that he
21 remembered.
22   Q.   Okay.  And you said you didn't get a reply.
23        Was that by text or email?
24   A.   No.  I spoke to Mr. Daniels in person.
25   Q.   Okay.  And then he said, I'll get back to you?

Paz, Brittany                                                    02-15-2022

158

1    A.   No.  He doesn't know.  I don't think he knows
2 who communicated it to him.
3    Q.   Well, you said you didn't get a reply.
4    A.   I think I asked, and the response was --
5    Q.   You did or you didn't?
6         Not you thought.
7    A.   The response I got was that he didn't remember.
8    Q.   Okay.  Did you talk to Mr. Nimmo?
9    A.   I did not talk to Mr. Nimmo, no.
10   Q.   Did you try?
11   A.   I think I -- we talked earlier about I asked
12 Melinda to try to get his number, and I don't -- and she
13 couldn't get it or she didn't have it, so I was not able
14 to talk to him.
15   Q.   Okay.  Did you talk to Mr. Jones?
16   A.   I've spoken to Mr. Jones, yes.
17   Q.   Okay.  About this specifically?
18   A.   About preservation of this -- of this
19 particular article and anything related to it, no.
20   Q.   Okay.  About -- and did you talk to anybody at
21 Free Speech Systems as to who made the decision to
22 instruct Mr. Daniels to preserve evidence?
23   A.   I think what my testimony was, was that I asked
24 Mr. Daniels and he wasn't sure.  But aside from that,
25 no.

159

1    Q.   Okay.  This is gonna be Exhibit 10.
2         (Exhibit 10 marked.)
3    Q.   (By Mr. Ogden) We went over this photo a little
4 bit previously.
5         You've seen this photo, correct?
6    A.   Yes.
7    Q.   And the Bates label at the bottom, DEFS, dash,
8 000106 would identify to you that it has been -- that
9 was in the production the defendants gave to plaintiffs
10 in this case, correct?
11   A.   Yes.
12   Q.   Okay.  Where'd this photo come from?
13   A.   I'm unable to tell just by looking at this
14 document its origin.
15   Q.   Okay.  Where was this located in -- in
16 Infowars' files?
17   A.   I don't know.
18   Q.   Who --
19   A.   There's no way to tell.
20   Q.   Who was tasked with searching and pulling out
21 things like this from Infowars' system?
22   A.   Like I said, I don't know where this came from,
23 so I don't know whether it was in our system, whether it
24 was online, whether we got it on the internet.  I -- I
25 don't know where it came from.  So...

160

1    Q.   One thing:  Did you -- what'd you do to try to
2 find that out?
3    A.   I didn't -- I don't -- I didn't do anything to
4 ask where this came from.
5    Q.   Okay.  Do you know when this was saved or
6 preserved?
7    A.   No.  I don't know how it came to be in the
8 files.
9    Q.   One thing we can agree on that you do know is
10 that this is the photo that was posted in the original
11 article by Mr. Daniels, correct?
12   A.   Yes.
13   Q.   Were there any other photographs of
14 Mr. Fontaine in the original article?
15   A.   No.  It was just this one.
16   Q.   How do you know?
17   A.   Based on my conversations with Mr. Daniels.
18   Q.   Okay.  Other than based on the conversations
19 with the individual who made the defamatory post, how
20 else, if at all -- do you know where this photo -- or if
21 any other photos were in the original post Mr. Daniels
22 made?
23   A.   Well, I can't -- I don't have the original
24 post, so I couldn't look at the original post.  So I
25 asked Mr. -- Mr. Daniels, and it was this was the only

161

1 photo -- or I believe it's the only photo, and there was
2 the commentary saying that he -- this is the alleged
3 shooter.
4    Q.   Okay.
5    A.   I think there was also another photo of
6 Mr. Cruz.
7    Q.   How do you know that?
8    A.   Because the subsequent version of the article
9 still contained a photo of Mr. Cruz.
10   Q.   You say still contained, but you don't know if
11 it was contained in the original post, because you've
12 never seen it, correct?
13   A.   Well, I've never seen it; that's correct.
14        But when I asked Mr. Daniels, his position
15 was the only thing that he did to change the article
16 once it had been up for however many hours it was up was
17 to remove the photo and the -- the commentary related to
18 the photo.
19        MR. BANKSTON:  No.  Don't worry about it.
20 No.
21   Q.   (By Mr. Ogden) Was there any text included that
22 was taken out of the original post?
23   A.   Yes.  I believe -- from what my conversation
24 with Mr. Daniels was that the comment related to this is
25 an alleged picture of the -- of the shooter was removed.

Paz, Brittany                                    02-15-2022

162

1   Q.  Anything else?
2   A.  Aside from that, I don't know.
3   Q.  Okay.
4   A.  But --
5   Q.  Did you ask anyone?
6   A.  Anyone else aside from Mr. Daniels?
7   Q.  Did you ask Mr. Daniels?
8   A.  When I asked Mr. Daniels, he told me that he
9 removed the photo and he removed the reference to the
10 photo.
11   Q.  What did you ask him specifically?
12   A.  What he did to mitigate the post once it came
13 to his attention that it was not accurate.
14   Q.  Okay.  This is gonna be Exhibit 11.
15         (Exhibit 11 marked.)
16   Q.  (By Mr. Ogden) Have you ever seen Exhibit 11?
17   A.  Yes.
18   Q.  Okay.  When?
19   A.  When I was reviewing the Fontaine document
20 sometime in the last week.
21   Q.  All right.  Since -- can you -- can you please
22 tell the jury when this was posted?
23   A.  You mean -- you want me to read the date?
24   Q.  Date and time.
25   A.  It says February 14th, 2018, 17:50:12.

163

1   Q.  Okay.  And at bottom right-hand corner, you see
2 that it's marked Defendants 00006?
3   A.  Yes.
4   Q.  Which would mean that it was produced by the
5 defendants, correct?
6   A.  Yes.
7   Q.  Okay.  You would -- why would the defendants
8 produce this to us?
9   A.  I don't know how it came to be in our
10 possession, so I don't know.
11   Q.  Okay.  Do you know anything about this -- the
12 history of this document?
13   A.  No.  This isn't -- wasn't produce -- produced
14 by us in the sense that this is a post that we made.
15 So, no.
16   Q.  Who made this post that we're looking at?
17   A.  It looks like a post by somebody posting on a
18 chat room, so to speak.
19   Q.  Okay.  How was it found?
20   A.  I don't know.
21   Q.  When was it found?
22   A.  I don't know how it came to be in our
23 possession, so I don't know.
24   Q.  When you got this document, did it confuse you
25 a little bit that -- as to why it was in the possession

164

1 of the defendants?
2   A.  No.
3   Q.  Okay.  Do you -- is this document -- is this --
4 is Defendants 006, is that the post that was used for
5 Mr. Daniels off of 4chan?
6   A.  I don't know.
7   Q.  Okay.  Did you take any steps to figure out
8 what this was?
9   A.  I didn't talk to Mr. Daniels about this
10 particular document.
11   Q.  Okay.  I'm gonna represent to you that this is
12 a post from 4chan.
13   A.  Okay.
14   Q.  And if it is a post from 4chan and Mr. Daniels
15 pulled the image from 4chan, wouldn't that be something
16 you wanted to talk about with him?
17   A.  He -- I don't think it's accurate to say he
18 pulled the image only from 4chan.  I think his response
19 was he saw the image on 4chan as well as other social
20 media sources.  So I don't know that this was the post
21 that he saw necessarily.
22   Q.  Where did Mr. -- where did Mr. Daniels pull the
23 post that he used in his article?
24   A.  As his representation in the production was and
25 his similar comment to me was he saw it on social media

165

1 first -- I think he said Twitter.  I think that's what
2 it says in the production -- in the responses -- and he
3 also saw it on 4chan.  I don't know whether this was the
4 particular document he saw on 4chan.  But when I spoke
5 to him, he said he had seen it, not first on 4chan, but
6 on a social media site, such as -- I believe Twitter.
7   Q.  Okay.  So we're not really -- you know, what I
8 got out of all that is we're not a hundred percent sure
9 why this exists in Infowars' files, correct?
10   A.  That's right.
11   Q.  Okay.  And we didn't really take any steps to
12 figure out what it is, why, when, how it came about,
13 anything, right?
14   A.  I didn't ask him about this, no.
15   Q.  You didn't ask anyone?
16   A.  No.
17   Q.  Okay.  Does any Info- -- do defendants have the
18 ability to provide information any time a post is put up
19 on the internet on its website?
20   A.  I'm sorry.  Can you repeat that.
21   Q.  Is it documented in Infowars' system when a
22 post is put up on its web page?
23   A.  I guess I don't understand the question.
24         So if a -- you mean if there's a post --
25 like an article --

Paz, Brittany                                    02-15-2022

166

1   Q.  Yeah.  Sure.
2   A.  -- and when that is up -- posted to the
3 website?
4   Q.  Yes.
5   A.  Okay.  So, yes, I think that what -- what would
6 happen is, if you post the article, the -- the time
7 would be posted.
8   Q.  Okay.  And if you alter the article, what's the
9 time say at the top?
10   A.  Oh, you know what, I don't know.  I don't know
11 if the time gets changed.
12   Q.  Okay.  Because that's kind of an important
13 detail, correct?
14   A.  As to the time that the original post --
15 article was uploaded?
16   Q.  As to the time that's at the top of the web
17 page that we have available to us today.
18   A.  Well, that's not the original article.
19   Q.  I know.
20   A.  Right.
21   Q.  But is that the original time?
22   A.  I don't know the answer to that.
23   Q.  What time was the article originally posted?
24   A.  Based on my conversation with Kit Daniels, he
25 says it was posted sometime in the late afternoon around

167

1 4:00 o'clock.
2   Q.  Okay.  So we don't know?
3   A.  I can give you an about time that it was
4 posted.
5   Q.  That sounds like a guess.
6       Wouldn't you agree?
7   A.  It's not a guess.  It's based on my interview.
8   Q.  Okay.
9   A.  So it's definitely not 9:00 o'clock in the
10 morning; I know that.  And it's definitely not 7:30 or
11 8:00 o'clock at night.
12   Q.  What about 3:00?
13   A.  In the afternoon?
14   Q.  Yeah.  What about 5:00?
15   A.  I don't know how late it was posted.  It was in
16 the afternoon.
17   Q.  7:00?
18   A.  I don't think it was posted that late, because
19 it was before Kit left in the afternoon.
20   Q.  What time does the afternoon end?
21   A.  To me, it would end before someone left in the
22 evening time.
23   Q.  Not to you, to the company.
24   A.  He would have left his office at the end of
25 business hours.

168

1   Q.  Okay.  What time is that?
2   A.  He would have left around 5:00.
3   Q.  Do employees clock in and clock out?
4   A.  I don't know around this time whether they were
5 clocking in or clocking out.
6   Q.  Did you look?
7   A.  Did I ask if people were clocking in and
8 clocking out?
9   Q.  Did you -- yeah.  Did you try -- did you look
10 for any information to ascertain when Mr. Daniels left?
11   A.  I don't know that the company has such
12 information.
13   Q.  You didn't look either.
14   A.  No, I don't.
15   Q.  My question is whether or not you looked.
16   A.  No.
17   Q.  Okay.  This is gonna be Exhibit 12.
18       (Exhibit 12 marked.)
19   Q.  (By Mr. Ogden)  Have you seen Exhibit 12?
20   A.  I -- I don't think so.
21   Q.  Really?
22   A.  It doesn't look familiar.
23   Q.  Okay.  Well, I'm gonna represent to you that
24 this is a screenshot or a screen capture on Infowars
25 internal system.

169

1       And if you look at it, the name of the
2 post -- the ID of the post is 479629.
3       See where it says that?
4   A.  Yes.
5   Q.  Then it says the name of the post is, report,
6 Florida shooter inspired by Isis Allahu Akbar.
7       You see that?
8   A.  Yes.
9   Q.  If you go up one line, it post status.
10       What's it say right next to that?
11   A.  You mean under that?
12   Q.  Next to it?
13   A.  Post modified.
14   Q.  Post modified.
15       Under that it says a time.
16   A.  Yes.
17   Q.  Okay.  So this tells us exactly when the post
18 was modified, correct?
19   A.  That's what it says.
20   Q.  Okay.  And that's April 2nd, 2018.
21       So that's when I represented to you
22 earlier when the retrac- -- the proper retraction was
23 made the day after this lawsuit was filed.
24       Do you remember that?
25   A.  I know we talked about that date, but that

Paz, Brittany                                        02-15-2022

170

1 doesn't represent all the times this article was
2 modified.
3    Q.   You're right.  Thank you for that.
4         Please tell the jury why we don't have one
5 of these for every other modification.
6    A.   Because I don't know that we saved that
7 information.
8    Q.   Why would you save this one?
9    A.   I don't know.
10   Q.   Okay.  So the -- the answer to my question of
11 why we don't have one of these for every single time
12 this article was published and then modified is because
13 you just don't know?
14   A.   Well, I don't know when in relationship to the
15 time we received your notification it was modified.  I
16 know it was modified on the 15th, and then we wouldn't
17 have necessarily saved that information because we
18 didn't get the letter yet.  And then it was modified
19 after that on this date, as well.  I don't know if it
20 was modified again before that.
21        But at least as far as the 2/15
22 modification, I can say that we wouldn't have saved this
23 because we weren't aware that it needed to be saved.
24   Q.   When -- or, actually, what -- what question
25 were you just answering?

171

1    A.   You asked me why you don't have --
2    Q.   No.
3    A.   -- this document for every modification.
4    Q.   That's not -- that's not what I asked.
5    A.   Okay.
6    Q.   Which is why I was sitting here with my arms
7 crossed, confused as to what you were talking about for
8 that long.
9         If you'll listen to my question, they're
10 not hard.  Most of them can be answered with a yes or
11 no.  I get that you want to advocate for your -- for
12 the, you know, company you represent here today.  You
13 don't have to.  If Ms. Blott wants to ask you questions
14 when I'm done, I'm -- she's free to do so.
15   A.   Do you want to reask your question?
16   Q.   I'd love to.
17        The reason we don't have a post -- a
18 document like document Defendants 0025 is because you
19 don't know.
20   A.   No.  No.  As in I'm not agreeing with your
21 question.
22   Q.   Okay.  How long does Infowars save these?
23   A.   I don't -- I don't know the answer to that.
24   Q.   Are they --
25   A.   I don't know that they are saved.

172

1    Q.   Are they auto deleted or does somebody go in
2 cache, if you know?
3    A.   I don't know.
4    Q.   Okay.  What program sets this up?
5    A.   I don't know the name of it.
6    Q.   Okay.  Does it happen -- does it happen
7 immediately after, or is there a delay after the article
8 goes live?  Or does this -- is this generated
9 immediately, if you know?
10   A.   You mean is this date -- is this time --
11   Q.   Was this document --
12   A.   Uh-huh.
13   Q.   -- created at this exact time that's listed on
14 it, or do you know?
15   A.   Oh, when was the document created?
16        I don't know when this document was
17 created.
18   Q.   Okay.
19   A.   No.
20   Q.   Who has access to the system that generates
21 this information?
22   A.   I don't know --
23   Q.   Okay.
24   A.   -- the name of the person.
25   Q.   Right.  And so when you say we -- we -- the

173

1 original post and modification were on 2/15, so we don't
2 have those.
3        You have no idea, do you?
4    A.   No.  I don't -- I have an idea, and that was
5 the prior answer I was giving.
6    Q.   Okay.
7    A.   But...
8    Q.   Ms. Paz, you just testified you've never even
9 seen this before.
10   A.   No.  I've never seen this.
11   Q.   Okay.  So -- but now all the sudden, you've got
12 all this knowledge as to when docu-- -- when information
13 on this system is deleted, not deleted, whether --
14   A.   That's not what I said, sir.
15   Q.   Okay.  Then I'll ask my questions a little more
16 simpler.
17        Do -- the information from the system in
18 Exhibit --
19   A.   12.
20   Q.   -- 12, does Infowars have possession of the
21 same information from when the post was originally
22 posted and -- and then the first modification?
23   A.   (Shaking head.)  I don't believe so, no.
24   Q.   Why?
25   A.   Because I don't think that information gets

Paz, Brittany                                     02-15-2022

174

1 saved.
2    Q.  I'm not asking you what you think; I'm asking
3 what you know.
4    A.  I don't know.
5    Q.  And I've tried very hard to be patient with you
6 Ms. Paz.  You're an attorney and you know better.
7 Answer my questions.  Don't guess.  Please stop.  Answer
8 the question that's on the table and stop guessing.
9    A.  I don't know why it doesn't save that
10 information or how it gets saved.  I don't know.
11    Q.  Is it saved?
12    A.  I don't know.
13    Q.  Right.  So when you're sitting here, no, I
14 don't believe so, that's a pure pull-out-of-the-air
15 guess, true?
16    A.  No.  It's not pull-out-of-the-air guess.  I'm
17 making an educated inference based on the information
18 that I see in this document.  You asked me about the
19 document, and you asked me what I -- about this
20 document, and I'm getting an inference from the
21 document.
22    Q.  Stop inferring, because that's a guess.  I want
23 to know what you know.
24    A.  I didn't ask about this document, so I don't
25 know.

175

1    Q.  I know you didn't, because you didn't know it
2 existed until I handed it to you.
3    A.  That's right.
4    Q.  Now, my question is:  Does -- does one of these
5 exist for February 15th -- or excuse me --
6 February 14th, 2018, that says original post?
7    A.  I don't know.
8    Q.  You don't know.
9        Does -- does a document like this with
10 this information exist for February 15th with the first
11 post modified?
12    A.  I don't know.
13    Q.  Okay.  Sitting here today, that information
14 very well could be on the system, correct?
15    A.  I don't know if it gets saved on the system, so
16 I don't know.
17    Q.  Right.  You have no idea.
18        So when you sit here and say, no, I don't
19 believe that exists, you have -- that is a guess, and
20 that's not accurate, true?
21    A.  I don't know what exists or what doesn't
22 exist --
23    Q.  Exactly.
24    A.  -- or what gets saved or what doesn't get saved
25 on this particular platform.

176

1    Q.  Okay.  With that answer in mind, I want you to
2 answer this question:  Why previously did you say
3 this -- that information no longer exists?
4    A.  Because it says the dates that are modified --
5 the post modified and whether it was posted.  It doesn't
6 say how many times it was modified.  That's why.  That's
7 the basis for my testimony.
8    Q.  I will let that answer stand for the jury.
9        (Sotto voce conversation between Mr. Ogden
10        and Mr. Bankston.)
11    MR. BANKSTON:  We're at 1:00.  I didn't
12 know if you wanted to take a break now.  I don't
13 remember when we took the last one.
14    MR. OGDEN:  Are you okay?
15    THE REPORTER:  Yes.  Thank you.
16    MR. OGDEN:  If you just give me the look,
17 I'll know.
18    THE REPORTER:  Okay.
19    (Exhibit 13 marked.)
20    Q.  (By Mr. Ogden) I'm gonna hand you Exhibit 13.
21        Have you Ever seen Exhibit 13 before?
22    A.  Yes.
23    Q.  Okay.  Earlier you said that you'd only seen
24 what I assumed was the petitions.  And you said that was
25 all that I've looked at.  And now we've established that

177

1 you have seen some interrogatory answers.  So let me go
2 back and ask you again.
3        What-all did you -- what documents did you
4 review to prepare yourself for today?
5    A.  I think this was shown to me in connection with
6 my conversations regarding the net worth.
7    Q.  With who?
8    A.  With Melinda, maybe.
9    Q.  Okay.  And it's your testimony, sitting here
10 today, that the conversation you had with
11 Mr. Whittenburg did not go into the net worth?
12        That was my understanding of your answer.
13    A.  No.  I -- yeah.  I didn't talk to him about the
14 net worth.
15    Q.  Okay.  Did he have information about any of the
16 deposition topics from yesterday or today?
17    A.  Him?
18    Q.  Yes.
19    A.  I don't know what he has information about.
20    Q.  Okay.
21    A.  I can't say what he knows.
22    Q.  That's very peculiar that you spoke to him.
23    A.  I don't agree.  He represents the company; I
24 represent the company.
25    Q.  In what capacity?

Paz, Brittany                                    02-15-2022

178

1    A.   What capacity do I represent the company?
2    Q.   Yeah.
3    A.   In connection with these depositions.
4         MR. BANKSTON:  I thought she told me she
5 didn't.
6    Q.   (By Mr. Ogden)  Yeah.  I thought you said you
7 did not represent the company.  You told Mr. Bankston --
8    A.   Oh, you mean -- oh, I'm sorry.  I'm sorry.  I
9 misspoke.  I'm getting exhausted.
10        I don't represent the company in a legal
11 capacity as a lawyer.  I represent the company as the
12 corporate representative.  But I don't represent the
13 company as an attorney, no.
14   Q.   How long did you talk to Mr. Whittenburg?
15   A.   I don't know.  I didn't talk to him very long.
16   Q.   After how yesterday went and how today has
17 definitely gone, don't you think that time would have
18 been more useful reviewing the information that you
19 should have been reviewing?
20   A.   No.
21   Q.   Okay.  And just to establish, your conversation
22 with Mr. Whittenburg had nothing to do with any of the
23 Infowars internal discussions about yesterday or today
24 or any of the depo topics that were listed yesterday or
25 today, correct?

179

1    A.   You mean did I talk to him in -- today or
2 yesterday?
3    Q.   No.  I'm asking --
4    A.   I'm sorry.  I don't --
5    Q.   Sure.
6    A.   I didn't understand your question.
7    Q.   You had two deposition --
8    A.   Yes.
9    Q.   You had two deposition notices, correct?
10   A.   Yes.
11   Q.   One for yesterday and one for today.
12   A.   Yes.
13   Q.   And Mr. Whittenburg, did he -- did he possess
14 knowledge on any of those topics?
15   A.   I don't know.  I don't think so.
16   Q.   Okay.  So my same question:  Don't you think
17 your very limited time preparing for these two
18 depositions would have been well spent doing something
19 actually productive to prepare you?
20   A.   No.
21   Q.   When you spoke to him, were you aware of how
22 many documents you were tasked with reviewing?
23   A.   Yes.
24   Q.   And knowing that, you still think that having a
25 conversation completely unrelated to these depos was a

180

1 good idea?
2    A.   Yes.
3    Q.   Okay.
4         (Sotto voce conversation between Mr. Ogden
5         and Mr. Bankston.)
6    Q.   (By Mr. Ogden)  Yeah.  I need to clear up a
7 little thing.
8    A.   Uh-huh.
9    Q.   You told us that today you spent about 10 hours
10 preparing for this deposition, true?
11   A.   Yes.
12   Q.   Okay.  How many total hours did you spend
13 preparing?
14   A.   Between the two cases?
15   Q.   Yes.  Since you've been hired by the defendant,
16 how much have you spent?
17   A.   It's about -- it's around a hundred hours, not
18 including the deposition time.
19   Q.   Okay.  Because yesterday I believe the
20 breakdown was a hundred hours of -- I thought it was --
21 I calculated it to be like 145 hours.
22        Is that wrong?  It's just hundred hours
23 total?
24   A.   How did you get 145?
25        I don't recall ever saying -- saying 145.

181

1        You mean --
2    Q.   Sure.
3    A.   -- we were adding up hours?
4    Q.   I'll break it down.  You gave Mr. Bankston
5 yesterday -- do you remember saying that you spent about
6 75 hours reviewing documents?  Do you remember that?
7    A.   No.  I think what I said was I spent about 35
8 hours or so reviewing videos.
9    Q.   Yep.  I got that one.
10   A.   Right.  And then I spent more hours -- I can't
11 remember what I said yesterday as far as reviewing
12 documents.  And then talking to people and et cetera.  I
13 don't think I said 75 hours reviewing documents.  That's
14 not accurate.
15   Q.   Okay.  What is accurate?  How many hours did
16 you spend reviewing documents?
17   A.   It -- are we talking about all documents, the
18 universe of documents, deposition, Bates stamps, things
19 like that?
20   Q.   Yep.
21   A.   Maybe 45 or 50 hours plus the interviews that I
22 did.
23   Q.   Okay.  How many hours did you do spending --
24 spend doing interviews?
25   A.   So I started interviewing people on Wednesday

Paz, Brittany                                                    02-15-2022

---

182

1 through Saturday.  So --

2    Q.   Yesterday you testified between that Wednesday

3 and Saturday doing interviews was about 25 hours.

4    A.   There -- thereabouts.  So eight, 16 -- 20, 25

5 hours.  I also spent on Sunday an hour interviewing

6 Mr. Watson via Zoom.

7    Q.   Okay.  So I got 50 --

8    A.   My math is terrible.  I'm sorry.

9    Q.   50 and 25 is 75 --

10   A.   Uh-huh.

11   Q.   -- plus 36 is 116?

12   A.   Okay.

13   Q.   Okay.  So in 14 days, you billed 116 hours?

14   A.   It's not billable time.  But can I account for

15 116 hours, I can account for my time, yes.

16   Q.   Okay.  So just breaking this down.  That's 58

17 hours -- no -- yeah -- 58 hours for week one, 58 hours

18 week two, if we just split it in half, right?

19   A.   I don't know.  My math's terrible.  So I can't

20 do that in my head.

21   Q.   So out of the, roughly, 116 hours -- and

22 I know that's not an exact number -- you spent 106 on

23 Sandy Hook and 10 Mr. Fontaine?

24   A.   No.  The review of the documents and those

25 hours and the time pro- -- include the Fontaine review.

---

183

1 But if you're saying did I spend 10 hours reviewing

2 Fontaine documents specifically, and if you're gonna

3 break it down like that, then -- in comparison, is that

4 what the question is?

5    Q.   I got 116 hours total.

6    A.   Right.

7    Q.   Earlier you told me that in preparation for

8 today total you spent about 10 hours on this

9 deposition --

10   A.   Right.

11   Q.   -- on these -- on these topics.

12   A.   Right.

13   Q.   So I'll end it there.  I think we're pretty

14 clear.

15        Do you think you're prepared for today?

16   A.   I'm prepared as I could be with the time that I

17 was given.  So, yes.

18        (Sotto voce conversation between Mr. Ogden

19        and Mr. Bankston.)

20   Q.   (By Mr. Ogden) Do you know when these

21 depositions were ordered by the Court?

22   A.   No, I don't.  I don't know the date.  All I can

23 tell you is when I was retained to prepare.

24   Q.   What is Ms. -- what is -- we'll start here.

25        What is Kit Daniels' net worth?

---

184

1    A.   I -- I don't know if we've produced that.

2    Q.   I'm asking you -- you were tasked with --

3    A.   Do I recall --

4    Q.   Hold on.

5    A.   -- his net worth?  No, I don't.

6    Q.   Let's back up.  Slow down.

7        You were tasked with the net worth of

8 defendants in this case, correct?

9    A.   I was tasked with being -- to testify

10 against -- to the net worth of Free Speech, because I am

11 the corporate representative.

12   Q.   Okay.  I'll back up.

13        What is the net worth of Free Speech

14 Systems?

15   A.   I believe we have a negative net worth.

16   Q.   I'm not asking what you believe.  I'm asking --

17   A.   We have a negative net worth.

18   Q.   Okay.  What is it?

19   A.   If I may refer to the profit-loss?

20   Q.   Okay.  I'm gonna throw a sticker on that.

21   A.   If you want to -- sure.

22   Q.   This will be 14.

23        (Exhibit 14 marked.)

24   Q.   (By Mr. Ogden) Couple of questions while you're

25 reviewing it.

---

185

1    A.   Sure.

2    Q.   Where'd that come from?

3    A.   As I testified earlier, I met with Melinda, who

4 printed me the QuickBooks information.

5        (Sotto voce conversation between Mr. Ogden

6        and Mr. Bankston.)

7    A.   May I continue?

8    Q.   (By Mr. Ogden) Yeah.  Sure.

9    A.   Sure.  So I asked Melinda for the profit-loss

10 statements through 2020.  The 2021 numbers are not

11 available yet; they're not finalized.

12        So according to the profit-loss for the

13 year, there is a negative net income of $6.8 million.

14   Q.   Sitting here today, what is Infowars -- what is

15 Free Speech Systems net worth?

16   A.   I don't -- I'm sorry.  This doesn't -- this

17 doesn't tell me the exact number.  Just give me one

18 second.

19        MR. BANKSTON:  (Inaudible.)

20   Q.   (By Mr. Ogden) What's the Bates label -- what's

21 the Bates number on Exhibit 14?

22   A.   This doesn't have a Bates label.

23   Q.   Okay.

24   A.   This was produced to me -- and just -- this was

25 at my request that I asked Melinda to produce this to

---

Paz, Brittany                                                      02-15-2022

---

186

1 me.
2    Q.  When'd she give it to you?
3    A.  Friday.
4    Q.  Okay.  And did you -- did you go over it with
5 anyone after you got it?
6    A.  I went over it with -- I don't think I spoke to
7 Melinda about it.  I might have spoken to Bob about it,
8 just asked him to explain it to me.  But other than
9 that, no.
10        MR. BANKSTON:  (Inaudible.)
11    Q.  (By Mr. Ogden) You spoke with Bob about it on
12 Friday?
13    A.  Friday.
14    Q.  Okay.  How long did y'all talk?
15    A.  An hour or so.
16    Q.  All right.  That was on phone or that was in
17 person?
18    A.  No.  I saw him in person.  He was at -- he was
19 at the office.
20    Q.  Okay.  So you were at the office during all
21 this?
22    A.  Yes.  I was at the office, Wednesday, Thursday,
23 Friday, and Saturday.
24    Q.  Okay.  Why did you ask for that document?
25    A.  Because I believe it was relative and -- to the

---

187

1 topics that I was to testify about today.
2    Q.  Okay.  Did you -- were you under -- were you
3 under the belief that that document had been produced in
4 this litigation?
5    A.  I don't know whether this has been produced.
6 These are the numbers for 2020.  I don't know if it's
7 been produced already.
8        MR. OGDEN:  Ms. Blott, we don't have that.
9        MS. BLOTT:  I know we don't, because the
10 numbers were -- this is a revised one that she and I was
11 given Friday, and I believe the revisions took place --
12        MR. OGDEN:  Can I ask you a question?
13        MS. BLOTT:  Sure.
14        MR. OGDEN:  Why didn't it come with the
15 other 333 I got last night?
16        MS. BLOTT:  Because I was concentrating on
17 those for the Fontaine, and I ran out of time.
18        MR. OGDEN:  Okay.  Why want -- why didn't
19 you hand it to me this morning or during the first break
20 or the second break, or the third break?
21        THE WITNESS:  This is actually in --
22        MR. OGDEN:  I'm not asking you, Ms. Paz.
23        THE WITNESS:  It was in the binder.
24        MR. OGDEN:  That's fine.  I understand you
25 have comments.  You can keep them to yourself for a

---

188

1 second.
2        MS. BLOTT:  I didn't do it.  That's my
3 answer.
4        MR. OGDEN:  Okay.  Do you believe that the
5 information in Exhibit 14 that I just stickered is
6 information plaintiffs are entitled to?
7        MS. BLOTT:  Yes, I do.
8        MR. OGDEN:  Okay.  Let's take a short
9 break so that we can read over what's in there.
10        THE VIDEOGRAPHER:  We are off the record
11 at 1:14.
12        (Recess from 1:14 p.m. to 1:29 p.m.)
13        THE VIDEOGRAPHER:  We are back on the
14 record at 1:29.
15        MS. BLOTT:  Mr. Ogden, I need to clarify
16 my response to the question you posed with respect to
17 the financial document that Ms. Paz has.
18        This document was provided on Friday, this
19 immediately past Friday.  And in my continuous review of
20 the answers or the discovery responses by prior counsel
21 in this case, I did not see where any profit and loss or
22 balance sheet had been produced in response to the
23 interrogatory that used the term financial statement.
24        And so I reached out and learned that no,
25 in fact, it had not been produced by prior counsel

---

189

1 because they did not consider it a financial statement,
2 which is contrary to my professional opinion.  And
3 because of that, I did get the document so that I can
4 supplement that discovery.
5        MR. OGDEN:  Okay.  I just want to put on
6 the record for myself and on behalf of my clients that
7 that document has been sitting in the corporate
8 representative's bag next to her all day without
9 producing it to us.
10        MS. BLOTT:  It is in the binder that you
11 have and contains another document.
12        MR. OGDEN:  What binder do we have?
13        THE WITNESS:  Yesterday.  I had brought
14 with me my binder.  It was in my binder.
15        MR. OGDEN:  I don't have that.
16        MS. BLOTT:  Well, whoever has it.  The
17 court reporter has it.  Somebody has it.
18        MR. OGDEN:  Did you give me a copy?  Does
19 it have a Bates number?
20        MS. BLOTT:  Yes, as a matter of fact.
21        MR. OGDEN:  What's the Bates number?
22        MS. BLOTT:  I'd have to look on my iPad.
23        MR. OGDEN:  (Inaudible.)
24        MR. BANKSTON:  (Inaudible.)
25        MR. OGDEN:  I have not produced it.

---

Paz, Brittany                                                02-15-2022

190

1          MR. BANKSTON:  It hasn't been produced.
2          MS. BLOTT:  It has not been formally
3 produced.
4          MR. OGDEN:  We --
5          MR. BANKSTON:  It's being produced right
6 now is what we're saying, like, within the past 10
7 minutes.
8          MR. OGDEN:  Yes.
9          MR. BANKSTON:  Okay.
10         MR. OGDEN:  Let's just -- I want to make
11 something clear.
12         When we started this depo, the topics were
13 very clear that -- that net worth was one of the topics.
14 And that document this witness testified was she -- she
15 asked for it to be prepared to discuss that topic, and
16 it's been sitting in her bag.
17         I wouldn't have a problem if I'd have
18 gotten it this morning or during any of our breaks.  But
19 the fact that at the very end after -- I don't know --
20 four or five hours of questioning, I ask the witness --
21 we get to that topic, and then all of a sudden it comes
22 out of the -- out of the bag, and now we're saying that
23 it's been Bates labeled and it's on the way and -- you
24 know, I'm -- you can obviously probably see how it looks
25 from my seat.

