**UNITED STATES DEPARTMENT OF JUSTICE**
**OFFICE OF THE UNITED STATES TRUSTEE**
**KEVIN M. EPSTEIN, UNITED STATES TRUSTEE**
**REGION 7, SOUTHERN and WESTERN DISTRICTS OF TEXAS**
**JAYSON B. RUFF, TRIAL ATTORNEY**
**HA M. NGUYEN, TRIAL ATTORNEY**
**515 Rusk, Suite 3516**
**Houston, TX 77002**
**Telephone: (713) 718-4650 Ext 252**
**Fax: (713) 718-4680**
**E-Mail: jayson.b.ruff@usdoj.gov**
**E-Mail: Ha.Nguyen@usdoj.gov**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
|  INFOW, LLC *et al.* | § | **CASE NO. 22-60020** |
| | § | |
| | § | **CHAPTER 11 (Subchapter V)** |
| | § | **Jointly Administered** |
| DEBTORS.[1] | § | |

**MOTION OF THE UNITED STATES TRUSTEE**
**TO DISMISS DEBTORS' CHAPTER 11 CASES**

TO THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE:

   Kevin M. Epstein, the United States Trustee for Region 7 (the "U.S. Trustee"),

respectfully moves to dismiss the Debtors' chapter 11 cases for cause pursuant to section 1112(b)

of the Bankruptcy Code (the "Motion"), and represents as follows:

---

[1] The Debtors in these chapter 11 cases along with the last four digits of each Debtor's federal tax identification number are as follows: InfoW, LLC, f/k/a Infowars, LLC (6916) ("InfoW"), IWHealth, LLC f/k/a Infowars Health, LLC (no EIN) ("IWHealth"), Prison Planet TV, LLC (0005) ("Prison Planet").  The address for service to the Debtors is PO Box 1819, Houston, TX 77251-1819.

## PRELIMINARY STATEMENT[2]

Debtors' cases should be dismissed for cause under section 1112(b)(1) because these are classic bad faith filings for two primary reasons:  these cases serve no valid bankruptcy purpose and were filed to gain a tactical advantage in the Sandy Hook Lawsuits.  The strategy employed here—filing bankruptcy for three non-operating members of a larger enterprise to channel and cap liability against the other, revenue-generating members of that enterprise and its owner using a bankruptcy subchapter designed to aid small, struggling businesses—is a novel and dangerous tactic that is abusive and undermines the integrity of the bankruptcy system.  Bankruptcy, however, is intended to protect honest but unfortunate debtors who subject themselves and their assets to the supervision of the Court.

The Debtors' cases arise out of a series of lawsuits in Texas and Connecticut brought primarily by relatives of the 2012 Sandy Hook shooting victims (the "Sandy Hook Plaintiffs") seeking redress for harms arising out of statements made by Alex Jones and other employees of FSS asserting that the Sandy Hook shooting was a "false flag" hoax.  According to the Debtors, they filed these cases to resolve the Sandy Hook Lawsuits (in which liability has already been established and all that remains are trials establishing damages) and other litigation claims and to pay such claims "in full."[3]  But despite that these lawsuits arise from Alex Jones's and FSS's allegedly tortious, intentional conduct, neither filed for bankruptcy.  Instead, three days before

---

[2]      Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms below or as set forth in *Debtors' Emergency Motion for Order Authorizing Appointment of Russell F. Nelms and Richard S. Schmidt as Trustees of the 2022 Litigation Settlement Trust and Granting Related Relief*, Dkt. No. 6.

[3]      Unfortunately, "payment in full" is inaccurate.  Rather, after removing to federal court the cases that were imminently set for damages trials, Debtors intend to force a claims *estimation* proceeding to value the claims of the Sandy Hook Plaintiffs and cap the distribution they will receive on those claims.  Thus, in an Orwellian use of language, when Debtors say "payment in full," what they actually mean is "payment of estimated damages."  *See* LST ¶ 10(c).

filing these cases, and eight days before jury selection was to begin in Texas, Alex Jones transferred his ownership interests in the Debtor entities into a settlement trust and, without any input from creditors, he entered into a plan support agreement that provides the roadmap for resolution of the Debtors' cases—cases that will be funded solely by Alex Jones and FSS because the Debtors have no ability to do so.

Debtors did not file these cases to reorganize their businesses or to preserve or maximize the value of their assets for the benefit of their creditors. As their proposed CRO has admitted, these Debtors have *no* businesses and *no* assets from which they earn any income.[4] Nor were these cases filed to avoid a "race to the courthouse," yet another self-serving pretextual justification offered by Debtors. Indeed, the Sandy Hook Plaintiffs in both the Texas and Connecticut lawsuits have sought to dismiss these cases. Instead, this bankruptcy is designed to misuse the subchapter V cases of three non-operating companies to shield the assets of Alex Jones, FSS, and other entities owned or controlled by Alex Jones or Alex Jones's insiders (the "Alex Jones Enterprise") from their primary—and maybe only—creditors, the Sandy Hook Plaintiffs, with "Resulting Releases" for both Jones and FSS as the ultimate end game.[5] *See, e.g.*, Plan Support Agreement ("PSA"), § 7(b); Litigation Settlement Trust ("LST"), p. 2 (Recitals); ¶¶ 2.2 and 10.1(b). Although the Debtors have not yet filed a plan, the PSA and LST

---

[4] Based on statements elicited from Mr. Schwartz at the first hearing in these cases, it appears that he has recently discovered that one debtor, IWHealth, has rights to a royalty payment from which it may begin to earn $38,000 a month. Tr. April 22, 2022 at 43, 48-9.

[5] Moreover, this would allow Alex Jones and FSS to retain their assets that they could not otherwise retain had they themselves filed for bankruptcy. If Alex Jones were a debtor, he would not be able to discharge the claims of the Sandy Hook Plaintiffs because section 523(a)(6) excepts from discharge debts arising from willful and malicious injury. And both Alex Jones and FSS as debtors would be subject to section 1129(a)(7)'s best interest of creditors' test for plan confirmation, requiring full disclosure of the value of their assets and a showing that impaired, dissenting creditors are receiving at least as much as they would in a chapter 7 liquidation.

have set the table for these cases in a very particular way—and it is already apparent what type of meal we're going to get.[6]  Dismissal is in the best interests of all creditors and the estates, and these cases should therefore be dismissed.

## JURISDICTION, VENUE & CONSTITUTIONAL AUTHORITY TO ENTER A FINAL ORDER

1.      The Court has jurisdiction to consider this matter under 28 U.S.C. § 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2).  Debtors assert that venue is proper in this district under 28 U.S.C. § 1408.

2.      This Court has constitutional authority to enter a final order in this matter.  If it is determined that the bankruptcy judge does not have the constitutional authority to enter a final order or judgment in this matter, the U.S. Trustee consents to the entry of a final order or judgment by this Court in this matter.

3.      Kevin M. Epstein is the duly appointed U.S. Trustee for Region 7.  The U.S. Trustee has standing to raise, appear and be heard on any issue in a case or proceeding under the Bankruptcy Code.  11 U.S.C. § 307.

4.      The U.S. Trustee has a statutory duty to monitor the administration of cases commenced under the Bankruptcy Code, including seeking relief under section 1112(b) of the Bankruptcy Code.  28 U.S.C. § 586(a).