191

1          I'm not accusing you one way or the other.
2 But I'm just looking at, you know, the aggregate of
3 what's happened in this case with all lawyers.  And
4 every lawyer has come in and told me they're not that
5 person; they're transparent; they're gonna get on it.
6 And every single time they are replaced, the new one
7 comes in and says the same thing.
8          Who did you talk to that had a different
9 professional opinion than you on the production of that
10 document so that I know who to name in my motion?
11         MS. BLOTT:  Bradley Reeves.
12         MR. BANKSTON:  All right.  I need to make
13 a phone call.
14         MR. OGDEN:  My other -- and I need to
15 clear one thing up before I go on to this line of
16 questioning.
17         A document was produced to me by
18 Mr. Whittenburg when y'all came to my office, and I
19 wanted to -- it was not clear which case he was giving
20 that to me for.
21         MS. BLOTT:  The profit and loss and
22 balance sheet.  So they were provided to you.  Okay?
23         MR. OGDEN:  A completely different one
24 with completely different numbers --
25         MS. BLOTT:  Correct.

192

1          MR. OGDEN:  -- was provided to me.  And
2 it's stamped attorney's eyes only.  And I don't know if
3 it was in regards to this case, the Sandy Hook cases, or
4 both.  And I don't want to violate a protective order by
5 bringing it out here right now.
6          So I'm asking on the record if you'll
7 consent to us using that as an exhibit when we question
8 the witness?
9          MS. BLOTT:  Yes.  I will represent to you,
10 though, Mr. Ogden, just so that there is no confusion,
11 the profit and loss -- oh, wait a minute -- may I see
12 that a minute?  I want to make sure --
13         MR. OGDEN:  Sure.
14         MS. BLOTT:  -- that's the most recent one.
15         MR. OGDEN:  That's what Mr. Whittenburg
16 gave us.
17         MS. BLOTT:  Oh.  Okay.  So wait.  Wait.
18 Before you -- okay.  You haven't marked this one.
19         This was -- this is not any type of
20 balance sheet, profit and loss statement; this was
21 merely prepared for the purposes of settlement
22 negotiations.
23         MR. OGDEN:  You'd agree with me, though,
24 that it has information in it that is completely
25 relevant to the net worth of the company?  Yes?

193

1          MS. BLOTT:  But it's not current.
2          MR. OGDEN:  I didn't ask if it was
3 current.  I asked if it had information relevant to the
4 net worth of the company.
5          MS. BLOTT:  Yes.
6          MR. OGDEN:  Okay.
7          MS. BLOTT:  At one point.
8          MR. OGDEN:  Okay.  With that said, is it
9 still okay if we --
10         MS. BLOTT:  No.
11         MR. OGDEN:  -- talk about it with this
12 witness?
13         MS. BLOTT:  No.  Because it's not a
14 financial statement, per se.  I don't know whether -- so
15 no.
16         MR. OGDEN:  Do you know what -- the order
17 does not say financial statement, neither does my net
18 worth discovery request.
19         MS. BLOTT:  Yes.  It does say financial
20 statement.
21         MR. OGDEN:  And so how -- I'll -- I'll --
22 I'm gonna propose a solution, potential solution, which
23 is:  We use this.  We've already established -- there is
24 no protective order in this case, so I guess that's --
25 that is an issue.

Paz, Brittany                                     02-15-2022

---

194

1        MS. BLOTT:  Well, we can take care of that
2 on the record.
3        THE REPORTER:  We are on the record.
4        MS. BLOTT:  I know.  I just realized that.
5 (Inaudible.)
6        MR. OGDEN:  How would you like to take
7 care of this?
8        MS. BLOTT:  I'm not gonna agree to it.
9 This was work product in preparation of settlement
10 negotiations only.
11        MR. OGDEN:  That's fine.
12        MS. BLOTT:  And it was provided to you
13 only for that reason.
14        MR. OGDEN:  That's fine.
15        But the Rule 408 that was cited prior to
16 us engaging in that discussion in my office was directly
17 to admissibility, not the use of it in discovery.  And
18 it's not work product because you gave it to me.
19        MS. BLOTT:  So let's do this -- and I will
20 tell you she has not seen this.
21        MR. OGDEN:  That's fine.  I know she's
22 talked to the person that put it together.
23        MS. BLOTT:  So I will agree that you can
24 use this at the deposition.
25        MR. OGDEN:  Okay.

---

195

1        MS. BLOTT:  Provided that we agree that
2 this document will not be produced or cir- -- will not
3 be circulated, will remain confidential, unless and
4 until one of us applies to the Court to release it to
5 dissemination.
6        MR. OGDEN:  We don't have a protective
7 order in place.  So if we use it -- what am I -- then
8 what happens to all the testimony that we have about it?
9        MS. BLOTT:  Well, right.  Oh.
10        THE WITNESS:  I don't even know what that
11 is.
12        MR. OGDEN:  I know.  It's kind of putting
13 me in a little pinch here.
14        MS. BLOTT:  I know.  And I'm sorry.  Both
15 of us.
16        So, yes, go ahead.
17        MR. OGDEN:  So we can use this in the
18 deposition.
19        MS. BLOTT:  (Nodding.)
20        MR. OGDEN:  Okay.
21        (Exhibit 15 marked.)
22        MR. OGDEN:  I'm gonna hand the witness
23 Exhibit 15, which is Bates labeled FSS, underscore, NET,
24 underscore, 204.
25        (Exhibit 16 marked.)

---

196

1        MR. OGDEN:  I'm also going to hand the
2 witness Exhibit 16, which is marked confidential,
3 attorney's eyes only.  It's not Bates labeled and was
4 provided to counsel by Ms. Blott and a Mr. Dustin
5 Whittenburg.
6        Is that his name, Dustin or Justin?
7        MS. BLOTT:  Dustin Whittenburg.
8        MR. OGDEN:  Was provided to counsel by
9 Dustin Whittenburg at plaintiff's counsel's office two
10 weeks ago in a meeting where myself, Mr. Bankston
11 Mr. Whittenburg, and Ms. Blott met.
12        Also gonna hand over Exhibit 17, which is
13 also marked attorney's eyes only, but it's actually a
14 public record.  It's just the UCC filing that we
15 discussed.  That'll be Exhibit 17.
16        (Exhibit 17 marked.)
17 Q.  (By Mr. Ogden) Just hold those.  We're gonna
18 work on that one first.
19        Now -- now that you have Exhibit 15 -- I
20 believe is the one you pulled out of your purse,
21 correct?
22   A.  No.  14.
23   Q.  14.  Okay.  14.
24        All right.  Same question:  What is the
25 net worth of Free Speech Systems?

---

197

1   A.  This is the profit-loss statement.  So this
2 document does not reflect a profit-loss number.  The
3 prof- -- the net worth of Free Speech Systems is
4 negative $53 million and change.
5   Q.  Okay.  How do you know?
6   A.  This is based on my conversations and my review
7 of the documents.  So I did -- as I previously
8 represented, I spoke to Mr. Roe.  I also -- like I said
9 earlier, I have seen this answer regarding the net
10 worth, and I do know that these numbers are updated
11 because these were revised for 2020.  So the numbers
12 that we see in Exhibit 13 are off by about $160,000, but
13 are otherwise accurate.
14   Q.  It does not sound like Free Speech Systems
15 operates a very good business, does it?
16   A.  I think I testified to that earlier that I did
17 not think that it was -- that Mr. Jones was a good
18 businessman.
19   Q.  Considering that he ran a company that was
20 highly profitable into a negative $53 million debt.
21        That's your understanding?
22   A.  That is my understanding, yes.
23   Q.  Okay.  Who is that debt owed to?
24   A.  A vast majority of that debt is approximately
25 $53 million -- $54 million so debt to PQPR on the basis

---

Paz, Brittany                                02-15-2022

198

1 of costs of products that were not paid to PQPR.
2    Q.   Okay.  How many -- how long has that debt been
3 accruing?
4    A.   I think that that debt was accruing up to a few
5 months ago, and I don't know when it started,
6 unfortunately.  I could tell you the reasons why it was
7 accruing, but I don't -- I don't know when it was
8 started to be accruing.
9    Q.   All right.  Let me see those real quick.
10    A.   This one?
11    Q.   Yeah.  This stack of (inaudible) here -- yeah.
12 Okay.
13            Who -- what -- how did we get to a
14 $53 million note?
15    A.   Sure.  So PQPR is the company that purchases
16 the products that are ultimately sold on the Infowars
17 website.  And for a number of years -- and I'm sorry I
18 don't know for how long -- all of the money was flowing
19 to Free Speech Systems instead of being paid to PQPR.
20 They were kind of just giving the money here and there,
21 but with no regularity.  And so the amount of money that
22 was owed to PQPR for those products totals that amount
23 of money.
24    Q.   Okay.  Who at PQPR was able to front
25 $53 million?

199

1    A.   I don't know -- I can't answer anything for
2 PQPR.  I don't represent them as a corporate
3 representative.
4    Q.   Sure.
5    A.   I don't know.
6    Q.   In -- where did you learn about PQPR?
7    A.   When I was discussing the structure of the
8 company from Melinda and how the -- the money is paid
9 from Free Speech to PQPR and who has ownership interests
10 in PQPR and Free Speech.  That's how I found it out.
11    Q.   How --
12    A.   Based on my conversations.
13    Q.   How is the money paid?
14    A.   Now how is it paid to PQPR?  I can say now how
15 it is.  Previously, I don't know.
16            So within the last few months, there is
17 this debt, and Free Speech has been attempting to pay
18 this debt down.  It pays PQPR $11,000 per week -- I
19 believe it's per business day -- five business days.  So
20 it's not seven business days, five -- five business
21 days -- plus a percentage of the products that are sold
22 on the site in attempt to address the backlog.
23            But prior to the last few months when it
24 was -- it wasn't being paid with any regularity.
25    Q.   So 11,000 -- so $44,000 every 20 days?

200

1    A.   Right.  So five days -- so, yes.  So per five
2 business days, $11,000.
3    Q.   The --
4    A.   Plus the percentage.
5    Q.   The -- when you say it started a few months
6 ago, when?
7    A.   I believe that -- based on my conversations
8 with Mr. Roe, the financial disentanglement between the
9 two companies happened within the last few months,
10 perhaps back to September.  But it's relatively recent.
11    Q.   Do you know what triggered that?
12    A.   I know that Mr. Jones had begun some -- some
13 estate management that was in -- in motion in the years
14 prior.  And I also know that PQPR and an attorney
15 associated with PQPR retained Mr. Roe as a consultant to
16 try to disentangle this.  I can't say as to when he
17 was -- he was retained to do that.  He wasn't retained
18 by Free Speech.  He was retained by -- by I believe an
19 attorney -- I can't remember his name -- on behalf of
20 PQPR.
21    Q.   His name's Eric Todd.
22    A.   I don't think that's the person that retained
23 him, no.
24    Q.   The only reason I say this is because
25 Mr. Whittenburg is the attorney you're talking about

201

1 that was retained, correct?
2    A.   No.  That's not accurate.
3    Q.   Well, then who is the attorney that was
4 retained?
5    A.   Like I said, I don't remember his name.
6    Q.   So you don't remember the name of anybody
7 that -- of the person that represents PQPR.  You don't
8 remember the attorney that was retained by that person
9 at PQPR.
10    A.   I don't -- I'm not the corporate representative
11 for PQPR.
12    Q.   I know.
13    A.   So I don't know.
14    Q.   Just trying to figure out what you know.
15    A.   Yeah.
16    Q.   So a lawyer at PQPR hired a lawyer?
17    A.   No.  The lawyer hired Mr. Roe.
18    Q.   Gotcha.
19    A.   Right.  As a consultant.
20    Q.   Okay.  If you look at -- let's look at
21 Exhibit 15.
22    A.   Okay.
23    Q.   Do you see the redactions?
24    A.   Yes.
25    Q.   Why are those redacted?

Paz, Brittany                                    02-15-2022

202

1    A.   I don't know.
2    Q.   Have you seen copies without redactions?
3    A.   I've only seen the Exhibit -- Exhibit 14.
4    Q.   So you -- someone showed you the profit-loss
5 breakdown, but nobody preparing you to talk about net
6 worth showed you the actual balance sheet?
7    A.   Wait, I'm sorry.  Just give me one second.
8         I don't know what the redactions are.  I
9 may have seen this.  It may have been in the binder that
10 I brought yesterday, but I don't know what the
11 redactions are.
12   Q.   Okay.  You said that you had an electronic copy
13 of the binder.
14   A.   No.  I have an electronic copy of my notes
15 on -- in the -- from the binder.  So I -- I don't have
16 an electronic copy of this.
17   Q.   It's my understanding that Ms. Blott printed
18 out all the documents in your binder yesterday, correct?
19   A.   I believe she put the binder together for me,
20 yes, because I didn't have a printer.
21   Q.   Okay.  Did you send her everything that needed
22 to go in the binder and then she printed it for you?
23   A.   No.  I sent her my notes to go into the binder.
24   Q.   Everything else that was in there was put in
25 there by Ms. Blott?

203

1    A.   I believe so.
2    Q.   How did Ms. Blott get a copy of the profit-loss
3 breakdown that is Exhibit 14?
4    A.   I don't -- I don't know where this came from.
5    Q.   That's 15.
6    A.   15, right.
7         So 14 -- you're asking for 14?
8         Oh, I believe I testified to this.  We
9 received this from Melinda.  Melinda printed this off of
10 QuickBooks.
11   Q.   Okay.  And that was on Friday?
12   A.   Yes.
13   Q.   And that was put into your binder?
14   A.   Yes.  This is in my binder.  I remember this
15 being in my binder.
16   Q.   And then the balance sheet, Exhibit 15, it's
17 your testimony that that is also in your binder?
18   A.   I think it is in the binder.
19   Q.   Okay.
20   A.   Because I remember that Attorney Blott told me
21 it was in the binder, but I didn't physically print it,
22 though.  So...
23   Q.   So Free Speech Systems has a 53 -- $54,876,000
24 note that it owed -- or, excuse me -- has a note that it
25 is secured against -- sorry.  Let me back up.

204

1         PQPR has a $54.876 million note that
2 Infowars -- or that Free Speech Systems is responsible
3 for paying?
4    A.   Yes.  Just with the caveat that that number I
5 don't think is accurate anymore, just because, like I
6 said, we've been paying down the debt.  It's a little
7 over -- it's probably a little over $53 million.  But,
8 principally, yes, that's correct.
9    Q.   Where were you getting the exact number from?
10   A.   So the numbers that are in the -- the answer
11 regarding net worth in Exhibit 13.
12   Q.   Uh-huh.
13   A.   These numbers are accurate with the caveat that
14 it's off by about $160,000, which is what the updated
15 information was that was provided to us this week.  The
16 reason why there is a discrepancy of the $160,000 was
17 there's some -- some writeoffs regarding the equipment
18 that needed to be corrected.
19   Q.   Who did that correction?
20   A.   I -- I don't know.  It -- it might have been --
21 it probably would have been the tax attorney, but I'm
22 not sure, so I don't -- I don't want to say.
23   Q.   Okay.  So these numbers are from 2020, correct?
24   A.   The ones that you're referring to?
25   Q.   Exhibit 15 and Exhibit 14 are numbers from

205

1 2020, correct?
2    A.   Yes.
3    Q.   Okay.  And Exhibit -- what is it -- 13, the
4 interrogatory?
5    A.   Yes.
6    Q.   Exhibit 13, that was produced in December of
7 2021?
8    A.   Yes.
9    Q.   Okay.  And it's now your -- it's your testimony
10 that the number that was given -- I don't know -- 60
11 days ago, 70 -- 75 days ago is not accurate, and,
12 instead, we go look at the balance sheet and profit-loss
13 sheet that have adjustments made by someone of $160,000,
14 and that's the accurate number for the net worth of the
15 company at the end of 2020?
16   A.   Yes.
17   Q.   Okay.  Why was -- why were adjustments being
18 made in the last 75 days to a balance sheet from almost
19 two years ago?
20   A.   I don't know.  I'm not an accountant.  I don't
21 know why -- I don't know.
22   Q.   Okay.
23   A.   I think there was an error that was found
24 regarding the -- the -- I'm sorry -- I'm not a -- I'm
25 not really a tax attorney.

Paz, Brittany                                        02-15-2022

206

1    Q.   Why do you think that?

2    A.   Just based on my conversations with Mr. Roe

3 regarding why -- the accuracy of these numbers --

4    Q.   And, again, you --

5    A.   -- and the reason why this was updated.

6    Q.   Again, we established that you are unaware of

7 any findings in Connecticut on Mr. Roe's accounting

8 practices, correct?

9    A.   I'm aware that there was an issue in

10 Connecticut, but I wouldn't say I'm aware of issues

11 regarding his practices.

12   Q.   Okay.  Do -- do you know whether or not he was

13 found to have manipulated the numbers?

14   A.   I didn't read that decision, so I don't -- I'm

15 not aware of the finding.

16   Q.   What's your -- what's your understanding of

17 what happened?

18   A.   My understanding of what happened was there was

19 a document that was produced, and there were lines at

20 the bottom that were missing or cut off and that

21 subsequently the accurate numbers with the lines that

22 were missing were produced.

23   Q.   Well, that doesn't sound like anything

24 nefarious, true?

25   A.   Not to me.

207

1    Q.   Did you know that the -- do you know what the

2 basis for the Connecticut Court's granting of the

3 default judgment?  Do you know why they did that?

4    A.   No, I don't.

5    Q.   Would it surprise you to know that Mr. Roe's

6 accounting practices had a little bit to do with that?

7    A.   Like I said, I didn't review it, so I don't

8 know.

9    Q.   Okay.  Do you find Mr. Roe to be reliable?

10   A.   I found him to be forthcoming in answering all

11 of my questions and providing me the information that I

12 requested and explaining this to me so that I could

13 testify cogently about it.

14   Q.   What were your questions to him?

15   A.   I asked him to explain to me these numbers.  I

16 asked him to explain to me why it -- why the numbers

17 were -- were slightly different.  I asked him to explain

18 to me how Free Speech has been addressing the debt.  I

19 asked him to explain to me the --

20   Q.   Does it --

21   A.   He -- he -- and the -- also, the -- the --

22 the -- what's it called?  The tax -- the Schedule C.  I

23 asked him to explain that to me, too.  And I -- I think

24 that that's it.  I think that I spoke to him for an hour

25 or two.  It wasn't a very long conversation.

208

1    Q.   What's Schedule C?

2    A.   The taxes.  I think I said I reviewed the taxes

3 earlier.

4         MR. OGDEN:  Do we have any taxes?

5         MR. BANKSTON:  No.

6    A.   So Free Speech is reported in Mr. Jones' taxes.

7 So I would -- I -- he showed me the Schedule C.  So when

8 I testified earlier, I reviewed the taxes, that's what I

9 reviewed, because those are where Free Speech's income

10 is reported.

11   Q.   (By Mr. Ogden) Okay.  Where -- where is the

12 copy of those?

13   A.   I'm sorry.  I don't have a copy of those.

14   Q.   You didn't ask for a copy of the document

15 that's filed with the federal agency that reflects Free

16 Speech Systems' income?

17   A.   I don't have a copy of the -- of the Schedule

18 C, no.

19   Q.   Okay.  What's in it?

20   A.   I can't testify as to the numbers that are --

21 that are in there.

22   Q.   Why?

23   A.   Because I don't recall.  I can't give you an

24 exact number, and I don't want to tell you a wrong

25 number.

209

1    Q.   Why didn't you ask for a copy of that?

2    A.   I saw it.  I don't -- I, honestly, assumed that

3 you had it.

4    Q.   Okay.  But if you knew you had to testify about

5 this and there was a filed document that reflected

6 income for Free Speech Systems, why didn't you get a

7 copy and bring it with you?

8    A.   Like I said, I assumed you had it.

9    Q.   Do you have an electronic copy?

10   A.   I don't -- no, I don't have an electronic copy.

11   Q.   Okay.  So Mr. Roe gave you a hard copy and

12 then --

13   A.   No.  He didn't give me a hard copy.  He showed

14 me a copy.  He did not give me a copy.  I don't have a

15 copy of the Schedule C.

16   Q.   And you just purposefully didn't ask him for a

17 copy to put with the -- I mean, you went to accounting

18 and asked her to pull a profit-loss breakdown?

19   A.   Well, I did that because this is -- I know this

20 is different.  This is updated information that was

21 updated just this past week.  So that's why I did that.

22   Q.   Why were the profit-losses from 2020 updated in

23 February of 2022?

24   A.   As I testified earlier, there was an issue with

25 the -- the deductions associated with some of the

Paz, Brittany                                      02-15-2022

210

1 equipment and that had to be adjusted.

2    Q.   And you learned that -- and Mr. Roe was the one
3 that made that adjustment and informed you, correct?

4    A.   I don't know whether he made the adjustment,
5 but he informed me of why the numbers were different.

6    Q.   Did you ask why so late?

7    A.   I didn't ask why so late.

8    Q.   Do you think, sitting here today under oath,
9 that -- that the numbers that are putting forth in these
10 balance sheet, the profit-loss, and everything -- and
11 the documents, Exhibit 17, do you believe those are
12 accurate?

13    A.   Yes.  With the -- with the exception that -- of
14 the $160,000 that I testified to, these numbers are
15 accurate.

16    Q.   Is it normal, based on any experience you may
17 have, for a company to accrue a $53 million debt over an
18 unknown amount of years, paying zero back on it, and
19 then in the middle of litigation, post losing a default
20 judgment dispute, all of the sudden that debt's secured
21 up and a payment system's been made in the last four --
22 four months?  Does that sound normal?

23    A.   I -- well, first of all, I don't have any
24 experience with that, so I don't think I am qualified to
25 answer that question.  But I also don't know when that

211

1 note was written, so I -- I don't -- I'm not qualified
2 to answer that question.

3    Q.   Does Mr. Roe work at Infowars?

4    A.   No.  He's not an employee of Infowars.

5    Q.   Okay.  Where's he an employee of?

6    A.   He's a consultant.  He's an independent
7 consultant.

8    Q.   He's a consultant, or he's a tax attorney, or
9 he's a CPA?  What is it?

10    A.   I don't know.  You'd have to ask him.  He's not
11 an employee.

12    Q.   Well, you were tasked with learning the net
13 worth of the company.

14    A.   Yes.

15    Q.   And some random person came in and started
16 telling you stuff.

17          And you didn't vet what his credentials
18 were?

19    A.   No.  I'm not -- I wasn't responsible for
20 retaining him.  So he was retained by the company.  I
21 didn't vet him myself, if that's the question.  But --

22    Q.   So Free Speech --

23    A.   -- he had already been hired.

24    Q.   So Free Speech Systems retained Mr. Roe?

25    A.   Yes.  As a consultant.

212

1    Q.   And a consultant for what?  These cases?

2    A.   So I -- just -- just to make clear, he
3 originally was retained by PQPR.

4    Q.   How do you know?

5    A.   Just based on my conversations with him, he
6 worked for PQPR.  And then at some point in time, that
7 ended, and then he was subsequently retained as
8 consultant for Free Speech.  But, originally, he was
9 retained by PQPR.  That's the discussion we had earlier
10 about the lawyer for PQPR who had retained Mr. Roe.

11    Q.   Okay.  So you got a company that has a dormant
12 debt of about 50 -- over $50 million.  You've got some
13 sort of -- I don't even know if you can -- financial
14 consultant, tax consultant.

15          What is -- what kind of consultant?

16    A.   I don't know how to -- how to describe it.

17    Q.   So you --

18    A.   Just consultant.

19    Q.   So somebody could just walk into you as a
20 corporate representative preparing for a deposition, and
21 say, hey, I'm a consultant, and you're just believing
22 every word they say?

23    A.   No.  He was already retained by the company
24 prior to me coming there.  Mr. Jones indicated to me
25 this was the person that was gonna help me understand

213

1 the financial documents.  And so did I trust Mr. Jones'
2 representation as to Mr. -- Mr. Roe, then, yes, that's
3 accurate.  But, no, no, a random person didn't just walk in.

4    Q.   So Mr. Jones vouched for Mr. Roe?  That's your
5 testimony?

6    A.   He indicated to me this was the person that
7 would help me understand the documents.

8    Q.   Okay.  Do you understand these documents?

9    A.   I am not an accountant, and I am not good with
10 numbers.  So I'm doing my best here.

11    Q.   If Mr. Roe is a consultant, wouldn't he be the
12 person that should have been designated for this topic?

13    A.   I don't -- I think that I can answer your
14 questions adequately.

15    Q.   Well, you just said you're not an accountant;
16 you're not a financial person.

17    A.   I'm not.

18    Q.   Okay.  And you don't know what my questions are
19 gonna be.

20    A.   No, I don't.

21    Q.   Yet, your testimony to the jury, under oath, is
22 that you can answer them.

23    A.   I think I understand enough about it to be able
24 to answer the questions.

25    Q.   Instead of wasting time talking with Mr. Roe

Paz, Brittany                                                02-15-2022

214

1 about this topic, don't you think it would have been
2 more efficient to let you have less topics and less
3 preparation and focus on the other stuff and then let
4 Mr. Roe discuss all the things that he's been doing?
5    A.  Unfortunately, that is above my pay grade.  I
6 don't make such decisions.
7    Q.  Did -- would Mr. Roe be more qualified to talk
8 on this subject than you?
9    A.  I don't know because I don't know the questions
10 you're going to ask me.
11    Q.  Well, let's say this:  In preparation -- in
12 preparing for today, Mr. Roe gave you the information
13 you needed, correct?
14    A.  Not all of it.  So the profit-loss statement,
15 as I said earlier, I received this from Melinda, and
16 this was in -- amongst the materials that I had access
17 to; although, Mr. Roe went through it with me.
18    Q.  Who owns PQPR?
19    A.  PQPR is owned 20 percent by Dr. and Mrs. Jones
20 and 80 percent by PLJR, ALC [sic].
21    Q.  David Jones, what was his wife's name?
22 20 percent by David Jones and who?
23    A.  And his wife.  I'm sorry.  Her name is escaping
24 me right now.  And Mrs. Jones.
25    Q.  Carol, I think, right?

215

1    A.  Oh, yes.  That's sound right.
2    Q.  Carol Jones.
3         Okay.  And then were PLJR.
4    A.  PLJR owns 80 percent of PQPR.
5    Q.  Okay.  And who owns PLJR?
6    A.  PLJR is owned 10 percent by Carol Jones, so
7 Mrs. Jones, Alex's mother, and 90 percent by the AEJ
8 Trust 2018.
9    Q.  Okay.  When did the trust begin?
10    A.  So I think the trust was finalized in 2018,
11 that's why it says AEJ Trust.  But as I said earlier,
12 Mr. Jones had actively been engaged in estate planning
13 prior to that.  But I think it was officially formed --
14 formed in that year.
15    Q.  Okay.
16         MR. BANKSTON:  Who's JLJR?  Who's this
17 one?
18    Q.  (By Mr. Ogden)  Yeah.  I've got a JLJR, as well.
19    A.  You know what, I'm not sure about that one.  I
20 know PLJR is -- is the one that's -- owns PQPR.
21    Q.  Okay.  The -- so Free Speech Systems gets into
22 litigation early 2018, and the trust is executed that
23 same year through PLJR, ALC [sic], correct?
24    A.  ALC or LLC?
25    Q.  LLC.

216

1    A.  Yeah.  LLC.  So -- so, like I said, I think
2 that the -- the trust was executed in that year, but the
3 estate planning for the trust had begun prior to that.
4    Q.  That's fine.
5    A.  Sure.
6    Q.  My question was just PLJR.
7         And the -- who is the trustee for this
8 trust?
9    A.  The trustee?  You know, I'm not sure who the
10 trustee is.  I know who the beneficiaries are.
11    Q.  Who are the beneficiaries?
12    A.  So the beneficiaries are -- of the corpus of
13 the trust are his children, so they're -- in the trust
14 are, you know, whatever money is in there.  And Alex as
15 a remainderman.  And then the income going into the
16 trust is paid to Alex.
17    Q.  Okay.  So Mr. Jones' income comes from the
18 profits of the trust.
19    A.  But, ultimately, that -- I don't think that
20 income --
21    Q.  I didn't ask a question --
22    A.  Okay.
23    Q.  -- Ms. Paz.
24         MS. BLOTT:  Can I ask when we're referring
25 to Mr. Jones, we articulate which Mr. Jones we are

217

1 referring to?
2         THE WITNESS:  Oh, you mean whether it's
3 Dr. Jones or Alex Jones?  Okay.
4         MS. BLOTT:  So that there's no confusion
5 in the record.
6    Q.  (By Mr. Ogden)  The income -- so the income goes
7 to the remainderman, Mr. -- Mr. Alex Jones, correct?
8    A.  The income -- the income is paid to Mr. Jones,
9 but with the caveat, which is what I was trying to say
10 before, that there is another entity, AEJ Holdings, that
11 owns Alex's interest in -- in PL -- in PQPR.  So, total,
12 Alex's interest is like 72 percent.
13    Q.  Say that again AL...
14    A.  AEJ Holdings, LLC.
15    Q.  What's -- do you know Alex Jones' middle name?
16    A.  I don't.  I'm so sorry.
17    Q.  I bet it starts with an E, though, huh?
18    A.  (Nodding.)
19         So that ownership interest in PQPR, he
20 owns about a -- if you divide it amongst his parents and
21 their percentages, he owns a 72 percent interest.  So he
22 sold his interest in that to AEJ Holdings, and there's a
23 25.9 or 29 -- $25.9 million note on that.
24    Q.  Okay.  Where's that come from?
25    A.  What do you mean where does it come from?