5.      No committee has been appointed.  Unless the Court determines there is cause for the appointment of a creditors' committee and orders the appointment of one, the U.S. Trustee is

---

[6]      All references to the provisions of the LST and PSA herein are to the original versions of those documents as filed as exhibits to Dkt. No. 6.  The U.S. Trustee understands that Debtors have filed revised versions of the PSA and LST.  Nevertheless, it is the initial versions that evidence the Debtors' purpose in filing these cases.  While the U.S. Trustee has not had a chance to digest these latest versions, it appears that these versions simply attempt to obfuscate what the earlier versions made clear—that the Debtors are using these cases to benefit Alex Jones and FSS, not the Sandy Hook Plaintiffs.  The U.S. Trustee reserves his rights to supplement this Motion.

prohibited from soliciting and appointing a committee of unsecured creditors in subchapter V

cases such as these.  11 U.S.C. § 1102(a)(3).

## FACTUAL BACKGROUND

**General Information**

6.      On April 17, 2022 (the "Petition Date") and April 18, 2022,[7] the Debtors filed

chapter 11 voluntary petitions and elected to proceed under Subchapter V of chapter 11 on their

respective Petitions.

7.      On April 18, 2022, the Court entered the Order directing joint administration of

the chapter 11 cases solely for procedural purposes.  *See* Dkt. No. 8.

8.      On April 18, 2022, the U.S. Trustee appointed Melissa Haselden as the Debtors'

Subchapter V Trustee.  *See* Dkt. Nos. 9 and 12.

**The Debtors**

9.      The Debtors are holding companies for certain intellectual property assets.  *See*

Dkt. No. 6 at ¶ 7.  Specifically, as their proposed Chief Restructuring Officer ("CRO") attests:

> Debtor's [sic] have no purpose other than to hold assets which may be used by
> other entities.  They undertake no business activities, they do not sell, rent or lease
> to others anything.  Their assets do not generate any income for them.  They have
> no bank accounts and do not pay money to anyone for any reason.  They have no
> debt or other liabilities other than those related to pending or potential litigation.
> For these reasons, they have no financial statements or books of account and they
> do not file income tax returns.

Dkt. No. 1 pp. 10-11 at ¶ 8.  Based on information elicited from the proposed CRO, W. Marc

Schwartz, IWHealth is also entitled to a royalty payment from Youngevity that for many years

---

[7]      InfoW, LLC filed just before midnight on April 17, 2022, while IWHealth, LLC and Prison Planet TV,
LLC's petitions were docketed shortly after midnight on April 18, 2022.

was paid directly to Alex Jones's personal bank account rather than IWHealth.  Tr. April 22, 2022, 48-9.[8]

10.     Each of the Debtors was previously located in Austin, Texas, prior to obtaining leases in Victoria, Texas, in April 2022.  Tr. April 22, 2022, at 52-3.

11.     Prior to April 14, 2022, Alex Jones was the 100% holder of the equity interests in the Debtors.  Dkt. No. 6 at ¶ 9.  The equity in each of the Debtors is now, as of three days before the Petition Date, wholly owned by a recently established Litigation Settlement Trust ("LST"). *Id.* at ¶¶ 9, 16-17.  Alex Jones established the Trust on April 14, 2022, and funded the Trust with his equity interests in the Debtors and an initial funding amount from his "exempt personal assets."  *Id.* at 16-17, Exhibit A (*Declaration of Trust*).

12.     Alex Jones remains the 100% equity holder of FSS, through which Mr. Jones and others operate the so-called InfoWars website and related enterprises.  *Id.*  All the assets of FSS allegedly serve as collateral to repay obligations to PQPR Holdings, LLC ("PQPR"), a vendor to FSS.  *Id.* at ¶ 8, n.1.  PQPR is owned by Alex Jones's insiders.[9]  Dkt. No. 17-6.

---

[8]      Transcript for April 22, 2022, Hearing is attached hereto as Exhibit A.

[9]      In a lawsuit filed in Texas state court on April 6 asserting fraudulent conveyance claims against Jones, FSS, and PQPR, among others, plaintiffs alleged that PQPR filed a UCC Financing Statement claiming a security interest in essentially everything FSS owns only after the Sandy Hook Lawsuits had considerably advanced.  *Heslin v. Jones*, No. D-1-GN-22-001610 (200th Dist. Tex.) Petition, ¶ 33 (filed April 6, 2022). According to plaintiffs, "[t]he [$54 million] supposed debt began accruing years earlier as part of an arrangement where Free Speech Systems sells PQPR's products on the InfoWars website. Under this alleged arrangement, PQPR was to be reimbursed for the costs of the products and receive 70% of the sales revenue while Free Speech Systems retained the other 30%.  In practice, however, Free Speech Systems supposedly kept 100% of the revenue for about seven years and didn't pay for the goods PQPR provided—to the point where a $54 million debt had accumulated.  All the while, PQPR not only supplied Free Speech Systems with more products to sell but also paid Free Speech Systems millions of dollars a year to advertise on the InfoWars website.  PQPR still supplies the Alex Jones Enterprise with products to sell and pays for advertising on the website."  *Id.*  Plaintiffs further allege that within weeks of the default judgments, as part of a scheme to render Jones and FSS "judgment proof," FSS began transferring to PQPR "between $11,000 per day and $11,000 per week plus 60–80% of Free Speech Systems' sales revenue—supposedly just to pay the interest on the alleged $54 million debt."  *Id.* at ¶ 36.

13.     Neither Jones, FSS, nor PQPR have filed bankruptcy petitions.

14.     The list of creditors attached to each of the Debtors' petitions contain the names of the relatives of some of the 20 children and six educators killed in the 2012 Sandy Hook school shooting.  *See, e.g.,* Dkt. No. 1 at pp. 6-7.  Their claims are classified as "disputed" and "unliquidated."  *Id.*  No other creditors are listed.  *See Id.*

**The Pending Litigation**

15.     In 2018, the Sandy Hook Plaintiffs filed suits in Texas and Connecticut (collectively, the "Sandy Hook Lawsuits") against Jones, FSS, and certain of the Debtors.[10] Dkt. No. 6 at ¶ 10-11.  As the Debtors admit in their pleadings, "both the Texas and Connecticut courts have imposed multiple sanctions and ruled that Jones, FSS, and the Debtors failed to comply with discovery requirements such that judgment on *liability* has been entered against them by default."  *Id.* at ¶ 13 (emphasis in original).  The first trial on damages, in Texas, was scheduled to begin jury selection on April 25, 2022. *Id.* at ¶ 14.  In the Connecticut litigation, several weeks before the bankruptcy filings, the court again sanctioned Alex Jones for failing to attend his deposition and advised that trial in that case would nevertheless go forward in August 2022.  Super Ct. DN 788, 3/30/22 Hearing at 25:4-9.

16.     Additionally, prior to filing these chapter 11 cases, the defendants in the Sandy Hook Lawsuits tried multiple times, all unsuccessfully, to remove the litigation to federal courts. *See, e.g.,* No.: 3:18-CV-1156 (JCH), DN 58, 11/5/18 Ruling Re: Mot. for Remand; No. 3:20-cv-1723 (JCH), DN 44, 3/5/21 Ruling Re: Mot. for Remand.  After the first remand in Connecticut failed, the defendants attempted to have the presiding Judge removed for "appearance of judicial

---

[10]     Specifically, the Connecticut cases appear to name all three Debtors, but the Texas cases name only one Debtor, InfoW (which the Sandy Hook Plaintiffs have since nonsuited in the imminent damages trial).  *See* Dkt. No. 6 at ¶ 12.

impropriety," which also failed.  *See* Dkt No. UWYCV186046438S, Order 421277 (Conn. Sup. Ct. November 4, 2021).