Paz, Brittany                                              02-15-2022

218

1    Q.   Where does the $29 million note come from --
2 or, I guess, 29.9.
3         Where does the $30 million note come from?
4    A.   So I thought I had seen the note.  It's the --
5 it represents the value of Mr. Jones' interest in PQPR.
6    Q.   Okay.
7    A.   Such that it -- such as it were because it's
8 about -- it's 72 percent.  And then the money that is
9 paid principal and interest off of that note is paid to
10 Alex Jones.
11   Q.   And I don't need you to, you know, kind of be
12 shooting from the hip guessing on the numbers.  If you
13 need to refer back to your notes, that's fine.
14   A.   No.  I believe that that's accurate.  It's
15 25.9.
16   Q.   Okay.  Did you take notes when you met with
17 Mr. Roe?
18   A.   (Shaking head.)  I don't believe so.  Aside
19 from looking at the documents.
20   Q.   Okay.  So Mr. Roe just broke down 20 percent to
21 David Jones; 80 percent to PLJR, LLC, who PLJR is
22 10 percent Carol, 90 percent AEJ Trust, which has
23 Mr. Jones' children as beneficiaries, Mr. Jones as the
24 remainderman, and the income due to the remainderman
25 goes to AEJ Holdings, which is 72 percent of the

219

1 interest, which would be roughly $29.9 million; that's
2 correct?
3    A.   72 percent of his interest in -- which
4 represents his interest in PQPR, not of the interest,
5 but his interest in that company.
6    Q.   Okay.  And you just can do all -- you -- you
7 learned all of that from Mr. Roe with no financial
8 background without taking any notes?
9         That's just what I want to make clear for
10 the record.
11   A.   I have a decent memory.
12   Q.   Okay.  I noticed you pulled your yellow pad
13 out.
14   A.   I have some notes.
15   Q.   Let's mark that as Exhibit 18.
16   A.   I don't think I took any notes.
17        (Exhibit 18 marked.)
18   Q.   (By Mr. Ogden) Mark the whole thing.
19   A.   The whole -- I don't know if there's any
20 information in there about my other clients.
21   Q.   Okay.  Well, it's been pulled out, and you said
22 that you got notes in it.
23        So by the Rules of Texas Procedure, I can
24 mark it as an exhibit, and it's gonna be admitted into
25 the deposition's record.  And you'll get a copy back

220

1 after she gets some copies to scan in.
2    A.   I haven't reviewed --
3    Q.   I'm sorry.
4         MR. OGDEN:  Ms. Paz.
5    A.   -- the notebook.  I'm just saying, I haven't
6 reviewed it.
7    Q.   (By Mr. Ogden) Can I see that?
8    A.   Sure.
9    Q.   Thank you.
10        (Witness handing notepad over.)
11        (Brief pause as Mr. Ogden reviews
12        notepad.)
13        MS. BLOTT:  These are the notes that were
14 transcribed and provided to you.
15        MR. OGDEN:  They were?
16        Because I don't remember these notes on
17 here.  These notes with the conversation with Bob, those
18 aren't in there.  I got $70 million sales.  Looks
19 like -- what is that under there?
20   Q.   (By Mr. Ogden) 260 D.
21        What is that?
22   A.   Divided by 260 days.
23   Q.   Okay.
24   A.   Those are business days.
25   Q.   And then, also, in Exhibit 18, you've got this

221

1 no way to determine --
2    A.   Which.
3    Q.   -- which...
4    A.   I don't -- I'm sorry.  I can't read my own
5 handwriting.
6    Q.   Blank generated checks.
7    A.   I don't -- wait.  Generated.  Generated.  That
8 is generated, yes.
9    Q.   What is that one?
10   A.   I'm not sure.
11   Q.   Okay.  So --
12   A.   But I -- I think --
13   Q.   And then it says here, no spoliation letter.
14 Then it talks about deplatforming.
15        What do you mean no spoliation letter?
16   A.   I asked when -- or if he knew or if anybody at
17 the company knew whether we had received a spoliation
18 letter for the Sandy Hook litigation.
19   Q.   Okay.  It says chain of title in parentheses.
20        Tell me about the chain of title you and
21 Bob talked about.
22   A.   That's what I just went over --
23   Q.   Okay.
24   A.   -- regarding Free Speech and the ownership
25 per -- on the ownership and who owns what and what

Paz, Brittany                                              02-15-2022

222

1 percentages. But, ultimately, I did talk to Melinda
2 about that, too.
3    Q.   These two words right here (indicating), what
4 does that say?
5    A.   Bill Love files tax returns.
6    Q.   Okay.  Who is Bill Love?
7    A.   I believe he's the company's tax attorney.
8        MS. BLOTT:  And just let me interrupt a
9 minute.
10       Are there any notes in there about
11 conversations you and I had?
12       THE WITNESS:  There might be.  That's why
13 I'm saying I haven't reviewed it.  That's why I'm saying
14 I think that I should review it first.
15       MR. OGDEN:  Ms. Blott, the witness pulled
16 this out to rely on it in answering my questions.
17   A.   I did not look at that to answer your
18 questions, sir.
19   Q.   (By Mr. Ogden) Okay.  Well, we can go back to
20 video, if you'd like, and I can -- there's -- I watched
21 you start doing this (flipping pages in notebook).
22 So...
23   A.   I didn't look at anything in there.  I didn't
24 pull out anything in there.
25       MR. OGDEN:  Ms. Blott and I can handle

223

1 this.
2        Ms. Blott, how would you like to proceed?
3        MS. BLOTT:  I would like to look at it
4 such that to the extent and only to the extent that she
5 took any notes regarding conversations she had with me,
6 they be redacted.  The entirety of -- of anything else
7 that she has in there, fair game.
8        MR. BANKSTON:  Well, we -- just to put
9 this on the record -- this is Mr. Bankston.  We would
10 have to bring a motion on that.  Because if the witness
11 was using this notepad to refresh her memories, then
12 regardless if it contained privileged information, we're
13 entitled to see it.
14       MS. BLOTT:  Well --
15       MR. BANKSTON:  So we'd have to bring a
16 motion on that.  And so that's what we'd want to know is
17 if you want to take this from us right now.
18       MS. BLOTT:  Yes, I do.
19       MR. BANKSTON:  Okay.  Then we can bring a
20 motion.
21       MS. BLOTT:  Because -- just to clarify,
22 she transcribed those notes, and they were provided to
23 you and are in --
24       MR. BANKSTON:  Kind of sounds like you're
25 testifying about what that is, and that sounds weird to

224

1 me.
2        MS. BLOTT:  Well, I don't give a shit.
3        Anyway, she transcribed the notes.  They
4 were in her binder.
5        MR. OGDEN:  Ms. Blott -- let's slow down.
6 Let's slow down, Ms. Blott.  Let's slow down.
7        MS. BLOTT:  You took her binder --
8        MR. OGDEN:  Ms. Blott.
9        MS. BLOTT:  -- and she pulled out the
10 notebook because she does not have her transcribed
11 notes.
12       MR. OGDEN:  Okay.  Ms. Blott, let me just
13 back up.
14       One, I am one who admires, you know,
15 zealous advocacy of a client.  Let's watch our language
16 on the record, just out of respect for the Court.
17 Second --
18       MR. BANKSTON:  If not for me.
19       MR. OGDEN:  Second of all, if these were
20 transcribed, there should be no problem with me reading
21 them.
22       THE WITNESS:  No.  But...
23       MR. OGDEN:  And your witness is the one
24 who made the decision to bring them and then take them
25 out.

225

1        MS. BLOTT:  I disagree.  I'm going to...
2        MR. OGDEN:  Disagree with what?  Her
3 bringing them or taking it out?
4        MS. BLOTT:  I disagree with the position
5 that you're taking.  When she transcribed those notes,
6 she would have omitted conversations with me.
7        MR. OGDEN:  Okay.
8        MS. BLOTT:  Because she does not have
9        MR. OGDEN:  If you would like to --
10       MS. BLOTT:  -- her transcribed notes --
11       MR. OGDEN:  If you would like to go
12 through -- and I'm not gonna read them.  I just want to
13 see how deep into it.  Okay.  So it's pretty deep.
14       If you would like to go into this and --
15 and redact -- or, I guess, just what are you gonna do?
16 Pull them out?
17       MS. BLOTT:  No.  I'm -- to the extent that
18 they're in the middle of the page with something else,
19 I'm going to redact it.
20       MR. BANKSTON:  I'd like to have photo
21 copies made of that before you do that.
22       MS. BLOTT:  Of what?
23       MR. BANKSTON:  You need to make sure that
24 there's secured photocopies of what is under those
25 redactions.

Paz, Brittany                                          02-15-2022

226

1        MR. OGDEN:  Yes.  Before you redact -- how
2 are you going to redact?
3        MR. BANKSTON:  Because we're going to move
4 to compel.
5        MR. OGDEN:  Yeah.
6        Hold on, Mark.  Let me do this.
7        How are you gonna redact this?  Like
8 how -- the actual process of covering the information,
9 how are you gonna do it?
10       MS. BLOTT:  Okay.  Here's what I suggest:
11 I will scan them in so that the original is preserved,
12 and then I will use a copy and save the document and
13 redact any information as it relates to conversations
14 with me.
15       MR. OGDEN:  Okay.  How are we going to do
16 that and allow me to ask questions about the notes here
17 right now?
18       MS. BLOTT:  Well, he's the one that just
19 said he wants to preserve it in its original form.  So
20 what do you propose?
21       MR. OGDEN:  I agree.  I agree.
22       MS. BLOTT:  We can go off the record, run
23 them through a copy machine.  I can take the originals.
24       MR. OGDEN:  If we want to do that, I think
25 we can have Sonya do a copy.

227

1        MR. BANKSTON:  Let's do it right now.  And
2 then let you sit down --
3        MR. OGDEN:  And I'll let you go through
4 it.  I'm trying to hurry.  It's 2:18 --
5        MS. BLOTT:  I understand.
6        MR. OGDEN:  -- and I'm trying to get
7 Ms. Paz out of here by 4:00 o'clock.  So...
8        THE WITNESS:  Do you want -- do you want
9 me to go through it?
10       MR. BANKSTON:  You know what might work
11 best is if you were to -- and I see you are reviewing
12 now.
13       MS. BLOTT:  Yeah.
14       MR. BANKSTON:  If you were -- if you were
15 to determine if you even need to redact.  And if you do,
16 then I will make sure that this office scans it for you
17 and you're able to have a copy.
18       MS. BLOTT:  This entire page needs to be
19 redacted.  Well, yeah.
20       MR. BANKSTON:  Okay.  Well, why don't you
21 make arrangements with the office staff here to have
22 that scanned so you can have an electronic copy, and
23 then you can make whatever redactions you believe you
24 need to make and we can bring our motion.  And then
25 Mr. Ogden can --

228

1        MR. OGDEN:  We can go off the record.  I
2 see -- I just realized you're pounding away.
3        THE VIDEOGRAPHER:  We are off the record
4 at 2:19.
5        (Recess from 2:19 p.m. to 2:28 p.m.)
6        THE VIDEOGRAPHER:  We are back on the
7 record at 2:28.
8        MR. OGDEN:  We're back from a small break.
9        Ms. Blott, were you able to go through the
10 notes that Ms. Paz took out mid deposition?
11       And it's plaintiff's position that those
12 notes in their entirety should be able to be marked as
13 an exhibit and added as an exhibit to this deposition.
14 However, I believe Ms. Blott has taken issue with that
15 position.  I'm not sure what the basis is, but I will --
16 I will say -- one more point before I hand it over to
17 Ms. Blott.  That a witness pulling out notes
18 privileged -- conversation with an attorney or not, are
19 not privileged and would be akin to an attorney sitting
20 there whispering into the witness' ear, which would also
21 be completely allowed to be produced and should be
22 produced to us.
23       MR. BANKSTON:  Yeah.  If I can just add
24 something to the record really quick.  This is Attorney
25 Bankston.

229

1        And I'd just like to -- to make a citation
2 to the -- to the Kerns case.  And -- I mean, that's just
3 something I pulled off the top here.  But in Kerns, the
4 Court agreed that if materials that were otherwise
5 claimed as attorney-client privilege could be protected,
6 but when the witness relies on such documents to provide
7 deposition testimony, it presented, quote, a conflict
8 between the liberal interpretation required under our
9 own rules of discovery and the liberal construction in
10 favor of the exercise of the attorney-client privilege.
11       Therefore, the Court decided that any
12 privileges were waived once the witness relied on that
13 document to provide testimony.  The Court said it would
14 be unconscionable to prevent the adverse party from
15 seeing and obtaining copies of it.
16       We've now been told that we will be
17 prevented from seeing and obtaining copies of them.  We
18 object and we will move to compel.
19       MR. OGDEN:  Thank you, Mark.
20       Ms. Blott, the floor's yours.
21       MS. BLOTT:  Thank you, very much.
22       The legal pad that Ms. Paz pulled out is
23 the handwritten notes of the transcribed notes that she
24 provided to counsel yesterday.  When she transcribed
25 those notes, she did not, obviously, include the

Paz, Brittany                                           02-15-2022

230

1 confidential communication with her -- with the counsel
2 for Free Speech Systems, Inc. And because she did not
3 have her transcribed notes with her today, she pulled
4 out the legal pad -- and did not have those notes,
5 through no fault of her own.
6          She pulled out the legal pad and has
7 not -- we will have to check the videotape. I don't
8 think that she has referred to it. However, that being
9 said, I have offered to take those portions of the
10 tablet that are subject to the attorney-client privilege
11 and redact them. And my understanding is that your
12 position is that that attorney-client privilege has been
13 waived.
14          MR. OGDEN: My -- my position is, yes,
15 it's been waived.
16          MS. BLOTT: Okay.
17          MR. OGDEN: For the sake of efficiency,
18 how many pages do you need to redact?
19          MS. BLOTT: Two.
20          MR. OGDEN: Okay. If you'd like to pull
21 that yellow piece of paper off and stick it over the
22 page that those are in, we can go through them with this
23 witness. We don't want to have to come back. It's
24 expensive for everybody. And then we can have that
25 given to the court reporter so that she can preserve the

231

1 original, and we can brief whether or not we're entitled
2 to the two redacted pages.
3          And, just to be clear, the two pages
4 you're referring to are attorney work product or are
5 they attorney-client privilege?
6          MS. BLOTT: Attorney-client privilege.
7          MR. OGDEN: Okay. The bigger question is:
8 Are they, like, bad for you guys or what?
9          MS. BLOTT: No, not at all.
10          Oh, okay.
11          MR. OGDEN: I get caught up, too.
12 Sometimes I argue just to argue. I was just curious.
13          MS. BLOTT: Do you want me to pull these
14 out and photocopy them and give the originals to her?
15 Is that what you suggested?
16          MR. BANKSTON: Wouldn't we be fine --
17          MR. OGDEN: I just said, we -- we can have
18 the court reporter withhold the exhibit -- the
19 unredacted version and she'll have a copy of it, and
20 then we can -- you can get that from her, send it to
21 Court, and we can have our motion.
22          MS. BLOTT: Well, just to be perfectly
23 clear, I don't have a problem with you having copies of
24 her notes, except to the extent of the pages that
25 contain...

232

1          MR. OGDEN: The good part about it is,
2 when I go through that, other than those two pages
3 you're talking about, I bet they're verbatim. I hope
4 that they are.
5          THE WITNESS: Do you mean my notes?
6          MR. OGDEN: Uh-huh.
7          THE WITNESS: Pretty -- yeah.
8          The top part of the page.
9          MS. BLOTT: Okay. That's what I thought.
10 I just wanted to make sure.
11          THE WITNESS: This makes me wish my
12 handwriting was better. Now everybody's gonna see my
13 real --
14          MS. BLOTT: Well, at least we're off the
15 record.
16          MR. OGDEN: Everybody's gonna think you're
17 a surgeon.
18          (Brief pause.)
19          (Ms. Blott handing notepad to Mr. Ogden.)
20          MR. OGDEN: Thank you.
21          Mark, take a gander.
22 Q. (By Mr. Ogden) Exhibit 16, maybe 17 -- 17.
23 A. Okay.
24 Q. Okay. Have you ever seen that before?
25 A. I don't remember.

233

1 Q. Okay. Do you know what a UCC-1 is?
2 A. Kind of. Like I said, I'm not an accountant.
3 So kind of.
4 Q. Okay. You understand that this goes directly
5 to Free Speech Systems assets and/or liabilities,
6 correct?
7 A. Yes.
8 Q. What is -- what's your understanding of what a
9 UCC-1 does?
10 A. I don't -- I -- honestly, I don't think I could
11 tell you with any -- with any specificity.
12 Q. That's fine. You said that you had a general
13 understanding what it was.
14          I just want to know what you believe it
15 is.
16 A. I think it's a financing statement for the --
17 for the company.
18 Q. What do you mean financing statement?
19 A. I think that it's a statement on the company's
20 finances to the government.
21 Q. Okay. What about the company's finances?
22 A. I -- I don't know. Like I said, I don't
23 recall. I don't know whether I've seen this.
24 Q. Okay. So that's fine.
25 A. I don't know if I've spoken to anybody about

Paz, Brittany                           02-15-2022

234

1 it.
2    Q.   Based on those two answers, I'm gonna go ahead
3 and assume really you don't know what this document is?
4    A.   Right.
5    Q.   Because you said it's a financing statement,
6 which is -- it says UCC financing statement at the top.
7    A.   Basically.
8    Q.   You're just kind of reading it.
9         So when it comes to liabilities of the
10 company, are any of them secured?
11   A.   Secured by -- what do you mean?  Secured by a
12 note?
13   Q.   Do you know what a secured debt is?
14   A.   I'm sorry.  I don't -- I don't know how to
15 answer that, and I'm not sure what the answer is.
16   Q.   When coming to evaluate the company's net
17 worth --
18   A.   Uh-huh.
19   Q.   -- you had to look at liabilities and you had
20 to look at assets, right?
21   A.   Right.  Yes.
22   Q.   Okay.  Do you know what the difference is on a
23 secured liability versus an unsecured liability?
24   A.   I don't know the difference.
25   Q.   So as you sit here today, you are in no

235

1 position to testify as to whether or not any of the
2 company's net worth is in a secured debtor's hands or if
3 any of it has been secured whatsoever, true?
4    A.   I don't know.  That's right.
5    Q.   Okay.  Do you -- you remember you talked to
6 Bob?
7    A.   Yeah, I spoke to Bob.
8    Q.   And that's -- and that's Bob Roe?
9    A.   Yes.
10   Q.   Okay.  And Mr. Roe, he gave you kind of a
11 presentation, correct?
12   A.   Yes.
13   Q.   Okay.  Do you know what company he works for?
14   A.   Acuity.
15   Q.   Okay.  You see the name on the file at the
16 top-left corner?
17   A.   Yes.
18   Q.   Do you know if Acuity -- do you know when Bob
19 Roe became a consultant for Free Speech Systems -- Free
20 Speech Systems and stopped his relationship with PQPR
21 Holdings, Limited?
22   A.   I don't know the exact date of -- when I asked
23 Bob about it, he said it was a couple of years ago.
24   Q.   Okay.
25   A.   So -- but I don't know the exact date.

236

1    Q.   Because right here, we've got a UCC-1 statement
2 that was filed on November 18th, 2020, correct?
3    A.   That's what it says.
4    Q.   By Bob Roe's company, correct?
5    A.   I see that.
6    Q.   On behalf of Free Speech Systems as the debtor,
7 correct?
8    A.   That's correct.
9    Q.   And on -- and as the secured party in Paragraph
10 3, it lists PQPR, correct?
11   A.   That's right.
12   Q.   Could that be a conflict of interest?
13   A.   I can't say.
14   Q.   Because it sounds like a conflict of interest.
15   A.   I don't -- I don't know.
16   Q.   Is it -- have you ever -- I think I know the
17 answer to this.
18        But have you ever seen a company secure a
19 $53 million debt nine months after a lawsuit is filed on
20 a debt that no one has any idea how old it is or why
21 it's so big?
22   A.   Well, I have an idea as to why it's so big.
23 But I can't answer your primary question, which is, in
24 my experience, have I ever seen that, because, as I've
25 said, I don't have that kind of experience.  I don't

237

1 think I'm qualified to answer it.
2    Q.   Why is it so big?
3    A.   As I testified earlier, there had been a
4 significant period of time where the -- the product that
5 was being purchased and sold by PQPR on Infowars'
6 website was not being paid to PQPR.  And so that money
7 represents the amount that is due and owing to PQPR for
8 those sales.
9    Q.   Just for the benefit of the jury, you would
10 agree that this spider web of trusts and secured
11 beneficiaries for different subsidiaries or holding
12 companies is just a way for Free Speech Systems to
13 protect its money from people that file lawsuits against
14 them?
15   A.   No, I don't agree.
16   Q.   Okay.  Why'd they set it up this way?
17   A.   I don't know why it was set up this way.
18   Q.   But you definitely don't agree that it -- it
19 was set up to -- to protect the assets of Mr. Jones?
20   A.   I don't know why it was set up.  I don't think
21 it was in relationship to this lawsuit.
22        As I testified earlier, the trusts and
23 that -- that structure of the companies was in motion
24 prior to the lawsuit.
25   Q.   And you got that from Robert Roe?

Paz, Brittany                                    02-15-2022

238

1    A.   Mr. Roe, Mr. Jones; that's correct.

2    Q.   Okay.  So the individual who worked for one
3 company, switched over and worked for another and
4 secured debt to one another with the sole proprietor
5 being a 72 percent beneficiary to three parent holding
6 companies down.

7         You trusted him and you trusted Mr. Jones,
8 the sole proprietor of a company that is the subject of
9 a number of defamation lawsuits involving parents who
10 lost children in a school shooting, who he, for years,
11 then went on to say that it didn't happen or it did, but
12 -- but there was a government conspiracy and all this
13 other stuff.

14         That -- those are the two people you
15 trusted, correct?

16    A.   Those are the people with the information, so
17 yes.

18    Q.   You think it's odd that they picked somebody
19 for this topic that has zero financial background?

20    A.   I can't answer that; I don't know.

21    Q.   When -- were you surprised when they said
22 you're gonna be talking about our finances and net
23 worth?

24    A.   I wasn't surprised.  I had seen the notice of
25 deposition.

239

1    Q.   Were you surprised when people started having
2 to make charts and breakdowns of the different
3 subsidiaries, who owned them and how many percent?

4    A.   No, not necessarily.  I'm aware that businesses
5 own shares through LLCs -- through other LLCs.  So I
6 don't think it's necessarily odd.

7    Q.   No.  You're -- you're completely right.

8         But are all of the holding LLCs typically
9 going to be the -- a sole proprietor's parents or
10 children or themselves?

11    A.   Oh, like I said, I don't know.  I'm not
12 qualified to answer that.

13    Q.   What's a spendthrift trust?

14    A.   I don't know if that's what this type of trust
15 is.  And, honestly, I don't have a background in trust
16 and estates either, so I can't answer that.

17    Q.   So throughout this, no one even told you the
18 AEJ Trust is a spendthrift?  Nobody even told you that?

19    A.   I don't know what type of trust it is, no.

20    Q.   You didn't ask either, right?

21    A.   I know what the trust does.  But...

22    Q.   Didn't ask you that.

23    A.   But, no, I don't ask -- I didn't ask what type
24 of trust it was.

25    Q.   Okay.  Why not, other than you didn't know to

240

1 ask?

2    A.   Well, I didn't know to ask.  But I think that
3 they tried to give me the information that I needed to
4 testify on the topic.

5    Q.   You said that you think they tried to give you
6 the answer -- the information you needed.

7         Or could it also be that they -- you
8 accepted as true the answers that they wanted you to
9 accept?

10    A.   No.  I think also the problem is that I
11 don't -- I am not -- I am a corporate rep for Free
12 Speech; I'm not a corporate rep for PQPR or PLJR.  So I
13 don't think that I need to necessarily have all the
14 nitty-gritty informations [sic] on other companies that
15 are not Free Speech.

16    Q.   Okay.  Based on this balance sheet, how is
17 Mr. Jones covering his bills every month?

18         Excuse me.  How is Free Speech Systems
19 covering their bills every month?

20    A.   So there are -- so there's income that the --
21 that Free Speech makes off of the relationship with PQPR
22 via the sales.  PQPR also pays money to Free Speech for
23 advertising on the website, that includes the banners
24 and such.  So that's -- and so, essentially, the way
25 that the business makes money is -- is those two primary

241

1 ways.

2    Q.   Okay.  Let's look at the balance sheet that was
3 provided.  It's Exhibit 15, I believe.

4    A.   Okay.

5    Q.   That one (indicating).  Yeah.

6         So the balance sheet is for all of 2020,
7 correct.  You understand that?

8    A.   That's what it says.

9    Q.   Okay.  And can you tell me where the income is
10 that Infowars makes from PQPR for advertising?

11    A.   I don't know if this is not a specific line
12 item.  I know that there are -- there are line items
13 more -- that would give this more specificity, but
14 there's no way to tell from looking at this.

15    Q.   Do you know what the GAP is?

16    A.   What do you mean, the GAP?

17    Q.   Do you know what GAP means in this context that
18 you're testifying about?

19    A.   I don't know what you mean by GAP.

20    Q.   I'm gonna represent to you it's not a store at
21 the mall.

22    A.   I don't think it was.

23    Q.   Generally accepted accounting principals.

24         Do you know any of them?

25    A.   I'm not an accountant, so no.

Paz, Brittany                                                02-15-2022

242

1   Q.   On a balance sheet, you use the term line item.
2        What's a line item?
3   A.   A line item is more specific information on --
4 on these numbers.
5   Q.   Okay.  So if there's not a specific line item,
6 there would still be a -- a broader category that would
7 encompass that income.
8        Can you tell me which one?
9        And if you don't know, I understand.
10   A.   I don't know if it's -- if it's redacted here
11 under assets.  So it may be in this redacted.  But, like
12 I said, I don't know because it's redacted.
13   Q.   Okay.  But your best guess is that, that
14 redacted line item would be your interest made from
15 PQPR?
16   A.   I -- I don't know.  Like I said, I -- I don't
17 see the specific line item here for that.
18   Q.   I have a question.
19   A.   Sure.
20   Q.   PQPR is owed $53 million, according to you,
21 right?
22   A.   About, yes.
23   Q.   Why are they paying Infowars for advertising
24 when they could just keep that money and have the
25 amount -- the -- the note go down?

243

1   A.   I think that the -- the answer that I got when
2 I spoke to Mr. Roe and Mr. Jones was the efforts that
3 have been made to make sure their -- the two companies
4 are -- are not so financially entangled.  So it's easier
5 to have them pay out the marketing and then have us
6 reimburse them than it is to just say, oh, just take it
7 off what I owe you.  It makes for cleaner tracking.
8   Q.   Okay.  So for the first time in the history of
9 this case, we have something in the business from Free
10 Speech that's cleaner tracking.
11        This is where they decided they wanted to
12 be clean?
13   A.   This only happened, like I said, within the
14 last few months.  So...
15   Q.   Before that, what was happening?
16   A.   As I testified earlier, there really was no set
17 schedule to repay this debt or any set schedule to make
18 payments to PQPR for the costs of the products.  So --
19 so there really wasn't anything clean about it.
20   Q.   Okay.  The -- at any point since 2018 to today,
21 has Infowars transferred any assets without an exchange
22 of goods or services?
23   A.   I don't -- I don't know what you mean.  I'm
24 sorry.
25   Q.   Do you know what goods and services are?

244

1   A.   Yes.  Paying somebody in response -- in
2 response to things -- good or service that you received,
3 yes.
4   Q.   You know what transfer means?
5   A.   Transfer of money.
6   Q.   Do you know what assets are?
7   A.   Assets could be money, it could be other
8 items --
9   Q.   Okay.
10   A.   -- including money.
11   Q.   Has -- has Free Speech Systems transferred any
12 assets without an exchange of goods and services from
13 the time this lawsuit was filed to now?
14   A.   That's a really broad question, and I don't
15 know how to answer it.
16   Q.   Well, it's a very broad question, so it should
17 be easy to answer, based on your knowledge.  If there's
18 not very many at all, then it wouldn't be hard at all
19 either.
20   A.   I don't -- honestly, I didn't ask that
21 question, so I don't know how to answer it.
22   Q.   So the broadness of the question doesn't
23 matter.
24        You just don't know one way or the other,
25 no matter how specific I get, true?

245

1   A.   True.  I don't know specifically what you're
2 referring to, but I didn't ask that specific question --
3   Q.   Okay.
4   A.   -- so I don't know the answer to it.
5   Q.   Did you -- you reviewed the Interrogatory,
6 Exhibit 13?
7   A.   Okay.  Yes.
8   Q.   Okay.  So you see B?
9   A.   I'm sorry.  What page are you on?  Is this
10 Page 4.
11   Q.   Page 4, yeah.
12   A.   Okay.
13   Q.   Part B listed in it, it asks for all assets
14 transferred in any manner.
15   A.   Okay.
16   Q.   Okay.  So with that said, were any of these
17 transfers done without an exchange -- a fair exchange of
18 goods and services?
19   A.   What transfers are you referring to?
20   Q.   Any at all.  They didn't itemize them, and
21 that's why you are sitting in the chair to answer the
22 specific question.  That's what you were tasked for.
23   A.   What do you mean itemized transfers?
24        I don't see any transfers listed here.
25   Q.   They're -- they're not itemized.  And the

Paz, Brittany                                      02-15-2022

246

1 reason I'm asking you for the itemized information is
2 because you're tasked with telling us what this means.
3    A.  I guess I don't understand the question.  And
4 I'm sorry that might just be because I don't have a
5 background in this.
6          But it says a list of all assets
7 transferred.  And there is a list of what assets the
8 company possesses, but I don't see where you're
9 referring to that there are transfers.
10         Can you point me to that.
11   Q.  No, I can't.  Because this answer doesn't give
12 them, which is why I'm asking you to give them to me
13 now.
14   A.  Well, the answer is -- the answer here, as I
15 read it, it doesn't seem to be responsive to B at all.
16 It doesn't say that there's any transfers.
17   Q.  You are completely right --
18   A.  Okay.
19   Q.  -- which is why I'm asking.
20   A.  You're assum- -- I guess my question is:
21 You're assuming there are transfers, but you're not
22 sure, and that is your question to me as to whether
23 there any transfers.
24   Q.  Are there any transfers?
25   A.  I don't know.

247

1    Q.  Did you ask?
2    A.  I did not ask.
3    Q.  You would agree that's a pretty bad fact?
4    A.  A bad fact as to what?
5    Q.  That you didn't ask.
6    A.  I did not ask.
7    Q.  If you're sitting here -- I can read these
8 words.  I understand all these words in this order.
9    A.  Yes.
10   Q.  Right?
11         You're sitting here to answer the
12 questions that these answers don't provide, and you
13 can't.
14         It's my -- it's my -- and correct me if
15 I'm wrong.  But the same individuals that have
16 everything to lose in this case gave you these numbers
17 and answers and said, this is what -- that's what it is?
18   A.  Well, I didn't do any independent analysis of
19 it.  I don't have a background in accounting.  So I
20 don't think I'm in a position to verify the accuracy of
21 these numbers.
22   Q.  Right.
23   A.  I asked for them, and I think that I -- I did
24 what I could in the time that was available to me, and
25 testifying as best as I can on it.

248

1    Q.  So you'd say, currently, as you sit there, you
2 are disseminating information that is unverified?  Does
3 that sound familiar with regard to the defendant you're
4 sitting in that chair for?
5    A.  I'm sorry.  I don't understand the question.
6    Q.  Sure.  Free Speech Systems, they spit out a
7 bunch of information that is completely unverified; some
8 of it is just made up.
9          And you're sitting here today -- does --
10 everything that you're giving us, you didn't verify?
11   A.  I didn't independently verify these, no.
12   Q.  You didn't even ask why Robert Roe, a
13 consultant that does not work for the company, had full
14 access to the company's books to the point where a year
15 and -- I don't know -- four months after the year was
16 over was able to go in and change numbers?  You didn't
17 ask why, did you?
18   A.  No.  I asked why, and I gave you my answer as
19 to why.  I know you -- I don't know if you don't
20 understand why.
21         But as far as verifying, I mean, like I
22 said, I didn't check these numbers myself.  But I did
23 see the tax return forms, the Schedule Cs, these numbers
24 are -- are the same as the numbers that are on the
25 Schedule Cs.

249

1          MR. OGDEN:  Ms. Blott --
2          Let's stop there.
3          Ms. Blott, this witness, now for the
4 second time, has given me information that in
5 preparation for her testimony today relied on tax
6 records that have not been produced.
7          What are we gonna do about it?
8          It's kind of -- it's like a revolving door
9 at this point.
10         MS. BLOTT:  It is not a complete tax
11 return.
12         MR. OGDEN:  I don't care what it is.
13 Whatever she had, I want.
14         MS. BLOTT:  Okay.  I'm sorry.  Are you
15 gonna let me finish?
16         MR. OGDEN:  Not if it starts with that.
17         Go ahead.
18         MS. BLOTT:  Just file your motion.
19         MR. OGDEN:  I'm giving you a chance right
20 here to try and tread water a little longer.
21         MS. BLOTT:  The Schedule C that she
22 reviewed, not the complete tax return, is not a
23 finalized Schedule C and has not been filed with the
24 Internal Revenue Service.
25         MR. OGDEN:  But the witness relied on it

Paz, Brittany                                    02-15-2022

250

1 for her testimony right now.  I don't understand where
2 the miscommunication is on my end.
3          MS. BLOTT:  I don't know why she's
4 testifying that she relied on it.  It has the same
5 numbers as what she's looking at now.
6          MR. OGDEN:  How do you know?  Have you
7 seen it?
8          MS. BLOTT:  Yeah.
9          MR. OGDEN:  Okay.  Why hasn't it been
10 produced?
11          MR. BANKSTON:  Why are we not producing it
12 right now at this very second?
13          MS. BLOTT:  Do you want to continue with
14 the deposition?
15          MR. BANKSTON:  Wow.
16          MR. OGDEN:  I -- if that -- I'm literally
17 giving you, you know, a lifeline here to try and just
18 fix it.  If you have it, hand it over.  If not -- we can
19 cure it now.
20          But if that's -- if your response is file
21 your motion or would you like to continue, then I will.
22          MS. BLOTT:  Well, here is my explanation.
23 It's an explanation; it's not an excuse.
24          Since the day I got on this case, I have
25 been working round the clock to get the production --

251

1 verify the documents you have been provided with are
2 full and complete documents.
3          As an example, I realized when I saw the
4 profit and loss and the balance sheet that it had not
5 been produced because of differences in opinions on the
6 definition of financial statement.
7          MR. BANKSTON:  Brad Reeves says you're not
8 telling the truth, by the way.
9          I'm sorry.  I didn't hear you.
10          MS. BLOTT:  I said, oh, gee, surprise,
11 surprise.
12          MR. BANKSTON:  Oh, so -- okay.  So -- so I
13 just want to make sure we're clear on the record.
14          We're just going to go ahead and make the
15 assertion that it's not surprising that Brad Reeves said
16 something that you think is false, because I guess the
17 implication is Brad Reeves is a liar or has a propensity
18 for lying.  And I certainly didn't find that Brad
19 Reeves.
20          MR. OGDEN:  Okay.  Let's just do this.  I
21 think with where we're at now on this impasse, doesn't
22 seem like there's very much more we can do.  If I don't
23 have the document, I'm not really hearing from you that
24 you're going to give it to me.
25          MS. BLOTT:  I am going to give it to you.