17.     Immediately after these filings, the defendants again sought to remove the Sandy Hook Lawsuits.  *See, e.g.,* Dkt. No. 1, Case No. 22-01022 (Bankr. W.D. Tex. April 18, 2022); Dkt. No. 1, Case No. 22-05004 (Bankr. D. Conn. April 18, 2022).  The Sandy Hook Plaintiffs have filed motions seeking a remand of the lawsuits back to the state courts.  *See, e.g.,* Dkt. No. 5 (Motion for Remand), Case No. 22-05004 (Bankr. Conn. April 21, 2022); Dkt. No. 7 (Motion for Abstention and Remand), Case No. 22-01023 (Bankr. W.D. Tex. April 26, 2022).  Debtor InfoW has also filed a motion seeking to transfer the Texas cases out of the bankruptcy court for the Western District of Texas to the bankruptcy court for the Southern District of Texas.  Dkt. No. 7, Case No. 22-01022 (Bankr. W.D. Tex. April 28, 2022).

18.     Certain of the Debtors are also defendants in other pending litigation, some of which was the result of the Sandy Hook Lawsuits.  Dkt. No. 6 at ¶ 12.  As with the Sandy Hook Lawsuits, while only certain of the Debtors are defendants in such litigation, both Alex Jones and FSS are defendants in *every* case.  *Id.*  In one case, plaintiffs sued under the Texas Uniform Fraudulent Transfer Act alleging that Alex Jones diverted his assets to companies owned by insiders such as his parents and children.  *Id.*

**The Litigation Settlement Trust and "Plan Support Agreement"**

19.     As stated above, only three days before the Petition Date, the Debtors, Alex Jones, and FSS entered into the LST.  *Id.* at ¶¶ 9, 16-17 (the LST is annexed to Dkt. No. 6 as Exhibit A).  Although Alex Jones transferred his equity interests in the Debtors into the LST,

Alex Jones and FSS remain in charge of the income-producing entities of the Alex Jones Enterprise. *See id.* Moreover, the funding in the LST will come from Alex Jones and FSS, who initially funded $725,000 into the trust to pay the administrative expenses of these cases and who propose to limit funding to $10 million. *Id.* at ¶ 17; LST at § 1.3(b), (c); Dkt. No. 35 at ¶ 11. The LST prohibits the LST Trustees from causing the Debtors to file an involuntary petition against either Alex Jones or FSS. LST at § 1.3(a)(iii).

20.     Simultaneously with the creation of the LST, the Debtors also entered into a PSA with Alex Jones and FSS that dictates the roadmap for the Debtors' cases. *Id.* at ¶ 17, Exhibit B (*Plan Support Agreement*), p. 1. Under the PSA, the parties agree to take various steps in the bankruptcy cases, including establishing a bar date for claims and a protocol for claims estimation and incorporating the settlement of the claims by the LST Trustee(s) in a subchapter V plan of reorganization. PSA at pp. 5-8. Under the PSA, any plan of reorganization in the Debtors' cases and all related documents must be approved by Alex Jones and FSS. *Id.* at p. 2 (definition of Approved Plan Documents).

21.     The LST appears to contemplate that the Debtors' plan of reorganization will include a channeling injunction and releases for Alex Jones and FSS. *See* LST at § 10.1(c). If approved, such a channeling injunction would force the Sandy Hook Plaintiffs to seek payment from the LST for their claims rather than pursue them directly against Alex Jones and FSS, and such a release would bar the claimants from ever pursuing Alex Jones and FSS in the future.

22.     Both the LST and PSA include secrecy provisions designed to limit the information that anyone, including the LST Trustees, can elicit from Alex Jones and FSS, including requirements for parties to agree to confidentiality agreements acceptable to Alex Jones and FSS before obtaining any information. *See* PSA at §§ 4(a)(iii), (b)(3); *see also* LST at

§§ 1.2(d), 2.2(a).  The PSA further limits the financial information Alex Jones or FSS must provide to only that "reasonably needed to determine that [Alex Jones and FSS have] the ability to pay Allowed Litigation Settlement Trust Claims in full, in accordance with the Plan."  PSA at §§4 (a)(iii).

23.     Unlike plan support agreements in other chapter 11 cases, no creditor participated in the drafting or negotiation of the LST or PSA in these cases.  Instead, these are agreements among insiders.

**Subchapter V**

24.     Debtors elected treatment under subchapter V, established by the Small Business Reorganization Act of 2019, Pub. L. No. 116-54 ("SBRA"), which establishes rules and procedures to lower the cost of and simplify the path through chapter 11 for certain small business enterprises.  Subchapter V is wholly elective and its "provisions . . . effectively hybridized chapters 11 and 13. The beneficiaries are the truly 'small' debtors: individuals or mom-and-pop/small businesses."  Robert C. Meyer, *Small Business Reorganization Act Arrives This Month*, XXXIX ABI Journal 2, 8-9, 48-49, at 9, February 2020.

25.     Eligibility for relief under subchapter V is governed by 11 U.S.C. § 1182(1).  Under section 1182(1)(A), a debtor is currently eligible for subchapter V if (a) the debtor is engaged in *commercial* or *business* activities; (b) the debtor has aggregate noncontingent liquidated secured and unsecured debts of not more than $3,024,725 (excluding debts owed to insiders or affiliates); and (c) at least 50% of the qualifying indebtedness arose from the commercial or business activities of the debtor.

## **LEGAL STANDARD**

26.     Section 1112(b)(1) of the Bankruptcy Code requires a court to dismiss a chapter 11 case upon finding that "cause" exists for such dismissal, unless the court instead determines that the appointment of a trustee or examiner is in the best interests of creditors.  11 U.S.C. § 1112(b)(1).[11]  Section 1112(b)(1) provides in full:

> Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1).  Although section 1112(b)(4) of the Code contains a non-exclusive list of what constitutes "cause" for dismissal, the Fifth Circuit Court of Appeals has joined other circuits in holding that "cause" can include a showing that a debtor has not filed its bankruptcy case in good faith.  *Little Creek Dev. Co. v. Commonwealth Mortg. Corp. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1072-73 (5th Cir. 1986); *see also In re Humble Place Joint Venture*, 936 F.2d 814, 816-17 (5th Cir. 1991).  As the Fifth Circuit has stated, this good faith requirement "protects the jurisdictional integrity of the bankruptcy courts by rendering their powerful equitable weapons . . . available only to those debtors and creditors with clean hands." *Little*

---

[11]     A debtor may also avoid dismissal if it proves unusual circumstances satisfying the criteria set forth in section 1112(b)(2).  Section 1112(b)(2) provides, in full,

> (2) The court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, and the debtor or any other party in interest establishes that—
> (A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and
> (B)the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A)—
> (i) for which there exists a reasonable justification for the act or omission; and
> (ii) that will be cured within a reasonable period of time fixed by the court.

11 U.S.C. § 1112(b)(2).

*Creek,* 779 F.2d at 1072.  It "prohibits a debtor's misuse of the process where the overriding motive is to delay creditors without any possible benefit, or to achieve a reprehensible purpose through manipulation of the bankruptcy laws." *Elmwood Dev Co. v. Gen. Elec. Pension Tr. (In re Elmwood Dev. Co.)*, 964 F.2d 508, 510 (5th Cir. 1992).  And in *Humble Place*, 936 F.2d at 818, the Fifth Circuit affirmed dismissal where, among other things, the bankruptcy court found that the principal purpose of the chapter 11 filing was to "cleanse the partners of their liability," reasoning that "[o]f course, the partners are not the Chapter 11 debtor, and their fate is irrelevant to the propriety of Humble Place's filing. The court was correct to determine that this impermissible purpose cast doubt on the venture's objective good faith."