252

1 Do I physically have it -- have I had physical
2 possession of it?  No.  It's like --
3          MR. OGDEN:  How'd you see it?
4          MS. BLOTT:  On a screen.
5          It's just like the Bates labeling -- or,
6 excuse me -- the financial documents.  I received those
7 on Friday.
8          MR. OGDEN:  I'm questioning Ms. Paz on net
9 worth.
10          MS. BLOTT:  I understand that.
11          MR. OGDEN:  When were you gonna give it to
12 me?  After the depo?
13          MS. BLOTT:  So what do you want to do?
14          MR. OGDEN:  I don't know much more I can
15 do.
16          MS. BLOTT:  Okay.
17          MR. OGDEN:  I mean, this is every time I
18 turn the corner, I've got something new or something --
19 I mean --
20          MS. BLOTT:  Okay.
21          MR. OGDEN:  I think at this point, we
22 should suspend the depo so that we can brief this to the
23 Court, because the Court, in the hearing, was very
24 clear, that if there are any issues, to bring them to
25 her attention, and she will act swiftly so that the

253

1 trial date is not interrupted.
2          MS. BLOTT:  Okay.
3          MR. OGDEN:  Do you have a solution
4 different to that?
5          MS. BLOTT:  No.
6          MR. OGDEN:  Okay.  Well, then we'll
7 suspend the deposition.
8          MR. BANKSTON:  Actually, can I confer with
9 you for a couple of minutes about some questions?
10          MR. OGDEN:  We won't suspend.  Let's take
11 a five-minute break.
12          MS. BLOTT:  You're not leaving with that
13 notebook in your hand.
14          THE REPORTER:  Okay.  Can we go off the
15 record?
16          MR. OGDEN:  Yes.
17          THE VIDEOGRAPHER:  We are off the record
18 at 2:57.
19          (Recess from 2:57 p.m. to 3:04 p.m.)
20          THE VIDEOGRAPHER:  We are back on the
21 record at 3:04.
22          MR. OGDEN:  We took a break.  I think that
23 at this point it is the safest decision for all parties
24 to suspend any more testimony on net worth until we can
25 get a complete set of documents and -- and kind of have

254

1 a understanding of what direction this is even going to
2 go.  But I do have a couple of follow-ups.
3          MR. BANKSTON:  There's one, two, three --
4 they're marked.
5    Q.   (By Mr. Ogden) And this is Exhibit --
6          THE WITNESS:  It's already -- I think it's
7 already marked.
8          THE REPORTER:  You already marked it.
9          MR. OGDEN:  I know.  But I was gonna make
10 it 18B -- 18A and D so it's clean.
11          I know I should have been a court
12 reporter.  I would have less gray in my hair.
13          (Exhibit 18A marked.)
14    Q.   (By Mr. Ogden) I have marked a couple pages out
15 of your notes, and I want to ask you about it.
16          We'll start with Page -- what's marked as
17 18A out of Exhibit 18.
18          Do you see --
19    A.   Yes.
20    Q.   -- see your notes there?
21          Okay.  Where did these notes come from?
22 Which interview, or who were you talking to?
23    A.   Can I flip back.
24    Q.   You can do whatever you want.
25    A.   Oh, this was a conversation I had with

255

1 Mr. Jones.
2    Q.   Okay.  And it says here at the top, perfect
3 place to post disinfo, hyphen, 4chan, underline.
4          Do you see that?
5    A.   Yes.
6    Q.   What did you think that means -- why did you
7 write that?
8    A.   So this was a conversation I had with Mr. Jones
9 about using 4chan --
10          THE WITNESS:  I'm sorry that's --
11          MR. OGDEN:  It's okay.
12          THE WITNESS:  -- my -- my father.
13 (Turning off phone.)
14    A.   So this was a conversation I had with Mr. Jones
15 about using 4chan for material from which to draw, and
16 Mr. Jones' -- he -- he -- he -- as you can see after
17 that, I talked a lot about Pizzagate and operatives on
18 4chan.
19          And it's Mr. Jones' opinion that 4chan
20 is -- that people purposefully sometimes post
21 information on there for the purpose of misleading.  And
22 he used Pizzagate as an example.  But his position was
23 he didn't realize that at the time.
24    Q.   But after Pizzagate, Mr. Jones realized 4chan
25 was not a reliable?

256

1    A.   Well, not that it wasn't reliable, but that I
2 think he thinks that people are -- people associated
3 with certain entities are posting things on there to try
4 to -- like a breadcrumb to get him to pick up on bait.
5 So I think that that was the sum and substance of that
6 part of our conversation.
7    Q.   What entities?
8    A.   The democratic party, people in the government,
9 any other people that he -- he thinks are trying to
10 spread misinformation.
11    Q.   Okay.  And did Mr. Jones, after Pizzagate, come
12 out and definitively tell his staff that 4chan is not a
13 reliable source to be using?
14    A.   Well, I think my note here says I told them not
15 to do it.  So I think at some point he -- you know, he
16 did convey to them that if you're -- I know you're
17 looking at, but if you're gonna see something on there,
18 make sure that there's other sources.
19    Q.   Okay.  And in this case, the other source was a
20 Twitter post, correct?
21    A.   I think that's what Mr. Daniels says in his
22 answer.  But, yes, that he had seen it on social media;
23 that's correct.
24    Q.   I'm not asking you about it the day after
25 tomorrow.

257

1    A.   Sure.
2    Q.   But it is unquestionable -- you know, it's not
3 really any doubt in this case that what Kit Daniels did
4 was just wrong, right?
5    A.   It was inaccurate; that's correct.  I don't
6 think there's any dispute that the photograph was not of
7 the shooter.  I don't think there's that dispute.
8    Q.   And has anybody during your preparation told
9 you what Mr. Fontaine's gone through?
10    A.   Has he gone through?  I mean, I read through
11 the materials as far as what was posted on the internet
12 and in various comments on the internet.  And I said I
13 read that letter from his therapist.  So I have some
14 idea of what he's been through, yes.
15    Q.   Do you know that Mr. Fontaine suffers from some
16 mental health issues?
17    A.   Pre this post, yes, I am aware of that.
18    Q.   And also post this post?
19    A.   I -- I don't know about that.  Like I said, I
20 read in the document that there weren't a lot of issues
21 post post.
22    Q.   What do you know about his mental health pre
23 this incident?
24    A.   You want me to testify as his -- as to the
25 diagnosis that I'm aware of?

Paz, Brittany                                                02-15-2022

258

1   Q.   Nope.  I want you -- I want you to tell us what
2 you know.
3   A.   Based on that material that I read that I just
4 referenced, his psychological -- it's not a psych
5 record.  It would more adequately be characterized as a
6 letter from his psychologist.  It summarizes his history
7 precontact with Mr. Fontaine, and it does diagnose him
8 with Asperger's.
9   Q.   Okay.  Anything else that you know about
10 Mr. Fontaine?
11   A.   Apart from what's in that letter, no.
12   Q.   You know anything about Asperger's?
13   A.   I don't have any personal knowledge of what
14 Asperger's is, no.
15   Q.   Okay.  I'll tell you it's -- it's on the
16 spectrum of autism.
17   A.   Okay.
18   Q.   And people that suffer from it are generally
19 very -- have a lot of social issues --
20   A.   Okay.
21   Q.   -- with their development and in their ongoing
22 adult life.
23        Did you know that?
24   A.   Like I said, I don't have any personal
25 knowledge about Asperger's, and I'm not really qualified

259

1 to say what it is or what the symptoms are.
2   Q.   Okay.  Well, you were tasked with the knowledge
3 of Mr. Fontaine.
4        And when you saw what it was, you didn't
5 do anything and take any steps to figure out what that
6 meant, correct?
7   A.   Well, I was tasked with what was in the
8 company's knowledge of Mr. Fontaine, which was what was
9 in that letter.
10   Q.   Let me just ask --
11   A.   The definition of Asperger's is not contained
12 in that material.  So...
13   Q.   I'm just asking as person.
14   A.   As a person, I did not do any independent
15 research as to what Asperger's is.
16   Q.   Do you have any personal feelings about what
17 happened in this case?
18   A.   I don't have any personal feelings, no.
19   Q.   What about the Sandy Hook case?
20   A.   I think I was asked that question yesterday.
21   Q.   Okay.
22   A.   I don't have any personal feelings, no.
23   Q.   Okay.  Do you -- is it your position as the
24 company today to sit here and say that Marcel Fontaine
25 did not suffer any injuries or damages as a result of

260

1 being misidentified by Infowars as the Parkland shooter?
2   A.   I don't know the extent to his damages.  I
3 didn't say he didn't suffer damages.  I don't know the
4 extent of his damages.
5   Q.   So we can agree that he did suffer damages?
6   A.   I don't -- I don't know.
7   Q.   Okay.  Has anybody at Infowars told you that
8 people contacted Marcel privately through messaging and
9 made threats?
10   A.   I did not see any private communications in the
11 material that I reviewed --
12   Q.   It's --
13   A.   -- directly to Mr. Fontaine.
14   Q.   And I want you to understand that the reason
15 I'm asking you these questions is:  I think with this
16 case, specifically with all of the documents and all of
17 the sanctions and all of the moving parts that you had
18 to deal with, with Bob Roe and Dustin Whittenburg and
19 Ms. Blott and Mr. Jones and Mr. Pattis and everyone else
20 that you had to go through to get to this point, I want
21 you to know there's a real person on the other side.
22   A.   Okay.
23   Q.   Go to the next one.
24        One follow up.
25        With the 4chan when Mr. Jones said not to

261

1 do it, you didn't ask him when he said that, right?
2   A.   Just based on my notes and just what I remember
3 of my notes, it -- I'm not sure when.  He was
4 referencing in relation to Pizzagate, but I'm not sure.
5        (Exhibit 18B marked.)
6   Q.   (By Mr. Ogden) Okay.  With -- with regard to
7 what's marked as 18B, bottom right corner, it says
8 Infowars, LLC, and then it says Jacobson circled.
9   A.   Uh-huh.
10   Q.   Why?
11   A.   Those two things are not connected.
12   Q.   Why are they in the same box?
13   A.   I was doodling.
14   Q.   Okay.  Why do you have arrows pointing towards
15 it?
16   A.   I was doodling.
17   Q.   Do you remember testifying yesterday?
18   A.   I did testify yesterday.
19   Q.   Do you remember when you said you had never
20 heard of affiliated relations?
21   A.   Yes.
22   Q.   Do you want to take a look a little bit higher
23 than the first box I pointed you to.
24        What's that say in quotations in your
25 notes?

Paz, Brittany                                    02-15-2022

262

1    A.   That was when you referenced it to me on the
2 record.  These are my notes from yesterday's deposition.
3 And so I made a note because you asked me the questions
4 regarding that, and I didn't know the answer.
5    Q.   Okay.  So you wrote this yesterday during the
6 depo or...
7    A.   Yes.  Those are my notes from yesterday --
8 well, I wouldn't call them notes, most of them doodles.
9 But those are from yesterday.
10   Q.   Okay.
11       MR. BANKSTON:  I think that's the same
12 notes.
13       MR. OGDEN:  Yeah.  This is probably the
14 same thing.
15   Q.   (By Mr. Ogden) Which -- do you remember which
16 document Bradley Reeves never produced we were talking
17 about in 18C?
18       (Exhibit 18C marked.)
19   A.   That was in response -- this is today's notes.
20 It's dated.  This was in -- this is the note of your
21 discussion with Attorney Blott about the financial
22 document that wasn't produced and the discussion back
23 and forth about whether it should have been produced or
24 not.
25   Q.   (By Mr. Ogden) Okay.  With -- with how this

263

1 depo's gone, how do you think you did?
2    A.   I think I did pretty good, depending just not
3 how -- obviously, I can't have all of the information
4 about everything under the sun.  But given the task, I
5 think I did okay.
6    Q.   You had eight topics, right?
7    A.   Yes.
8    Q.   You realize that you were not prepared to
9 discuss five -- three of them?
10   A.   Okay.
11   Q.   Okay.  So you still think that's a passing
12 score?
13   A.   Do you want me to give myself a rate from 0 to
14 100?
15   Q.   If you want to.
16   A.   I'm sorry?
17   Q.   I said if you would like to.
18   A.   I'm asking what you would like for me in my
19 answer.
20   Q.   I was just asking if you thought you -- now --
21 now that we are at this point in the depo having to
22 suspend the last topic for a number of reasons, if you
23 thought -- if you still thought now, like you did at
24 beginning, which is that you were prepared?
25   A.   I think I did a decent job, given all the other

264

1 circumstances involved.  And I think the depo's being
2 suspended just because you don't have documents.  I
3 don't -- I don't think that has -- really relates to my
4 testimony.  But...
5    Q.   Okay.  Then I'll clear that up just so there's
6 no confusion.
7        Tell me the information that's in the
8 Schedule C that you reviewed in preparing for you
9 testimony.
10   A.   Oh, I can't cite to it, as I sit here.
11   Q.   You have it memorized?
12   A.   I do not have it memorized.
13   Q.   So you're not prepared to talk about it, if you
14 don't have the document in front of you?
15   A.   I can't talk about it if it isn't in front of
16 me.
17   Q.   Okay.  That's what --
18       MR. OGDEN:  We'll go ahead and go off the
19 record.  We'll suspend there.
20       MS. BLOTT:  Okay.  I have --
21       THE VIDEOGRAPHER:  Off the record?
22       MR. OGDEN:  Stay on.  Ms. Blott would like
23 to make a record.
24
25

265

1            EXAMINATION
2 BY MS. BLOTT:
3    Q.   Ms. Paz, did -- you testified that you did not
4 read the Court's order with respect to the motion to
5 compel and for sanctions --
6        MR. OGDEN:  I'll object.
7    Q.   (By Ms. Blott) -- on the corporate --
8        MR. OGDEN:  I'll object to leading.
9    A.   Yes, I did.
10   Q.   (By Ms. Blott) Did you see the order?
11       MR. OGDEN:  Same objection.
12   A.   The order regarding the sanctions?
13       I -- I don't know that I saw it.  I think
14 we talked about it.
15       MR. OGDEN:  I'm going to object to
16 nonresponsive.
17   A.   I don't -- I don't remember seeing it.
18   Q.   (By Ms. Blott) Did you have conversations with
19 anyone about the judge's expectations?
20   A.   I did have conversations with counsel.
21   Q.   Was it your understanding that you were trying
22 to determine the viewership based on the judge's ruling?
23   A.   Yes.
24   Q.   Did you -- was it your understanding that the
25 judge gave instructions on specific things that could be

Paz, Brittany                                                02-15-2022

266

1 done to determine that?
2        MR. OGDEN:  Object to leading.
3   A.  Yes.
4   Q.  (By Ms. Blott) Did you -- what was your
5 understanding of what was suggested by the judge to be
6 done?
7   A.  As I said, I didn't read the order.  But based
8 on my conversation with counsel, the judge had suggested
9 that we try to determine the number of orders that were
10 placed on the days that those broadcasts were aired, and
11 I believe we did that.
12   Q.  Okay.  And did you speak with someone at
13 Infowars about doing that?
14   A.  The number of orders?  Yes.  I spoke to
15 somebody at the warehouse.  She worked -- well, I don't
16 think she works for Infowars.  I think she might work
17 for PQPR.
18   Q.  In the over-- you've test-- with respect to
19 the documents that you reviewed in preparation for your
20 testimony in the Sandy Hook cases, were those documents
21 separated between the two cases, meaning Sandy Hook and
22 Fontaine?
23   A.  There was a Fontaine folder with production in
24 that specific case; but, otherwise, most of the
25 documents were just Sandy Hook documents.

267

1   Q.  Okay.  Were the documents in the Sandy Hook
2 folder equally pertinent to Fontaine in some instances
3 as it relates to the notice of deposition?
4   A.  In some instances, yes.
5        MR. OGDEN:  Well, we're gonna be here a
6 while.
7   Q.  (By Ms. Blott) Did you have any conversations
8 with employees regarding editorial conversations?
9   A.  I asked employees.  Specifically, I spoke to
10 Adan, to Mr. Jones, to -- to Mr. Daniels regarding
11 whether or not they had editorial discussions, and that
12 would include, I guess, personal discussions.  And I
13 confirmed that there -- they wouldn't -- they didn't
14 have any editorial discussions.  The only discussion
15 that Mr. Salazar recalled -- I think we talked about
16 this yesterday in connection Mr. Jacobson.  That wasn't
17 regarding the Fontaine case, though, that was regarding
18 the Sandy Hook case.  But other than that...
19   Q.  Do you know -- do you know the distinction
20 between how electronic data is printed and hard form
21 versus web pages?
22   A.  How it's printed versus how it appears on a web
23 page?
24   Q.  Yes.
25   A.  You mean how -- how -- is there a difference

268

1 between how it appears?
2   Q.  Yes.
3   A.  I mean, I don't have any technology on that,
4 no.
5   Q.  Okay.  And you made references several times to
6 posts.
7        Were there times that you were referring
8 to actual posts on the internet versus posts that were
9 produced as hard copies?
10       Because I was confused about that.
11       MR. OGDEN:  I'm gonna object to leading.
12   A.  I -- I don't understand the question.
13       MS. BLOTT:  Okay.  Pass the witness.
14       MR. OGDEN:  Got quite a bit of follow ups
15 now that we did that.
16            FURTHER EXAMINATION
17 BY MR. OGDEN
18   Q.  Fontaine folder, correct?
19   A.  There was -- on the Dropbox, there was a folder
20 labeled Fontaine on it, yes.
21   Q.  Who labeled it?
22   A.  I didn't label it.  I don't know who labeled
23 it.
24   Q.  Who sent it to you?
25   A.  It was on the Dropbox.  It wasn't sent to me.

269

1   Q.  Is the Dropbox protected?
2   A.  What do you mean is it protected?
3   Q.  Does it require a password or does it require
4 an invite, or is it --
5   A.  It required an invite, yes.
6   Q.  Who invited you?
7   A.  It was our consultant at the time.  I don't
8 think he's our consultant anymore.
9   Q.  What's his name?
10   A.  Chris LaTronica.
11   Q.  LaTronica.  Just laughing when I write that
12 name because there's no way me or the court reporter can
13 get that one right.
14   A.  It's L-a, capital, T-r-o-n-i-c-a.
15   Q.  Okay.  And Mr. LaTronica is a criminal defense
16 attorney in Brooklyn, New York.
17   A.  I believe so, yes.
18   Q.  Okay.  So your electronic consultant's a
19 criminal defense attorney in Brooklyn.
20       When was he brought on as your consultant?
21   A.  I don't know.  I know he's been involved in the
22 case longer than I have.
23   Q.  Okay.
24   A.  So I don't know.
25   Q.  So as far as preservation and issues with

Paz, Brittany                                    02-15-2022

270

1 document production and possibly altered or -- or
2 corrupted documents, he would be a person that we would
3 want to talk to, correct?
4    A.   I don't think that's accurate.  I think all he
5 did was organize the folders.  I don't think he had any
6 responsibility in production of any documents.
7    Q.   When did he organize the folders?
8    A.   I don't know when he did it.
9    Q.   Before you came on?
10   A.   Before and probably during.  They were actively
11 being reorganized.
12   Q.   Okay.  The -- what -- what files were in the
13 Fontaine folder that Chris LaTronica put together for
14 you?
15   A.   Those would be the -- whatever we had regarding
16 what we produced.  And, as I indicated, there were also
17 files in there that the plaintiffs produced that had
18 your Bates numbers on it.
19   Q.   Did you ask if that was a complete set of all
20 files produced by plaintiffs and defendants?
21   A.   I don't know if it's a complete set.
22   Q.   The judge tasked you with reading every single
23 document produced, right?
24   A.   Yes.  But I don't know -- like I said earlier,
25 there's been an issue with me seeing what's been

271

1 produced in each and every case and whether I had the
2 complete production.  So I -- I don't know, as I sit
3 here, if it was complete.
4    Q.   You said that there was a number of documents
5 that were pertinent during the Sandy Hook doc review
6 that were pertinent to the Fontaine case.
7    A.   Sure.
8    Q.   Okay.  Which ones?
9    A.   So I think the financials documents, there were
10 [sic] overlap.  I think that this issue of editorial
11 discussions, there are overlap.  I think that the issue
12 of sourcing of materials, there's overlap.
13   Q.   Okay.  Why were the financial documents in
14 Sandy Hook pertinent to Fontaine?
15   A.   They're the same financial statements from the
16 company, whether it's Fontaine or Sandy Hook.  So...
17   Q.   Yeah.  But you weren't tasked and did not
18 testify on the financial -- on the financial issues with
19 the company in the Sandy Hook deposition yesterday.
20   A.   No.  I wasn't asked questions about it.
21   Q.   So why did you spend time prepping?
22   A.   I spent one amount of time prepping for the
23 financials.
24   Q.   Okay.  Right.  Because --
25   A.   I mean, I didn't prep once for one deposition

272

1 for the financials and a second time for a second
2 deposition, if that's your question.
3    Q.   Financials weren't a topic yesterday, were
4 they?
5    A.   I wasn't asked about it, no.
6    Q.   Yet you still prepared?
7    A.   I prepared on the financials.
8    Q.   Okay.  Well, it sounds like you prepared for
9 the financials for Sandy Hook and for Fontaine?
10   A.   I prepared to speak on the financials, and I
11 thought I would be asked them at -- at yesterday's
12 deposition.
13   Q.   What made you think that?
14   A.   That's -- that was my impression, but
15 apparently it was inaccurate.
16   Q.   Did you read the depo notices?
17   A.   I did.
18   Q.   They weren't identical.
19        You understand that, right?
20   A.   I understand they're not identical.
21   Q.   Nothing in the deposition topics you were
22 tasked with being prepared yesterday had anything to do
23 with the financials, correct?
24   A.   Okay.
25   Q.   Correct?

273

1    A.   I don't remember, as I sit here today.
2    Q.   Yet.  Over the last two weeks, you've been
3 going through financial docs for -- you know, for the
4 Sandy Hook case, it seems.
5    A.   No.  I think what I testified to was when I got
6 here I was talking to people about the financials.  I
7 didn't have the financial materials prior, arriving
8 here.  So it hasn't been two weeks, no.
9    Q.   Well, you prepped for the financial stuff just
10 for Fontaine, true?
11   A.   Sure.
12   Q.   Otherwise, you wasted a bunch of time doing it
13 for the Sandy Hook depos because you weren't asked --
14 you weren't tasked with it in the topics.
15        I mean, I'm completely lost.
16   A.   Sir, there's no separate preparation that would
17 have been required.  So you -- the way you're phrasing
18 your question is that I would have prepped it once for
19 Sandy Hook and then I would have prepped it a second
20 time for Fontaine.
21   Q.   No.
22   A.   And that's not what I'm testifying to.
23        I'm saying that I reviewed materials
24 regarding financials for both -- you know, just for the
25 depositions.  And I was under the impression you were

Paz, Brittany                                    02-15-2022

274

1 gonna ask them [sic] about it yesterday, but you didn't,
2 and so that was my error.
3        But I didn't make two separate
4 preparations for -- for one case versus the other.
5    Q.  I don't think you understood my question, but I
6 think you ended up giving the answer kind of right
7 eventually.
8        What other -- other than the financials,
9 which I'm still not sure how they are pertinent in any
10 way to the Sandy Hook documents that you were tasked.
11       What other documents were in the Sandy
12 Hook folders and not in the Fontaine ones that you found
13 pertinent to the Fontaine case?
14   A.  Did I just -- I think I just said the
15 sourcing -- the issues regarding the sourcing and the --
16 I forgot what my answer was.
17   Q.  Uh-huh.
18   A.  Sourcing and one other thing I said.
19   Q.  Okay.  So the documents about sourcing.
20       Because the -- and the -- and the sourcing
21 had a little bit of overlap, maybe.
22       But the Fontaine topics were very
23 specific; you would agree?
24   A.  Sure.
25   Q.  The Sandy Hook ones were more broad?

275

1    A.  Sure.
2    Q.  Okay.  Well, other than that, what -- what
3 other -- what other topics did you find pertinent to
4 Ms. Blott's question as far as you -- stuff you looked
5 at in the Sandy Hook folders also was pertinent to the
6 Fontaine preparation?
7    A.  I forgot what I said in addition to sorting --
8 to sourcing.
9    Q.  I did too.
10       And so we can just move on.
11   A.  Sure.
12   Q.  You also said that there is no such thing as
13 editorial discussions in response to Ms. Blott's
14 questioning.
15       You remember that?
16   A.  Right.  I think this was a topic we spoke about
17 yesterday, as well.
18   Q.  Can you think of one editorial discussion that
19 you came across in your preparation for today?
20   A.  Well, I think -- and I said this yesterday --
21 my -- my problem was with the term editorial discussion,
22 just assuming that it happens on a regular basis.
23       But it sound to me like -- in connection
24 with Fontaine, when I spoke to Mr. Salazar, there may
25 have been some discussion about Mr. Fontaine -- about

276

1 this particular case.  I don't know to the extent that
2 was conveyed to Mr. Daniels.
3    Q.  Okay.
4    A.  But, as I said, Mr. -- Mr. Salazar and the
5 three individuals, they sit together, generally, and
6 they pass around their -- their articles.  So I suppose
7 you could term that an editorial discussion; although, I
8 don't think it's formally an editorial discussion.
9    Q.  Well, an editorial discussion would be as if --
10 if Mr. Daniels and Adan and a couple other writers got
11 together about a post, and after having the editorial
12 discussion decided to take it down, right?
13   A.  If that happened.  Because I'm not sure that
14 that was -- that's what happened.  When I -- so when
15 I -- when I talked to Adan, he -- he was -- he's told me
16 that he thought that he spoke to everybody, but I don't
17 know that that was conveyed to Kit.
18   Q.  Did you ever -- I understand that you had some
19 issues with the definition of editorial discussion; is
20 that fair?
21   A.  That's fair.
22   Q.  Okay.  Did you -- did you relay that to
23 Ms. Blott?
24   A.  Did -- that I had an issue with it?
25   Q.  That you didn't know exactly what it was or

277

1 what qualified or constituted an editorial discussion.
2    A.  That's not what my problem is with the term.
3    Q.  What's your problem with the term?
4    A.  The term is -- the problem is, is I don't think
5 that what is happening here could be termed an editorial
6 discussion, and I think I raised that issue yesterday.
7    Q.  What's an editorial discussion?
8    A.  So I think that --
9    Q.  Not what you think.
10       What is an editorial discussion?
11   A.  An editorial discussion would be a -- a
12 conversation amongst people about what should or
13 shouldn't be published, whether or not the articles
14 are -- are grammatically correct, whether they are
15 being -- the sources are written in there appropriately.
16 I think that's an editorial discussion.
17   Q.  How did you come to that understanding of that
18 being an editorial discussion?
19   A.  That's just based on my conversations.  It's
20 not a definition anybody provided to me.
21   Q.  Okay.  If the judge was very clear on what she
22 expected the corporate deposition notice -- or, excuse
23 me -- the corporate representative deposition to be --
24 sorry -- let me back up here.
25       If Judge Guerra Gamble, on the record,

Paz, Brittany                           02-15-2022

278

1 clearly defined what an editorial -- what an editorial
2 discussion was to both myself, Mr. Bankston, and
3 Ms. Blott, would that -- would that definition what she
4 expected you to be prepared to do, would that be
5 important to you in preparing for today?
6    A.  Sure.  As I said, I didn't read the exact
7 order, but I did have a conversation with Attorney Blott
8 about it.
9    Q.  Okay.  But what the judge is -- okay.  So
10 it's -- but you didn't -- you said that -- how much of
11 your definition of editorial discussion came from
12 Ms. Blott?
13    A.  I am aware that the judge wanted me to also
14 find out whether there were any hallway conversations.
15 I don't know if that was the exact term.  But, as I
16 said, when I asked these people those questions, there
17 were no such discussions.
18    Q.  What'd you ask them?
19    A.  What did I ask or who?
20    Q.  What?  What questions were you asking these
21 people?
22    A.  I asked Adan and Kit and I believe I asked
23 Daria, as well, whether they had any discussions and at
24 any point in time with anybody about these cases, and
25 the answer was no, with the caveat of what I've already

279

1 testified to.
2    Q.  Okay.
3         MR. OGDEN:  I think that will be all the
4 redirect I have, other than to just preserve that this
5 will be suspended as far as the last topic, which is the
6 net worth.
7         THE VIDEOGRAPHER:  We are off the record
8 at 3:34.
9         (Proceedings concluded at 3:34 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

280

1              CHANGES AND SIGNATURE
2 WITNESS NAME: BRITTANY PAZ, CORPORATE REPRESENTATIVE OF
3                FREE SPEECH SYSTEMS, LLC
3 DATE OF DEPOSITION:February 15, 2022
4 PAGE LINE  CHANGE                     REASON
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

281

1    I, BRITTANY PAZ, CORPORATE REPRESENTATIVE OF FREE
2 SPEECH SYSTEMS, LLC, have read the foregoing deposition
3 and hereby affix my signature that same is true and
4 correct, except as noted above.
5
6    _____
7    BRITTANY PAZ,
8    CORPORATE REPRESENTATIVE OF FREE SPEECH SYSTEMS, LLC
9
10 THE STATE OF _____)
11 COUNTY OF _____)
12
13    Before me, _____, on this day
14 personally appeared BRITTANY PAZ, CORPORATE
15 REPRESENTATIVE OF FREE SPEECH SYSTEMS, LLC, known to me
16 or proved to me (under oath or through
17 _____ ) (description of identity
18 card or other document) to be the person whose name is
19 subscribed to the foregoing instrument and acknowledged
20 to me that he/she executed the same for the purpose and
21 consideration therein expressed.
22
23
24
25

Paz, Brittany                                02-15-2022

---

282

1       Given under my hand and seal of office on this _____
2 day of _____, _____.
3
4                       _____
5                       NOTARY PUBLIC IN AND FOR
6                       THE STATE OF _____
7 My Commission Expires: _____
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

284

1 of time used by each party at the time of the
2 deposition:
3       Mr. Bill Ogden (5h19m)
                Attorney for Plaintiff
4       Mr. Mark Bankston (0h0m)
                Attorney for Plaintiff
5       Ms. Jacquelyn Blott (0h05m)
                Attorney for Defendants
6       That a copy of this certificate was served on all
7 parties shown herein on _____ and filed
8 with the Clerk.
9       I further certify that I am neither counsel for,
10 related to, nor employed by any of the parties in the
11 action in which this proceeding was taken, and further
12 that I am not financially or otherwise interested in the
13 outcome of this action.
14       Further certification requirements pursuant to
15 Rule 203 of the Texas Code of Civil Procedure will be
16 complied with after they have occurred.
17       Certified to by me on this 21st day of February,
18 2022.
19
20
21                       Amy M. Clark, CSR
                        Texas CSR 8753
22                      Expiration:  10/31/2023
                        Res Ipsa Litigation Support, LLC
23                      Firm No. 11371
                        501 Congress Avenue, Suite 150
24                      Austin, Texas 78701
                        (512) 334-6777
25

---

283

1               CAUSE NO. D-1-GN-18-001605
2 MARCEL FONTAINE,            )  IN THE DISTRICT COURT
                             )
3       Plaintiff,           )
                             )
4 vs.                        )  TRAVIS COUNTY, TEXAS
                             )
5 INFOWARS, LLC, FREE        )
  SPEECH SYSTEMS, LLC, and   )
6 KIT DANIELS,               )
                             )
7       Defendants.          )  261ST JUDICIAL DISTRICT
8
9               REPORTER'S CERTIFICATE
10     ORAL AND VIDEOTAPED DEPOSITION OF BRITTANY PAZ,
11  CORPORATE REPRESENTATIVE OF FREE SPEECH SYSTEMS, LLC
12               February 15, 2022
13     I, Amy M. Clark, Certified Shorthand Reporter in and
14 for the State of Texas, hereby certify to the following:
15     That the witness, BRITTANY PAZ, CORPORATE
16 REPRESENTATIVE OF FREE SPEECH SYSTEMS, LLC, was duly
17 sworn and that the transcript of the deposition is a
18 true record of the testimony given by the witness;
19     That the deposition transcript was duly submitted on
20 _____ to the witness or to the attorney for
21 the witness for examination, signature, and return to me
22 by _____.
23     That pursuant to information given to the deposition
24 officer at the time said testimony was taken, the
25 following includes all parties of record and the amount

---

285

1       FURTHER CERTIFICATION UNDER TRCP RULE 203
2
3       The original deposition was/was not returned to the
4 deposition officer on _____.
5       If returned, the attached Changes and Signature
6 page(s) contain(s) any changes and the reasons therefor.
7       If returned, the original deposition was delivered
8 to Bill Ogden, Custodial Attorney.
9       $_____ is the deposition officer's charges to the
10 Plaintiff for preparing the original deposition and any
11 copies of exhibits;
12       The deposition was delivered in accordance with Rule
13 203.3, and a copy of this certificate, served on all
14 parties shown herein, was filed with the Clerk.
15       Certified to by Res Ipsa Litigation Support, LLC on
16 this _____ day of _____, _____.
17
18
19
20
21                       Res Ipsa Litigation Support, LLC
                        Firm No. 11371
22                      501 Congress Avenue, Suite 150
                        Austin, Texas 78701
23                      (512) 334-6777
24
25

Paz, Brittany                     02-15-2022          Index: $11,000..25.9

**$**

**$11,000**  199:18 200:2

**$160,000**  197:12 204:14,16
205:13 210:14

**$25.9**  217:23

**$29**  218:1

**$29.9**  219:1

**$30**  218:3

**$30,000**  14:14,17,20,23 15:16
23:8,15

**$350**  23:11

**$44,000**  199:25

**$50**  212:12

**$53**  197:4,20,25 198:14,25
204:7 210:17 236:19 242:20

**$54**  197:25

**$54,876,000**  203:23

**$54.876**  204:1

**$6.8**  185:13

**$70**  220:18

**0**

**0**  263:13

**00006**  163:2

**000106**  159:8

**000989**  147:21

**001103**  92:14

**0025**  171:18

**006**  164:4

**00991**  148:4

**04**  102:11

**1**

**1**  31:17,18,19,21 32:25 33:13,
14 49:7 55:18 125:22

**1,104**  93:9

**1.25**  16:16

**10**  16:8,11,25 129:17 159:1,2
180:9 182:23 183:1,8 190:6
215:6 218:22

**10/1/2012**  65:2

**100**  154:25 263:14

**106**  182:22

**10:18**  77:24,25

**10:28**  77:25 78:2

**10:42**  91:20,21

**10s**  56:19

**10th**  29:3

**11**  129:17 162:14,15,16

**11,000**  199:25

**1100**  93:14,15

**1103**  96:12 99:18 102:11
131:4

**1104**  92:14,15 96:12 99:18
131:4

**116**  182:11,13,15,21 183:5

**11:02**  91:21,23

**11:57**  137:15,16

**12**  168:17,18,19 173:19,20

**12:12**  137:16,18

**13**  176:19,20,21 197:12
204:11 205:3,6 245:6

**14**  182:13 184:22,23 185:21
188:5 196:22,23 202:3 203:3,
7 204:25

**140**  20:2

**145**  180:21,24,25

**14th**  71:22 73:6 77:2 125:25
135:23 139:6,16 148:11,19
149:2 150:22 151:13 152:15
162:25 175:6

**15**  16:17 195:21,23 196:19
201:21 203:5,6,16 204:25
241:3

**15th**  5:2 71:22 73:7 129:16,20
130:3 135:24 170:16 175:5,10

**16**  182:4 195:25 196:2 232:22

**17**  196:12,15,16 210:11
232:22

**17:50:12**  162:25

**18**  219:15,17 220:25 254:17

**18A**  254:10,13,17

**18B**  254:10 261:5,7

**18C**  262:17,18

**18th**  236:2

**1:00**  176:11

**1:14**  188:11,12

**1:29**  188:12,14

**1st**  8:25 129:11

**2**

**2**  43:12,14,17 97:10,11
134:15,24 135:7,9,12,13

**2/15**  170:21 173:1

**20**  182:4 199:25 214:19,22
218:20

**200**  19:25

**2000-**  59:14

**2018**  49:15 58:18 59:16,17
64:24,25 65:6 69:7 71:10,22
77:3 81:17 86:10 125:25
135:24 139:6,16 148:11,19
149:2 151:13 152:9,13 162:25
169:20 175:6 215:8,10,22
243:20