27.     In *Little Creek*, the Fifth Circuit addressed how a reviewing court should approach the good faith inquiry—using an "on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities. . . .predicated on certain recurring but non-exclusive patterns, and [ ] based on a conglomerate of factors rather than on any single datum." 779 F.2d 1068 at 1072.[12]  This is often referred to as a "totality of the circumstances" approach, and a similar approach is followed by most other circuits.  *See In re 15375 Mem'l Corp. v. Bepco, L.P.*, 589 F.3d 605, 618, n.7 (3d Cir. 2009) (collecting cases); *see also In re Nat'l Rifle Ass'n of Amer.*, 628 B.R. 262, 280 (Bankr. N.D. Tex. 2021) (citation omitted).

28.     The Third Circuit Court of Appeals has highlighted two inquiries that are particularly relevant to the question of good faith when considering the totality of circumstances

---

[12]     In *Little Creek*, the court also described various factors that tend to be present in a bad faith filing, including that the debtor has one asset that is encumbered by a secured creditor's liens, no employees, little or no cash flow or sources of income to fund a plan, few unsecured creditors, and is subject to a foreclosure action or a state-court litigation that has proceeded to a stand-still, and that there are allegations of wrongdoing by the debtor or its principals. *Id.* at 1072-73. Several of these factors are present in the Debtors' cases. They have minimal assets, no employees, no cash flow, little or no income with which to fund a plan, few unsecured creditors beyond the litigation plaintiffs, are involved in a state court litigation in which they have already been found liable, and there are allegations of wrongdoing by their former 100% controlling interest holder.

12

of a debtor's filing: (1) whether the petition serves a valid bankruptcy purpose and (2) whether the petition is filed merely to obtain a tactical litigation advantage. *Off. Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*, 200 F.3d 154, 165 (3d Cir. 1999). Other courts, including those within the Fifth Circuit, have adopted a similar inquiry when considering whether to dismiss a case as a bad faith filing. *See, e.g., Antelope Techs., Inc. v. Janis Lowe (In re Antelope Techs., Inc.)*, 431 Fed. Appx. 272, 275 (5th Cir. 2011) (affirming dismissal of a case for bad faith where the lower court concluded the debtors filed to gain an advantage in shareholder litigation); *Nat'l Rifle Ass'n*, 628 B.R. at 264, 270, 279-80 (finding cause to dismiss case for bad faith "because it was filed to gain an unfair litigation advantage and because it was filed to avoid a state regulatory scheme"); *In re Leslie*, No. 98-35386-H3-11, 1999 Bankr. LEXIS 2113, at *5 (Bankr. S.D. Tex. Feb. 11, 1999) (finding, in the totality of circumstances, that case was commenced for the primary purpose of gaining an unfair advantage in a litigation).

29.     In the Fifth Circuit, the party seeking dismissal is required to make a *prima facie* showing that the debtor lacked good faith in filing its case, after which the burden shifts to the debtor to demonstrate good faith. *In re Mirant Corp.*, 2005 Bankr. LEXIS 1686, *27 n.20 (Bankr. N.D. Tex. Jan. 26, 2005); *In re Sherwood Enters., Inc.*, 112 B.R. 165, 170-71 (Bankr. S.D. Tex. 1989), *judgment entered*, (Bankr. S.D. Tex. Jan. 27, 1989). The moving party need only prove that the filing was objectively in bad faith, rather than showing that a debtor intended to misuse its bankruptcy filing. *See Elmwood Dev.*, 964 F.2d at 512 ("Because the good faith standard is an objective one, the court was not constrained to entertain and give dispositive weight to the subjective state of mind of Elmwood's manager.").

## ARGUMENT

**I.     These Bankruptcy Cases Must be Dismissed for Cause.**

13

30.     The totality of facts and circumstances establishes cause for this Court to dismiss the Debtors' cases as a bad faith filing for at least two reasons: (1) the Debtors' cases do not serve a valid bankruptcy purpose; and (2) the Debtors filed these cases to gain a tactical litigation advantage.

31.     Although the facts and indicia of bad faith supporting each of these grounds for cause have already been established in the public filings before this Court, the U.S. Trustee is also prepared to propound discovery, if necessary, to further adduce evidence supporting each ground.

**A.  These Cases Do Not Serve a Valid Bankruptcy Purpose.**

32.     The purpose of bankruptcy is to give "to the honest but unfortunate debtor . . . a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt." *Loc. Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934); *see* Report of the Committee on the Judiciary, House of Representatives to Accompany H.R. 8200, H.R. Rep. No. 595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 6179 ("The purpose of a business reorganization case, unlike a liquidation case, is to restructure a business's finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders."). Chapter 11 furthers this purpose in two complementary ways: (1) "preserving going concerns" and (2) "maximizing property available to satisfy creditors." *Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 452 (1999).[13]

---

[13]     Other objectives of the Bankruptcy Code include "avoidance of the consequences of economic dismemberment and liquidation, and the preservation of ongoing values in a manner which does equity and is fair to rights and interests of the parties affected." *SGL Carbon*, 200 F.3d at 161 (citing *In re Victory Constr. Co., Inc.*, 9 B.R. 549, 558 (Bankr. C.D. Cal. 1981), *order stayed, Hadley v. Victory Constr. Co., Inc. (In re Victory Constr. Co., Inc.)*, 9 B.R. 570 (Bankr. C.D. Cal. 1981), *order vacated*, 37 B.R. 222 (1984)).

14

33.     In furthering these objectives, chapter 11 vests a debtor with considerable

protections—among them the automatic stay and the discharge of debts.  Subchapter V adds

additional debtor protections—no creditors' committee unless the Court orders one for cause, no

requirement for a disclosure statement, the debtor's exclusive right to file a plan of

reorganization, and the debtor's ability to "cram down" confirmation of a plan without an

impaired accepting creditor class—that "can impose significant hardship on creditors."  *See SGL

Carbon,* 200 F.3d at 165.  Under appropriate circumstances, "the exercise of those powers is

justified.  "But this is not so when a petitioner's aims lie outside those of the Bankruptcy Code."

*Id.* at 166 (emphasis added).  As the Fifth Circuit (affirmed by the Supreme Court) advised in

*Timbers of Inwood Forest*, "when there is no reasonable likelihood that the statutory objective of

reorganization can be realized . . . then the automatic stay and other statutory provisions designed

to accomplish the reorganization objective become destructive of the legitimate rights and

interests of creditors, the intended beneficiaries."  *United Savs. Assoc. of Texas v. Timbers of

Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 808 F.2d 363, 373

(5th Cir. 1987) (en banc), *aff'd*, 484 U.S. 365 (1988).

    **i.**     ***The Debtors have no Reorganizational Purpose.***

34.     These cases are demonstrably not about reorganizing, rehabilitating, or granting a

fresh start to an honest, unfortunate debtor.  The Debtors' bankruptcy filings do not serve any

recognized objective of the Bankruptcy Code.  These Debtors have no businesses and no purpose

to reorganize.

35.     As the Debtors' proposed CRO attests, these Debtors have "no purpose other than

to hold assets which may be used by other entities," but these assets "do not generate any income

for them."[14]  Dkt. No. 1 at 10-11, ¶ 8.  The Debtors do not have bank accounts, financial

statements, books of account, or income tax returns.  *Id.*  There is no debt to restructure, no liens

being primed, no cash collateral required, and no post-petition financing being granted because

these Debtors "undertake no business activities, they do not sell, rent or lease to others

anything."  *Id.*  But these Debtors were, until three days before the filings, members of a larger

enterprise controlled by Alex Jones.[15]  Dkt. No. 6 at ¶¶ 8-9.  Based on the extremely limited

information disclosed about the rest of the Alex Jones Enterprise to date, all the assets and

businesses of that enterprise are with Alex Jones, FSS, and other, non-debtor companies, whose

finances are not transparent in these cases.  *Id.*; *see also* Tr. April 22, 2022 at 55.