**2020**  103:13 141:6 185:10
187:6 197:11 204:23 205:1,15
209:22 236:2 241:6

**2021**  185:10 205:7

**2022**  5:2 209:23

**204**  195:24

**22,000**  57:3

**25**  182:3,4,9

**25,000**  15:8

**25.9**  217:23 218:15

**252** 97:16

**260** 220:20,22

**26th** 129:7 130:11 152:9,13

**29** 217:23

**29.9** 218:2

**296** 97:16

**2:18** 227:4

**2:19** 228:4,5

**2:28** 228:5,7

**2:57** 253:18,19

**2nd** 81:17 129:15 130:8 169:20

---

**3**

**3** 97:10,11 118:7,9 138:6 148:8,9 236:10

**30** 15:9 64:8

**31st** 8:25

**333** 74:14,18 187:15

**35** 28:25 181:7

**350** 23:19

**36** 182:11

**3:00** 167:12

**3:04** 253:19,21

**3:34** 279:8,9

---

**4**

**4** 76:6,10 78:13,22 81:3,13 117:18,19 118:6,9 122:20 123:4 245:10,11

**4/2/2018** 94:1

**40,596** 56:24

**408** 194:15

**425** 92:21

**45** 181:21

**450** 79:6,12,13,17

**479629** 169:2

**4:00** 28:10,12 126:10 167:1 227:7

**4chan** 48:13,17,18 61:16,25 62:17 63:22 69:8,13,15,19 148:22 149:10 164:5,12,14, 15,18,19 165:3,4,5 255:3,9, 15,18,19,24 256:12 260:25

**4th** 86:10

---

**5**

**5** 81:15,18 125:15,16 134:16

**50** 181:21 182:7,9 212:12

**53** 203:23

**58** 182:16,17

**5:00** 167:14 168:2

---

**6**

**6** 82:7 137:19,20 138:4,5

**60** 205:10

**600** 93:8

---

**7**

**7** 137:8 140:8,9,16,17 141:10, 18,20 142:1 143:20 144:14 148:3

**70** 205:11

**72** 217:12,21 218:8,25 219:3 238:5

**75** 181:6,13 182:9 205:11,18

**7:00** 167:17

**7:30** 167:10

---

**8**

**8** 103:10 141:7,8,10,19,25 143:13 144:10,15,25 145:22 147:21

**80** 214:20 215:4 218:21

**81,000** 79:3,5

**81,290-** 56:10

**81,297** 56:13

**86** 23:18

**8:00** 167:11

---

**9**

**9** 148:5,6,8

**90** 215:7 218:22

**95** 42:1

**97** 42:1

**98** 36:11,14 39:25 40:5 41:16 42:1,7 43:5,11

**99** 42:1

**991** 147:25 148:1

**9:00** 167:9

**9:03** 5:2

---

**A**

**a.m.** 5:2 77:25 91:21 137:16

**ability** 11:16 13:19 165:18

**able-bodied** 11:8

**abnormal** 150:4,17

**Absolutely** 76:23

**accept** 240:9

**accepted** 240:8 241:23

**access** 97:23 120:21 145:14 154:4 172:20 214:16 248:14

**account** 139:15 182:14,15

**accountant** 205:20 213:9,15 233:2 241:25

**accountants** 107:21,25 108:2

**accounting** 206:7 207:6 209:17 241:23 247:19

**accounts** 139:19

**accrue** 210:17

**accruing** 198:3,4,7,8

**accuracy** 206:3 247:20

Paz, Brittany                 02-15-2022   Index: accurate..appearan

**accurate** 40:5,6 92:18 94:6
101:15 130:1,17 144:25 145:4
153:4 162:13 164:17 175:20
181:14,15 197:13 201:2
204:5,13 205:11,14 206:21
210:12,15 213:3 218:14 270:4

**accusation** 98:3

**accusing** 191:1

**act** 252:25

**acting** 25:14

**actions** 116:6,14

**actively** 215:12 270:10

**actual** 22:19 62:8,18 202:6
226:8 268:8

**Acuity** 235:14,18

**ad-** 36:3

**Adan** 60:20 61:10 70:8 84:8
137:25 267:10 276:10,15
278:22

**add** 6:4 228:23

**added** 228:13

**adding** 181:3

**addition** 82:13 275:7

**additional** 20:2 69:20 126:3
144:21 145:2

**address** 199:22

**addressing** 207:18

**adequate** 150:8

**adequately** 26:23 30:5
213:14 258:5

**adhere** 47:4

**adhered** 43:14

**adjusted** 210:1

**adjustment** 210:3,4

**adjustments** 205:13,17

**admires** 224:14

**admissibility** 194:17

**admissions** 133:15

**admitted** 113:13 219:24

**adult** 258:22

**adverse** 229:14

**advertisement** 141:6

**advertising** 240:23 241:10
242:23

**advice** 26:3 116:12

**advise** 133:13

**advised** 133:1,3,12

**advocacy** 224:15

**advocate** 36:4 171:11

**AEJ** 215:7,11 217:10,14,22
218:22,25 239:18

**affiliated** 261:20

**affirmative** 122:23

**afternoon** 28:8 50:7 83:25
84:2,4 126:9,15 166:25
167:13,16,19,20

**agency** 208:15

**agent** 138:9

**aggregate** 191:2

**agree** 13:11,16,17 34:25
35:21 36:4 43:20 52:2,10,17
53:1 58:7 80:24,25 95:14
110:5 129:23 141:12 146:24
150:5 151:21 152:9,13 155:12
160:9 167:6 177:23 192:23
194:8,23 195:1 226:21
237:10,15,18 247:3 260:5
274:23

**agreed** 11:7 60:21 84:5,12
229:4

**agreeing** 171:20

**ahead** 7:1 115:23 137:24
144:19 195:16 234:2 249:17
251:14 264:18

**air** 42:8,19 43:25 60:5,6

**aired** 266:10

**Akbar** 169:6

**akin** 228:19

**ALC** 214:20 215:23,24

**Alex** 30:19 68:14,20 69:1,4
216:14,16 217:3,7,15 218:10

**Alex's** 47:20 48:3 103:24
215:7 217:11,12

**algorithm** 41:22

**Allahu** 169:6

**allegations** 8:9,10

**alleged** 101:12 130:4 161:2,
25

**allegedly** 149:8

**allocated** 14:19,24

**allowed** 228:21

**alter** 166:8

**altered** 270:1

**alternative** 67:25

**amend** 5:24 119:7

**American** 93:25

**amount** 10:24 11:19 14:12
15:11 23:12 198:21,22 210:18
237:7 242:25 271:22

**analysis** 247:18

**analytics** 71:20,24 72:3,6
73:5,24 76:2,3 78:24 79:16,
18,21 80:3,8,13 81:15 147:13,
14

**and/or** 233:5

**anonymous** 61:14,18,22
63:16

**answering** 170:25 207:10
222:16

**answers** 72:19 78:18 116:8
145:3 177:1 188:20 234:2
240:8 247:12,17

**anymore** 66:25 98:13 204:5
269:8

**apologetic** 132:8,10,11
133:15,20

**apologies** 5:21

**apologize** 115:2,13,20
132:23 133:5

**apology** 132:12

**apparently** 272:15

**appearance** 110:2

Paz, Brittany                02-15-2022        Index: appeared..base

**appeared** 92:20

**appears** 31:23 34:10 93:25 101:19 141:1 267:22 268:1

**applies** 195:4

**apply** 60:5

**appropriately** 52:8 109:19 111:19 277:15

**approximately** 197:24

**April** 81:17 129:11,15 130:8 169:20

**archive** 139:10

**argue** 231:12

**arms** 171:6

**arrangements** 227:21

**arriving** 273:7

**arrows** 261:14

**article** 6:6,8 19:22 46:13 50:7 71:21 79:23 83:17,24 86:15, 17 88:16,21 92:11 93:20,21, 22 94:1 96:12,15,17 97:3 100:11 101:10,11 102:10,22, 24 118:11 128:9 129:20 134:11 135:1 138:11,16 139:1,8,11 140:2,3 144:1 149:18,19,22,24 150:16 158:19 160:11,14 161:8,15 164:23 165:25 166:6,8,15,18, 23 170:1,12 172:7

**articles** 19:19,21 30:21 37:1 43:22 46:5 47:24 53:20,21 55:8 59:24 60:3,24,25 62:24 80:1 88:18,22,24 89:3,4 90:21,24 91:3 94:22,23 276:24 277:13

**articulate** 216:25

**ascertain** 84:16 118:12 136:2 168:10

**ascribe** 93:1

**asks** 22:20 245:13

**Asperger's** 258:8,12,14,25 259:11,15

**assertion** 251:15

**assessment** 49:6

**asset** 114:2,14

**assets** 233:5 234:20 237:19 242:11 243:21 244:6,7,12 245:13 246:6,7

**assum-** 246:20

**assume** 64:8 111:24 234:3

**assumed** 176:24 209:2,8

**assuming** 60:11 94:5 121:25 246:21 275:22

**at-** 109:18

**attached** 63:11 70:2

**attachment** 53:5,7

**attempt** 199:22

**attempting** 199:17

**attempts** 111:10,11 136:10

**attention** 6:9 51:15 162:13 252:25

**attorney** 6:5,18 7:13 9:8,13, 17,22 24:25 25:12,19,21 88:2 90:13 102:14 105:9,18,19 174:6 178:13 200:14,19,25 201:3,8 203:20 204:21 205:25 211:8 222:7 228:18,19,24 231:4 262:21 269:16,19 278:7

**attorney's** 6:20 192:2 196:3, 13

**attorney-client** 25:18 98:16, 18 105:15 229:5,10 230:10,12 231:5,6

**attorneys** 16:9 24:22,24 94:12 107:18,21 109:18 111:23 112:24 144:8

**audience** 39:7

**audiences** 38:5

**Austin** 7:14 24:11 25:22,23 28:1

**autism** 258:16

**auto** 172:1

**aware** 10:20 58:22 59:1 74:17 100:23 101:3 108:5,12,15 114:13,16 122:1,7 127:9 129:5 152:22 170:23 179:21 206:9,10,15 239:4 257:17,25

278:13

**awkward** 74:19

---

**B**

**back** 15:9 27:24 28:3 31:7 41:16 59:8 60:9 70:23 72:17 78:1,3,4,17 85:2 91:22 106:18 116:23 117:14 127:10 137:17 149:10 157:25 177:2 184:6,12 188:13 200:10 203:25 210:18 218:13 219:25 222:19 224:13 228:6,8 230:23 253:20 254:23 262:22 277:24

**background** 21:18 219:8 238:19 239:15 246:5 247:19

**backlog** 199:22

**bad** 82:5,6 231:8 247:3,4

**bag** 189:8 190:16,22

**bait** 256:4

**baking** 43:12

**balance** 188:22 191:22 192:20 202:6 203:16 205:12, 18 210:10 240:16 241:2,6 242:1 251:4

**bank** 104:2

**Bankston** 5:16 6:2,6,19 7:2 8:18,21 14:22 22:13 26:10 73:13 75:4 76:23 77:13,17,21 90:16 95:9,12 104:6,8,13,15 110:14,17,24 117:14,23 121:17 126:17 129:4 136:13 137:4,5 140:9,12 147:15,19, 23 148:2 153:14 155:17,20 161:19 176:10,11 178:4,7 180:5 181:4 183:19 185:6,19 186:10 189:24 190:1,5,9 191:12 196:10 208:5 215:16 223:8,9,15,19,24 224:18 225:20,23 226:3 227:1,10,14, 20 228:23,25 231:16 250:11, 15 251:7,12 253:8 254:3 262:11 278:2

**banners** 240:23

**Barnes** 110:17,18,19 111:25 132:21

**base** 41:18

Paz, Brittany                02-15-2022        Index: based..brought

**based** 22:24 36:18 40:6 42:6,
17,21 43:2 44:5 47:19 48:20
52:1 59:21 60:14 63:12 69:23
87:3,5 100:7 101:4,14,18
112:3 113:24 122:10 123:1,5
124:2,13,25 125:4 126:8,13
130:13 146:22 147:10 153:21
160:17,18 166:24 167:7
174:17 197:6 199:12 200:7
206:2 210:16 212:5 234:2
240:16 244:17 258:3 261:2
265:22 266:7 277:19

**basic** 62:13

**basically** 47:22 234:7

**basing** 42:13 46:18

**basis** 42:19 43:10 68:9
124:19 149:17 176:7 197:25
207:2 228:15 275:22

**Bates** 55:22 56:1,3,5,6,7
57:4,10,13,16,21,23,25 92:7,
13,17 95:12 96:12 97:15
99:24 111:17 147:16,21 159:7
181:18 185:20,21,22 189:19,
21 190:23 195:23 196:3 252:5
270:18

**battery** 141:14

**began** 58:18

**begin** 215:9

**beginning** 263:24

**begun** 200:12 216:3

**behalf** 8:3 36:7 86:22 109:11
189:6 200:19 236:6

**behavior** 150:3

**belief** 187:3

**beliefs** 106:10

**believed** 120:9

**believes** 42:7

**believing** 212:21

**beneficiaries** 216:10,11,12
218:23 237:11

**beneficiary** 238:5

**benefit** 90:20 237:9

**bet** 74:21 217:17 232:3

**big** 236:21,22 237:2

**bigger** 231:7

**Bill** 222:5,6

**billable** 182:14

**billed** 182:13

**bills** 240:17,19

**binder** 17:23 18:5,7 75:17
103:9 187:23 189:10,12,14
202:9,13,15,18,19,22,23
203:13,14,15,17,18,21 224:4,
7

**bit** 31:8 85:2 104:19 107:22
113:21 159:4 163:25 207:6
261:22 268:14 274:21

**Blank** 221:6

**blog** 19:19

**blogging** 31:15

**Bloomberg** 6:6

**Blott** 5:12,19,21 6:3,12,18,23
7:1 9:8,9,13,16 20:11 24:25
25:10,17 26:19 39:10 46:25
54:15,17,21 55:5 73:18 76:17,
19,21,24 78:5 81:7,9 98:16,18
104:5,11,20 105:14 111:3,4
112:17 114:19,22,25 115:5,9,
12,16,20 116:18 124:7,9
132:20 134:18,22 155:11
171:13 187:8,9,13,16 188:2,7,
15 189:10,16,20,22 190:2
191:11,21,25 192:9,14,17
193:1,5,7,10,13,19 194:1,4,8,
12,19,23 195:1,9,14,19 196:4,
7,11 202:17,25 203:2,20
216:24 217:4 220:13 222:8,
15,25 223:2,3,14,18,21 224:2,
5,6,7,8,9,12 225:1,4,8,10,17,
22 226:10,18,22 227:5,13,18
228:9,14,17 229:20,21
230:16,19 231:6,9,13,22
232:9,14,19 249:1,3,10,14,18,
21 250:3,8,13,22 251:10,25
252:4,10,13,16,20 253:2,5,12
260:19 262:21 264:20,22
265:2,7,10,18 266:4 267:7
268:13 276:23 278:3,7,12

**Blott's** 275:4,13

**blurt** 27:17

**Bob** 110:17,18 186:7,11
220:17 221:21 235:6,7,8,18,
23 236:4 260:18

**body** 53:11,13

**book** 8:19

**booked** 28:7

**books** 248:14

**bottom** 97:16 108:15 142:9
147:9 159:7 163:1 206:20
261:7

**bought** 115:5

**box** 261:12,23

**boy** 138:2

**Brad** 110:2,6 251:7,15,17,18

**Bradley** 191:11 262:16

**brain** 43:12,15

**breached** 109:2

**breadcrumb** 256:4

**break** 13:4 66:9 77:15,18
78:4,8,18 90:3 91:15,24
107:22 134:19 137:13 176:12
181:4 183:3 187:19,20 188:9
228:8 253:11,22

**breakdown** 180:20 202:5
203:3 209:18

**breakdowns** 239:2

**breaking** 50:4 63:9 182:16

**breaks** 23:20 190:18

**bring** 6:9 18:16 76:5,6 78:21
91:13 209:7 223:10,15,19
224:24 227:24 252:24

**bringing** 192:5 225:3

**Brittany** 5:3,4,11

**broad** 244:14,16 274:25

**broadcasts** 39:5 266:10

**broader** 242:6

**broadness** 244:22

**broke** 218:20

**Brooklyn** 269:16,19

**brought** 78:5,15 189:13

202:10 269:20

**browser** 135:8,21,22 136:9
152:17 154:1

**browsing** 136:25 137:10
152:10,14,23 153:20

**brunt** 13:6

**bunch** 30:19 55:1 71:3 97:7
110:5 248:7 273:12

**Burnett** 110:13,14,15

**business** 17:12 43:11 68:7,8
122:9 138:25 167:25 197:15
199:19,20 200:2 220:24
240:25 243:9

**businesses** 239:4

**businessman** 197:18

**button** 115:3,4,7

─────────────────

**C**

**cache** 172:2

**cakes** 43:12

**calculated** 23:12 180:21

**call** 9:14,15 20:22 78:11 81:8
97:2 150:18 191:13 262:8

**called** 9:6,16,17,18 10:4
207:22

**calling** 60:17

**calls** 21:21 22:3 46:25

**capable** 38:17,18

**capacity** 13:12 25:14 49:14
177:25 178:1,11

**capital** 269:14

**caps** 54:13 55:9

**capture** 168:24

**care** 67:22 69:1 72:21 86:19
194:1,7 249:12

**carefully** 38:10

**Carol** 214:25 215:2,6 218:22

**case** 5:14,25 6:15 7:4,10
8:12,23,25 11:6 14:10,12
15:14,20 16:2,7,10 17:4

18:13,17 20:24 21:1 24:19
25:20,24 26:4,20 49:24 50:1,
3,18 56:1 72:13,14 75:24
78:21,25 79:5,6,19,20 82:20,
22 88:1 89:9,17,21 90:5 91:6
93:4 95:13 97:13 98:3 99:19
104:12 107:16 108:9 109:2,8
113:2,16 114:12 119:25
120:2,5 133:16,25 134:3
137:7 146:23 150:3 152:1,2
159:10 184:8 188:21 191:3,19
192:3 193:24 229:2 243:9
247:16 250:24 256:19 257:3
259:17,19 260:16 266:24
267:17,18 269:22 271:1,6
273:4 274:4,13 276:1

**cases** 11:18 14:14,20 21:5
29:15,18 40:21 108:6 109:21
111:22 120:1 180:14 192:3
212:1 266:20,21 278:24

**categories** 63:12

**category** 242:6

**caught** 144:11 231:11

**caused** 112:8

**caveat** 58:20 204:4,13 217:9
278:25

**cell** 141:14

**cetera** 44:11 148:16 181:12

**chain** 221:19,20

**chair** 12:20 37:13 85:24
245:21 248:4

**challenged** 125:25 135:25
136:1 139:5,6,14,18 148:11,
12,19,21 149:1,4

**chance** 249:19

**change** 35:11,12,18 78:18
161:15 197:4 248:16

**changed** 35:20 40:9 166:11

**characterized** 258:5

**charge** 23:22 30:9 68:11 69:3
112:18 113:17

**charts** 239:2

**chat** 163:18

**chatter** 101:13,17 102:4,23

**chattering** 101:24

**cheat** 74:10

**check** 5:22 60:24 230:7
248:22

**checked** 55:8,11

**checking** 31:1,6 60:1 61:1,2,
21

**checks** 221:6

**children** 216:13 218:23
238:10 239:10

**chose** 67:19,20,22

**Chris** 269:10 270:13

**cir-** 195:2

**Circle** 117:14

**circled** 261:8

**circulate** 60:23

**circulated** 195:3

**circulating** 50:5 150:7

**circumstances** 264:1

**citation** 229:1

**cite** 60:21 264:10

**cited** 46:5 53:8 131:4 194:15

**cites** 62:22

**citing** 30:24

**civil** 21:16,21,23,25 22:2,3,4,
5,6 29:17

**claimed** 229:5

**clarification** 54:23

**clarify** 188:15 223:21

**clean** 243:12,19 254:10

**cleaner** 243:7,10

**clear** 23:3 180:6 183:14
190:11,13 191:15,19 212:2
219:9 231:3,23 251:13 252:24
264:5 277:21

**cleared** 152:17

**clearer** 51:20

**clears** 152:17

click 141:9,18,22 144:2,5

client 113:11 224:15

clients 113:11 133:14 189:6 219:20

clock 168:3 250:25

clocking 168:5,7,8

close 38:8 106:25

CNN 141:3 144:4

co-counsel 90:18

cogently 11:14 207:13

coherently 8:8

collar 107:11

colleagues 10:3

color-coded 17:23

color-coding 75:18

comment 38:9 131:10 161:24 164:25

commentary 31:15 36:12 38:3,4,12 43:8 141:4 147:5 161:2,17

commentator 38:20

commenting 36:22

comments 97:5,6,7 101:4 131:20,24,25 132:2 187:25 257:12

commie 147:5

commit 133:14

committed 53:15

common 99:16

communicate 70:24

communicated 132:24 133:20 156:12 157:5,7,9,10 158:2

communicating 112:12

communication 230:1

communications 99:10 101:5 106:9 118:10 122:18,19 124:4,14,25 125:4 153:21 260:10

communist 141:4

companies 37:17,23 103:21, 23 200:9 237:12,23 238:6 240:14 243:3

company 8:4,9 9:3 17:12 25:20,21 29:21 30:10 31:6 32:16 36:8 37:2,5,8,22 39:6 42:4,6,13 43:4 49:13 51:11, 13,16 52:6 53:2,18 54:1,5,7 64:7 65:23,25 67:6 68:7,10, 11,20 86:7 96:13,18,21,24 100:22 101:2,3 102:7,12 103:4,19 104:23 105:19 106:3,5,22 107:2,4,6,7,8 109:2,11,17 111:9 112:8 113:10,25 114:14,16,17 115:25 116:13,15 120:20 121:8,14 126:23 127:17,24,25 138:15,16 142:20 146:8,13 151:6 154:7,9,12,13,17,20,23 155:5,6,9,23 167:23 168:11 171:12 177:23,24 178:1,7,10, 11,13 192:25 193:4 197:19 198:15 199:8 205:15 210:17 211:13,20 212:11,23 219:5 221:17 233:17 234:10 235:13 236:4,18 238:3,8 246:8 248:13 259:24 271:16,19

company's 24:10 30:13,22 34:13 35:3,10 36:11 37:21 38:2,25 42:6,9 51:11 69:12 82:7 88:10 94:13 95:3 105:11 109:12,14 137:7 222:7 233:19,21 234:16 235:2 248:14 259:8

comparison 183:3

compel 226:4 229:18 265:5

complete 145:4 249:10,22 251:2 253:25 270:19,21 271:2,3

completely 7:9 13:19 63:21 179:25 191:23,24 192:24 228:21 239:7 246:17 248:7 273:15

complies 92:6

computer 91:13,16,25 118:23,25 119:6 136:17 143:23 153:6 156:3

concentrating 187:16

concern 107:14,20 108:1

concerned 6:20

concerns 109:1,11

concluded 279:9

conclusion 44:1 45:25 46:15 124:20,24

confer 253:8

conference 9:14

conferred 90:17

confidential 96:3,5,9 195:3 196:2 230:1

confirmatory 42:22

confirmed 43:3 70:7 101:13 267:13

conflict 229:7 236:12,14

confuse 163:24

confused 171:7 268:10

confusing 86:25

confusion 192:10 217:4 264:6

conjecture 102:11,20

connected 261:11

Connecticut 7:13 21:5 29:6 109:23 206:7,10 207:2

connection 16:7 24:19 30:17 32:15 40:20 75:23 79:18 94:11 177:5 178:3 267:16 275:23

consent 139:22 142:21 192:7

considered 10:11 36:25

conspiracy 238:12

constituted 277:1

constraint 10:18

constraints 10:10,23 11:13 15:13,20 40:14

construction 229:9

consultant 40:24 71:19 200:15 201:19 211:6,7,8,25 212:1,8,14,15,18,21 213:11 235:19 248:13 269:7,8,20

consultant's 269:18

Paz, Brittany          02-15-2022    Index: contacte..Daniels

contacted 260:8

contained 88:3 97:4 101:11 139:9 161:9,10,11 223:12 259:11

contend 134:10

contends 148:10

content 54:16 61:18 63:16 139:23 146:14

context 46:16,17 241:17

continue 185:7 250:13,21

continuous 188:19

contractor 122:8

contrary 189:2

control 118:17 126:4 135:5 139:2

conversation 14:21 43:2 47:13 60:14 67:13 69:23 73:12 84:8 90:15 99:2,6 121:16 125:5 126:16 129:3 137:3 147:18 155:19 161:23 166:24 176:9 177:10 178:21 179:25 180:4 183:18 185:5 207:25 220:17 228:18 254:25 255:8,14 256:6 266:8 277:12 278:7

conversations 36:18 38:1 40:7 43:3 47:19 48:20 58:20 59:22 67:12 101:18 105:15 106:7 113:13 116:19 117:5 126:8,14 146:3,12 160:17,18 177:6 197:6 199:12 200:7 206:2 212:5 222:11 223:5 225:6 226:13 265:18,20 267:7,8 277:19 278:14

convey 256:16

conveyed 83:10 84:3 98:12 276:2,17

copies 202:2 220:1 225:21 229:15,17 231:23 268:9

copy 8:16 52:24 103:11 135:1,21 140:20 144:25 189:18 202:12,14,16 203:2 208:12,13,14,17 209:1,7,9,10, 11,13,14,15,17 219:25 226:12,23,25 227:17,22 231:19

corner 163:1 235:16 252:18 261:7

corporate 5:4 7:23,25 8:23 9:10 10:4,8,14 11:14,20,25 12:7,13 13:5 20:23 21:12,22 79:10 80:11 81:23 86:3,24 128:13 157:12 178:12 184:11 189:7 199:2 201:10 212:20 240:11,12 265:7 277:22,23

corpus 216:12

correct 7:16 9:20 10:15 16:20 18:14 21:6,19 23:16,19 28:8 29:9,22 32:4 33:11,21,23 35:24 37:15 41:20 42:8 43:15 49:13 50:2 51:3 52:10,20,21 54:1,14 55:9 57:15 63:23 65:24 66:14 67:23 69:10 72:10,15 73:9 76:18 86:14 87:16 92:16,21 96:19 97:23 98:7 100:16,19 106:23 107:2 112:10 113:11 122:18,25 123:7,12,15,18,21 124:4,15 125:10,14 126:4 131:6 132:12 138:17 140:4 144:3,8,16,22 147:13 150:18,23 151:3,7 153:3 154:2 155:25 157:15,16 159:5,10 160:11 161:12,13 163:5 165:9 166:13 169:18 175:14 178:25 179:9 184:8 191:25 196:21 201:1 202:18 204:8,23 205:1 206:8 210:3 214:13 215:23 217:7 219:2 233:6 235:11 236:2,4,7,8,10 238:1,15 241:7 247:14 256:20,23 257:5 259:6 268:18 270:3 272:23,25 277:14

corrected 204:18

correction 100:12 204:19

correctly 139:24 149:5

corrupted 270:2

costs 198:1 243:18

counsel 73:16 96:11 108:22 122:11 188:20,25 196:4,8 229:24 230:1 265:20 266:8

counsel's 196:9

couple 10:14 19:23,25 21:1 24:3 50:6 63:1 85:23 93:6 184:24 235:23 253:9 254:2,14 276:10

couple-hundred 74:13,16

court 7:5 11:13 23:2 59:4 77:16,18 78:11 81:8 108:10 183:21 189:17 195:4 224:16 229:4,11,13 230:25 231:18,21 252:23 254:11 269:12

Court's 108:17,18 207:2 265:4

coverage 50:14,21,23

covering 226:8 240:17,19

CPA 211:9

created 40:22 62:7 65:14 172:13,15,17

creating 58:7

credentials 211:17

creditor 114:13

crimes 53:14

criminal 21:18 22:6 26:13 29:17 54:12 133:14 269:15,19

cross-post 146:19

crossed 171:7

Cruz 100:15 161:6,9

Cs 248:23,25

culling 120:15 121:24 123:21 145:19

cure 54:23 72:24 250:19

curious 231:12

current 48:3,6 128:9,17 129:14 150:10,11 193:1,3

custody 118:17 119:2 126:4 135:5 139:2

cut 206:20

cycle 36:13,21 43:9

D

daily 42:19 43:10 68:9

damages 259:25 260:2,3,4,5

Daniels 16:6 23:25 24:16 26:18 31:23,24 32:9,11,21 33:23,25 34:10,17 49:9,11

Paz, Brittany                 02-15-2022   Index: Daniels'..differen

50:4 58:7,21 60:15 63:25 64:2
70:4 71:16 82:13 85:1 86:6
101:5,7,18 118:21 119:3,5,10
126:8,14 127:8,16 128:2
132:9,19 136:17,18 137:11
139:13 148:18,25 149:8,11,
16,17 150:16 151:12,17
153:6,18,22 154:10,14 155:23
157:14,15,20,24 158:22,24
160:11,17,21,25 161:14,24
162:6,7,8 164:5,9,14,22
166:24 168:10 256:21 257:3
267:10 276:2,10

**Daniels'** 71:21 127:22 140:3
150:3,10 152:10,14,23 183:25

**Daria** 30:18 48:3 278:23

**dash** 159:7

**data** 44:1 45:24 267:20

**date** 59:15 65:2,15 86:9
127:1,2 129:1 130:7 152:11
162:23,24 169:25 170:19
172:10 183:22 235:22,25
253:1

**dated** 94:1 262:20

**dates** 113:19 176:4

**David** 44:18 214:21,22
218:21

**day** 50:7,8,9 63:8 85:12
128:17 129:15 169:23 189:8
199:19 250:24 256:24

**days** 98:24 129:17 182:13
199:19,20,21,25 200:1,2
205:11,18 220:22,24 266:10

**deadline** 130:16,18

**deadlines** 111:13

**deal** 260:18

**dealing** 121:3

**death** 130:24

**debt** 197:20,23,24,25 198:2,4
199:17,18 204:6 207:18
210:17 212:12 234:13 236:19,
20 238:4 243:17

**debt's** 210:20

**debtor** 236:6

**debtor's** 235:2

**debts** 103:22

**December** 205:6

**decent** 110:9 219:11 263:25

**decided** 10:12 51:10 113:25
114:3 229:11 243:11 276:12

**decision** 158:21 206:14
224:24 253:23

**decisions** 114:4,7 214:6

**dedicate** 15:24 30:8

**deductions** 209:25

**deep** 44:10 225:13

**defamation** 29:18 113:4
128:12 238:9

**defamatory** 128:15,16
129:22,24 151:15 160:19

**default** 207:3 210:19

**defendant** 126:2 134:3
180:15 248:3

**defendant's** 143:9

**defendants** 94:16 100:5
108:8 113:3 121:7 127:5
128:12,14 130:14 132:7
134:10 144:22 145:2,13
146:23 152:23 159:9 163:2,5,
7 164:1,4 165:17 171:18
184:8 270:20

**defendants'** 122:5,9

**defense** 269:15,19

**deficiencies** 72:25

**defined** 278:1

**definition** 251:6 259:11
276:19 277:20 278:3,11

**definitive** 122:17 124:3
125:10

**definitively** 124:3 256:12

**DEFS** 159:7

**DEFS000334** 92:10

**delay** 172:7

**deleted** 172:1 173:13

**democratic** 256:8

**department** 68:16,23 85:7,9

**departments** 51:18,22 52:3

**depending** 68:16 263:2

**deplatforming** 221:14

**depo** 12:10 13:13 75:16 132:5
178:24 190:12 252:12,22
262:6 263:21 272:16

**depo's** 263:1 264:1

**depos** 12:3,14 179:25 273:13

**depose** 30:4

**deposition** 5:3 6:13,21 7:4,6,
8,20,22 10:21 11:23 13:23
14:3 16:14 17:14 18:4 21:9
22:23 23:1 26:24 27:17 37:13
40:10 55:18 77:22 78:13
81:23 88:9 113:22 137:8
177:16 179:7,9 180:10,18
181:18 183:9 194:24 195:18
212:20 228:10,13 229:7
238:25 250:14 253:7 262:2
267:3 271:19,25 272:2,12,21
277:22,23