      36.     On the contrary, these filings are an attempt to subvert the purpose of the

Bankruptcy Code and the subchapter V provisions designed to assist struggling small businesses

to reorganize.  Alex Jones and FSS hand-picked these three holding companies for bankruptcy as

part of a scheme engineered solely to limit their own legal liability, to deny parties in interest a

full accounting of their assets, and to deny individuals their day in court and imminent recovery

for established liability.  Neither the Debtors nor their creditors benefit from these bankruptcy

cases.  The only ones benefiting are Alex Jones and FSS, who seek to reap the benefits of chapter

11 without any of its burdens.

---

[14]     One debtor, IWHealth, apparently has rights to a royalty payment of $38,000 previously diverted to Alex Jones. The newly hired CRO discovered this debtor asset after some due diligence before this bankruptcy filing and requested that the royalty be paid to the rightful entity. *See* Tr. April 22, 2022 at 43, 48-9.

[15]     Equitable principles relating to insider transactions support dismissal of these cases given Alex Jones's control of all parties and engineering of the LST and PSA prior to the filing of these cases. *See Pepper v. Litton*, 308 U.S. 295, 306-07 (1939) ("The essence of the test [for good faith of an insider transaction] is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside.").

ii.     *The Insider-Negotiated PSA and LST Evidence that Debtors Are Attempting to Abuse the Bankruptcy Code to Shield Non-Debtors from Disclosure and Legal Liability and to Minimize Recovery to Creditors.*

37.     Although the Debtors claim they filed these cases because they were concerned that "efforts to collect on a judgment of the Texas actions would result in leaving nothing for the Connecticut Sandy Hook Plaintiffs or other creditors" and further claim they intend to pay all litigation claims "in full," all evidence suggests that these filings were *not* a benevolent effort by the Debtors to ensure a fair distribution to all creditors.  *See* Dkt. No. 6 at ¶¶ 15, 16.  Because the members of the Alex Jones Enterprise who hold the assets and are themselves defendants and liable to the Sandy Hook Plaintiffs—Alex Jones and FSS—did not file for relief, there is no transparency into their assets or any statutory mechanism for distributing those assets.  Instead, we start this case with the LST and PSA—entered into prior to bankruptcy between affiliated entities, without any creditor support—which cloak Alex Jones's and FSS's books and records in secrecy by imposing confidentiality restrictions on those seeking access and further provide that parties can only obtain access to information reasonably needed to determine whether Alex Jones and FSS can pay estimated, not actual, claim amounts.[16]  *See* PSA at §§4(a)(iii), (b)(3); *see also* LST at §§1.2(d), 2.2(a).

38.     But the PSA sets a course for the Debtors whereby claims will not be paid in full by any ordinary understanding of that term.  Instead, under the PSA, the Debtors must quickly seek approval for a litigation claims bar date and then a claims estimation process, which allows them to cap what can be paid to creditors from whatever assets Alex Jones and FSS choose to

---

[16]     Given this structure, no party in interest can determine whether Alex Jones and FSS actually have the funds to satisfy all of the claims against them (in which case, they have no reason to be concerned about favoring certain creditors over others) or whether they do not have sufficient funds (in which case, it is unclear why they would care how these assets are divided).

contribute in a subchapter V plan of reorganization.  *See* PSA at 5-8.  Based on the information provided to date, even were Debtors to succeed in having the claims estimated, it is not clear how any plan for the Debtors could be feasibly confirmed because the Debtors have no assets to contribute to a plan, and the PSA provides only that Alex Jones and FSS will contribute money until they decide not to.  *See* PSA at §4(b).

39.     Moreover, section 502(c) of the Bankruptcy Code only requires a bankruptcy court to estimate a contingent or unliquidated claim where failure to do so "would unduly delay the administration of the case." *See* 11 U.S.C. § 502(c); *O'Neill v. Continental Airlines, Inc.* (*In re Continental Airlines, Inc.*), 981 F.2d 1450, 1461 (5th Cir.1993) ("In order for the estimation process of § 502(c) to apply, . . . fixing the claim must entail undue delay in the administration of justice."); *In re Dow Corning Corp.*, 211 B.R. 545, 563 (Bankr. E.D. Mich. 1997) ("[E]stimation does not become mandatory merely because liquidation may take longer and thereby delay administration of the case. . . .bankruptcy law's general rule is to liquidate, not to estimate. For estimation to be mandatory, then, the delay associated with liquidation must be 'undue.'").  To determine whether liquidating a claim would unduly delay the case and should instead be estimated, a court should "perform a kind of cost-benefit analysis by considering the time, costs and benefits associated with both estimation and liquidation."  *Id.* at 563.

40.     Here, the Debtors have attempted to manufacture exigency by electing subchapter V treatment despite not having any operations or assets.  Thus, they cannot establish that any delay caused by full liquidation of the claims would be "undue."  *See Id.* at 563, 566-67 (denying request for estimation where court determined that the strategy behind the request was ultimately to limit the amount the debtor would have to pay and the time delay was "highly speculative" and there was no guarantee estimation would be faster.).  Estimation is a "second-best"

procedure in any circumstance, and it is hard to see how there is any benefit to estimating the Sandy Hook Plaintiffs' claims rather than allowing the imminent trials to proceed to full, actual judgment.  *See, e.g., Apex Oil Co. v. Stinnes Interoil, Inc. (In re Apex Oil Co)*, 107 B.R. 189, 193 (Bankr. E.D. Mo. 1989) (finding no undue delay where trial in was "imminent"); *see also In re N. Am. Health Care, Inc.,* 544 B.R. 684, 689 (Bankr. C.D. Cal. 2016) (limiting the claims to be estimated and stating "[b]ecause estimation is a second-best method . . . . a bankruptcy court ought not to expand the estimation's scope beyond this limited extent absent compelling reasons to do so.").[17]

41.     Further, the handwriting is on the wall that Alex Jones and FSS will seek orders of this Court staying further actions against them in the Sandy Hook Lawsuits (which they have already sought to remove based on these cases) and that they and the Debtors will ultimately seek involuntary non-consensual releases, or their functional equivalent, of the plaintiffs' tort claims against Jones, FSS, and other related, non-debtor parties.  The LST itself suggests that the Debtors' forthcoming plan of reorganization will involve a channeling injunction and, ultimately, some type of release for Alex Jones and FSS.  *See* LST at 2; § 10.1(c).  The liabilities facing Alex Jones arise out of allegations of his intentional tortious conduct that could likely not be discharged in his own bankruptcy under section 523 of the Code.  11 U.S.C. § 523(a)(6).  Thus,

---

[17]     Moreover, the claims in the Sandy Hook Lawsuits are personal injury claims and thus a trial on the claims is not a core proceeding in the Debtors' cases and cannot be adjudicated by this Court.  *See* 28 U.S.C. § 157(b)(2)(B) and (b)(5).  In addition, bankruptcy courts are constitutionally prohibited from holding jury trials on non-core claims and may not hold jury trials on core claims without the consent of both parties.  *See* 28 U.S.C. § 157(e); *Orion Pictures Corp. v. Showtime Networks Inc. (In re Orion Pictures Corp.),* 4 F.3d 1095, 1101 (2nd Cir. 1993).  Finally, the Debtors' proposal to impose on the plaintiffs an expedited bar date, an estimation process, and a capped distribution via a settlement trust through an artificially staged and orchestrated bankruptcy may also raise concerns about whether they are receiving the due process owed to them under the Constitution.

any such outcome would give him more from the bankruptcy of three non-operating entities in his enterprise than he could obtain in his own personal bankruptcy case.