**deposition's** 219:25

**depositions** 10:25 11:21
25:5 30:2,4 37:16,25 40:17
41:19 56:3,6 109:5,10 178:3
179:18 183:21 273:25

**describe** 140:24 212:16

**designated** 79:4 213:12

**designees** 13:5

**detail** 11:19 13:13 166:13

**determine** 221:1 227:15
265:22 266:1,9

**determines** 47:12

**development** 258:21

**device** 135:23

**devices** 127:10,22

**Dew** 30:18 35:14

**diagnose** 258:7

**diagnosis** 257:25

**difference** 234:22,24 267:25

Paz, Brittany            02-15-2022     Index: differen..earlier

**differences** 251:5

**differentiation** 79:19

**diligent** 118:15

**direction** 157:6,14 254:1

**directly** 9:7 194:16 233:4 260:13

**dis-** 17:9 18:18

**disagree** 91:2 132:13,15 225:1,2,4

**disclosed** 145:3

**discount** 37:23

**discoveries** 18:7,8

**discovery** 12:22 17:8 20:17 104:12 117:25 125:18 188:20 189:4 193:18 194:17 229:9

**discrepancy** 204:16

**discuss** 13:13 26:23 30:12 71:23,25 76:6 78:22,23 79:10 80:13 81:3,13,18,21 82:10 103:5 137:9 138:25 152:18 190:15 214:4 263:9

**discussed** 103:15,18 104:22 114:8,9,10 196:15

**discussing** 16:9 73:5 86:3 154:6 199:7

**discussion** 84:15 114:11 194:16 212:9 262:21,22 267:14 275:18,21,25 276:7,8, 9,12,19 277:1,6,7,10,11,16,18 278:2,11

**discussions** 10:11 108:21 112:3 122:10 178:23 267:11, 12,14 271:11 275:13 278:17, 23

**disentangle** 200:16

**disentanglement** 200:8

**disinfo** 255:3

**disorganization** 112:8

**displayed** 96:21

**dispute** 210:20 257:6,7

**disseminate** 63:20 146:9

**disseminated** 59:20

**disseminates** 30:14

**disseminating** 64:11 248:2

**dissemination** 195:5

**distinction** 267:19

**divide** 217:20

**divided** 14:19 220:22

**dividing** 16:23

**doc** 271:5

**docs** 273:3

**docu-** 173:12

**document** 12:12,14,21 16:4 34:8,10 35:1,7,15 52:25 55:20 56:25 59:3 67:14 74:9,11 75:3 77:8 81:5 88:2,11 92:1 93:18 95:6,7 96:4 102:15 117:3 123:2 125:19 126:6 134:21 140:21,25 141:14 144:15,16 146:24 147:17 159:14 162:19 163:12,24 164:3,10 165:4 171:3,18 172:11,15,16 174:18,19,20,21,24 175:9 186:24 187:3 188:17,18 189:3,7,11 190:14 191:10,17 195:2 197:2 206:19 208:14 209:5 226:12 229:13 234:3 251:23 257:20 262:16,22 264:14 270:1,23

**documented** 165:21

**documents** 11:4,6,9,11 12:25 13:21 15:12,19 16:22, 25 56:4,9,11,13,24 57:3,11, 13,16 58:3 73:8,14,22,23 75:23 76:1 78:5,8,10,15 79:3, 7,11 82:16 89:12,18,23 90:8, 12 91:16 92:2,20,21,23 93:3, 5,7 95:8 96:2,8 97:13,18 99:18 111:21 116:6 117:10, 15,17 118:16 123:1,5,10,11, 14 125:24 126:3 134:10 135:4 143:7 144:9 146:22 177:3 179:22 181:6,12,13,16,17,18 182:24 183:2 197:7 202:18 210:11 213:1,7,8 218:19 229:6 251:1,2 252:6 253:25 260:16 264:2 266:19,20,25 267:1 270:2,6 271:4,9,13 274:10,11,19

**dogs** 27:16

**Donald** 141:3 144:4

**doodles** 262:8

**doodling** 261:13,16

**door** 249:8

**dormant** 212:11

**dot** 63:23 126:1 139:5,7 140:3 142:12,13,14,19,23 143:4,17 145:1,6,10,20,23,24 146:2,6, 11,16,17 147:8,13 148:21,22 149:4

**doubt** 23:12 257:3

**Douglas** 118:12 136:2

**download** 97:25 98:5

**drafted** 136:7

**drafts** 116:9

**draw** 255:15

**drew** 107:14

**drives** 121:12 122:8

**Dropbox** 19:18 40:19,22 41:1 88:1 89:10 91:10,12,17 98:8 268:19,25 269:1

**Drudge** 48:8

**due** 103:23 218:24 237:7

**duly** 5:6

**Dustin** 105:8,9 117:6 196:4,6, 7,9 260:18

**duties** 107:15

**duty** 38:4,14,23 39:4,9 43:20 44:25 109:2

**E**

**ear** 228:20

**earlier** 24:17 29:7,25 31:5 34:13 37:12 61:25 62:16 69:15 92:19 122:17 125:17 126:18 127:8 143:3 158:11 169:22 176:23 183:7 185:3 197:9,16 208:3,8 209:24 212:9 214:15 215:11 237:3,22 243:16 270:24

early 215:22

easier 243:4

easy 244:17

editorial 33:5 84:15 267:8,11, 14 271:10 275:13,18,21 276:7,8,9,11,19 277:1,5,7,10, 11,16,18 278:1,11

editors 54:13 55:9,12 69:22

educated 174:17

effect 39:21 108:13

effective 65:2

efficiency 230:17

efficient 214:2

efforts 49:21 51:25 118:11 127:4,7,9 136:1,15 137:7 143:10 149:7 153:25 243:2

electronic 135:23 202:12,14, 16 209:9,10 227:22 267:20 269:18

email 6:18 33:12 49:10 53:4, 5,8,12 55:14,15 57:19 58:23 90:9 119:22 128:19 157:23

emailed 19:8

emailing 53:14

emails 57:21,23,25 119:9,12, 13,15,24 120:3,4,8,11,12 127:13,14,19 155:24

employee 25:13 41:12 65:6, 8,9 67:7 138:9,15 151:14 211:4,5,11

employees 16:7 24:17 36:19 42:18 68:12 138:25 151:15 168:3 267:8,9

encompass 14:25 242:7

encompassed 14:14

encourage 108:23 132:5

end 45:25 93:11 99:2,6 119:17 127:14 139:11,20 146:10 148:21 167:20,21,24 183:13 190:19 205:15 250:2

ended 15:24 212:7 274:6

engage 30:22 138:24

engaged 34:14 35:4 37:2 43:8 68:8 215:12

engaging 194:16

enlarging 142:1

Enoch 110:7,8 132:22

entangled 243:4

entered 5:14

enters 95:9

entire 109:7 141:23 227:18

entirety 78:9 91:5 96:18 223:6 228:12

entities 256:3,7

entitle- 50:25

entitled 50:25 188:6 223:13 231:1

entity 217:10

entries 108:11

entry 111:10

equally 267:2

equipment 204:17 210:1

Eric 200:21

error 205:23 274:2

escalated 68:25

escaping 214:23

ESI 121:24 122:5

espys 80:21

essentially 103:11 240:24

establish 144:20 178:21

established 176:25 193:23 206:6

estate 200:13 215:12 216:3

estates 239:16

estimated 23:18

estimating 23:9

estimation 42:3

ethical 26:13 107:15,20 108:2

evaluate 234:16

evening 167:22

eventually 274:7

everybody's 232:12,16

evidence 44:5 127:5,20 137:7 146:5 152:19 158:22

exact 57:1 78:23 80:16 81:5 127:2 129:1 148:25 172:13 182:22 185:17 204:9 208:24 235:22,25 278:6,15

EXAMINATION 5:7 265:1 268:16

exception 210:13

exchange 243:21 244:12 245:17

excuse 20:11 34:20 47:25 122:15 140:18 151:14 152:12 175:5 203:24 240:18 250:23 252:6 277:22

executed 215:22 216:2

exercise 229:10

exhausted 178:9

exhaustive 48:7

exhibit 18:3 31:17,18,19,21 32:25 33:13,14 49:7 85:16 103:10 117:18,19 125:15,16 135:13,16,18 137:19,20 138:4 140:15,17 141:7,8,10,18,19, 20,25 142:1 143:13,20 144:10,14,15,25 145:22 147:21 148:3,5,6,8 159:1,2 162:14,15,16 168:17,18,19 173:18 176:19,20,21 184:23 185:21 188:5 192:7 195:21, 23,25 196:2,12,15,16,19 197:12 201:21 202:3 203:3,16 204:11,25 205:3,6 210:11 219:15,17,24 220:25 228:13 231:18 232:22 241:3 245:6 254:5,13,17 261:5 262:18

exhibits 97:10,11 143:2

exist 124:4,14 136:5 175:5, 10,22

existed 65:15 136:8 152:10, 15 175:2

exists 165:9 175:19,21 176:3

**expect** 12:11 43:13

**expectations** 11:25 20:16 265:19

**expected** 11:20 13:7 60:21 277:22 278:4

**expensive** 230:24

**experience** 210:16,24 236:24,25

**explain** 186:8 207:15,16,17, 19,23

**explaining** 146:10 207:12

**explanation** 113:7 250:22,23

**extensive** 75:17

**extent** 54:15 68:22 105:14 223:4 225:17 231:24 260:2,4 276:1

**extra** 22:9

**extremely** 43:13

**eye** 144:12

**eyes** 192:2 196:3,13

---

**F**

**fabulous** 111:4 115:15

**Facebook** 19:20 139:15,20 141:2

**fact** 8:3 31:1,6 44:5,23 45:5, 12,13 46:24 100:15 145:5 188:25 189:20 190:19 247:3,4

**facts** 69:9

**factual** 30:13 55:19

**factually** 51:2 63:21

**fair** 15:14,17 49:6 73:10 74:3 85:21 144:14 147:11 223:7 245:17 276:20,21

**fake** 62:5,6

**false** 22:5 38:17,18,21 251:16

**familiar** 168:22 248:3

**fashion** 111:15

**father** 255:12

**fault** 230:5

**favor** 229:10

**February** 5:2 8:25 58:18 59:14 69:7 71:10,22 73:6,7 77:2 86:10 125:25 129:7,16, 20 130:3,11 135:23,24 139:6, 16 148:11,19 149:2 150:22 151:13 152:9,13,15 162:25 175:5,6,10 209:23

**federal** 208:15

**fee** 14:14,25

**feel** 7:7 26:22 106:2

**feelings** 106:10 259:16,18,22

**felt** 101:15 106:1

**fighting** 54:2

**figure** 15:15 51:8 89:12 164:7 165:12 201:14 259:5

**figured** 107:5

**file** 110:2 114:6 116:10 235:15 237:13 249:18 250:20

**filed** 7:24 20:20 113:2 129:10 169:23 208:15 209:5 236:2,19 244:13 249:23

**files** 90:10 159:16 160:8 165:9 222:5 270:12,17,20

**filing** 34:2 113:8 196:14

**filings** 142:23

**final** 114:3,7

**finalized** 185:11 215:10 249:23

**finally** 52:2

**finances** 233:20,21 238:22

**financial** 109:6 188:17,23 189:1 193:14,17,19 200:8 212:13 213:1,16 219:7 238:19 251:6 252:6 262:21 271:13, 15,18 273:3,7,9

**financially** 243:4

**financials** 271:9,23 272:1,3, 7,9,10,23 273:6,24 274:8

**financing** 233:16,18 234:5,6

**find** 12:2 39:8 41:1 62:3 70:19

76:1 78:16 91:16 92:1 108:19 143:3,8 145:10 157:8,14 160:2 207:9 251:18 275:3 278:14

**finding** 99:16 206:15

**findings** 206:7

**fine** 72:23 93:12 106:8 187:24 194:11,14,21 216:4 218:13 231:16 233:12,24

**finish** 23:1 56:12 83:12 249:15

**fire** 68:14

**fired** 63:20 64:1,2,4,10,15,21 68:22

**five-minute** 253:11

**Fives** 56:18

**fix** 250:18

**flags** 83:25

**flat** 14:14,20,25 23:8

**flight** 28:7

**flip** 74:4,12,15,18 76:1 77:10 92:5 254:23

**flipped** 78:10

**flipping** 20:13 222:21

**floor's** 229:20

**Florida** 130:22 169:6

**flowing** 198:18

**focus** 34:24 44:22 125:21 214:3

**focused** 53:11

**folder** 87:21,22,23,24 266:23 267:2 268:18,19 270:13

**folders** 270:5,7 274:12 275:5

**follow** 54:18 68:12 260:24 268:14

**follow-up** 61:8

**follow-ups** 61:7 88:13 254:2

**Fontaine** 7:22 14:4 16:5,19, 25 17:3 18:13 19:14,16 24:19 49:24 50:1,3 72:9,13,14 79:6 80:8 82:8,10,19 83:3,20 86:7,

Paz, Brittany                02-15-2022        Index: Fontaine..half

12 88:25 89:9,13,21 90:25
92:12,14 93:4 94:8,16 95:11
96:12,14,18 97:4 98:22 99:18
100:6,15 102:11 113:2 120:5,
8,12 124:22 130:1,25 131:4,
23 132:8 138:16 139:10 141:5
147:4,21 148:4,20 156:4
160:14 162:19 182:23,25
183:2 187:17 257:15 258:7,10
259:3,8,24 260:13 266:22,23
267:2,17 268:18,20 270:13
271:6,14,16 272:9 273:10,20
274:12,13,22 275:6,24,25

**Fontaine's** 95:21 96:10,21
97:1 101:25 130:21 140:2
144:21 257:9

**forget** 132:22

**forgot** 274:16 275:7

**form** 47:4 54:19,21 128:9,17,
18 129:14 226:19 267:20

**formally** 190:2 276:8

**formed** 215:13,14

**forms** 248:23

**forthcoming** 207:10

**forward** 51:20 106:10 114:12

**found** 12:4 47:23 94:4 101:24
108:10 119:1 163:19,21
199:10 205:23 206:13 207:10
274:12

**frankly** 72:21 103:1

**free** 5:4 7:23 10:5,13 31:11
37:9,10,11 41:14 65:11 71:21
73:7 103:21 118:16 135:3
139:4,8,16,19,22,23 140:1
142:23 145:15 146:4,17,18
148:9,17 151:14 158:21
171:14 184:10,13 185:15
196:25 197:3,14 198:19
199:9,10,17 200:18 203:23
204:2 207:18 208:6,9,15
209:6 211:22,24 212:8 215:21
221:24 230:2 233:5 235:19
236:6 237:12 240:11,15,18,
21,22 243:9 244:11 248:6

**Friday** 72:7 186:3,12,13,23
187:11 188:18,19 203:11
252:7

**friends** 10:1,2

**front** 32:25 35:15 59:7 79:1
80:17,20 81:6 85:14 102:10
198:24 264:14,15

**FSS** 195:23

**fuck** 115:12

**full** 141:10 248:13 251:2

**fully** 13:12 20:5 27:5

**future** 53:20,22 54:6

———————

**G**

**gain** 111:10

**Gamble** 277:25

**game** 223:7

**gander** 232:21

**GAP** 241:15,16,17,19

**gave** 31:20 40:18 55:20 88:2
117:3 122:17 144:9 159:9
181:4 192:16 194:18 209:11
214:12 235:10 247:16 248:12
265:25

**gee** 251:10

**general** 69:16 79:18 96:8
112:14 138:23 233:12

**generally** 25:4 30:20 31:5
34:14 43:7 62:3 70:7 85:11
112:3 241:23 258:18 276:5

**generated** 172:8 221:6,7,8

**generates** 172:20

**ghost** 136:23

**girl** 138:2

**give** 42:24 53:19 58:2 74:10
76:11 77:18 97:14 116:12
128:3 132:11 137:19,22
147:24 167:3 176:16 185:17
186:2 189:18 202:7 208:23
209:13,14 224:2 231:14
240:3,5 241:13 246:11,12
251:24,25 252:11 263:13

**giving** 23:5 26:3 53:21,25
125:10 173:5 191:19 198:20
248:10 249:19 250:17 274:6

**global** 92:21

**God** 37:14 124:20

**good** 11:19 61:8 63:19 68:1,3
134:18 141:15 180:1 197:15,
17 213:9 232:1 244:2 263:2

**goods** 243:22,25 244:12
245:18

**Google** 71:24 72:3,6 78:24
79:16,17,21 80:3

**gotcha** 65:5 104:10 201:18

**government** 233:20 238:12
256:8

**grade** 214:5

**grammatically** 277:14

**granting** 207:2

**gray** 254:12

**ground** 99:16

**group** 85:10

**growing** 51:16

**Guerra** 277:25

**guess** 6:17 23:18 64:16,17
73:2 75:1 85:25 116:18
141:16 165:23 167:5,7 174:7,
15,16,22 175:19 193:24 218:2
225:15 242:13 246:3,20
251:16 267:12

**guessing** 74:25 75:2 133:7
155:1 156:21,22 174:8 218:12

**guests** 62:14

**guidance** 53:19,21,23,25

**guideline** 69:17 70:2

**guidelines** 63:18,19

**guys** 115:1 231:8

———————

**H**

**hac** 111:11 112:7 113:8 116:2

**hair** 254:12

**hairs** 88:7

**half** 56:20,25 93:16 182:18

Paz, Brittany                02-15-2022     Index: Halfway..importan

**Halfway** 56:22,23

**hallway** 278:14

**hand** 37:14 141:7 176:20
187:19 195:22 196:1,12
228:16 250:18 253:13

**handbook** 32:16 64:22,25
65:6,8,9,12,18 66:6,10 67:7

**handed** 35:7 73:16,18 148:7
175:2

**handing** 34:8 35:1 112:16
220:10 232:19

**handle** 29:18 222:25

**hands** 235:2

**handwriting** 221:5 232:12

**handwritten** 229:23

**happen** 114:11 156:15 166:6
172:6 238:11

**happened** 22:25 83:6
133:19,22 151:25 152:1,2
156:16,17,19,24 191:3 200:9
206:17,18 243:13 259:17
276:13,14

**happening** 243:15 277:5

**hard** 54:25 74:18 121:11
122:8 171:10 174:5 209:11,13
244:18 267:20 268:9

**hashtag** 63:10,12

**hashtags** 63:11

**head** 17:20 74:7 84:19 118:1
120:23 134:8 173:23 182:20
218:18

**heads** 23:5

**health** 96:10 257:16,22

**hear** 131:17 251:9

**heard** 36:14 39:14,18 105:7
142:14 261:20

**hearing** 251:23 252:23

**Hedge** 48:9

**held** 71:17

**helpful** 12:2,4,9

**helps** 54:3,5

**hey** 21:6 87:12 88:13 98:9
132:23 212:21

**hierarchical** 51:24

**high** 95:13 118:12 136:2

**higher** 261:22

**highly** 197:20

**hip** 218:12

**hired** 121:8 180:15 201:16,17
211:23

**histories** 136:9

**history** 108:5 135:8,21
136:25 137:10 152:10,14,17,
24 153:20 154:1 163:12 243:8
258:6

**hold** 115:3 184:4 196:17
226:6

**holding** 237:11 238:5 239:8

**Holdings** 217:10,14,22
218:25 235:21

**home** 27:25 28:3

**honest** 156:25

**honestly** 209:2 233:10
239:15 244:20

**Hook** 7:4,10 17:7 18:10
50:14,18,23 79:5,19,20 89:17
90:5 92:24 104:12 108:6
113:2 182:23 192:3 221:18
259:19 266:20,21,25 267:1,18
271:5,14,16,19 272:9 273:4,
13,19 274:10,12,25 275:5

**Hook's** 72:10

**hope** 232:3

**horrific** 131:9,11

**host** 47:16,23 48:2

**hosts** 48:5 50:24

**hot** 27:16

**hour** 16:17 23:9 182:5 186:15
207:24

**hourly** 23:11

**hours** 15:25 16:3,8,11,21,24,
25 17:8 23:19 24:3,4 39:11,19
84:1 161:16 167:25 180:9,12,

17,20,21,22 181:3,6,8,10,13,
15,21,23 182:3,5,13,15,17,21,
25 183:1,5,8 190:20

**How'd** 42:1 70:24 252:3

**HR** 64:20

**hundred** 11:3 15:25 16:21,24
17:8 19:23,25 39:19 40:23
93:5,6 165:8 180:17,20,22

**hurry** 227:4

**hyphen** 255:3

**hypothetical** 45:7,10,11

---

I

**ID** 169:2

**idea** 15:16 58:2 102:12 106:3,
5,22 107:2,4 123:6,17 154:21
157:3 173:3,4 175:17 180:1
236:20,22 257:14

**identical** 272:18,20

**identified** 118:17

**identifies** 92:12

**identify** 148:13 159:8

**identities** 136:24 148:23
149:11

**identity** 101:24 102:4 118:12
119:14 136:2

**image** 96:21 121:11 125:25
136:1 139:9,11 148:11,12,19,
21 149:1,4 164:15,18,19

**imaged** 122:4,8

**images** 141:9

**imagine** 74:20

**immediately** 50:9 98:1
172:7,9 188:19

**impasse** 251:21

**implemented** 33:21 34:1
66:3 67:3

**implication** 48:25 251:17

**important** 151:6 166:12
278:5

Paz, Brittany                    02-15-2022         Index: impressi..ipad

**impression** 272:14 273:25

**in-depth** 89:17

**inability** 112:9

**inaccurate** 50:8,22 257:5 272:15

**inappropriate** 52:4,14

**inappropriately** 52:10

**inaudible** 17:19 77:14 104:16 122:13 185:19 186:10 189:23, 24 194:5 198:11

**inception** 59:13

**incident** 257:23

**include** 16:24 17:7,8 69:19 182:25 229:25 267:12

**included** 55:23 161:21

**includes** 16:9 240:23

**including** 16:5 139:20 148:22 180:18 244:10

**income** 185:13 208:9,16 209:6 216:15,17,20 217:6,8 218:24 240:20 241:9 242:7

**incorporated** 65:8

**incorrect** 100:16

**increase** 152:5

**independent** 36:25 43:23 46:13 87:8 143:18 211:6 247:18 259:14

**independently** 89:15 248:11

**indexing** 90:18

**indicating** 19:6 33:12 89:6 147:4 222:3 241:5

**individual** 36:8 38:23 160:19 238:2

**individually** 154:12

**individuals** 29:20 38:12 128:1 136:22 146:3 247:15 276:5

**infer-** 126:19

**inference** 174:17,20

**inferred** 52:9

**inferring** 174:22

**Info-** 165:17

**inform** 78:11 114:17 115:25

**information** 17:13,23 25:5 28:17 30:14 33:25 39:1,8 40:25 45:18,20 46:10 55:19 58:8,9,10,11,13,14,17 59:11, 12,19 60:2 61:24 62:4 63:12 64:11 68:2,3,10 69:8 70:14 76:7,9 78:14,17 79:13 80:7 82:17 84:17 86:11 87:4 88:3, 5,6 89:2 91:9 92:12 95:10,21 100:14 101:2,23 102:4,22 103:14 107:9 108:19 113:24 120:6 124:24 127:21 136:11, 15 139:3 143:11,19 145:24 146:10 147:12 153:17 156:3 165:18 168:10,12 170:7,17 172:21 173:12,17,21,25 174:10,17 175:10,13 176:3 177:15,19 178:18 185:4 188:5,6 192:24 193:3 204:15 207:11 209:20 214:12 219:20 223:12 226:8,13 238:16 240:3,6 242:3 246:1 248:2,7 249:4 255:21 263:3 264:7

**informations** 85:13 240:14

**informed** 78:14 99:1,4 113:14 118:22 126:19,23 210:3,5

**informing** 69:9

**Infowars** 10:5,14 25:13 30:14 31:1,9,10,13 33:2 34:9 35:2,8, 16,23 37:10 39:12 41:4,12 43:20 44:25 45:23 46:12,23 47:11 49:17,24,25 50:12,14, 17 51:10 52:17,18 57:4 58:18 59:10,13,20 63:22 65:10 69:3 86:17 89:13,18 90:9 94:3,5,8, 18 95:11 100:6 101:20 118:10 126:1 138:9,24 139:5 140:3 143:4 146:16 148:13,21 149:4 151:13 168:24 171:22 173:20 178:23 185:14 198:16 204:2 211:3,4 241:10 242:23 243:21 260:1,7 261:8 266:13,16

**Infowars'** 88:18 135:2 146:10 159:16,21 165:9,21 237:5

**initially** 66:3,18

**injecting** 28:16

**injuries** 259:25

**inspired** 169:6

**instances** 64:21 107:14 267:2,4

**instruct** 25:10 158:22

**instructed** 153:14,15,19

**instructing** 34:11

**instructions** 87:3 265:25

**interest** 217:11,12,19,21,22 218:5,9 219:1,3,4,5 236:12,14 242:14

**Interesting** 115:8

**interests** 199:9

**internal** 143:7 168:25 178:23 249:24

**internet** 19:22 148:15 159:24 165:19 257:11,12 268:8

**interpretation** 229:8

**interrogatory** 138:5 139:3 143:2 145:3 148:8,9 177:1 188:23 205:4 245:5

**interrupt** 222:8

**interrupted** 253:1

**interview** 42:14,15 83:23 167:7 254:22

**interviewing** 181:25 182:5

**interviews** 16:6 40:1 42:17, 22 101:5 120:20 125:1 181:21,24 182:3

**introduce** 5:9

**inventer** 37:22

**investigation** 66:23

**invite** 269:4,5

**invited** 269:6

**invoked** 67:7

**involved** 15:20 51:17 92:20 112:21 116:6 264:1 269:21

**involving** 54:12 238:9

**ipad** 115:17 189:22

**irrelevant** 7:9 86:2

**Isis** 169:6

**issue** 57:6 68:23,24,25 83:6 89:1 108:12,16 110:20 130:19 193:25 206:9 209:24 228:14 270:25 271:10,11 276:24 277:6

**issues** 99:22 109:16,25 111:7,12,16 112:4,15 113:14 206:10 252:24 257:16,20 258:19 269:25 271:18 274:15 276:19

**item** 241:12 242:1,2,3,5,14,17

**itemize** 245:20

**itemized** 245:23,25 246:1

**items** 155:24 241:12 244:8

---

**J**

**Jacobson** 261:8 267:16

**Jaimie** 137:25 138:1,2

**January** 8:25

**Jefferies** 110:10

**JLJR** 215:16,18

**job** 8:5 85:23 110:9 263:25

**jobs** 85:23

**Jones** 6:7 9:5 21:1 24:21 26:18 30:19 33:22,24 35:13 36:18 37:11,13,17,21 38:1 39:14 40:2 42:3,5,7,10,14,23, 24 43:2,24 64:19 65:20,21 68:14,20 69:4 82:15,19 83:3 84:25 86:6 158:15,16 197:17 200:12 212:24 213:4 214:19, 21,22,24 215:2,6,7,12 216:25 217:3,7,8 218:10,21,23 237:19 238:1,7 240:17 243:2 255:1,8,14,24 256:11 260:19, 25 267:10

**Jones'** 44:9 48:6 83:19 85:3 104:24 208:6 213:1 216:17 217:15 218:5,23 255:16,19

**journal-** 31:10

**journalism** 30:23 34:15 35:4, 16,19 39:17,25 42:8 43:18

60:7,11

**journalist** 34:23

**journalists** 31:14 33:6,9 34:10,12,18,21 35:2,9,16,18 49:17

**judge** 11:18,24 12:6,11,18 13:3 55:4 265:25 266:5,8 270:22 277:21,25 278:9,13

**judge's** 265:19,22

**judgment** 207:3 210:20

**June** 59:16,17 64:24,25 65:6

**jury** 5:10 21:16,17 31:21 32:3, 9 34:9 35:2,8 85:21 124:4,14, 24 125:10 140:24 143:20 149:7 152:8 162:22 170:4 176:8 213:21 237:9

**Justin** 196:6

---

**K**

**Karpova** 35:14

**Kellan** 137:25 138:1

**Kerns** 229:2,3

**keyword** 34:23

**kind** 5:25 9:14 23:7 29:15 39:15 49:4 63:15 90:10 111:7 113:9 116:24 138:21 166:12 195:12 198:20 212:15 218:11 223:24 233:2,3 234:8 235:10 236:25 249:8 253:25 274:6

**Kit** 31:23 32:8,11,21 33:22 49:9,10 61:10 84:12 139:13 148:18 166:24 167:19 183:25 257:3 276:17 278:22

**knew** 8:9 20:25 82:21 83:5,10 157:17 209:4 221:16,17

**Knight** 44:19

**knowing** 85:4 179:24

**knowledge** 64:3 69:9 82:8 83:19 85:3 86:7,23 88:10,12, 17 94:15,17,22 95:2,3 96:13 100:6,18,20 136:8 155:14 173:12 179:14 244:17 258:13, 25 259:2,8

**Kurt** 60:16 70:6 71:1,4 150:14,15

---

**L**

**L-A** 269:14

**label** 99:24 159:7 185:20,22 268:22

**labeled** 57:23 96:12 97:16 147:21 190:23 195:23 196:3 268:20,21,22

**labeling** 252:5

**laid** 81:22

**landing** 79:22 80:1,4,9,10

**language** 115:13,18 129:22, 24 130:3 224:15

**late** 50:7 83:24 84:2 126:9,14 166:25 167:15,18 210:6,7

**Latronica** 269:10,11,15 270:13

**laugh** 115:9

**laughing** 99:15 269:11

**law** 7:15 21:18 26:12 29:1,2, 13 107:11 116:1

**lawsuit** 77:4 118:22 126:19, 22,24 128:12 129:10 146:4 169:23 236:19 237:21,24 244:13

**lawsuits** 34:2 51:24 54:6 237:13 238:9

**lawyer** 21:21,25 22:2,3,4,5,17 25:14 124:18 132:16 154:18 178:11 191:4 201:16,17 212:10

**lawyers** 108:25 109:1,14,24 123:11 132:17,18,19,25 133:2 191:3

**lead** 35:7 71:11,15

**leading** 265:8 266:2 268:11

**learn** 130:14 199:6

**learned** 188:24 210:2 219:7

**learning** 211:12

Paz, Brittany                02-15-2022           Index: leave..marked

**leave** 26:8 28:12 144:9

**leaves** 28:10

**leaving** 253:12

**left** 50:8 84:4 141:6 167:19, 21,24 168:2,10

**legal** 26:3 37:7 114:1,4 116:12 178:10 229:22 230:4,6

**lesser** 68:22

**letter** 95:19 100:10,17,22,25 126:25 127:4,9 128:19,22,25 129:6,17,18 130:10,12 153:10 170:18 221:13,15,18 257:13 258:6,11 259:9

**liabilities** 233:5 234:9,19

**liability** 54:12 234:23

**liar** 251:17

**liberal** 229:8,9

**license** 116:1

**licensed** 26:12

**life** 258:22

**lifeline** 250:17

**limited** 90:7 179:17 235:21

**lines** 108:14 111:13 113:15 206:19,21

**link** 62:23,25 138:10 139:1,4, 13,17 141:18,19 148:15 149:23 150:1,2

**links** 62:22 98:12

**list** 47:15,16,20 48:3,6,7,11 87:3 96:16 138:8,18 246:6,7

**listed** 35:22 64:22 79:14 136:22 172:13 178:24 245:13, 24

**listen** 38:10 39:10 171:9

**listening** 39:5

**lists** 48:1,2 236:10

**literally** 250:16

**litigates** 21:5

**litigating** 21:3

**litigation** 49:20 51:9 57:12 94:12 108:6 112:19 113:7

132:14 187:4 210:19 215:22 221:18

**live** 172:8

**lived** 88:5

**lives** 86:14,15 89:3 90:25 91:1

**living** 7:12

**LLC** 5:5 10:6,14 37:10 138:24 139:4,16,19,22 142:24 148:10 215:24,25 216:1 217:14 218:21 261:8

**LLC's** 139:23

**LLCS** 37:7 239:5,8

**locate** 143:11

**located** 6:8 159:15

**location** 94:19 96:16 148:14

**locations** 50:6 101:9

**long** 24:2 29:11 125:8 138:21 171:8,22 178:14,15 186:14 198:2,18 207:25

**longer** 28:15,18 29:22 35:18 67:5 98:13,21 99:2 176:3 249:20 269:22

**longest** 65:23

**looked** 19:14 20:8,12,14 75:18 93:15 97:21 98:7 168:15 176:25 275:4

**lose** 247:16

**losing** 210:19

**loss** 188:21 191:21 192:11,20 251:4

**lost** 238:10 273:15

**lot** 17:11,23 51:17 61:8 70:15 75:23 102:3 112:14,23 132:6 255:17 257:20 258:19

**love** 171:16 222:5,6

**lying** 75:9,10,11 251:18

---

**M**

**machine** 226:23

**Madam** 59:4

**made** 8:10 49:21 51:25 53:2, 18,19 59:2 64:25 65:1,9 92:3 96:24 114:3,7,13 127:4,9 138:19 143:10 145:2 149:8 151:13,15 153:25 157:14 158:21 160:19,22 163:14,16 169:23 205:13,18 210:3,4,21 224:24 225:21 242:14 243:3 248:8 260:9 262:3 268:5 272:13

**main** 85:11

**maintain** 149:20

**maintained** 139:19

**majority** 36:19 37:3 197:24

**make** 28:18 43:21 45:9 51:20 58:21,25 60:24 61:21 62:4,14 63:25 69:18 79:19 115:1 124:24 133:15 144:1 190:10 191:12 192:12 212:2 214:6 219:9 225:23 227:16,21,23,24 229:1 232:10 239:2 243:3,17 251:13,14 254:9 256:18 264:23 274:3