42.     Finally, the creditors themselves are plainly not asking for this relief.  No creditor was involved in negotiating the LST or the PSA prior to the filings.  And the main creditors in these cases, the Sandy Hook Plaintiffs, have rejected this structure.

### iii. *The Lawsuits that Allegedly Precipitated these Filings Primarily Concern Non-Debtors.*

43.     To add to the Debtors' lack of an ongoing concern or valuable property that this case might seek to preserve or to maximize, the proposed CRO also admits that the Debtors "have no debt or other liabilities other than those related to pending or potential litigation."  Dkt. No. 1 at 10-11, ¶ 8.  This pending litigation, which the Debtors claim caused a "classic 'race to the courthouse'" precipitating this filing, appears to comprise fewer than ten lawsuits, some of which have been ongoing for many years.  Dkt. No. 6 at ¶¶ 12, 14.  The true catalysts that prompted the filing of these cases are the Sandy Hook Lawsuits pending in Texas and Connecticut, each of which were scheduled for a jury trial on damages before the filings (the first beginning April 25, 2022).[18]  *Id.;* Dkt. No. 5, Case No. 22-05004 (Bankr. D. Conn. April 18, 2022).

44.     But these lawsuits do not arise from Debtors' conduct.  Rather, the lawsuits arise from the allegedly tortious, intentional conduct of Alex Jones and FSS (through its employees),

---

[18]     Counsel for plaintiffs has advised that the other Sandy Hook Lawsuits in Texas are scheduled for trial in June and August 2022.  Tr. April 22, 2022 at 70.  The Connecticut Sandy Hook Lawsuit is scheduled for trial in August 2022.  Dkt. No. 1, Case No. 22-05004 (Bankr. D. Conn. April 18, 2022).

who did not file for bankruptcy in this or any other court.  In fact, the Debtors are not co-defendants in every lawsuit involving the Alex Jones Enterprise.[19]

45.     This all begs the same question—the obvious question since the day these cases were filed—why are these three Debtors in bankruptcy when Alex Jones and FSS are not?  At the first hearing in these cases, the Debtors' CRO suggested that Alex Jones was concerned about reputational damage to himself and the possible loss of vendors to FSS if they filed for bankruptcy.  *See* Tr. April 22, 2022 at 45, 55.  But the main vendor to the Alex Jones Enterprise, PQPR Holdings, is simply another member of that enterprise, controlled by Alex Jones insiders. Dkt. No. 17-6.  Surely Alex Jones wasn't concerned he would refuse to deal with himself.  In any event, it is clear that by not seeking bankruptcy relief themselves, Alex Jones and FSS do not have to disclose their finances.

### iv.     *The Debtors Are Attempting to Manipulate the Provisions of Subchapter V.*

46.     The Debtors assert that they are precisely the types of enterprises that Congress had in mind when it passed SBRA, enacting subchapter V of chapter 11.  Nothing in the language of subchapter V or in its legislative history validates this position.  The Debtors, who are incapable of funding a plan themselves, attempt to subvert a statutory scheme that was designed to aid well-intentioned small businesses in their efforts to reorganize their financial

---

[19]     While all three debtors appear to be co-defendants in the Connecticut Sandy Hook Lawsuit, only one debtor, InfoW, is a co-defendant in the Texas Sandy Hook Lawsuit that was scheduled for jury selection April 25, 2022.  Nevertheless, when the plaintiffs in one such case filed to nonsuit that debtor and proceed against Alex Jones and FSS, defendants continued their efforts to remove the case to federal court based on the bankruptcy of the non-suited defendant.  *See* Chuck Lindell, *Judge Reluctantly Delays Alex Jones Trial in Sandy Hook Case, Criticizes His Lawyers,* Austin American Stateman (April 20, 2022, updated April 21, 2022, 8:21AM), https://www.statesman.com/story/news/2022/04/20/austin-tx-judge-delays-alex-jones-sandy-hook-trial/7382689001/.

affairs into an obvious scheme to protect Alex Jones and FSS from liability in the Sandy Hook Lawsuits. The bankruptcy process should not be used to further this abusive scheme.

47. The elements of this scheme are not difficult to see. The three non-operating Debtors filed in an attempt to satisfy eligibility for subchapter V to benefit all of the non-debtor defendants.

48. Even though courts in Texas and Connecticut had entered default judgments against Debtors in favor of Sandy Hook Plaintiffs due to Jones's pattern of misconduct in those cases, the Debtors assert that their indebtedness is all "unliquidated." Why? Because unliquidated debts are not counted toward establishing if a debtor and its affiliated debtors have too much debt in the aggregate to avail themselves of subchapter V. 11 U.S.C. § 1182(1). How? The Debtors—some of which aren't defendants in every action against Alex Jones and FSS— filed to stay the damages phases of the Sandy Hook Lawsuits that would establish the amounts that the Debtors, Alex Jones, and FSS owe the plaintiffs for their tortious conduct. Although the Debtors claim that they are trying to avoid a "race to the courthouse," the only race that has occurred here is the Debtors' race to this courthouse, seeking the protection of this Court to avoid the scheduled state court trials on damages. Little doubt exists that the total damage award against the Debtors, Alex Jones, FSS, and other non-debtor solvent entities of the Alex Jones Enterprise would exceed the debt limit currently in place for subchapter V.

49. It is also not difficult to see what led the Debtors to choose subchapter V for this scheme. Subchapter V has features that, when manipulated in the manner proposed by the Debtors, can transform it from a tool to be used by earnest small operating entities to rehabilitate their business and financial affairs to a weapon used against innocent creditors. For example, a subchapter V debtor must file a plan not later than 90 days after the date of the order for relief.

Although at first blush this requirement might seem burdensome to a debtor, in these cases, it appears the Debtors intend to rely on the 90-day plan deadline to argue that the Court must quickly estimate the Sandy Hook Plaintiffs' claims to avoid "undue delay" in the administration of these cases.  *See* 11 U.S.C. § 502(c)(1); *see supra, ¶¶ 38-9*.

50.     As another example, in a subchapter V case, no committee is appointed unless the Court determines there is cause for the appointment of a creditors' committee and orders the appointment of one.  11 U.S.C. § 1102(a)(3).  Relatedly, confirmation of a non-consensual subchapter V plan under section 1191 of the Code does not require that any class of impaired non-insider claims affirmatively vote to accept the plan.  Instead, subchapter V enables a court to confirm a plan over the dissenting votes of unsecured creditor classes so long as the plan provides that three to five years of the debtor's projected disposable income will be paid under the plan.  11 U.S.C. § 1191(c)(2).  Thus, the Debtors can seek to "cram down" their plan without regard to whether a single Sandy Hook Plaintiff votes in favor of that plan.  And because the Debtors have little or no income, this would not be much of a burden for Debtors nor much of a benefit for creditors.  Although Alex Jones and FSS have agreed to advance some amount to the Debtors for plan payments, there is no transparency to how those amounts were determined— and they were not determined by negotiation with creditors.  Further, because Alex Jones and FSS are not themselves debtors, this Court will not have authority to require them to satisfy the best interests of creditors test—showing that the plan yields more value for creditors than a chapter 7 liquidation—or require that all of Alex Jones's and FSS's projected disposable income for three to five years will be paid to Debtors for distribution to their joint creditors.