**makes** 232:11 240:21,25 241:10 243:7

**making** 68:12 82:4 174:17

**male** 138:3

**mall** 241:21

**malpractice** 114:1,4

**managed** 51:18 52:8,10,11, 17,18

**management** 200:13

**manipulated** 108:10 206:13

**manner** 245:14

**Marcel** 259:24 260:8

**mark** 31:17,19 97:10 125:15 219:15,18,24 226:6 229:19 232:21

**marked** 18:3 31:18 97:11 102:10 103:10 117:19 125:16 137:20 140:17 141:8 148:6 159:2 162:15 163:2 168:18 176:19 184:23 192:18 195:21, 25 196:2,13,16 219:17 228:12

254:4,7,8,13,14,16 261:5,7
262:18

**marketing** 243:5

**Massachusetts** 86:16 94:19
96:16

**material** 17:9 19:24 30:10
41:2 42:18 55:24 56:2 87:25
98:22 100:9 102:2 109:17
153:7 255:15 258:3 259:12
260:11

**materials** 10:24 19:10 39:7
40:20 57:7 75:15 91:25
140:22 143:14 154:15 214:16
229:4 257:11 271:12 273:7,23

**math** 182:8

**math's** 182:19

**matrix** 41:23

**matter** 6:16 30:1 142:6
189:20 244:23,25

**matters** 21:23

**meaning** 107:18 266:21

**means** 8:3 87:2 99:24 136:7
147:6 156:25 157:3 241:17
244:4 246:2 255:6

**meant** 39:22 259:6

**media** 19:20 50:5 61:18,22,25
62:2 63:16 101:7,8,10,13,19,
23 102:4,23 139:18 141:1
150:6 164:20,25 165:6 256:22

**medium** 138:9

**meeting** 196:10

**Melinda** 30:18 32:18,24
64:20 65:12,17,18 66:7 70:19,
24,25 103:12,18 104:22 146:8
158:12 177:8 185:3,9,25
186:7 199:8 203:9 214:15
222:1

**members** 120:20

**memories** 223:11

**memorized** 264:11,12

**memory** 219:11

**mental** 96:10 257:16,22

**mention** 10:23 19:18 146:5

**mentioned** 23:24 79:12
155:22

**mentions** 54:11

**message** 133:20

**messaging** 260:8

**met** 185:3 196:11 218:16

**Michael** 110:14,15

**mid** 228:10

**middle** 210:19 217:15 225:18

**million** 185:13 197:4,20,25
198:14,25 204:1,7 210:17
212:12 217:23 218:1,3 219:1
220:18 236:19 242:20

**mind** 176:1

**minute** 114:20 192:11,12
222:9

**minutes** 16:17 190:7 253:9

**mirror** 121:11

**mischaracterized** 54:16

**miscommunication** 250:2

**misidentification** 131:22

**misidentified** 260:1

**misinformation** 256:10

**misleading** 255:21

**missed** 130:18

**missing** 48:11 108:14
206:20,22

**misspoke** 178:9

**misunderstood** 102:25

**mitigate** 162:12

**mitigated** 130:19

**modification** 170:5,22 171:3
173:1,22

**modified** 169:13,14,18 170:2,
12,15,16,18,20 175:11 176:4,
5,6

**money** 198:18,20,21,23
199:8,13 216:14 218:8 237:6,
13 240:22,25 242:24 244:5,7,
10

**month** 153:11 240:17,19

**months** 198:5 199:16,23
200:5,9 210:22 236:19 243:14
248:15

**morning** 19:8 20:3,20,21
72:4 74:2 150:25 167:10
187:19 190:18

**mother** 215:7

**motion** 113:8 191:10 200:13
223:10,16,20 227:24 231:21
237:23 249:18 250:21 265:4

**motions** 116:5

**motto** 39:15

**mouth** 44:24

**move** 14:7 226:3 229:18
275:10

**moving** 260:17

**MSNBC** 141:4 144:4

**multiple** 13:5 54:13 55:8,12
59:24 60:9,12,19,25 61:3
69:18,20,22

---

**N**

**name's** 200:21

**named** 36:2

**names** 61:4 84:11,18,22
137:21

**narrow** 89:23

**native** 143:25

**necessarily** 31:13 111:18
121:10 142:7 146:13 151:23
164:21 170:17 239:4,6 240:13

**necessitate** 105:22,24

**needed** 18:6 25:5 59:19 76:6,
7 112:12 170:23 202:21
204:18 214:13 240:3,6

**nefarious** 206:24

**negative** 131:24,25 132:2
184:15,17 185:13 197:4,20

**negotiated** 15:5,8

**negotiations** 134:5 192:22

Paz, Brittany                    02-15-2022        Index: neighbor..Ogden

194:10

**neighborhood** 16:8

**net** 103:4 104:11 116:24 177:6,11,14 183:25 184:5,7, 10,13,15,17 185:13,15 190:13 192:25 193:4,17 195:23 196:25 197:3,9 202:5 204:11 205:14 211:12 234:16 235:2 238:22 252:8 253:24 279:6

**news** 19:21 36:13,21 43:9 50:4 62:22,23 63:7,9

**newspaper** 148:15

**Newswars** 139:7

**nice** 132:2

**night** 7:8 73:9,20 90:19 92:3 167:11 187:15

**Nikko** 47:19,20 62:12

**Nimmo** 60:16 70:6,9,11 150:14,15 158:8,9

**Nimmo's** 70:18 71:1,4,9

**nitty-gritty** 240:14

**Nobody's** 63:20

**nodding** 53:16 69:14 82:9 83:21 105:3 125:1 127:6 144:13 154:24 195:19 217:18

**nonparty** 148:11,13

**nonresponsive** 59:5 265:16

**norm** 21:25 22:2 37:2

**Norm's** 22:5

**normal** 210:16,22

**note** 198:14 203:24 204:1 211:1 217:23 218:1,3,4,9 234:12 242:25 256:14 262:3, 20

**notebook** 220:5 222:21 224:10 253:13

**notepad** 220:10,12 223:11 232:19

**notes** 202:14,23 218:13,16 219:8,14,16,22 220:13,16,17 222:10 223:5,22 224:3,11 225:5,10 226:16 228:10,12,17 229:23,25 230:3,4 231:24

232:5 254:15,20,21 261:2,3, 25 262:2,7,8,12,19

**notice** 8:17 10:21 11:23 12:10 16:14 17:14 26:24 55:18 78:13 81:22 88:9 137:8 139:21 238:24 267:3 277:22

**noticed** 13:23 14:4 219:12

**notices** 13:13 179:9 272:16

**notification** 170:15

**November** 236:2

**number** 15:3,5,7,10,14,21 23:15,16,17 29:20 30:16 36:16 39:11 41:18,23,25 42:2, 3 43:6 57:1,11 58:5 70:1,18 71:2,20 73:6 74:8 76:11 77:7 79:8 80:16,20,21 81:5,11,16 92:7,13,21,22 93:2 95:12 101:8 117:23 131:12 147:7 150:7 158:12 182:22 185:17, 21 189:19,21 197:2 198:17 204:4,9 205:10,14 208:24,25 238:9 263:22 266:9,14 271:4

**number's** 147:16

**numbers** 71:3 78:23 81:24 82:1 92:17 103:20 185:10 187:6,10 191:24 197:10,11 204:10,13,23,25 206:3,13,21 207:15,16 208:20 210:5,9,14 213:10 218:12 242:4 247:16, 21 248:16,22,23,24 250:5 270:18

**numerous** 39:15 88:24 89:4

─────────────────

**O**

**oath** 41:17 124:20 210:8 213:21

**object** 6:23 25:10,17 54:15, 19 59:5 105:14 229:18 265:6, 8,15 266:2 268:11

**objection** 46:25 54:21 98:18 155:11 265:11

**objections** 54:20 55:2

**obligation** 7:8

**obligations** 6:21 10:11

**obscured** 147:16

**observed** 78:4

**obtaining** 229:15,17

**obviate** 54:5

**occasion** 138:8

**odd** 238:18 239:6

**offenses** 133:14

**offered** 230:9

**offering** 38:6,7,9

**office** 24:8,9,10 29:5,6 167:24 186:19,20,22 191:18 194:16 196:9 227:16,21

**officially** 215:13

**Ogden** 5:8,15,20,25 6:11,15 7:11 8:16,20,22 14:16,17,21, 23 25:22 26:8,11 31:17,19 39:11 47:3,6 52:25 53:1 54:17,22 55:5,7,16,17 59:4,6 73:13,14 75:6 76:20,24 77:1, 15,19 78:3 81:7,10,12 90:15, 17 91:15,24 95:10,14,15 97:12 98:20 104:5,7,10,14,18, 21,22 105:17 106:18,21 110:13,15,18,23,25 112:18 114:21 115:3,24 116:4,21 117:16,18,20,24 121:16,18,19 124:10 125:17 126:16,18 129:3,5 133:2 134:20,24 136:14 137:3,6,13,19,24 140:8,11,14,15,18 141:9 147:18,20 148:1,3,5,7 153:15 155:12,16,19,21,22 159:3 161:21 162:16 168:19 176:9, 14,16,20 178:6 180:4,6 183:18,20 184:24 185:5,8,20 186:11 187:8,12,14,18,22,24 188:4,8,15 189:5,12,15,18,21, 23,25 190:4,8,10 191:14,23 192:1,10,13,15,23 193:2,6,8, 11,16,21 194:6,11,14,21,25 195:6,12,17,20,22 196:1,8,17 208:4,11 215:18 217:6 219:18 220:4,7,11,15,20 222:15,19, 25 224:5,8,12,19,23 225:2,7, 9,11 226:1,5,15,21,24 227:3, 6,25 228:1,8 229:19 230:14, 17,20 231:7,11,17 232:1,6,16, 19,20,22 249:1,12,16,19,25 250:6,9,16 251:20 252:3,8,11, 14,17,21 253:3,6,10,16,22

Paz, Brittany                02-15-2022        Index: older..people

254:5,9,14 255:11 261:6
262:13,15,25 264:18,22
265:6,8,11,15 266:2 267:5
268:11,14,17 279:3

**older** 114:25

**omitted** 225:6

**on-air** 60:3

**ongoing** 113:13 132:14
258:21

**online** 131:9 159:24

**oop** 135:10

**operates** 197:15

**operating** 150:17

**operatives** 255:17

**opinion** 38:17,18 42:13 44:3,
4 46:18,19,20,22,24 50:24
72:20 110:12,16 111:1 115:22
150:7 189:2 191:9 255:19

**opinions** 38:6 40:2 50:25
251:5

**order** 5:13 41:8,10 95:23
108:17,18,24 112:5 116:2
192:4 193:16,24 195:7 247:8
265:4,10,12 266:7 278:7

**ordered** 7:5 11:13 183:21

**orders** 111:13,14 266:9,14

**org** 148:22

**organization** 57:7 111:17,22

**organize** 41:1 270:5,7

**organized** 52:5 111:18

**origin** 159:14

**original** 45:12 100:9 128:4,8,
10,17 138:16 149:23 160:10,
14,21,23,24 161:11,22
166:14,18,21 173:1 175:6
226:11,19 231:1

**originally** 101:6 134:12
166:23 173:21 212:3,8

**originals** 226:23 231:14

**other's** 60:25

**outstanding** 112:13,14

**over--** 266:18

**overlap** 112:23 271:10,11,12
274:21

**overlapping** 112:2

**overlaps** 113:20

**owe** 38:14 243:7

**owed** 39:4 103:23 197:23
198:22 203:24 242:20

**Owen** 44:21 45:4

**owing** 103:23 237:7

**owned** 142:23 145:15 214:19
215:6 239:3

**owner** 37:22 67:6

**ownership** 199:9 217:19
221:24,25

**owns** 37:8,9,10,11 142:16,20
214:18 215:4,5,20 217:11,20,
21 221:25

---

**P**

**p.m.** 126:10 137:16 188:12
228:5 253:19 279:9

**packet** 19:6

**pad** 219:12 229:22 230:4,6

**pages** 11:3 19:23 20:2 71:21
74:13,16,19 77:10 79:3,12,13,
17,22 80:1,4,10 81:16 92:16
93:8,9,15 97:20 98:10,21 99:1
119:23 135:22,25 140:18
222:21 230:18 231:2,3,24
232:2 254:14 267:21

**paid** 14:8,11,13,24 198:1,19
199:8,13,14,24 216:16 217:8
218:9 237:6

**paper** 87:14 230:21

**Paragraph** 236:9

**parameters** 123:7

**parent** 238:5

**parentheses** 139:10,12,20,
21 148:20,22 221:19

**parents** 217:20 238:9 239:9

**Parkland** 97:3 130:2 149:2
260:1

**part** 11:6 21:20 33:15 51:4
72:4 108:2 149:24 232:1,8
245:13 256:6

**parties** 253:23

**parts** 19:16 260:17

**party** 41:6,7 121:7,13 122:4
229:14 236:9 256:8

**pass** 268:13 276:6

**passing** 263:11

**password** 269:3

**past** 36:6 39:12 47:23 98:23
188:19 190:6 209:21

**patient** 22:13 87:1 174:5

**Pattis** 9:11,13,15,17,18,20,22
10:4,17,22 11:2,17 20:23
25:1,12,16,19,22 26:3,19 29:8
260:19

**Pattis's** 25:2

**Paul** 71:17,18

**pause** 117:16 220:11 232:18

**pay** 151:19,22 152:5 199:17
214:5 243:5

**paying** 204:3,6 210:18
242:23 244:1

**payment** 210:21

**payments** 243:18

**pays** 199:18 240:22

**Paz** 5:3,4,11 7:5,11 20:12
78:3 99:16 173:8 174:6
187:22 188:17 216:23 220:4
227:7 228:10 229:22 252:8
265:3

**peculiar** 177:22

**pendency** 133:16

**pending** 111:12 112:7

**people** 19:22 30:4,16,19
36:5,8,9 38:3 42:22 43:3,4
49:17 51:17 59:22 61:11 64:6,
21 70:16 84:3 86:25 168:7
181:12,25 237:13 238:14,16
239:1 255:20 256:2,8,9

258:18 260:8 273:6 277:12
278:16,21

**percent** 36:11,14 39:25 40:5,
23 41:16 42:7 43:5,11,12,14,
17 154:25 165:8 214:19,20,22
215:4,6,7 217:12,21 218:8,20,
21,22,25 219:3 238:5 239:3

**percentage** 36:24 42:25 43:1
199:21 200:4

**percentages** 217:21 222:1

**perfect** 61:12 255:2

**perfectly** 231:22

**period** 63:10 70:5 83:7,18
112:22,25 237:4

**periods** 112:2

**permissible** 54:20

**perseveration** 152:19

**person** 12:25 24:6 26:2 29:25
30:9 33:20 35:22 36:2 41:4
46:10 62:8,9,15 66:21,24 67:4
68:11,13,24 70:25 100:23
102:5 119:14 121:4,8 132:12
154:21 157:24 172:24 186:17,
18 191:5 194:22 200:22
201:7,8 211:15 212:25 213:3,
6,12,16 259:13,14 260:21
270:2

**personal** 9:23 72:20 86:23
89:2 92:12 95:2,21 118:23
258:13,24 259:16,18,22
267:12

**personality** 43:25 44:18

**personally** 63:6 142:20

**pertinent** 267:2 271:5,6,14
274:9,13 275:3,5

**petition** 7:24 8:10 118:3

**petitions** 56:7 118:4 176:24

**phone** 24:5 26:2 55:4 70:18
71:2,3 77:16 112:16 114:18
118:24 119:5 141:14 153:6
156:3 186:16 191:13 255:13

**photo** 50:4,5 97:20 101:25
130:4 144:6 145:22 147:3
159:3,5,12 160:10,20 161:1,5,
9,17,18 162:9,10 225:20

**photocopies** 225:24

**photocopy** 231:14

**photograph** 96:23 97:1,4,8
101:6,11,15 102:5 129:25
130:20 141:5,23 144:22
149:18 257:6

**photographs** 141:20 160:13

**photos** 160:21

**phrasing** 273:17

**physical** 252:1

**physically** 203:21 252:1

**pick** 256:4

**picked** 238:18

**picture** 62:8,10 100:23
101:12,14 140:3 141:10
142:1,10 147:4 161:25

**pictures** 150:6

**piece** 45:18,20 55:20 87:14
230:21

**pinch** 195:13

**pipe** 122:16

**Pizzagate** 255:17,22,24
256:11 261:4

**PL** 217:11

**place** 49:22 51:10,14 59:10
61:14 62:19 69:7 72:24
111:14 122:9 140:1 143:3
187:11 195:7 255:3

**places** 101:8 150:8

**plaintiff** 88:4,6,10,12,18
100:19,21 118:11 132:24
136:1

**plaintiff's** 81:22 196:9
228:11

**plaintiffs** 73:8 95:18 99:19
114:12 130:11 133:21 143:6
159:9 188:6 270:17,20

**planet** 40:5 142:12,14,19,23
143:17 145:1,6,10,20,23,24
146:2,6,11,17 147:8,13

**planning** 215:12 216:3

**platform** 145:20 175:25

**platforms** 139:21

**pleadings** 116:5 118:3,4
125:18

**PLJR** 214:20 215:3,4,5,6,20,
23 216:6 218:21 240:12

**plurally** 24:23

**point** 28:22 73:22 91:18
113:1,17 115:24 118:6 132:20
153:19 193:7 212:6 228:16
243:20 246:10 248:14 249:9
252:21 253:23 256:15 260:20
263:21 278:24

**pointed** 261:23

**pointing** 261:14

**points** 112:24 124:2

**policies** 30:13,17 31:1,4
32:3,10 33:21 49:22 51:20
55:19 58:17 59:10,18 61:13
63:16 69:6

**policy** 33:5 34:1 35:17 51:10
53:1,3,10,11,13 58:8 59:2,6,9,
23 60:16,17,18 61:20,24 65:7
69:6 70:7

**political** 38:3,4,9,12,20

**popular** 63:13

**portions** 230:9

**pose** 28:20,23

**posed** 188:16

**position** 7:5,9 30:22 34:14
35:3,10 36:11 37:21 38:2,25
42:5,6,9 43:7 51:11 60:20
65:5 69:9,12,17 71:9 150:10,
11 161:14 225:4 228:11,15
230:12,14 235:1 247:20
255:22 259:23

**positions** 38:24

**positive** 105:2,5

**possess** 179:13

**possesses** 246:8

**possession** 93:25 94:14,23
95:1 118:17 126:3 135:4
139:2 163:10,23,25 173:20
252:2

Paz, Brittany                02-15-2022   Index: possibil..procedur

possibility 53:14 64:22,23

possibly 29:25 270:1

post 34:2 80:8,13 84:16 85:4,
5 96:24 97:2 100:15 101:3
128:4,8,10,15,16 129:16,19
138:19 139:1 141:1 145:1
146:10,14 149:18 150:9
151:12 160:19,21,24 161:11,
22 162:12 163:14,16,17
164:4,12,14,20,23 165:18,22,
24 166:6,14 169:2,5,9,13,14,
17 171:17 173:1,21 175:6,11
176:5 210:19 255:3,20 256:20
257:17,18,21 276:11

posted 19:21 50:6 81:17
100:23 138:10,16 139:18
143:4,8 150:16,21 160:10
162:22 166:2,7,23,25 167:4,
15,18 173:22 176:5 257:11

posting 69:8 163:17 256:3

postings 145:24

posts 19:19,20 69:8 96:20
102:8 142:20 144:21 145:14
151:15 268:6,8

potential 54:6,12 114:1,13,14
193:22

potentially 62:25 130:2

pounding 228:2

power 68:17 115:3,4,7

PQPR 103:22 104:23 197:25
198:1,15,19,22,24 199:2,6,9,
10,14,18 200:14,15,20 201:7,
9,11,16 204:1 212:3,6,9,10
214:18,19 215:4,20 217:11,19
218:5 219:4 235:20 236:10
237:5,6,7 240:12,21,22
241:10 242:15,20 243:18
266:17

practices 22:6 206:8,11
207:6

practicing 7:13,15 26:12
116:1

pre 257:17,22

precontact 258:7

predated 65:13

preferred 47:17

prefers 47:23

premise 62:13

prep 271:25

preparation 16:9 23:25
41:19 90:5 106:11 107:13
109:9 116:5 183:7 194:9
214:3,11 249:5 257:8 266:19
273:16 275:6,19

preparations 274:4

prepare 10:19 30:12 55:21
82:12 87:4 103:7 177:4
179:19 183:23

prepared 6:20,25 7:7 10:25
11:8,12 12:1,7 13:12,19,22
18:25 20:18 26:23 27:2,5,12
30:1 71:23,25 74:5 76:10
78:22 79:15,17 80:13,15,19,
22 81:2,12,18,21 82:2,3,10
103:4 137:9 152:18 183:15,16
190:15 192:21 263:8,24
264:13 272:6,7,8,10,22 278:4

preparing 12:3 16:3 31:24
56:5 109:5 179:17 180:10,13
202:5 212:20 214:12 264:8
278:5

prepped 7:6 273:9,18,19

prepping 271:21,22

preproduction 47:15

presentation 235:11

presented 30:6 46:22 229:7

preservation 127:20,21
128:19 137:9 145:19 146:5
153:25 158:18 269:25

preserve 102:7 127:5 136:13,
15,24 137:7 149:8,12,25
152:23 153:20 154:5,7,14
155:10,24 156:2,3,5,8,10,12
157:5 158:22 226:19 230:25
279:4

preserved 128:6,18 153:24
160:6 226:11

pretty 11:19 17:22 84:2 89:17
106:4 107:9 110:9 183:13
225:13 232:7 247:3 263:2

prevent 229:14

prevented 229:17

previous 8:24 81:20 89:8

previously 10:15 30:3 49:23
53:24 97:13 159:4 176:2
197:7 199:15

primary 236:23 240:25

principal 218:9

principally 204:8

principals 241:23

print 17:17 203:21

printed 185:4 202:17,22
203:9 267:20,22

printer 202:20

printouts 97:14

prior 9:21 20:13 21:9 32:2
33:10 34:8,25 35:6 55:14
60:15 64:24 70:5 100:22
106:18 108:11 109:12,14
117:20 148:12,20 173:5
188:20,25 194:15 199:23
200:14 212:24 215:13 216:3
237:24 273:7

Prison 142:12,14,19,23
143:17 145:1,5,10,20,23,24
146:2,6,11,16 147:8,13

private 260:10

privately 260:8

privilege 25:18 58:16 98:19
105:15 229:5,10 230:10,12
231:5,6

privileged 25:8,9,10 106:6
107:9 223:12 228:18,19

privileges 229:12

pro 111:11 112:7 113:8 116:2

pro- 182:25

problem 38:15,19 111:22,24
190:17 224:20 231:23 240:10
275:21 277:2,3,4

procedure 61:20 150:18
219:23

procedures 30:17,21 32:4,
10 49:22 61:13 72:23

Paz, Brittany                02-15-2022    Index: proceed..qualifie

**proceed** 104:19 223:2

**proceedings** 115:25 279:9

**process** 28:19 36:21 43:7,9 60:23 62:14 226:8

**produce** 120:11 125:24 126:2 135:21 163:8,13 185:25

**produced** 12:21 18:19 20:17 32:16 40:20 57:3,11 66:13,16, 17,18,20 73:8,15,19 74:1 78:25 79:18,21 80:5 85:16 86:1 90:8 91:6 92:18 93:18,19 94:11 95:18 97:13 99:19,25 100:2,8 102:3,17,18 104:11 108:14 109:17,18 111:19,21 112:10,13 119:23 120:2,4 123:2 124:5,21 125:3 134:10 135:4 146:23 163:4,13 184:1 185:24 187:3,5,7 188:22,25 189:25 190:1,3,5 191:17 195:2 205:6 206:19,22 228:21,22 249:6 250:10 251:5 262:16,22,23 268:9 270:16, 17,20,23 271:1

**producing** 108:11 189:9 250:11

**product** 194:9,18 231:4 237:4

**production** 18:18,21,25 19:15,16 36:20 42:20 56:25 57:7,22 78:25 82:16 87:6,11, 14,25 88:24 89:5,6,7,8,14 90:19,20 91:5,7,8,17 92:3,16 93:11 94:7 98:4 99:21 100:4 102:2 112:15 113:15 118:6,9 120:6 122:20 123:3 125:22 131:2,3,5,7,8 134:15 135:9 144:7 159:9 164:24 165:2 191:9 250:25 266:23 270:1,6 271:2

**productions** 42:21

**productive** 179:19

**products** 198:1,16,22 199:21 243:18

**prof-** 197:3

**professional** 9:21 29:8 75:19 189:2 191:9

**profile** 62:10

**profit** 188:21 191:21 192:11, 20 251:4

**profit-loss** 103:13,15 104:23 105:12 108:13 184:19 185:9, 12 197:1,2 202:4 203:2 205:12 209:18 210:10 214:14

**profit-losses** 209:22

**profitable** 197:20

**profits** 216:18

**program** 172:4

**programming** 146:18

**promise** 61:7 83:11

**promoted** 150:18,19 151:6,8, 9,15,17,22 152:4

**promotion** 151:3

**propensity** 251:17

**proper** 130:15 169:22

**propose** 193:22 226:20

**proprietor** 238:4,8

**proprietor's** 239:9

**protect** 51:10,13 53:2,18 54:1 237:13,19

**protected** 229:5 269:1,2

**protective** 5:13,16,17 41:8, 10 95:23 192:4 193:24 195:6

**proved** 115:21

**proven** 38:18,21

**provide** 165:18 229:6,13 247:12

**provided** 40:19 55:24 100:4 188:18 191:22 192:1 194:12 195:1 196:4,8 204:15 220:14 223:22 229:24 241:3 251:1 277:20

**providing** 207:11

**psych** 258:4

**psychological** 258:4

**psychologist** 95:17,19 258:6

**public** 142:22 143:8 196:14

**publically** 138:10

**publication** 135:25 139:5,7, 14,18 145:2 148:12,14,15,20 149:3

**publications** 148:10

**publicly** 138:25

**published** 125:25 126:6,9 134:12 135:2 139:4,9 140:2 144:22 145:5 170:12 277:13

**publisher** 148:13

**pull** 73:23 91:16 164:22 209:18 222:24 225:16 230:20 231:13

**pull-out-of-the-air** 174:14, 16

**pulled** 63:22 87:18 164:15,18 196:20 219:12,21 222:15 224:9 229:3,22 230:3,6

**pulling** 159:20 228:17

**punditry-type** 31:14

**purchased** 237:5

**purchases** 198:15

**pure** 64:16,17 174:14

**purely** 153:17

**purpose** 42:18,20 54:10 255:21

**purposefully** 209:16 255:20

**purposes** 192:21

**purse** 196:20

**pursuant** 130:14

**put** 6:9 7:3 19:11 39:1 40:25 42:19 49:21 51:10,14 59:7 74:24 75:2,14,15 92:22 101:8 147:17 165:18,22 189:5 194:22 202:19,24 203:13 209:17 223:8 270:13

**puts** 39:6

**putting** 22:14 45:13 132:8 195:12 210:9

**Q**

**qualified** 35:23 36:1 43:14 210:24 211:1 214:7 237:1

239:12 258:25 277:1

**qualities** 61:9

**question** 13:24 14:1,2,6 22:8,
15,19,21 23:1 27:23 28:5,20,
23 32:6,17,19,21 34:16,17
35:5,22 38:8,15,19 39:10 45:8
49:1 50:10 52:12 53:17 55:6,7
56:12 57:14 58:12 61:23 69:4
77:2,3,5 78:12 80:18 82:3,5
83:12 87:9 88:16 103:1
106:25 109:3 115:8,14 118:11
124:11 126:11,21 134:11
135:2 138:11 139:1 149:13
152:20 156:13 157:2 165:23
168:15 170:10,24 171:9,15,21
174:8 175:4 176:2 179:6,16
183:4 187:12 188:16 192:7
196:24 210:25 211:2,21
216:6,21 231:7 236:23 242:18
244:14,16,21,22 245:2,22
246:3,20,22 248:5 259:20
268:12 272:2 273:18 274:5
275:4

**questioning** 147:11 190:20
191:16 252:8 275:14

**questions** 17:11 28:17 55:1
61:9 82:6 171:13 173:15
174:7 184:24 207:11,14
213:14,18,24 214:9 222:16,18
226:16 247:12 253:9 260:15
262:3 271:20 278:16,20

**quick** 52:22 72:17 198:9
228:24

**Quickbooks** 103:12 108:10
185:4 203:10

**quickly** 101:13

**Quinnipiac** 29:2

**quit** 115:1

**quotations** 261:24

**quote** 60:7 229:7

──────────────

R

──────────────

**R0** 147:5

**raise** 151:19,22

**raised** 37:13 277:6

**ran** 43:11 187:17 197:19

**Randazzao** 110:1,6 111:6,
10,25 112:6,18 113:3 114:17
115:25 116:4,12,20 132:21

**random** 27:18 211:15 213:3

**randomly** 27:17 28:16

**range** 93:7

**rate** 23:8,11 263:13

**reach** 66:25

**reached** 9:9 188:24

**reaction** 10:6,7

**read** 6:2 11:22,23 12:4,12,25
20:6 31:21 32:25 33:3 40:10,
11,12,13,17 46:13,17 57:24
86:15 87:11,12 92:7 97:5,6
106:18,20 108:17,18,23 118:5
128:8,10 130:10 131:3,5,7,12,
14,15 139:24 142:11 143:3
149:5 162:23 188:9 206:14
221:4 225:12 246:15 247:7
257:10,13,20 258:3 265:4
266:7 272:16 278:6

**readily** 70:14

**reading** 91:3 95:19 131:20
132:6 224:20 234:8 270:22

**ready** 19:1

**real** 52:22 72:17 141:3 144:4
198:9 232:13 260:21

**realize** 255:23 263:8

**realized** 194:4 228:2 251:3
255:24

**reask** 171:15

**reason** 40:15 53:25 70:12
98:4 121:2 143:1 171:17
194:13 200:24 204:16 206:5
246:1 260:14

**reasons** 103:19 198:6 263:22

**recall** 17:20 37:24 39:20 71:5
91:2 95:17,19 122:3 132:4
146:1 147:1,3,6,7 148:24,25
149:12 180:25 184:3 208:23
233:23

**recalled** 267:15

**receive** 116:23 128:18

**received** 71:21 100:25
126:25 127:4 128:22,24
130:25 153:10 170:15 203:9
214:15 221:17 244:2 252:6

**recent** 103:14 192:14 200:10

**recently** 62:7

**recess** 77:25 91:21 137:16
188:12 228:5 253:19

**recklessly** 64:11

**recollection** 143:18

**record** 5:1,12 6:10 7:3 11:18
13:3 23:3 25:12 77:20,23 78:2
91:19,23 102:9 106:20
114:20,23 137:14,18 147:15,
17,20 188:10,14 189:6 192:6
194:2,3 196:14 217:5 219:10,
25 223:9 224:16 226:22
228:1,3,7,24 232:15 251:13
253:15,17,21 258:5 262:2
264:19,21,23 277:25 279:7

**records** 96:11 139:17 149:21,
25 249:6

**rectified** 83:7

**rectify** 51:25

**red** 83:25

**redact** 225:15,19 226:1,2,7,
13 227:15 230:11,18

**redacted** 201:25 223:6
227:19 231:2 242:10,11,12,14

**redactions** 201:23 202:2,8,
11 225:25 227:23

**redirect** 144:2 279:4

**Reeves** 104:16 110:2,6
111:25 132:21 191:11 251:7,
15,17,19 262:16

**refer** 184:19 218:13

**reference** 162:9

**referenced** 6:7 138:11,19
258:4 262:1

**references** 268:5

**referencing** 90:25 261:4

**referred** 129:15 230:8

Paz, Brittany                    02-15-2022   Index: referrin..response

**referring** 17:13 37:24 44:9 45:3 46:5 50:20 51:6 61:19 90:1 204:24 216:24 217:1 231:4 245:2,19 246:9 268:7

**reflect** 197:2

**reflected** 209:5

**reflects** 208:15

**refresh** 223:11

**refusing** 78:16

**regard** 109:4 248:3 261:6

**regular** 275:22

**regularity** 198:21 199:24

**regurgitated** 108:20

**reimburse** 243:6

**related** 16:5,19 17:10 18:9 135:25 156:4 158:19 161:17, 24

**relates** 226:13 264:3 267:3

**relating** 118:10

**relation** 8:12 261:4

**relations** 261:20

**relationship** 7:24 9:19,21,23 29:8 103:21 170:14 235:20 237:21 240:21

**relative** 186:25

**relay** 276:22

**release** 195:4

**relevant** 13:22 27:23 88:15 192:25 193:3

**reliability** 69:7

**reliable** 47:23 48:25 49:3 124:19,23 207:9 255:25 256:1,13

**relied** 90:12 149:9 229:12 249:5,25 250:4

**relies** 31:6 229:6

**rely** 59:25 222:16

**relying** 73:8

**remain** 195:3

**remainderman** 216:15 217:7

218:24

**remember** 16:13 17:25 31:3 66:7 70:9 73:3 84:19 91:2 96:8,9 110:3 120:25 121:22 122:7 125:6,7,9 126:20 127:1, 2 128:9 140:10 144:10 158:7 169:24 176:13 181:5,6,11 200:19 201:5,6,8 203:14,20 220:16 232:25 235:5 261:2, 17,19 262:15 265:17 273:1 275:15