51.     These cases thus represent an imaginative attempt to misuse subchapter V of chapter 11 to protect non-debtors whose conduct hardly shows them to be the honest but unfortunate debtors entitled to bankruptcy relief even had they themselves filed.

**v.      *For the Reasons Set Forth in Subsections i through iv, The Debtors'
Bankruptcy Cases Must be Dismissed.***

52.     Given the totality of circumstances supporting the Debtors' petitions, as set forth in subsections *i* through *iv* above, these Debtors do not belong in bankruptcy and their cases must be dismissed.  "According to the Fifth Circuit, '[g]ood faith implies an honest intent and genuine desire on the part of the petitioner to use the statutory process to effect a plan of reorganization and not merely as a device to serve some sinister or unworthy purpose.'"  *In re Cedar Short Resort, Inc.*, 235 F.3d 375, 379 (8th Cir. 2000) (quoting *In re Metro. Realty Corp.*, 433 F.2d 676, 678 (5th Cir. 1970)).  "Congress has never intended that bankruptcy be a refuge for the irresponsible, unscrupulous or cunning individual." *In re Rognstad*, 121 B.R. 45, 50 (Bankr. D. Haw. 1990).  And courts should apply particular scrutiny to cases involving "asset-culled entities where 'debtors have elected not to submit the actual entities in interest to the jurisdiction of the court, thereby isolating the entities in interest from the scrutiny and control of the court during proceedings.'" *In re Eden Assocs.,* 13 B.R. 578, 58485 (Bankr. S.D.N.Y. 1981) (dismissing case where court determined, among other things, "that this debtor was formed, if at all, and the property purportedly conveyed to it, to shield the assets of Cook's more affluent companies from the jurisdiction of the Bankruptcy Court") (*quoting In re Dutch Flat Inv.,* 6 B.R. 470, 471 (Bankr. N.D. Cal. 1980)) (emphasis added).

53.     Alex Jones and FSS should not be permitted to use chapter 11 as a means to shield their assets from the plaintiffs.  "Chapter 11 was not designed for the purpose of protecting assets and interests of non-debtor parties under the guise of a legitimate plan of

reorganization." *In re Davis Heritage GP Holdings, LLC*, 443 B.R. 448, 462 (Bankr. N.D. Fla. 2011). Because these cases were not filed for a valid bankruptcy purpose, they must be dismissed.

### B. The Debtors Filed these Cases to Gain a Litigation Advantage for Non-Debtors Alex Jones and FSS.

54. The timing of these filings—only eight days before the commencement of a jury trial against the defendants in one of the Texas Sandy Hook Lawsuits—together with the pattern of behavior exhibited by the defendants before the courts overseeing the Sandy Hook Lawsuits, reveals that the Debtors' bankruptcy petitions were filed as a litigation tactic to obstruct and delay an imminent trial establishing damages against defendants, including non-debtors Alex Jones and FSS, in state court litigation.

55. "[B]ecause filing a Chapter 11 petition merely to obtain tactical litigation advantage is not within the legitimate scope of bankruptcy laws, . . . courts have typically dismissed chapter 11 petitions under these circumstances. . . ." *SGL Carbon*, 200 F.3d at 165 (citations omitted); *see also Antelope Techs.*, 431 Fed. Appx. at 275 (affirming dismissal of a case for bad faith where the lower court concluded the debtors filed to gain an advantage in shareholder litigation); *Leslie*, 1999 Bankr. LEXIS 2113, at *5 (finding, in the totality of circumstances, that case was commenced for the primary purpose of gaining an unfair advantage in a litigation). Further, "[w]here the timing of the filing of a Chapter 11 petition is such that there can be no doubt that the primary, if not sole, purpose of the filing was a litigation tactic, the petition may be dismissed as not being in good faith." *15375 Memorial Corp.*, 589 F.3d at 625-26 (citing *SGL Carbon*, 200 F.3d at 165). For example, in *15375 Memorial Corp.,* the Third Circuit found that given a mix of facts and "the Debtors' sudden decision to file for bankruptcy

despite their [sic] having been dormant and without employees or offices for several years," the Court "[could not] escape the conclusion that the filings were a litigation tactic." *Id*. at 625-26. And in *Cedar Shore,* the Eighth Circuit affirmed dismissal of a case where there existed "strong evidence to support the finding that [the debtor] did not file bankruptcy to effectuate a valid reorganization, but rather to prevent the [the plaintiffs] from pursuing their claims in state court." 235 F.3d at 380–81.

56.     Here, the Debtors have all but admitted that they filed these petitions solely to stop the Sandy Hook Lawsuits from proceeding in state court and to resolve them in the way the Alex Jones Enterprise—but not the Sandy Hook Plaintiffs—sees fit.  *See* Dkt. No. 6 at ¶¶ 15, 16; PSA at 5-8.   Based on the information disclosed thus far, the Debtors have no or virtually no creditors beyond the litigation plaintiffs. *See, e.g.,* Dkt. No. 1 at ps. 6-7.  As discussed above, the main lawsuits the Debtors identify as precipitating these filings are the Sandy Hook Lawsuits pending in Texas and Connecticut.  *See* Dkt. No. 6 at ¶¶ 12, 15.  Although the Sandy Hook Lawsuits are in different venues, they share many similarities, and these cases thus bear the hallmarks of a classic two-party dispute best left to resolution in the state court.  *See Little Creek* at 1072-73; *Sherwood Enters.,* 112 B.R. at 170.  And the history of these lawsuits evidences a pattern of behavior—of repeated obstruction and delay tactics—that is simply being repeated and moved to a different forum by these bankruptcy filings.

57.     As the Debtors admit in their pleadings, the defendants' sanctionable behavior over a period of at least four years led the courts in both Texas and Connecticut to enter default judgments against them.  *See* Dkt. No. 6 at ¶ 13; *see also Lafferty v. Jones,* 336 Conn. 332, 374, (2020)*, cert. denied,* 141 S. Ct. 2467 (2021) (Connecticut Superior Court quoting the trial court stating that "the discovery in this case has been marked with obfuscation and delay on the part of

the defendants").  When the defendants appealed one such sanction, the Connecticut Supreme Court affirmed that the defendants had "willfully disregarded the court's discovery orders." *Lafferty,* 336 Conn. at 377, 79 (noting trial court's consideration of this willfulness "along with the defendants' harassing and intimidating speech toward the plaintiffs' counsel, which together created a whole spectrum of bad faith litigation misconduct.").  Defendants have also tried multiple times to remove the Sandy Hook Lawsuits to federal court—even after the first gambit had been rejected and the suit remanded.  *See, e.g.,* No.: 3:18-CV-1156 (JCH), DN 58, 11/5/18 Ruling Re: Mot. for Remand; No. 3:20-cv-1723 (JCH), DN 44, 3/5/21 Ruling Re: Mot. for Remand.  Unsurprisingly, immediately upon the Debtors' bankruptcy filing, the defendants again sought to remove the lawsuits.  *See, e.g.,* Dkt. No. 1, Case No. 22-01022 (Bankr. W.D. Tex. April 18, 2022); Dkt. No. 1, Case No. 22-05004 (Bankr. D. Conn. April 18, 2022). These bankruptcy filings are merely the latest in a long line of efforts by Alex Jones and FSS to obstruct and hinder the courts' ability to liquidate damages in Texas and Connecticut.