**remembered** 157:21

**reminding** 133:9

**remove** 161:17

**removed** 130:3,5 139:22 161:25 162:9

**rendered** 144:25

**reorganized** 270:11

**rep** 240:11,12

**repay** 243:17

**repeat** 47:6 165:20

**rephrase** 49:2

**replaced** 191:6

**reply** 157:17,22 158:3

**replying** 141:3

**report** 43:21 48:8 95:17 127:10 169:5

**reported** 149:3 208:6,10

**reporter** 23:2 59:4 77:18 114:24 176:15,18 189:17 194:3 230:25 231:18 253:14 254:8,12 269:12

**reporters** 33:6,7 34:19,21

**reporting** 43:23

**reports** 48:21

**reposted** 147:7

**represent** 76:16 100:1 129:6, 9,13 142:3,22 145:9 164:11 168:23 170:1 171:12 177:24 178:1,7,10,11,12 192:9 199:2 241:20

**representation** 109:12 111:8 112:8 113:6 164:24

213:2

**representative** 5:4 7:23 8:1, 23 9:10 10:5,9 11:14,21,25 12:7,13 13:5 20:23 21:13,22 79:10 80:12 81:23 86:3,24 128:13 157:13 178:12 184:11 199:3 201:10 212:20 277:23

**representative's** 189:8

**representatives** 10:15

**represented** 73:19 116:15 130:1 169:21 197:8

**representing** 45:4 113:3 129:25 143:17 154:13

**represents** 177:23 201:7 218:5 219:4 237:7

**reproduced** 108:15

**republish** 146:19

**request** 106:16 118:6,9 125:21 134:14 135:9 138:12 185:25 193:18

**requested** 106:17,20 120:6 136:9 153:5 207:12

**requesting** 100:11

**requests** 120:6 122:19

**require** 8:5 13:5 15:19,22,23 32:6 269:3

**required** 23:21 25:6 30:7 229:8 269:5 273:17

**requirements** 34:12

**requires** 30:23

**requiring** 15:25

**research** 41:18 44:1,10,23 45:24 46:4,14 48:4 87:8 259:15

**researchers** 34:18,19

**respect** 188:16 224:16 265:4 266:18

**respond** 127:14,16

**responded** 111:14

**responds** 115:8,11 148:18

**response** 118:15 119:7 122:18 126:2,21 129:10 135:3

136:5 138:24 143:2 157:17
158:4,7 164:18 188:16,22
244:1,2 250:20 262:19 275:13

**responses** 117:25 125:18
165:2 188:20

**responsibilities** 8:6

**responsibility** 8:8 270:6

**responsible** 112:2 204:2
211:19

**responsive** 78:14 118:16
120:7,12 126:3 127:11 135:4
139:3 143:11 246:15

**rest** 127:25

**restrict** 47:3

**restricted** 85:4

**restrictions** 120:21

**result** 123:14 131:24 259:25

**resulted** 109:19

**retained** 8:22 9:2,5 10:17
183:23 200:15,17,18,22
201:1,4,8 211:20,24 212:3,7,
9,10,23

**retaining** 211:20

**retrac-** 169:22

**retraction** 81:16 100:11
129:14 130:6,15 169:22

**return** 248:23 249:11,22

**returns** 104:4 222:5

**Revenue** 249:24

**review** 11:3,8,10 12:10 13:4
15:12,19,25 16:4,22 17:9
18:23 19:5 20:5 45:24 56:4
57:9 88:3 93:4,10 96:3 99:13
100:7,10 117:3,10,20 123:1
124:25 144:15,16 153:6 177:4
182:24,25 188:19 197:6 207:7
222:14 271:5

**reviewed** 12:14,21 13:9,21
18:20 20:19 55:25 56:2 72:6
78:24 80:2 82:15 101:22
102:13 103:24 104:8 118:5
123:5 125:18 131:1 140:23
143:14 146:24 208:2,8,9
220:2,6 222:13 245:5 249:22

260:11 264:8 266:19 273:23

**reviewing** 52:25 97:12,19
98:22 162:19 178:18,19
179:22 181:6,8,11,13,16
183:1 184:25 227:11

**reviews** 220:11

**revised** 129:20 187:10
197:11

**revisions** 187:11

**revolving** 249:8

**rewarded** 151:5

**right-hand** 163:1

**ringing** 114:18 115:1

**road** 27:24

**Rob** 30:18

**Robert** 108:3 237:25 248:12

**Roe** 108:3,9,21 197:8 200:8,
15 201:17 206:2 207:9 209:11
210:2 211:3,24 212:10 213:2,
4,11,25 214:4,7,12,17 218:17,
20 219:7 235:8,10,19 237:25
238:1 243:2 248:12 260:18

**Roe's** 206:7 207:5 236:4

**role** 25:2 34:11 150:11 151:6
152:4

**roles** 49:13

**room** 78:4 163:18

**rooms** 12:8

**roughly** 16:16 93:3 182:21
219:1

**round** 20:1 250:25

**rude** 54:24

**rule** 23:7 68:15 70:3 194:15

**rules** 47:4 54:19 63:17 68:12
219:23 229:9

**ruling** 265:22

**run** 226:22

**runs** 107:8

**S**

**safe** 20:15 76:9 78:21 93:9
127:3

**safest** 253:23

**sake** 230:17

**Salazar** 24:21 26:18 37:1
82:15 83:22 84:25 86:6
136:23 267:15 275:24 276:4

**sales** 220:18 237:8 240:22

**sanctioned** 108:9

**sanctions** 109:20 260:17
265:5,12

**Sandy** 7:4,10 17:7 18:10
50:14,18,23 72:9 79:5,19,20
89:17 90:5 92:24 104:12
108:6 113:2 182:23 192:3
221:18 259:19 266:20,21,25
267:1,18 271:5,14,16,19
272:9 273:4,13,19 274:10,11,
25 275:5

**sat** 22:12 37:15 103:12

**Saturday** 24:14 182:1,3
186:23

**save** 101:20,22,23 149:23
170:8 171:22 174:9 226:12

**saved** 87:20 94:4 160:5
170:6,17,22,23 171:25 174:1,
10,11 175:15,24

**scan** 220:1 226:11

**scanned** 227:22

**scans** 227:16

**schedule** 207:22 208:1,7,17
209:15 243:17 248:23,25
249:21,23 264:8

**scheduling** 111:13

**school** 29:1,2,13 118:12
136:2 238:10

**score** 263:12

**scraped** 139:7

**screen** 168:24 252:4

**screenshot** 141:11 142:8

168:24

**screenshots** 149:22

**search** 89:15,17,23,24 90:4,
5,7 118:16,19,20 119:4,9,12,
22 120:13,17,18,24 121:1,8,
10,13,20 123:6,8,10,15
125:11 127:9 136:10,17,25
143:7

**searched** 118:23,24 119:5,
13,15 123:17

**searches** 127:13 135:24

**searching** 89:11,18 120:15
121:23 123:20 145:19 159:20

**seat** 190:25

**sections** 131:10

**secure** 236:18

**secured** 203:25 210:20
225:24 234:10,11,13,23
235:2,3 236:9 237:10 238:4

**send** 202:21 231:20

**sending** 34:1 49:16

**sense** 150:19 163:14

**separate** 273:16 274:3

**separated** 266:21

**September** 200:10

**serve** 10:8

**served** 21:12

**servers** 90:9

**service** 244:2 249:24

**services** 243:22,25 244:12
245:18

**set** 78:15 90:19,20 138:23
237:16,17,19,20 243:16,17
253:25 270:19,21

**sets** 172:4

**settle** 41:25 134:5

**settlement** 192:21 194:9

**shaking** 118:1 120:23 134:8
173:23 218:18

**share** 13:6

**shared** 95:22 138:10,19
139:13

**shares** 239:5

**she'll** 231:19

**sheet** 74:10 103:13,15 188:22
191:22 192:20 202:6 203:16
205:12,13,18 210:10 240:16
241:2,6 242:1 251:4

**Shelton** 29:6

**shit** 224:2

**shocked** 57:8

**shooter** 101:12,14 118:13
130:2,5 131:23 136:3 141:4
147:5 161:3,25 169:6 257:7
260:1

**shooting** 97:3 149:3 218:12
238:10

**short** 83:7,18 188:8

**shortly** 84:1

**should've** 12:20

**show** 8:19 91:4 117:13
125:24 142:23

**showed** 202:4,6 208:7
209:13

**showing** 134:10 135:22

**shown** 177:5

**shows** 39:15 68:9 145:22

**Shroyer** 35:14 44:21 113:22
133:19

**sic** 33:22 34:11 80:21 214:20
215:23 240:14 271:10 274:1

**side** 80:22,23 260:21

**sign** 6:2 41:10 95:24 116:10

**signed** 41:8 95:22

**significant** 237:4

**significantly** 92:24

**signify** 92:15

**signing** 39:16

**silence** 74:19

**similar** 60:21 95:11 164:25

**simpler** 80:18 173:16

**sincerely** 115:2

**single** 11:9,11 12:11,14,21
20:8,9 35:22 73:25 149:25
170:11 191:6 270:22

**sir** 28:5,20 74:1 106:6 173:14
222:18 273:16

**siri** 115:8,11

**sit** 9:24 11:24 39:24 121:22
175:18 227:2 234:25 248:1
259:24 264:10 271:2 273:1
276:5

**site** 139:9 165:6 199:22

**sites** 62:17 97:7

**sits** 12:13

**sitting** 12:19,20 26:22 37:20
85:24 124:3 128:11,13 146:15
156:14 171:6 174:13 175:13
177:9 185:14 189:7 190:16
210:8 228:19 245:21 247:7,11
248:4,9

**skip** 99:7,11

**slapped** 94:8

**slightly** 207:17

**slow** 83:11 138:22 184:6
224:5,6

**small** 36:24 228:8

**smaller** 79:8

**social** 19:20 50:5 61:18,22,25
62:2 63:16 101:7,8,10,13,19,
23 102:3,23 139:18 141:1
150:6 164:19,25 165:6 256:22
258:19

**sold** 198:16 199:21 217:22
237:5

**sole** 238:4,8 239:9

**solely** 59:25

**solution** 193:22 253:3

**someone's** 44:24 45:19
152:4

**son** 115:5

**Sonya** 226:25

**sort** 41:22 120:21 212:13

**sorting** 275:7

**sotto** 14:21 73:12 90:15 121:16 126:16 129:3 137:3 147:18 155:19 176:9 180:4 183:18 185:5

**sound** 197:14 206:23 210:22 215:1 248:3 275:23

**sounded** 63:16

**sounds** 75:25 167:5 223:24, 25 236:14 272:8

**source** 39:6,8 45:12,16,21 46:1,6,8,11,18 47:11,18 49:3 59:25 60:22 61:2,17,22 62:3, 25 68:1,3 93:20 94:21 149:21, 23,25 256:13,19

**sources** 30:24 31:6,7 36:22, 23 47:16,17,22 48:12 59:24 60:9,12,19,25 61:3,14 62:1, 18,22,25 69:18,20,24 149:8 164:20 256:18 277:15

**sourcing** 30:21 46:6 48:16, 18,19,23,24,25 150:8 271:12 274:15,18,19,20 275:8

**speak** 8:8 9:7 25:25 32:11,21 33:22 61:24 70:11 106:17 108:3 138:1 163:18 266:12 272:10

**speaking** 30:20 31:5 55:2 82:13 118:21

**specific** 14:24 23:16,17 34:1 36:16 49:19 50:16 58:9,11 61:15 64:9,21 70:1 74:8 75:24 76:11 77:7 79:14 96:22 107:17 108:7 109:25 116:14 119:5 128:3 134:1 152:19 241:11 242:3,5,17 244:25 245:2,22 265:25 266:24 274:23

**specifically** 9:4 12:6 16:2,5, 18,25 18:9 44:22 50:1 51:6 65:9 72:14 73:3 83:4 91:3 104:16 106:14,16 120:2,5 127:17 154:1 156:1 158:17 162:11 183:2 245:1 260:16 267:9

**specificity** 233:11 241:13

**specifics** 109:24 125:13

**spectrum** 258:16

**speculation** 47:1

**Speech** 5:4 7:23 10:5,13 31:11 37:9,10,11 41:14 65:11 71:22 73:7 103:21 118:16 135:3 139:4,8,16,19,22,23 140:1 142:24 145:15 146:4, 17,18 148:9,17 151:14 158:21 184:10,13 185:15 196:25 197:3,14 198:19 199:9,10,17 200:18 203:23 204:2 207:18 208:6,16 209:6 211:22,24 212:8 215:21 221:24 230:2 233:5 235:19,20 236:6 237:12 240:12,15,18,21,22 243:10 244:11 248:6

**Speech's** 208:9

**spend** 180:12 181:16,24 183:1 271:21

**spending** 181:23

**spendthrift** 239:13,18

**spent** 16:16 179:18 180:9,16 181:5,7,10 182:5,22 183:8 271:22

**spider** 237:10

**spit** 248:6

**split** 182:18

**splitting** 88:6

**spoke** 9:8 24:6,16,21,22,25 25:24 26:2,20 30:17,18,19 31:24 32:8 33:20 60:20 61:10, 11 70:4,8,9,15,25 72:7 82:14, 15 84:9 106:24 107:1 117:4, 10 125:7 132:9 146:4 153:16 157:24 165:4 177:22 179:21 186:6,11 197:8 207:24 235:7 243:2 266:14 267:9 275:16,24 276:16

**spoken** 30:15,16 32:2 64:19 84:12 158:16 186:7 233:25

**spoliation** 221:13,15,17

**spread** 256:10

**stack** 74:21,23 92:2 198:11

**staff** 33:2 227:21 256:12

**stamp** 55:22 57:10 111:18

**stamped** 56:1,3,5,7,8 96:3,4, 9 192:2

**stamps** 57:4,13,17,21 58:1 181:18

**stand** 152:7 176:8

**standard** 45:14 150:17

**standards** 43:14 49:21

**stands** 133:25

**start** 28:16 72:19 107:25 112:5 183:24 222:21 254:16

**started** 5:23 12:2 19:10,11 37:17 49:14 51:9 66:11 68:8 181:25 190:12 198:5,8 200:5 211:15 239:1

**starting** 15:5,7

**starts** 217:17 249:16

**state** 26:12 91:1

**stated** 29:25

**statement** 44:10 45:2 46:17 73:10 108:13 188:23 189:1 192:20 193:14,17,20 197:1 214:14 233:16,18,19 234:5,6 236:1 251:6

**statements** 50:24 103:25 104:2,3,24 109:7 185:10 271:15

**states** 26:13 100:14

**Statesman** 94:1

**stating** 35:15

**status** 169:9

**statute** 130:15,16,18

**Stay** 264:22

**steps** 101:20 102:7 152:22 164:7 165:11 259:5

**stick** 230:21

**sticker** 94:9 184:20

**stickered** 188:5

**Stoneman** 136:2

**stop** 66:22 133:7 174:7,8,22 249:2

Paz, Brittany                    02-15-2022        Index: stopped..taxes

**stopped** 235:20

**store** 241:20

**stories** 63:7

**story** 50:4 54:11

**strive** 39:1

**structure** 17:12 51:24 68:10
103:18 104:23 107:7 146:13
199:7 237:23

**structures** 146:9

**stuff** 46:14 141:15 142:7
211:16 214:3 238:13 273:9
275:4

**stupid** 114:19

**subject** 5:13 6:5,16 30:1 33:3
151:12 214:8 230:10 238:8

**subscribed** 93:1

**subsequent** 161:8

**subsequently** 108:15
206:21 212:7

**subsidiaries** 237:11 239:3

**substance** 256:5

**sudden** 173:11 190:21
210:20

**suffer** 258:18 259:25 260:3,5

**suffers** 257:15

**suggest** 226:10

**suggested** 231:15 266:5,8

**suing** 89:1

**suits** 113:4

**sum** 256:5

**summaries** 18:9

**summarizes** 258:6

**sun** 263:4

**Sunday** 182:5

**supervised** 51:19 52:3

**supervisor** 49:13 60:16
68:24 70:6 71:14 150:11,13,
20,23 151:1 152:4

**supervisorial** 34:11

**supervisors** 51:9

**supplement** 189:4

**supplemental** 18:18,25 91:7

**suppose** 276:6

**supposed** 76:1,25 87:4

**surely** 39:14,18,24 41:8 57:8
65:19

**surgeon** 232:17

**surgery** 43:13,15

**surprise** 13:2 21:7 207:5
251:10,11

**surprised** 20:22,25 21:2,24
22:1 238:21,24 239:1

**surprising** 251:15

**suspend** 252:22 253:7,10,24
263:22 264:19

**suspended** 264:2 279:5

**suspending** 77:22

**swear** 33:7

**swearing** 124:20

**swiftly** 252:25

**switched** 238:3

**swore** 37:14 105:7

**sworn** 5:6 145:4

**symptoms** 259:1

**system** 121:9 122:5 149:25
159:21,23 165:21 168:25
172:20 173:13,17 175:14,15

**system's** 210:21

**Systems** 5:5 10:5,13 31:11
41:14 65:11 73:7 135:3 139:4,
16,19,22,23 140:2 142:24
145:15 146:4,17,18 148:10,17
151:14 158:21 184:14 185:15
196:25 197:3,14 198:19
203:23 204:2 209:6 211:24
215:21 230:2 233:5 235:19,20
236:6 237:12 240:18 244:11
248:6

**Systems'** 118:16 208:16

---

**T**

**T-R-O-N-I-C-A** 269:14

**Tab** 140:8,9

**tabbed-up** 17:23

**table** 22:16 32:19 174:8

**tablet** 230:10

**tabs** 75:18

**takes** 46:12

**taking** 7:4 219:8 225:3,5

**talent** 60:4

**talk** 11:14 13:22 24:2,18 25:7,
16 48:3 58:21 65:18 70:15
76:10 77:21 81:15 82:19
105:10,11,13,25 106:1,12,14,
16 107:5 117:8 120:22 137:11
158:8,9,14,15,20 164:9,16
177:13 178:14,15 179:1
186:14 191:8 193:11 202:5
214:7 222:1 264:13,15 270:3

**talked** 5:24 23:25 62:12 74:25
82:14 84:4 105:8,20,21,22,23
106:8,15,21 107:8,19 111:17
117:2 146:8 155:2 158:11
169:25 194:22 221:21 235:5
255:17 265:14 267:15 276:15

**talking** 18:12 25:4 32:20
44:15 45:19,23 51:23 53:15
64:10 87:24 90:21,25 91:18
92:1,11 102:4 171:7 181:12,
17 200:25 213:25 232:3
238:22 254:22 262:16 273:6

**talks** 221:14

**task** 263:4

**tasked** 7:18,22 8:7 11:12 59:8
69:10 80:12 86:3 154:6
157:13 159:20 179:22 184:2,
7,9 211:12 245:22 246:2
259:2,7 270:22 271:17 272:22
273:14 274:10

**tax** 103:24 104:2,4,24 105:9,
18,19 117:14 204:21 205:25
207:22 211:8 212:14 222:5,7
248:23 249:5,10,22

**taxes** 208:2,4,6,8

**teaching** 58:16

**technology** 268:3

**television** 148:16

**telling** 10:22 32:3 76:4 86:21 124:3,13 153:18 211:16 246:2 251:8

**tells** 39:7 169:17

**Tens** 56:18

**tenure** 65:14

**term** 7:25 45:16 52:7,14 63:1 188:23 242:1 275:21 276:7 277:2,3,4 278:15

**termed** 277:5

**terminated** 64:6

**termination** 64:23

**terms** 49:19 89:25 120:16,18 121:24 123:20,21

**terrible** 182:8,19

**terribly** 6:19

**test-** 266:18

**testified** 5:6 14:9,13 15:4,18 16:21 27:7 30:15 34:13 38:2 49:12 51:21 69:15 81:4 89:22 106:17 113:25 127:8,12 152:25 153:1,5 173:8 182:2 185:3 190:14 197:16 203:8 208:8 209:24 210:14 237:3,22 243:16 265:3 273:5 279:1

**testify** 14:3 20:16 26:15 30:1, 5,10 36:7 51:13 80:16 81:4,11 94:21 95:1,2 98:15 99:9 184:9 187:1 207:13 208:20 209:4 235:1 240:4 257:24 261:18 271:18

**testifying** 37:22 223:25 241:18 247:25 250:4 261:17 273:22

**testimony** 35:7 37:21 40:12 147:10 158:23 176:7 177:9 195:8 203:17 205:9 213:5,21 229:7,13 249:5 250:1 253:24 264:4,9 266:20

**Texas** 7:14 21:7 40:21 47:4 54:19 104:14 109:21 111:10 116:1,7,14 219:23

**text** 157:23 161:21

**that'll** 58:2 196:15

**therapist** 95:20 257:13

**thereabouts** 182:4

**thing** 13:11 31:16 53:7 55:25 89:21 90:2,10 113:23 125:7 129:23 137:10 160:1,9 161:15 180:7 191:7,15 219:18 262:14 274:18 275:12

**things** 20:17 21:23 31:14 33:14 36:6,12,24 38:20 51:21 54:9 62:24 63:9 89:19 131:9, 11 159:21 181:18 214:4 244:2 256:3 261:11 265:25

**thinking** 119:8

**thinks** 85:18 111:9 256:2,9

**third-party** 121:4 122:8

**thought** 15:11,14,18 27:11 42:4 83:23 85:3 117:5 128:7 158:6 178:4,6 180:20 218:4 232:9 263:20,23 272:11 276:16

**thousand** 11:3

**thousands** 56:11,15,16,17, 18,19 79:25 80:1,3,4 119:23 120:3

**threats** 130:24 132:3 260:9

**threw** 63:22

**throw** 184:20

**Thursday** 72:7 186:22

**tied** 116:24

**time** 8:9,24 9:1,7 10:10,18,23 11:13 14:24 15:11,13,18,20, 22,23 16:1,22 23:12 30:7 40:14,24 47:18 54:18,25 63:8, 10 70:5,15 71:11 77:9 82:6 83:7,18 87:1 103:14 111:13 112:1,20,22,25 113:15 125:8, 24 126:7,13 134:11,18 136:7 138:18 141:15 148:14 150:9, 13 156:24 162:24 165:18 166:6,9,11,14,16,21,23 167:3, 20,22 168:1,4 169:15 170:11, 15 172:10,13 178:17 179:17 180:18 182:14,15,25 183:16 187:17 191:6 212:6 213:25

237:4 243:8 244:13 247:24 249:4 252:17 255:23 269:7 271:21,22 272:1 273:12,20 278:24

**timely** 111:15

**times** 23:19 35:13 37:15 39:15 63:1 147:7 149:1 170:1 176:6 268:5,7

**tip** 49:4 69:16

**tips** 48:22 62:1,17

**title** 71:17 221:19,20

**today** 7:14,15,19 9:24 11:24 12:8 13:14 14:18 17:6 18:2,6, 16 19:3 20:16 23:25 27:25 31:25 33:11,16 37:20 41:20 55:14 56:5 58:18 59:7 63:2 75:20 78:6,15,22 79:5 81:18 85:24 86:10 91:13 106:11 107:14 117:21 124:3 128:11 146:15 166:17 171:12 175:13 177:4,10,16 178:16,23,25 179:1,11 180:9 183:8,15 185:14 187:1 210:8 214:12 230:3 234:25 243:20 248:9 249:5 259:24 273:1 275:19 278:5

**today's** 262:19

**Todd** 200:21

**told** 11:2 16:18 27:21 32:9 33:10 34:9 60:13 70:3 74:21 75:6 98:14,20 102:18 108:21 143:20 149:19 153:18 155:18, 23 157:15 162:8 178:4,7 180:9 183:7 191:4 203:20 229:16 239:17,18 256:14 257:8 260:7 276:15

**tomorrow** 256:25

**top** 17:20 74:7 84:19 141:13 142:7 166:9,16 229:3 232:8 234:6 255:2

**top-left** 235:16

**topic** 16:17 55:18 64:9 68:2 71:23 76:6,10 78:13,22 79:14 81:3,13,15,18 82:7 86:25 103:8 137:8 152:19 157:13 190:15,21 213:12 214:1 238:19 240:4 263:22 272:3 275:16 279:5

Paz, Brittany                02-15-2022     Index: topics..verified

**topics** 7:6 11:15 13:6,13,22
14:3 16:13,23 17:3 26:23 27:8
30:5 68:4 69:10 72:1 81:22
86:4 177:16 178:24 179:14
183:11 187:1 190:12,13 214:2
263:6 272:21 273:14 274:22
275:3

**total** 16:11,22 93:8 180:12,23
183:5,8 217:11

**totals** 198:22

**tracking** 243:7,10

**traditionally** 133:13 149:20

**transcribed** 220:14 223:22
224:3,10,20 225:5,10 229:23,
24 230:3

**transcript** 11:19,22,23 13:3,
10

**transcripts** 12:5

**transfer** 244:4,5

**transferred** 243:21 244:11
245:14 246:7

**transfers** 245:17,19,23,24
246:9,16,21,23,24

**transparent** 191:5

**tread** 249:20

**trending** 48:9 62:23 63:1,8,
10,13

**trial** 21:16,17 253:1

**trick** 74:6

**triggered** 200:11

**true** 22:5 27:15,16,22 38:17,
18,21 43:21 55:21 58:12
60:10 64:12 91:10 95:23,25
96:1 125:19 126:12 127:18
142:2 143:23 144:25 145:4
152:15 155:7 157:9 174:15
175:20 180:10 206:24 235:3
240:8 244:25 245:1 273:10

**Trump** 141:3,6 144:4

**trust** 32:23 47:24 213:1
215:8,9,10,11,22 216:2,3,8,
13,16,18 218:22 239:13,14,
15,18,19,21,24

**trusted** 238:7,15

**trustee** 216:7,9,10

**trusts** 237:10,22

**trustworthy** 47:12

**truth** 37:14 38:5 39:16 145:4
251:8

**truthful** 38:14,16,24 39:1,9
44:25

**turn** 115:2 252:18

**turned** 99:22,23

**turning** 255:13

**Twitter** 19:20 48:9 62:20,21,
24 63:5,6,7,9 139:14,20 141:2
148:22 149:10 165:1,6 256:20

**two-source** 70:3

**type** 31:15 58:9,11,13 61:16
68:7,10 192:19 239:14,19,23

**types** 11:5 42:18 149:21

**typically** 151:21,24 152:4
239:8

---

**U**

**UCC** 196:14 234:6

**UCC-1** 233:1,9 236:1

**Uh-huh** 38:13,22 43:19 49:8
60:8 128:5 148:2 172:12
180:8 182:10 204:12 232:6
234:18 261:9 274:17

**ultimate** 68:21 69:5

**ultimately** 10:12 15:24 23:21
111:12 198:16 216:19 222:1

**unable** 159:13

**unaware** 206:6

**unconscionable** 229:14

**underline** 255:3

**underneath** 147:5

**underscore** 195:23,24

**understand** 10:13 12:12,19
22:10 26:11,14,17 27:25
28:18,21,22 31:10,12 45:9
49:1,9,10 79:2,4,9 80:11
94:25 97:15 103:19 138:12

141:17,25 157:2 165:23 179:6
187:24 212:25 213:7,8,23
227:5 233:4 241:7 242:9
246:3 247:8 248:5,20 250:1
252:10 260:14 268:12 272:19,
20 276:18

**understanding** 59:23 60:18
99:18 146:16,20 152:3 177:12
197:21,22 202:17 206:16,18
230:11 233:8,13 254:1
265:21,24 266:5 277:17

**understood** 26:16 37:12
274:5

**undertaking** 30:8

**unfortunate** 101:9

**universe** 82:17 109:7 181:18

**University** 29:2

**unknown** 86:5 210:18

**unprepared** 76:17

**unquestionable** 257:2

**unquote** 60:7

**unredacted** 231:19

**unrelated** 179:25

**unsecured** 234:23

**unsuccessful** 111:11

**unverified** 248:2,7

**updated** 65:4,6,15 197:10
204:14 206:5 209:20,21,22

**uploaded** 166:15

**ups** 268:14

**upset** 132:10

**URL** 148:15

---

**V**

**vacuum** 37:7

**vast** 36:19 37:3 197:24

**veracity** 59:19,21 60:1 61:2
115:21

**verbatim** 78:12 232:3

**verified** 98:6

**verify** 49:5 62:18 247:20 248:10,11 251:1

**verifying** 248:21

**version** 135:1 139:8,11 161:8 231:19

**versus** 234:23 267:21,22 268:8 274:4

**vet** 59:10,12,19 62:13 211:17, 21

**vetted** 54:13

**vetting** 30:13,21,23 45:18,20 46:7 55:19 58:8,9,17

**vice** 111:11 113:9 116:2

**video** 18:7,8 222:20

**videos** 18:9 80:2 181:8

**videotape** 230:7

**viewed** 96:25 97:2

**viewers** 38:14,24 46:23

**viewership** 39:5 147:12 265:22

**viewing** 95:16

**views** 73:6

**violate** 192:4

**violated** 68:15 107:16

**violating** 23:7

**violation** 26:13

**violations** 107:20 108:2

**visited** 135:22 148:18

**voce** 14:21 73:12 90:15 121:16 126:16 129:3 137:3 147:18 155:19 176:9 180:4 183:18 185:5

**volumes** 11:5

**vouched** 213:4

———————————

**W**

———————————

**Wade** 110:10

**wait** 74:19 192:11,17 202:7 221:7

**waived** 229:12 230:13,15

**walk** 78:4 212:19 213:3

**walking** 27:1

**wanted** 6:9 51:19 53:10 58:25 82:21 84:14 106:11,22 107:1 132:19 164:16 176:12 191:19 232:10 240:8 243:11 278:13

**warehouse** 266:15

**wasted** 273:12

**wasting** 213:25

**watch** 224:15

**watched** 39:11,19 222:20

**water** 122:15 249:20

**Watson** 71:17,18 142:18 182:6

**ways** 241:1

**web** 77:3 98:10,21 135:8,21, 22 137:9 139:10 152:10,14, 17,23 153:20 165:22 166:16 237:10 267:21,22

**website** 135:2 139:6 142:10, 11 143:9 145:14,25 147:14 148:13 149:4 165:19 166:3 198:17 237:6 240:23

**websites** 146:14 148:18,23 149:1,11

**Wednesday** 181:25 182:2 186:22

**week** 18:24 19:1,11,17 72:5,7 98:23 162:20 182:17,18 199:18 204:15 209:21

**weekend** 18:24

**weeks** 9:1 10:19 29:22 39:12 128:22 196:10 273:2,8

**weird** 223:25

**what'd** 25:7 29:15 41:22 105:10,13 160:1 278:18

**What-all** 177:3

**whatsoever** 235:3

**When'd** 186:2

**where'd** 29:1 36:17 87:12

88:13 159:12 185:2

**whispering** 228:20

**white** 107:11

**Whitehurst** 110:23

**Whitehurt** 132:21

**Whittenburg** 105:8,16 117:2, 4,6,9 177:11 178:14,22 179:13 191:18 192:15 196:5, 7,9,11 200:25 260:18

**Whittenburg's** 105:17

**Who'd** 23:24

**whoever's** 12:19 39:5

**wholly** 73:8

**Why'd** 27:14 82:19 105:25 106:2 237:16

**wife** 214:23

**wife's** 214:21

**Wilhite** 110:24,25 132:22

**winded** 124:12

**withheld** 33:25 34:3

**withhold** 231:18

**witness'** 228:20

**woke** 150:22,25

**woman** 66:8

**word** 33:8 46:20,21 48:19,22 63:19 67:1 69:17 212:22

**words** 80:24 222:3 247:8

**work** 10:3,10,12,24 23:19 29:9,15,16 66:25 115:17 116:5 118:25 146:9,19 194:9, 18 196:18 211:3 227:10 231:4 248:13 266:16

**work-related** 139:14,15

**worked** 40:25 47:21 116:9,11 212:6 238:2,3 266:15

**working** 21:1,3 85:12 250:25

**works** 23:10 146:20 235:13 266:16

**worry** 161:19

**worth** 19:24 103:4 104:12

Paz, Brittany                    02-15-2022                 Index: Wow..Zoom

116:24 177:6,11,14 183:25
184:5,7,10,13,15,17 185:15
190:13 192:25 193:4,18
196:25 197:3,10 202:6 204:11
205:14 211:13 234:17 235:2
238:23 252:9 253:24 279:6

**Wow**  250:15

**write**  53:20,21 65:22 255:7
269:11

**writeoffs**  204:17

**writer**  71:12,15

**writers**  33:6 48:21 50:25
84:9,15 85:6,8,10,11 86:5
136:23 137:22 276:10

**writing**  34:17 60:22 85:7,9

**written**  31:4 32:3,10 60:17
66:1 211:1 277:15

**wrong**  49:25 50:12,15,18,21
51:1,2,12 63:21 76:17,19
100:23 122:15 180:22 208:24
247:15 257:4

**wrote**  33:21 101:10 262:5

**WWW**  142:12

---

### Y

**y'all**  10:1 24:2 25:7 106:8
115:9 186:14 191:18

**year**  29:3 153:12 185:13
215:14,23 216:2 248:14,15

**years**  21:2 29:12 64:8 153:12
198:17 200:13 205:19 210:18
235:23 238:10

**yellow**  219:12 230:21

**yesterday**  5:24 7:6 12:8
13:14 14:9,13 15:4 17:22
18:19 19:19 20:20 21:10
22:12 27:1 30:16,25 31:5
36:14,20 41:19 47:14 49:12
51:22 56:5 75:17,21 85:16
89:16,22 103:9 105:7 107:13
111:20 177:16 178:16,23,24
179:2,11 180:19 181:5,11
182:2 189:13 202:10,18
229:24 259:20 261:17,18
262:5,7,9 267:16 271:19
272:3,22 274:1 275:17,20

277:6

**yesterday's**  262:2 272:11

**York**  269:16

---

### Z

**zealous**  224:15

**Zimmerman**  72:7,12 80:2
121:15,19,23 125:5,8

**Zoom**  182:6