58.     In addition, the *timing* of these filings also unquestionably supports a finding that their purpose was as a litigation tactic against the Sandy Hook Plaintiffs.  After all the defendants' delay and obstruction, the first trial on damages was scheduled to begin with jury selection on April 25, 2022.  *Id.* at 14.  These cases were filed *only eight days before.*  The cases were also filed only weeks after Alex Jones repeatedly refused to attend his scheduled deposition in Connecticut, after which the court again sanctioned him and advised that the trial in that case would nevertheless go forward in August 2022.  20  Super Ct. DN 788, 3/30/22 Hearing at 25:4-9.  And while only one debtor, InfoW, is a co-defendant in Texas, when the Sandy Hook Plaintiffs filed to nonsuit InfoW and proceed solely against Alex Jones and FSS, InfoW

---

[20]     After the imposition of escalating sanctions, Jones ultimately appeared for his deposition.

nonetheless continued its efforts to remove the cases to a federal court and has now sought to transfer venue of those cases. *See* Dkt. No. 1, Case No. 22-01022 (Bankr. W.D. Tex. April 18, 2022); Dkt. No. 7, Case No. 22-01022 (Bankr. W.D. Tex. April 28, 2022); Chuck Lindell, *Judge Reluctantly Delays Alex Jones Trial in Sandy Hook Case, Criticizes His Lawyers,* Austin American Stateman (April 20, 2022, updated April 21, 2022, 8:21AM),

https://www.statesman.com/story/news/2022/04/20/austin-tx-judge-delays-alex-jones-sandy-hook-trial/7382689001/.

59.    Perhaps the best evidence that this filing is for a litigation advantage comes from Mr. Jones's lawyer himself as reported by the Wall Street Journal:

> Mr. Jones's lawyer, Norm Pattis, said Wednesday that they have tried to settle the case "on reasonable terms" and that Sandy Hook families "persist in trying to destroy Alex and his companies." **"We're turning to the bankruptcy courts to compel the plaintiffs to estimate the value of their claims in open court by discernible evidentiary standards,"** Mr. Pattis said. "The plaintiffs have turned this litigation into a macabre morality play and have refused to negotiate in good faith. We hope they will show respect to the federal courts."

*Infowars Bankruptcy Delays Upcoming Sandy Hook Trial,* Wall Street Journal (April 20, 2022) (emphasis added) available at https://www.wsj.com/articles/infowars-bankruptcy-delays-upcoming-sandy-hook-trial-11650494400?mode=list

60.    All the evidence suggests that Alex Jones and FSS intended and still intend to use this bankruptcy to accomplish their long-sought goal of having some other court besides those in Texas and Connecticut resolve the Sandy Hook Lawsuits.[21] But they don't want just any court.

---

[21]    Immediately prior to the filing. the Debtors obtained leases for the Debtor entities in Victoria, Texas, despite their being previously located at all times in Austin, Texas (the site of the rest of the Alex Jones Enterprise as well as the Texas Sandy Hook Lawsuits). Tr. April 22, 2022 at 52-3. For purposes of venue under 28 U.S.C. § 1408, at least one bankruptcy court has held that the "domicile" of an entity is its state of incorporation, and venue in any district in the state is proper for that entity. *See In re ERG Intermediate Holdings, LLC,* No. 15-31858-

They now seek to abuse the bankruptcy system not only to resolve these lawsuits against all of the defendants—Debtors and non-debtors alike—but also to minimize the possible recovery the plaintiffs can receive.  *See supra*, ¶¶ 34-51.  Because the Debtors' bankruptcy petitions were filed as a litigation tactic to thwart the Sandy Hook Plaintiffs from pursuing their claims in state court, these cases must be dismissed.

### II.  Dismissal is in the Best Interests of Creditors and the Estates.

61.     Once cause is established, "a bankruptcy court *shall*"—must—convert[22] or dismiss the case unless the court determines that appointing a section 1104(a) trustee or examiner is in the best interests of the creditors and the estate'" or the debtor establishes unusual circumstances to avoid dismissal.  11 U.S.C. § 1112(b)(1), (2) (emphasis added).[23]

62.     Here, dismissal is in the best interests of the Debtors' creditors, all or almost all of whom are plaintiffs in lawsuits against the Alex Jones Enterprise.[24]  These lawsuits are already

---

HDH11, 2015 WL 6521607, at *4 (Bankr. N.D. Tex. Oct. 27, 2015) ("[A]n entity that is formed under the laws of a given state is domiciled in the entire state for purposes of section 1408(1) and may file a case under the Bankruptcy Code in any District in that state).  Nevertheless, the timing of the effort to obtain these leases and obtaining the leases themselves—suggesting that Debtors were seeking a bankruptcy forum outside of Austin, Texas, the site of the Texas Sandy Hook Lawsuits—is evidence of Jones's intention to manipulate every aspect of this case for his benefit and further indicia of the bad faith of the Debtors leading up to these cases.  As the CRO testified at the First Day hearing, the Victoria office is empty and unused by Debtors.

[22]     While the U.S. Trustee seeks dismissal as the appropriate remedy in these cases, the Court may also choose to convert these cases to chapter 7.  If converted, a chapter 7 trustee may be able to find and monetize assets (as the CRO has in discovering the royalty payment) and initiate actions to avoid fraudulent transfers, among other things.

[23]     The Debtors have the burden to prove unusual circumstances.  The U.S. Trustee is not aware of any facts that would support such a finding here but reserves his right to oppose any such showing at an appropriate time.

[24]     Because the Debtors are the only members of the Alex Jones Enterprise who filed for bankruptcy, there is no benefit to be obtained by the appointment of an examiner that would not be better served by dismissing the case.  Moreover, given that these cases can only survive by the funding of Alex Jones and FSS and the pattern of behavior

being administered in state court, the presiding courts have already found the defendants liable, and all that remains is a trial on damages.  As of the filings, jury selection in one Texas case was only days away, and jury selection in Connecticut will follow in August.  Dismissal would ensure not only that the families can see these proceedings through in the venue they chose before a jury of their peers, but also that any claimant who secures a judgment against any member of the Alex Jones Enterprise can enforce that judgment on assets held by those companies without being subject to the roadblocks and limitations the Debtors, Alex Jones, and FSS have attempted to place before them with the PSA, LST, and these filings.  And as evidenced by their own pending motions, the Sandy Hook Plaintiffs—as creditors in these cases—believe their interests would be best served by dismissal of these cases.

## RESERVATION OF RIGHTS

63.     The U.S. Trustee reserves his rights to supplement this motion further should it become appropriate at any time in the future.

## CONCLUSION

WHEREFORE the U.S. Trustee respectfully requests that this Court grant this Motion and grant such other and further relief as it may deem just and proper.


Dated:  April 29, 2022                                    Respectfully Submitted,

                                                          KEVIN M. EPSTEIN
                                                          UNITED STATES TRUSTEE

---

they have displayed in the state court litigations in Texas and Connecticut, it seems unlikely they would agree to continue such funding were an examiner appointed.

Section 1104, which governs the appointment of a trustee in a typical chapter 11 case, does not apply in subchapter V cases.

By: /s/Jayson B. Ruff
Jayson B. Ruff
Trial Attorney
United States Department of Justice
Office of the United States Trustee
Michigan Bar No. P69893
Houston, TX  77002
Telephone:  (713)718-4650 ext. 252
Facsimile:  (713)718-4670

/s/ Ha M Nguyen
Ha Nguyen
Trial Attorney
CA Bar #305411 | FED ID NO. 3623593
United States Department of Justice
Office of the United States Trustee
515 Rusk Street, Suite 3516
Houston, Texas 77002
E-mail: Ha.Nguyen@usdoj.gov
Cell: 202-590-7962

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by electronic means via ECF transmission to all Pacer System participants in these bankruptcy cases, on the 29th day of April, 2022.

/s/ Jayson B. Ruff
Jayson B. Ruff